## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE LISA W. WANG, JUDGE

|  |  |
|---|---|
| NURA USA, LLC, | : |
| *Plaintiff,* | : |
| JIANYUAN INTERNATIONAL CO., LTD., *et al.*, | : Consol. Court No. 24-00182 |
| *Consolidated Plaintiffs,* | : |
| v. | : |
| UNITED STATES, | : |
| *Defendant,* | : |
| and | : |
| PURIS PROTEINS, LLC, | : |
| *Defendant-Intervenor.* | : |

## CONSOLIDATED PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the Court of International Trade, Consolidated Plaintiffs Jianyuan International Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Linyi Yuwang Vegetable Protein Co., Ltd., Yantai Oriental Protein Tech Co., Ltd., and Jiujiang Tiantai Food Co., Ltd., respectfully move for judgment on the administrative record. For the reasons set forth in the accompanying brief in support of their motion, Consolidated Plaintiffs request that the Court determine that the U.S. International Trade Commission's critical circumstances determination in its antidumping and countervailing duty ("ADD/CVD") investigation of pea protein from China, which was published as *Certain Pea Protein from China*, 89 Fed. Reg. 67,671 (Aug. 21, 2024); *Certain Pea Protein from China*, Inv. Nos. 701-TA-692 & 731-TA-1628 (Final), USITC Pub. 5529 (Aug. 2024), resulting in publication by the

U.S. Department of Commerce of *Certain Pea Protein from the People's Republic of China: Antidumping and Countervailing Duty Orders,* 89 Fed. Reg. 68,390 (Aug. 26, 2024), is not supported by substantial evidence on the record and is otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

 /s/ Ned H. Marshak
Ned H. Marshak
Jordan C. Kahn*
Ruting Chen

599 Lexington Ave., 36th Floor
New York, New York 10022
**
*1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Consolidated Plaintiffs
Jianyuan International Co., Ltd., Shandong
Yuwang Ecological Food Industry Co., Ltd.,
Linyi Yuwang Vegetable Protein Co., Ltd.,
Yantai Oriental Protein Tech Co., Ltd., and
Jiujiang Tiantai Food Co., Ltd.*

Dated: May 27, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

————————————————————————x
:
NURA USA, LLC,                                                    :
:
        *Plaintiff,*                                      :
:
JIANYUAN INTERNATIONAL CO., LTD., *et al.,* :    Consol. Court No. 24-00182
:
     *Consolidated Plaintiffs,*          :    **PUBLIC VERSION**
   v.                                                             :
:
UNITED STATES,                                                :
:
        *Defendant,*                                  :
   and                                                          :
:
PURIS PROTEINS, LLC,                                     :
:
     *Defendant-Intervenor.*                   :
————————————————————————x

<u>**MEMORANDUM OF LAW IN SUPPORT OF CONSOLIDATED**</u>
<u>**PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Ned H. Marshak
Jordan C. Kahn*
Ruting Cheng

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Ave., 36th Floor
New York, New York 10022
**
*1201 New York Ave., NW
Suite 650
Washington, DC 20005

*Counsel for Consolidated Plaintiffs*
*Jianyuan International Co., Ltd., Shandong*
*Yuwang Ecological Food Industry Co., Ltd.,*
*Linyi Yuwang Vegetable Protein Co., Ltd.,*
*Yantai Oriental Protein Tech Co., Ltd., and*
*Jiujiang Tiantai Food Co., Ltd.*

Dated: May 27, 2025

# TABLE OF CONTENTS

USCIT RULE 56.2 STATEMENT ............................................................................. 1

    A.    ADMINISTRATIVE DETERMINATION UNDER APPEAL ...................... 1

    B.    ISSUES OF LAW .......................................................................................... 1

    C.    REASONS FOR CONTESTING THE ADMINISTRATIVE
            DETERMINATION .................................................................................... 2

STANDARD OF REVIEW .......................................................................................... 2

STATEMENT OF FACTS ........................................................................................... 4

    A.    THE ITC'S INVESTIGATION OF PEA PROTEIN FROM CHINA ................. 4

    B.    THE COMMISSION'S CRITICAL CIRCUMSTANCES DETERMINATION... 8

         1.    The Views of Chair Karpel and Commissioner Kearns .......................... 9

         2.    Commissioner Schmidtlein's Dissent ..................................................... 11

         3.    This Appeal ............................................................................................. 12

SUMMARY OF THE ARGUMENT .......................................................................... 12

ARGUMENT ............................................................................................................... 12

I.      THE LEGAL STANDARD FOR THE COMMISSION'S CRITICAL
        CIRCUMSTANCES ANALYSIS ............................................................... 15

II.     ITC UNLAWFULLY USED A TRUNCATED COMPARISON PERIOD ............. 20

III.    ITC UNLAWFULLY FOUND CRITICAL CIRCUMSTANCES BASED ON
        VOLUME DATA ....................................................................................... 24

IV.    ITC INCORRECTLY FOUND CRITICAL CIRCUMSTANCES BASED ON
        INVENTORY DATA ................................................................................. 33

V.     THERE WERE NO OTHER BASES TO FIND CRITICAL CIRCUMSTANCES
        ................................................................................................................... 37

CONCLUSION ........................................................................................................... 43

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Chevron, U.S.A., Inc. v. NRDC, Inc*, 467 U.S. 837 (1984) ................................................ 3

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ................................... 4

*Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*,
   23 CIT 88 (1999) ........................................................................................ 16, 30, 31

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ............................................... *passim*

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .......................... 3, 23, 33, 37

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ......... 2, 24, 35, 43

*Hyundai Elecs. Indus. Co. v. ITC*, 899 F.2d 1204 (Fed. Cir. 1990) ..................................... 4

*ICC Indus., Inc. v. United States*, 812 F.2d 694 (Fed. Cir. 1987) ............................ 16, 28

*Longkou Haimeng Mach. Co. v. United States*, 581 F. Supp. 2d 1344 (CIT 2008) ......... 3

*Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024) ................................... 3, 31, 36

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ................. 2

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ............... 3, 23, 32, 36

*SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011) ............... 3, 23, 32, 36

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005) .......................... 4, 32

*Tak Fat Trading Co. v. United States*, 185 F. Supp. 2d 1358 (CIT 2002) .................. 16, 31

**Statutes**

5 U.S.C. § 706 ........................................................................................................... 3

19 U.S.C. § 1516 .............................................................................................. *passim*

19 U.S.C. § 1671 .............................................................................................. *passim*

19 U.S.C. § 1673 .............................................................................................. *passim*

19 U.S.C. § 1677 ...................................................................................................... 29, 41

**ITC Publications**

*Carbon and Certain Steel Wire Rod from China*, Inv. Nos. 701-TA-512 & 731-TA-1248 (Final), USITC Pub. 4509 (Jan. 2015) ................................................................................................. 22

*Certain Corrosion-Resistance Steel Products from China, India, Italy, Korea, and Taiwan*, Inv. No. 701-TA-534-537 & 731-TA-1274-1278 (Final), USITC Pub. 4620 (July 2016) ....... 22

*Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 & 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) ...................... 21

*Certain Pea Protein from China*, Inv. Nos. 701-TA-692 & 731-TA-1628 (Preliminary), USITC Pub. 5457 (Sept. 2023) ...................................................................................................... 4

*Certain Pea Protein from China*, Inv. Nos. 701-TA-692 & 731-TA-1628 (Final), USITC Pub. 5529 (Aug. 2024) ...................................................................................... *passim*

*Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-547 & 731-TA-1291-1297 (Final), USITC Pub. 4638 (Sept. 2016) ...................................................................................................... 22

*Certain Preserved Mushrooms from China, India, and Indonesia*, Inv. Nos. 731-TA-777-79 (Final), USITC Pub. 3159 (Feb. 1999) ............................... 18, 30, 31

*Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. Nos. 701-TA-481 & 731-TA-1190 (Final), USITC Pub. 4360 (Nov. 2012) .................... 17

*Gas Powered Pressure Washers from China*, Inv. Nos. 701-TA-684 & 731-TA-1597 (Final), USITC Pub. 5488 (Feb. 2024) ............................................................................................. 20, 21

*Gas Powered Pressure Washers from Vietnam*, Inv. No. 731-TA-1598 (Final), USITC Pub. 5465 (Oct. 2023) ..................................................................................... 21, 37, 39

*Honey from Argentina and China*, Inv. Nos. 701-TA-402 & 731-TA-892-93 (Final), USITC Pub. 3470 (Nov. 2001) .................................................................................. 18, 25, 35

*Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines, Poland, Slovenia, and Taiwan*, Inv. Nos. 731-TA-1629-31, 1633, 1636-38 & 1640 (Final), USITC Pub. 5520 (June 2024) ...................................................................................................................... *passim*

*Raw Honey from Argentina, Brazil, India, and Vietnam*, Inv. Nos. 731-TA-1560-62 & 1564 (Final), USITC Pub. 5327 (May 2022) ............... 19, 25, 34

*Refined Brown Aluminum Oxide from China*, Inv. No. 731-TA-1022 (Final), USITC Pub. 3643 (Nov. 2003) ................................................................................................................................ 18

*Small Vertical Shaft Engines from China*, Inv. Nos. 701-TA-643 & 731-TA-1493 (Final), USITC Pub. 5185 (Apr. 2021) ............................................................................................. 19, 25

*Steel Wheels from China*, Inv. Nos. 701-TA-602 & 731-TA-1412 (Final), USITC Pub. 4892 (May 2019)..................................................................................................................... 18

*Steel Wire Garment Hangers from Vietnam*, Inv. Nos. 701-TA-487 & 731-TA-1198 (Final), USITC Pub. 4371 (Jan. 2013)............................................................................................ 17

*Synthetic Indigo from China*, Inv. No. 731-TA-851 (Final), USITC Pub. 3310 (June 2000)............................................................................................................... 18, 25

**Federal Register Publications**

*Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 87 Fed. Reg. 64,440 (Oct 25, 2022)............................ 21

*Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Preliminary Affirmative Critical Circumstances Determination*, 88 Fed. Reg. 13,425 (Mar. 3, 2023) ......................... 21

*Certain Pea Protin from China: Notice of Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 45,924 (July 18, 2023) ................................................................................................ 4, 22

*Certain Pea Protein from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 88 Fed. Reg. 87,403 (Dec. 18, 2023).................................................... 5, 22, 23

*Certain Pea Protein from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 10,038 (Feb. 13, 2024) ......................................................... 5

*Certain Pea Protin from China: Notice of Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 89 Fed. Reg. 15,895 (Mar. 5, 2024)............................. 5

*Certain Pea Protein From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,557 (July 5, 2024).............................................................................. 8

*Certain Pea Protein from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,559 (July 5, 2024).............................................................................. 8

*Certain Pea Protein from China*, 88 Fed. Reg. 60,495 (Sept. 1, 2023)........................................ 4

*Certain Pea Protein from China*, 89 Fed. Reg. 67,671 (Aug. 21, 2024)................................... 1, 8

*Certain Pea Protein from the People's Republic of China: Antidumping and Countervailing Duty Orders,* 89 Fed. Reg. 68,390 (Aug. 26, 2024) ........................................................................... 1

*Gas Powered Pressure Washers from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 88 Fed. Reg. 4,812 (Jan. 25, 2023) ................................. 21

*Gas Powered Pressure Washers from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 88 Fed. Reg. 36,531 (June 5, 2023) ................................................................. 21

**Other Authorities**

DICTIONARY.COM ........................................................................................................................... 35

H.R. Rep. 96-317 (1979) .......................................................................................................... 16, 31

H.R. Rep. No. 317, 96th Cong. 1st Sess. 63, 1979 U.S.C.C.A.N. 449 (1979) ...................... 16, 28

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. 103-316; 1994 U.S.C.C.A.N. 4040 ................................................................... *passim*

Consolidated Plaintiffs Jianyuan International Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Linyi Yuwang Vegetable Protein Co., Ltd., Yantai Oriental Protein Tech Co., Ltd., and Jiujiang Tiantai Food Co., Ltd. (collectively, "Chinese Respondents"), hereby submit this brief in support of their Motion for Judgment on the Agency Record.

## USCIT RULE 56.2 STATEMENT

### A.    Administrative Determination Under Appeal

Chinese Respondents seek judicial review of the final determination of the U.S. International Trade Commission (the "Commission" or "ITC") in its antidumping and countervailing duty ("ADD/CVD") investigation of pea protein from China, which was published as *Certain Pea Protein from China*, 89 Fed. Reg. 67,671 (Aug. 21, 2024), P.R. 126; *Certain Pea Protein from China*, Inv. Nos. 701-TA-692 & 731-TA-1628 (Final), USITC Pub. 5529 (Aug. 2024), P.R. 130 ("*ITC Final*"); Views of the Commission (Final), C.R. 220 ("Views"); Final Staff Report (July 16, 2024), C.R. 205 ("FSR"); Revisions to Final Staff Report (July 17, 2024), C.R. 206, resulting in publication by the U.S. Department of Commerce ("Commerce") of *Certain Pea Protein from the People's Republic of China: Antidumping and Countervailing Duty Orders,* 89 Fed. Reg. 68,390 (Aug. 26, 2024).

### B.    Issues of Law

1.    Did the Commission unlawfully find critical circumstances, given the statute, legislative history, and consistent agency practice that such findings are only made in extraordinary cases featuring compelling records evidencing post-petition surges in both volume and inventories?

2.    Did the Commission unlawfully find critical circumstances using truncated five-month pre- and post-petition comparison periods, when there was no reason in this case to deviate from the ordinary agency practice using full six-month comparison periods?

3.      Did the Commission unlawfully find critical circumstances based on post-petition volume

data that do not [              ] to an increase in post-petition imports required in prior cases,

merely because the increase in this case was based on a significant preexisting subject import

market share – a newfangled, illogical, arbitrary, and unexplained approach that contradicts the

statute?

4.      Did the Commission unlawfully find critical circumstances based on post-petition

inventory data [      ] lower than those increases previously required, disregarding both the

statutory requirement for rapid stockpiling and contradictory end-of-year inventory ratio data?

5.      Did the Commission unlawfully find critical circumstances based on "other

circumstances" through an analysis that cherry-picked months and misinterpreted the statute by

considering ordinary injury factors, ignoring the fact that post-petition pricing data supported a

negative determination?

     **C.      Reasons for Contesting the Administrative Determination**

Chinese Respondents' reasons for contesting the ITC determination are set out below.

<u>**STANDARD OF REVIEW**</u>

This Court must hold unlawful any aspect of the Commission's decision-making that is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197,

217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

Substantial evidence requires more than mere assertion of "evidence which in and of itself

justified {the determination}, without taking into account contradictory evidence or evidence

from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132

F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

PUBLIC VERSION

The Supreme Court recently overruled *Chevron, U.S.A., Inc. v. NRDC, Inc*, 467 U.S. 837 (1984), which had directed courts to defer to reasonable interpretations of ambiguous statutes by administrative agencies. *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 369-70, (2024) ("Courts need not . . . defer to an agency interpretation of the law simply because a statute is ambiguous."). *Loper* underscores the "solemn duty of the Judiciary" to interpret statutes and "say what the law is." *Id*. at 385 (internal quotations omitted). Further, *Loper* forecloses this Court from affirming the Commission's decision merely upon finding that the government's statutory interpretations is "reasonable," and for that reason alone, "must" affirm. *Id*. at 395, 400. *Loper* clarified that it "makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best. **In the business of statutory interpretation, if it is not the best, it is not permissible**." *Id.* (emphasis added).

 "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011) ("*SKF II*"). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("*SKF I*"); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("the agency must show . . . a more detailed justification . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy.").

This Court must further hold unlawful and set aside any aspect of the Commission's final determination that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1966); *see Longkou Haimeng Mach. Co. v. United States*, 581 F. Supp. 2d 1344, 1360 (CIT 2008). While the scope of review under this standard is narrower than for substantial evidence, "{a}n abuse of discretion occurs when the {agency's} decision is

PUBLIC VERSION

based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005). In evaluating whether an agency has abused its discretion, "{t}he touchstone . . . is rationality." *Hyundai Elecs. Indus. Co. v. ITC*, 899 F.2d 1204, 1209 (Fed. Cir. 1990) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## STATEMENT OF FACTS

### A.    The ITC's Investigation of Pea Protein from China

In July 2023, the ITC initiated ADD/CVD investigations of high protein content ("HPC") pea protein from China ("subject imports"), in response to a Petition filed on July 12, 2024, by Defendant-Intervenor PURIS Proteins LLC ("PURIS"). *Certain Pea Protein From China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 45,924, 45,924 (July 18, 2023), P.R. 11 ("*Initiation*"). In September 2023, the ITC found "that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of certain pea protein from China." *Certain Pea Protein from China*, 88 Fed. Reg. 60,495, 60,495 (Sept. 1, 2023), P.R. 54. Chinese Respondents participated in this preliminary phase of the ITC investigation. *Certain Pea Protein from China*, Inv. Nos. 701-TA-692 & 731-TA-1628 (Preliminary), USITC Pub. 5457 (Sept. 2023), P.R. 55, at 4, n.5.

Commerce on December 18, 2023, issued the preliminary determination in its CVD investigation of pea protein from China, finding that subject imports were subsidized and assigning CVD rates between 15.09 and 342.53 percent. *Certain Pea Protein from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With*

4

*Final Antidumping Duty Determination*, 88 Fed. Reg. 87,403, 87,405 (Dec. 18, 2023)

("*Commerce CVD Prelim*"). Commerce in February 2024 issued the preliminary determination

in its ADD investigation of pea protein from China, finding that subject imports had been sold at

less than fair value and assigning ADD rates between 122.19 and 280.31 percent. *Certain Pea*

*Protein from the People's Republic of China: Preliminary Affirmative Determination of Sales at*

*Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances,*

*Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg.

10,038, 10,038 (Feb. 13, 2024) ("*Commerce ADD Prelim*"). In both investigations, Commerce

preliminarily found that critical circumstances existed for all Chinese exporters – meaning that

ADD/CVD liability could retroactively extend 90 days before the dates that Commerce

published its preliminary determinations, if the ITC also found that critical circumstances exist

under its separate statutory standard. *Commerce CVD Prelim*, 88 Fed. Reg. at 87,404; *Commerce*

*ADD Prelim*, 89 Fed. Reg. at 10,039.

The ITC in March 2024 commenced the final phase of its ADD/CVD investigations of

pea protein from China, with the period of investigation ("POI") spanning 2021 through 2023.

*Certain Pea Protin from China: Notice of Scheduling of the Final Phase of Countervailing Duty*

*and Antidumping Duty Investigations*, 89 Fed. Reg. 15,895, 15,895 (Mar. 5, 2024), P.R. 80.

Chinese Respondents fully participated in the final phase, and in particular argued in their

Prehearing Brief that the ITC should not find critical circumstances. Chinese Respondents'

Prehearing Brief (June 18, 2024), C.R. 191 & 194, P.R. 98, at 4, 90-97. Chinese Respondents

refuted both critical circumstances and injury with data-based arguments. While recognizing that

pricing data showed underselling by subject imports, Chinese Respondents relied on record

evidence to establish that underselling was not injurious because: pea protein is not purchased on

the basis of price; there is a weak statistical correlation between market share and such insignificant underselling; and subject imports neither depressed nor suppressed U.S. prices. *Id.* at 3, 43-55. While recognizing domestic producers' underperformance, Chinese Respondents relied on record evidence to establish that such performance was not caused by subject imports but instead was driven by [                                    ] start-up costs, and the industry's cost reporting methodology wherein the [

                                                     ] – as shown by domestic industry employment and investment indicators remaining strong over the POI. *Id.* at 3, 56-70.

Chinese Respondents further argued against injury and critical circumstances at the ITC Hearing conducted on June 25, 2025, emphasizing that the Chinese pea protein industry was serving loyal U.S. customers long before the domestic industry came into being. *Id.* at 13-21; Hearing Transcript, P.R. 102 ("Transcript"), at 10, 13, 145-46. Witnesses on both sides testified as to the fundamentally different cost structures in the Chinese and U.S. industries, in that China has a robust home market for pea starch, which is produced in large quantities alongside pea protein – unlike the United States, where there is no demand for pea starch. *Id.* at 12-13, 27, 36, 43, 105-07, 120, 133, 141-44, 173, 182-84, 189-90, 202-03, 237. Chinese Respondents further testified that the domestic industry was not injured by reason of subject imports despite evidence of underselling and domestic industry underperformance. *Id.* at 11-13, 127-29, 137-44, 147-52, 162-7, 235-38. At that Hearing, the Commissioners asked only a single, generic question concerning critical circumstances:

> CHAIR KARPEL: . . . my last question -- I wondered if . . . both domestic producers and Respondents could talk more about critical circumstances.
>
> At least how I look at this inquiry is it's not just what was the percentage change in volume. Actually, Commerce, you know, has that question to answer, whether it was a massive, you know, increase.

PUBLIC VERSION

> But we're really looking at whether that massive increase, you know, is enough to seriously undermine the remedial effects of the order. So, in our more recent critical circumstances sections of our opinions, of course we've looked at the percentage increase in imports, but we've gotten into a number of other factors, including trying to put that volume that the increase comprises in the context of consumption -- as well as looking at a number of other factors.
>
> So if the parties could address the, sort of, broader array of factors we look at post-hearing, that would be great.

*Id*. at 222-23.

Chinese Respondents in their Posthearing Brief responded to Chair Karpel's question and demonstrated the impropriety of finding critical circumstances. Chinese Respondents' Posthearing Brief (July 2, 2024), C.R. 199 & 201, P.R. 106, at 13-15, Response to Commissioner Question 12. Chinese Respondents also established that subject imports did not cause adverse price effects because: price was a relatively unimportant consideration in purchase decisions; market segmentation existed, shown by average unit values ("AUV"), with minimal overlap between domestic producers and subject imports; an extensive qualification process prevented pea protein suppliers from being readily changed; there was an absence of correlation between subject imports underselling and adverse effects experienced by the document industry. *Id*. at 3-8, Response to Commissioner Questions 1-5, at 1-28. Finally, Chinese Respondents established that subject imports did not materially injure the domestic industry because: the domestic industry's poor performance was attributable to its business model – that unlike the Chinese industry, U.S. producers do not export starch to offset production costs – and startup costs. *Id*. at 8-12, Response to Commissioner Questions 7-9. Chinese Respondents reiterated their arguments against injury and critical circumstances in their final comments. Final Comments of Chinese Respondents (July 23, 2024), C.R. 216, P.R. 113, at 1-15.

Commerce in July 2024 published its final CVD determination, finding that subject imports were subsidized and assigning CVD rates between 15.15 and 355.89 percent. *Certain Pea Protein From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,557, 55,558 (July 5, 2024) ("*Commerce CVD Final*"). Commerce also in July 2024 published its final ADD determination, finding that subject imports were sold at less than fair value and assigning ADD rates between 122.19 and 280.31 percent. *Certain Pea Protein from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,559, 55,560 (July 5, 2024) ("*Commerce ADD Final*"). Commerce also finalized its finding that critical circumstances existed for all exporters. *Commerce CVD Final*, 89 Fed. Reg. at 55,557-58; *Commerce ADD Final*, 89 Fed. Reg. at 55,559-60. Therefore, because the ITC also found critical circumstances, ADD/CVD liability has been extended 90 days before publication of Commerce's preliminary determinations – *i.e.*, September 19, 2023, for CVD and November 15, 2023, for ADD.

### B. The Commission's Critical Circumstances Determination

The ITC in August 2024 found that the domestic pea protein industry was materially injured by reason of Subject Imports. *Pea Protein from China*, 89 Fed. Reg. at 67,671; *ITC Final*, USITC Pub. 5529. Chair Karpel and Commissioner Kearns made an affirmative critical circumstances finding. BPI Views at 57-66. Commissioner Schmidtlein made a negative determination with respect to critical circumstances. Dissenting Views of Commissioner Schmidtlein Regarding Critical Circumstances, C.R. 221 ("Dissent"). Commissioner Johanson found that the domestic industry was only threatened with material injury by reason of subject imports, such that ADD/CVD would only apply prospectively following the ITC vote – meaning that he necessarily found that critical circumstances did not exist. Separate and Concurring

Views of Commissioner Johanson, C.R. 222. Because a tie vote on critical circumstances favors

petitioner, the Commission found critical circumstances. *ITC Final*, USITC Pub. 5529 at 42-47.

### 1.    The Views of Chair Karpel and Commissioner Kearns

As an initial matter, the Commission deviated from the normal six-month comparison

periods and, instead, compared the volume of subject imports in the five-month pre-and-post

petition timeframe:

> The Commission frequently relies on six-month comparison periods, but has
> relied on shorter periods when Commerce's preliminary determination applicable
> to the country at issue fell within the six-month post-petition period. That
> situation arises here as Commerce's preliminary critical circumstance
> determination with respect to the {CVD} investigation was rendered on
> December 18, 2023. We have therefore determined to compare the volume of
> subject imports in the five months prior to the filing of the petition
> (February 2023 – June 2023) with the volume of subject imports in the five
> months after the filing of the petition (July 2023 – November 2023).

*Id*. at 43 (footnotes omitted).

Next, the Commission found significant volume increases in the post-petition period,

focusing on the large subject import market share – while recognizing these increases were less

than those previously relied upon to find critical circumstances:

> The increase in the volume of subject imports in the post-petition period was
> significant, particularly given how large the volume of subject imports was even
> before the post-petition increase in that volume, within the context of the overall
> U.S. market. Subject imports from China increased from [          ] pounds in
> the pre-petition period to [          ] pounds in the post-petition period, an
> increase of [     ] percent. The post-petition volume of subject imports and the
> post-petition increase in the volume of subject imports were equivalent to [     ]
> percent and [     ] percent, respectively, of apparent U.S. consumption in 2023.
>
> As indicated above, from 2022 to 2023, subject imports from China also increased
> as a share of apparent U.S. consumption from [     ] percent in 2022 to [     ]
> percent in 2023, gaining [     ] percentage points of market share. Further, the
> post-petition increase in the volume of imports from China was equivalent to
> [     ] percent of the domestic industry's production in 2023. We also note that
> **effect of this increase in post-petition volume was exacerbated by the
> already-dominant position of subject imports in the U.S. market**, having
> increased their share of apparent U.S. consumption irregularly from [     ] percent

PUBLIC VERSION

in 2021 to [    ] percent in 2023. In short, **while the percentage increase in post-petition imports is less than in some other recent investigations, that increase was from a very large base—a share of more than [                ] of the entire market.**

Views at 61-63 (emphases added) (footnotes omitted).

The Commission then focused on inventories, pricing, and timing to support its

affirmative critical circumstances determination:

> The increase in the volume of imports involved in the post-petition period did not replace decreasing inventories. Rather, end-of-period U.S. inventories of the relevant subject imports from China were [              ] pounds at the end of the pre-petition period and [              ] pounds at the end of the post-petition period, an increase of [    ] percent. With respect to pricing, **although prices of subject imports did not markedly decrease in the post-petition period, we observe that subject imports undersold the domestic like product at large margins of underselling throughout the POI**, averaging 38.6 percent. That still larger margins of underselling were not required to effect the significant increase in the volume of imports involved in the post-petition period is not remarkable. Overall, **subject imports from China continued to undersell** the domestic like product in [              ] comparisons in the second half of 2023, involving [              ] pounds, and at significant margins ranging from [    ] to [    ] percent. . . .

> Although apparent U.S. consumption declined over the POI, including from 2022 to 2023 by [    ] percent, subject imports from China significantly increased in the post-petition period by [    ] percent. Subject imports decreased in every month of the five-month pre-petition period and were higher in three months of the post-petition period (August, September, and November) than in any month of the pre-petition period. Subject import volume was higher in September 2023, at [              ] pounds, than in any other month in 2023, and [    ] percent higher than in the peak month of the pre-petition period. Given importers' reported 45- and 67-day lead times for sales made from foreign inventories and produced to order, respectively, subject imports arriving in September would have been ordered immediately following the filing of the petitions in July. Further, **the effect of the post-petition increase in subject imports was to create a stockpile of imports** prior to the imposition of provisional duties, as reflected by the [    ] percent increase in end-of-period inventories of subject merchandise between the pre-and post-petition periods.

*Id*. at 63-65 (emphases added).

The Commission concluded its affirmative determination by reiterating the dominant

share of subject imports and emphasizing the condition of the domestic industry:

> **Subject imports, which maintained a dominant and increasing share of the U.S. market throughout the POI** while universally underselling domestic product at large margins of underselling, increased by [    ] percent in the post-petition period, where this increase in volume of subject imports was equivalent to [    ] percent of the domestic industry's production in 2023 and occurred in the context of increasing U.S. inventories of subject imports. . . . {T}he domestic industry as a whole and on a company-specific basis [
>           ] throughout the POI as it lost sales and sustained downward pricing pressure on account of universal underselling by subject imports at large margins of underselling. Accordingly, we determine that critical circumstances exist with respect to subject imports from China.

*Id*. at 65-66 (emphasis added) (footnotes omitted).

### 2.    Commissioner Schmidtlein's Dissent

Commissioner Schmidtlein began her dissent by accepting the five-month comparison

period, "assum{ing} arguendo that a five-month period is the appropriate comparison in the

current investigations." Dissent at 4. She next found that neither subject import volume nor

inventory data supported an affirmative determination:

> The volume of subject imports from China increased from [            ] pounds in the pre-petition period to [            ] pounds in the post-petition period, an increase of [    ] percent. U.S. importers' end-of-period inventories of subject imports from China were [            ] pounds at the end of the pre-petition period (June 2023) and [            ] pounds at the end of the post-petition period (November 2023), an increase of [    ] percent. If a six month pre- and post-petition review period is utilized, the volume of subject imports increased by even less at [    ] percent and U.S. importers' end-of-period inventories of subject imports increased by substantially less at [    ] percent. In my view, **neither set of increases demonstrate a massive and rapid increase that would likely undermine the remedial effect of the orders. Indeed, importers' U.S. inventory levels at the end of 2023 were lower than each of the prior years of the POI, which does not suggest that importers were stockpiling imports prior to the imposition of duties to be used to undermine the orders**. There also is **no evidence of significant changes in pricing patterns that might suggest the imports entering in the post-petition period were intended to circumvent a potential order**. The average quarterly prices of subject imports from China generally started declining prior to the petitions being filed, with no apparent acceleration of this trend after the petitions were filed, and many pricing

products actually show an increase in the price of subject imports in the last
quarter of 2023.

*Id*. at 5-6 (emphases added) (footnotes omitted).

Commissioner Schmidtlein concluded by explaining why these data fell short of the

statutory standard and pointing out a fundamental flaw in the Commission's logic:

> The statute and legislative history make clear that **the magnitude of the
> increases in both import volume and inventories are important** to the
> Commission's analysis (e.g., "massively increasing imports," "rapid increase in
> inventories"). I find that **the increases present on this record do not satisfy this
> standard. The majority focuses on the total volume of subject imports in the
> post-petition period, rather than the increase**, and emphasizes that the imports
> were starting from a large base. **Following the majority's logic, if subject
> imports start from a large base, there does not necessarily need to be an
> increase in import volume in the post-petition period at all, let alone a
> substantial or "massive" increase** as contemplated by the statute and legislative
> history. . . .

*ITC Final*, USITC Pub. 5529 at 64 (Dissent) (emphases added) (footnotes omitted).

### 3.    This Appeal

Chinese Respondents initiated this appeal in September 2024. Summons (Sept. 25, 2024),

Case No. 24-184, ECF 1; Complaint (Oct. 25, 2024), Case No. 24-184, ECF 11. In December

2024, this Court consolidated Chinese Respondents' appeal with – and under – the appeal of the

Commission's critical circumstances determination of Plaintiff NURA USA, LLC, a U.S.

importer of pea protein from China that participated before the Commission. Order (Dec. 30,

2024), ECF 30; *ITC Final*, Pub. 5529 at 4 & n.7.

### SUMMARY OF THE ARGUMENT

1.    Congressional intent mandates that retroactive duty assessment is only necessary to

counter significant and injurious post-petition import surges that seriously undermine the

remedial effect of the ADD/CVD orders. Judicial precedent confirms that the necessity for such

significant and injurious post-petition import surges makes the "seriously undermined" test

extremely difficult to satisfy. An affirmative finding of critical circumstances requires, at the very least, a clearly defined "massive" surge in imports after a petition has been filed leading to a stockpile of subject imports to be sold in the U.S. market after the ordinary date for ADD/CVD applicability. Historically, the Commission has concluded that the requisite "serious undermining" does not exist despite Commerce finding that there had been a massive surge in imports. In the rare instances in which the Commission has issued affirmative determinations, those findings were based on extraordinary post-petition increases in both subject import volumes and inventories compared to the pre-petition period. Although the Commission has found critical circumstances several times in recent years, after decades without doing so, the recent cases have continued to be based on the existence of substantial record evidence of large volume and inventory increases that are absent in this case.

2.      The Commission's use of a five-month comparison period in the current investigation improperly deviated from consistent agency practice without an adequate explanation. There was no basis to shorten the full six-month comparison period that the Commission ordinarily uses in its critical circumstances analysis because the preliminary CVD publication published on the 18th day of the month. The Commission improperly relied upon inapposite precedent where the five-month comparison was used because in those instances the preliminary CVD determination published early in the month. Here, by contrast, use of the full six-month period is warranted.

3.      Using either a five-month or six-month comparison period, neither set of post-petition increases demonstrates a massive and rapid increase that would seriously undermine the remedial effect of the ADD/CVD orders. The percentage of cumulative import volume increases after Petition filing does not [            ] to those in cases where the Commission previously found critical circumstances, as the Commission concedes. The Commission improperly based its

affirmative finding on the subject import share of apparent U.S. consumption and the domestic industry's production. In so finding, the Commission expressly and improperly interpreted the statutory factors as considering the "timing" and "volume" of imports separately, in isolation from one another, and it improperly shifted the focus to the time period before the Petition was filed. Such statutory contortion renders the Commission's critical circumstances finding not in accordance with law. Particularly erroneous is the Commission's conclusion that significant post-petition volume increases are unnecessary when there is a large preexisting base of subject imports. The Commission further arbitrarily deviated from practice using this newfangled approach that prejudices those exporters who served the U.S. market long before the domestic industry came into existence.

4.      Using either a five-month or six-month comparison period, the inventory maintained by the U.S. importers were [                    ] higher than inventory maintained prior to filing of the Petition. The data does not satisfy the statutory requirement of "a rapid increase in inventories of the imports" that would seriously undermine the remedial effect of the ADD/CVD orders. The statutory requirement for "rapid increase" cannot be satisfied merely because "decreasing inventories" were not replaced. The Commission's interpretation unlawfully disregarded statutory language and failed to consider that the ratio of inventories to import volumes for the year following Commerce's CVD preliminary determination is [        ] than the end of year inventory ratios to import quantities for 2022 – disproving any claim that post-petition subject import inventories would seriously undermine the remedial effect of the ADD/CVD orders. As the inventory increase is [        ] less than the increase in previous cases where the Commission found critical circumstances, the affirmative finding based on such a [            ] inventory increase was arbitrarily without adequate explanation.

5.     No other circumstances constitute substantial evidence that the remedial effect of the order will be seriously undermined. The post-petition pricing trends disprove any "rush" to beat the ADD/CVD deposit requirements. The absence of large margins of underselling in the post-petition period supports a negative determination of critical circumstances, despite the Commission's strained reliance on such pricing data. Further, the Commission impermissibly considers timing as a separate critical circumstances criterion divorced from volume. That analysis improperly cherry-picks months and ignores arranged imports. Finally, the Commission improperly bleeds its considerations for ordinary injury, such as underselling and the impact of imports on domestic producers throughout the POI, into the distinct critical circumstances analysis. That analysis is required by law to focus only on a pre-and-post-petition comparison period. To the extent the Commission is permitted to transpose these factors, it must address contrary record evidence – which it failed to do.

## **ARGUMENT**

### I.    **THE LEGAL STANDARD FOR THE COMMISSION'S CRITICAL CIRCUMSTANCES ANALYSIS**

In determining whether additional ADD/CVD can be assessed retroactively, the Commission is required to consider, among "other factors it considers relevant":

> (I)    the **timing and volume** of the imports,
>
> (II)    a **rapid increase in inventories** of the imports, and
>
> (III)    any other circumstances indicating that **the remedial effect** of the {ADD/CVD} order **will be seriously undermined**.

19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii) (emphases added).

In fulfilling this statutory mandate, the Commission, in prior decisions, had adhered to Congress' intent that additional ADD/CVD should be assessed retroactively – *i.e.*, to merchandise entered before publication of the Commerce's preliminary determinations – only if

PUBLIC VERSION

necessary to counter significant, injurious post-petition import surges. As summarized by the

Court of Appeals for the Federal Circuit, retroactive assessments are intended:

> to deter exporters whose merchandise is subject to an investigation from
> circumventing the intent of the law by increasing their exports to the United
> States during the period between initiation of an investigation and a preliminary
> determination by {Commerce}.

*ICC Indus., Inc. v. United States*, 812 F.2d 694, 699-700 (Fed. Cir. 1987) (quoting H.R. Rep. No.

317, 96th Cong. 1st Sess. 63, 1979 U.S.C.C.A.N. 449 (1979)).

This limited purpose was reaffirmed by Congress when U.S. law was amended by the

Uruguay Round Agreements Act of 1994. In comments prior to passage, the Senate Finance

Committee stated that the critical circumstances provisions of U.S. law were:

> designed to address situations where **imports have surged** as a result of
> the initiation of an {ADD/CVD} investigation, as exporters and importers
> **seek to increase shipments** of the merchandise subject to investigation
> into the importing country before an {ADD/CVD} order is imposed.

*Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 23 CIT 88,

120 n.38 (1999) ("*Brake Drum Mfrs.*") (emphasis added) (quoting S. Rep. No. 103-412 (1994)).

This Court, quoting legislative history, summarized the purpose of this statutory

provision as follows:

> Congress promulgated the critical circumstances provision in order "to
> provide prompt relief to domestic industries suffering from **large volumes of,
> or a surge over a short period of, imports** and to deter exporters whose
> merchandise is subject to an investigation from circumventing the intent of
> the law by increasing their exports to the United States during the period between
> initiation of an investigation and a preliminary determination by
> {Commerce}."

*Tak Fat Trading Co. v. United States*, 185 F. Supp. 2d 1358, 1360 (CIT 2002) (emphasis added)

(quoting H.R. Rep. 96-317 (1979), at 63).

The Statement of Administrative Action accompanying the Uruguay Round Agreements

Act ("SAA") provides that the Commission's critical circumstances analysis must determine:

PUBLIC VERSION

> whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order {and specifically} whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order.

SAA, H.R. Rep. 103-316, Vol. I at 877; 1994 U.S.C.C.A.N. 4040, 4204.

In its critical circumstances determinations, the Commission's practice is to compare import quantities for a period prior to the filing of the petition with post-petition imports entered before publication of Commerce's preliminary determinations – regardless of the period that Commerce selected in fulfilling its responsibility to determine whether imports had been massive. *See, e.g.*, *Steel Wire Garment Hangers from Vietnam*, Inv. Nos. 701-TA-487 & 731-TA-1198 (Final), USITC Pub. 4371 (Jan. 2013), at 6 & n.18; *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. Nos. 701-TA-481 & 731-TA-1190 (Final), USITC Pub. 4360 (Nov. 2012), at 41-44. As provided by statute, the Commission's analysis of critical circumstances focuses on the imports that are "subject to" the affirmative determination, *i.e.* the imports that were entered during the 90-day period preceding suspension of liquidation. 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i).

The Commission also has afforded substantial weight to the Congressional mandate that retroactive assessments are limited to cases in which a clearly discernible post-petition import surge has "seriously undermined" the remedial effect of an ADD/CVD order. As Commissioners Bragg, Askey, and Crawford explained in *Certain Preserved Mushrooms from China*:

> Neither the statute nor the legislative history defines the term "undermines seriously." Nonetheless, the choice of this term clearly indicates that something more than merely affecting the order is required. *Black's Law Dictionary* defines "serious" as grave or great, and Webster's Third New International Dictionary defines "undermine" as to subvert or weaken insidiously. **Therefore, the plain meaning of the term "undermine seriously" establishes a very high standard: that the surge in imports greatly and insidiously weakens or subverts the effect of the order.**

17

PUBLIC VERSION

> **An {ADD} order provides a remedy for market disruption caused by dumped imports.** Therefore, evaluating the market disruption caused by the surge in imports and increase in inventories serves to measure the effect they have on the order. **If the magnitude of the surge in imports and increase in inventories is sufficiently large that they greatly and insidiously weaken or subvert the effect of the order, then the order is undermined seriously**.

*Certain Preserved Mushrooms from China*, *India, and Indonesia*, Inv. Nos. 731-TA-777-79 (Final), USITC Pub. 3159 (Feb. 1999) ("*Mushrooms*"), at 27-28 (emphases added) (footnotes omitted).

Accordingly, the Commission has historically concluded that the requisite "serious undermining" does not exist notwithstanding Commerce's conclusion that there had been a massive surge in imports. *See, e.g.*, *Refined Brown Aluminum Oxide from China*, Inv. No. 731-TA-1022 (Final), USITC Pub. 3643 (Nov. 2003), at 20; *Steel Wheels from China*, Inv. Nos. 701-TA-602 & 731-TA-1412 (Final), USITC Pub. 4892 (May 2019), at 30-32. Those historically rare instances in which the Commission issued affirmative determinations were based on extraordinary post-petition increases in both subject import volumes and inventories compared to the pre-petition period. For example:

- *Mushrooms from China* (1999): Three Commissioners voting affirmative emphasized that, with respect to the one named exporter subject to Commerce's "massive import" finding: "in the months immediately following . . . the month the petition in the instant investigation was filed, **import volumes surged dramatically, far exceeding previous monthly levels**." USITC Pub. 3159 at 24 (emphasis added);

- *Synthetic Indigo from China* (2000): Commission majority (Commissioners Koplan and Askey dissenting) based its affirmative determination on a **more than 300 percent post-petition import surge** at the same time that prices had fallen to their lowest level during the POI. Inv. No. 731-TA-851 (Final), USITC Pub. 3310 (June 2000) ("*Indigo*"), at 14-15 & nn.91-104 (emphasis added); and

- *Honey from China* (2001): **Chinese imports increased by more than 78.5 percent while end-of period inventories of subject Chinese imports increased by 292 percent** during the relevant comparison periods. *Honey from Argentina*

*and China*, Inv. Nos. 701-TA-402 & 731-TA-892-93 (Final), USITC Pub. 3470 (Nov. 2001), at 22-24 & nn.161-73 (emphasis added).

Following *Honey from China* in 2001, the Commission went decades without issuing another affirmative critical circumstances determination. Beginning in 2021, the Commission has made several affirmative critical circumstances determinations – albeit with divided Commissioners and in investigations having records presenting extraordinary facts based on compelling data. First, in 2021, with Commissioner Johanson dissenting, the Commission found critical circumstances in *Small Vertical Shaft Engines* ("*SVSEs*") *from China* because: "imports in the post-petition period . . . **increased sharply** as compared to the pre-petition period . . . The effect of the increase in imports was to create a **large stockpile** of imports prior to the imposition of provisional duties." Inv. Nos. 701-TA-643 & 731-TA-1493 (Final), USITC Pub. 5185 (Apr. 2021), at 45-51 (emphases added).

In 2022, again with Commissioner Johanson dissenting, the Commission found critical circumstances in *Raw Honey from Vietnam* because there was a "post-petition . . . **increase of 83.2 percent**" and an "almost **threefold increase**" **in inventories**. *Raw Honey from Argentina, Brazil, India, and Vietnam*, Inv. Nos. 731-TA-1560-62 & 1564 (Final), USITC Pub. 5327 (May 2022) ("*Honey from Vietnam*"), at 47 (emphases added).

In June 2024, *Mattresses from Burma*, again with Commissioner Johanson dissenting, the Commission found critical circumstances because "imports from Burma increased . . . in the post-petition period" by "**101.6 percent**. . . . The increase in the volume of imports involved in the post-petition period was substantial, particularly within the **context of the overall U.S. market**. . . . Further, the effect of the increase in imports was to **create a stockpile** of imports prior to the imposition of provisional duties." *Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines, Poland, Slovenia, and Taiwan*, Inv. Nos. 731-TA-1629-31,

19

1633, 1636-38 & 1640 (Final), USITC Pub. 5520 (June 2024) ("*Mattresses*"), at 68-70 (emphases added). Although this Commission determination was made before the pea protein determination, the analysis was not released beforehand; Chinese Respondents advised the Commission at the Hearing that they would address *Mattresses* in their Posthearing Brief if it became available in time, but that they were unable to do so. Transcript at 223-24; Chinese Respondents' Posthearing Brief Response to Commissioner Questions at 60.

In sum, the Commission's precedent confirms that the "seriously undermined" test is extremely difficult to satisfy. An affirmative finding of "critical circumstances" requires, at the very least, a clearly defined "massive" surge in imports after a petition has been filed leading to a stockpile of imports to be sold in the U.S. market after the normal data for imposing provisional measures. It also requires that conditions of competition – as apparent from an examination of inventory levels and/or pricing and/or other factors such as subject import market share – establish that the remedial effects of ADD/CVD orders would be "seriously undermined" by shipments entered after the petition was filed and prior to Commerce's publication of its preliminary determinations. These standards are not satisfied in this investigation, for the reasons detailed below. Sections III, IV, V, *infra*.

## II.    THE ITC UNLAWFULLY USED A TRUNCATED COMPARISON PERIOD

The Commission's affirmative critical circumstance analysis improperly deviated from practice by employing a five-month comparison period, despite acknowledging that it "frequently relies on six-month comparison periods." *ITC Final*, Pub. 5529 at 43. Indeed, the Commission has a consistent agency practice to employ a six-month comparison period unless there is a compelling basis not to do so. *See, e.g. Gas Powered Pressure Washers from China*, Inv. Nos. 701-TA-684 & 731-TA-1597 (Final), USITC Pub. 5488 (Feb. 2024) ("*GPPW from*

*China*"), at 5; *Gas Powered Pressure Washers from Vietnam*, USITC Inv. No. 731-TA-1598 (Final), USITC Pub. 5465 (Oct. 2023) ("*GPPW from Vietnam*"), at 28; *Certain Freight Rail Couplers and Parts Thereof from China,* Inv. Nos. 701-TA-682 & 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) ("*FRCs from China*"), at 30.*.*

The Commission has used a shorter comparison period in instances where Commerce's preliminary determination fell within the six-month comparison period. *ITC Final*, Pub. 5529 at 43 & n.251. However, doing so in this investigation was neither necessary nor appropriate. In the Commission's recent cases where a shorter than six-month comparison period was used, the reasons were clear – petitions were filed at the very end of a month and Commerce's preliminary determinations were issued at the beginning of a month within the six-month period. *See, e.g., GPPW from China* USITC Pub. 5488 at 5; *GPPW from Vietnam*, USITC Pub. 5465 at 28; *FRCs from China*, USITC Pub. 5438 at 30.

- In *FRCs from China*, the petition was filed on September 28, 2022, while Commerce's preliminary determination was published on March 3, 2023. *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 87 Fed. Reg. 64,440 (Oct 25, 2022); *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Preliminary Affirmative Critical Circumstances Determination*, 88 Fed. Reg. 13,425 (Mar. 3, 2023).

- In *GPPW from China*, the petition was filed on December 30, 2022 while Commerce's preliminary determination was issued on June 5, 2023. *Gas Powered Pressure Washers from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 88 Fed. Reg. 4,812 (Jan. 25, 2023); *Gas Powered Pressure Washers from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 88 Fed. Reg. 36,531 (June 5, 2023).

In each of these recent cases, the Commission clearly had only a five-month comparison period from which to work because the petition was filed at the very end of a month and the preliminary determinations were published at the very beginning of the month.

In this case, the Petition was filed in the first half of July, on July 12, while **the preliminary CVD determination was published by Commerce in the latter part of December 2023, on December 18**. *Initiation*, 88 Fed. Reg. at 45,924; *Commerce CVD Prelim*, 88 Fed. Reg. 87,403. Because this case features a full six-month period between the filing of the petition and the publication of Commerce's preliminary determination, there was no basis to shorten the comparison period that the Commission generally relies upon in performing its critical circumstances analysis. The Commission should have compared the full six-month periods before and after Petition filing, *i.e.*, January 2023 – June 2023 with July 2023 – December 2023. Yet the Commission instead examined a truncated five-month periods before and after Petition filing, *i.e.*, February 2023 – June 2023 with July 2023 – November 2023. ITC Final, USCIT Pub. 5529 at 43.

The precedent relied upon by the Commission does not support using a truncated comparison period. Examination of each investigation reveals that the applicable preliminary CVD determination was published either early in the omitted month or, at minimum, in the first part of that month:

- In *Certain Corrosion-Resistance Steel Products from China, India, Italy, Korea, and Taiwan*, **Commerce's preliminary CVD determinations published on November 6, 2015 – early in the month.** Inv. No. 701-TA-534-537 & 731-TA-1274-1278 (Final), USITC Pub. 4620, at 35-40, I-1 (July 2016);

- In *Carbon and Certain Steel Wire Rod from China*, **Commerce's preliminary CVD determination published on July 8, 2014 – early in the month**. Inv. Nos. 701-TA-512 & 731-TA-1248 (Final), USITC Pub. 4509 at 25-26 (Jan. 2015); and

- In *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, **Commerce's preliminary CVD determination published on January 15, 2016 – within the first half of the month.** Inv. Nos. 701-TA-545-547 & 731-TA-1291-1297 (Final), USITC Pub. 4638 at 49-50 & n.251 (Sept. 2016).

In none of these cited cases did the Commission omit a month where Commerce's preliminary CVD determination was published in the latter half of the omitted month, as it did here where the determination was published on **December 18**, 2023. *Commerce CVD Prelim*, 88 Fed. Reg. 87,403.

The Commission impermissibly deviated from its established agency practice by using a truncated comparison period in this investigation. "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF II*, 630 F.3d at 137. Here, by feigning adherence to its agency practice, the Commission failed to "provide an adequate explanation for the change." *Id*. Therefore, its use of a truncated comparison period of the critical circumstances analysis was "arbitrary" because "the agency offer{ed} insufficient reasons for treating similar situations differently." *SKF I*, 263 F.3d at 1382. The rationale for this Commission's practice is to include months where Commerce's preliminary CVD determinations published in the latter half of the month as the final month for the critical circumstances comparison period because the majority of the days in that month featured imports entering the United States before duties went into effect. Therefore, "the agency must show . . . a more detailed justification . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy." *Fox*, 556 U.S. at 515. Yet the Commission here provided no explanation, let alone the requisite heightened justification.

This Court should order remand for the Commission to conform with its agency practice using a six-month comparison period or at minimum explain its deviation. Moreover, the

Commission's decision to eliminate a month from the comparison period where the majority of days in that months featured imports without duties is not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 217. This decision failed to "tak{e} into account contradictory evidence or evidence from which conflicting inferences could be drawn," and accordingly cannot be affirmed. *Gerald Metals*, 132 F.3d at 720.

### III.    THE ITC UNLAWFULLY FOUND CRITICAL CIRCUMSTANCES BASED ON VOLUME DATA

The post-petition volume increase of subject imports do not "indicat{e} that the remedial effect of the {ADD/CVD} order will be seriously undermined." 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). The volumes subject to Commerce's critical circumstances determinations in relative terms increased [                    ] in the periods before and after Petition filing:

Quantity in 1,000 pounds dry weight

| Comparison pre-post petition period | Cumulative before period quantity | | Cumulative after period quantity | | Difference in percent | |
|---|---|---|---|---|---|---|
| 1 month | | | | | | |
| 2 months | | | | | | |
| 3 months | | | | | | |
| 4 months | | | | | | |
| **5 months** | | | | | | |
| **6 months** | | | | | | |

FSR at IV-13 (Table IV-8) (emphasis added).

These data show that over a six-month comparison period, the import volume increased by [    ] percent, from [    ] to [        ] pounds; over a five-month period the volume increased by [    ] percent, from [    ] to [        ] pounds. *Id*. Using either comparison period, the percentage of cumulative import volume increase after the filing of the Petition does not [          ] approaching the increases in import volumes in cases where the Commission found critical circumstances. Whether [    ] or [    ] percent, such a [          ] increase

of import volumes during these pre- and post-petition periods do not support a finding that "the timing and volume of the imports indicat{e} that the remedial effect of the {ADD/CVD} order will be seriously undermined." 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

The Commission concedes that "the percentage increase in post-petition imports is less than in some other recent investigations." *ITC Final*, USITC Pub. 5529 at 44-45. In fact, these increases are [                    ] than those in prior affirmative critical circumstances cases, including the more than 300 percent increase in *Indigo*, USITC Pub. 3310 at 14-15 & nn.91-104, 78.5 percent increase in 2001 *Honey from China*, USITC Pub. 3470 at 22-24 & nn.161-73, and 83.2 increase in 2022 *Honey from Vietnam*, USITC Pub. 5327 at 47. And the *Honey* cases also featured a tripling of inventories, which did not occur here. Section IV, *infra*. A post-petition increase of [    ] or [    ] percent does not constitute the "**sharp increase**" needed to support an affirmative determination. *SVSEs from China*, USITC Pub. 5185 at 45 (emphasis added).

As Commission Schmidtlein correctly noted: "The increases in subject import volume . . . noted by the majority are [        **] less than the increases in previous cases** where the Commission reached affirmative critical circumstances determinations." Dissent at 6-7 n.22 (emphasis added) (citing Chinese Respondents' Prehearing Brief at 92-97; *Mattresses*, USITC Pub. 5520 at 68; *Honey from Vietnam*, USITC Pub. 5327 at 47; *Honey from China*, USITC Pub. 3470 at 24; *Indigo*, USITC Pub. 3310 at 15; *SVSEs from China*, USITC Pub. 5185 at 45-47). She correctly found that, using either a six-or five-month comparison period, "neither set of increases demonstrate a massive and rapid increase that would likely undermine the remedial effect of the orders." *ITC Final*, USITC Pub. 5529 at 64 (Dissent).

To justify its decision, the Commission claims to have acted in accordance with its 2024 *Mattresses* determination. *Id.* at 44-45 & nn.257-58.[1] However, the Commission acknowledges that "the post-petition increase in the post-petition period was [    ] than the post-petition increase in the recent affirmative critical circumstances determination in *Mattresses* with respect to imports from Burma (101.6 percent)," *id*. n.257 – nearly [    ] the increase in this investigation.

The Commission also claimed that its decision was justified because of the high subject import market share of apparent U.S. consumption and a comparison of subject imports and domestic industry's production:

- The post-petition volume of subject imports and the post-petition increase in the volume of subject imports were equivalent to [    ] percent and [    ] percent, respectively, **of apparent U.S. consumption in 2023**.

- from 2022 to 2023, subject imports from China also increased as a share of apparent U.S. consumption from [    ] percent in 2022 to [    ] percent in 2023, gaining [    ] percentage points **of market share**. Further, the post-petition increase in the volume of imports from China was equivalent to [    ] percent of the **domestic industry's production** in 2023.

- that effect of this increase in post-petition volume was exacerbated by the **already-dominant position of subject imports in the U.S. market**, having increased their share of apparent U.S. consumption irregularly from [    ] percent in 2021 to [    ] percent in 2023.

- **while the percentage increase in post-petition imports is less than in some other recent investigations, that increase was from a very large base - a share of more than [         ] of the entire market.**

Views at 61-63 (emphases added) (footnotes omitted).

In so finding, the Commission expressly and improperly interpreted the statutory factors – "timing" and "volume" of imports – separately, in isolation from one another:

---

[1] *Mattresses* was published after the close of briefing. Transcript at 223-24; Chinese Respondents' Posthearing Brief Response to Commissioner Questions at 60. The Commission decision was based on a rationale that was unavailable when posthearing briefs were filed.

PUBLIC VERSION

the Commission is to consider both the timing and the volume of imports. 19
U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). We have considered both the
timing *and the volume* of imports subject to Commerce's affirmative critical
circumstances determination, **both in absolute terms and relative to apparent
U.S. consumption**.

*ITC Final*, USITC Pub. 5529 at 45 n.260 (emphases modified).

This analytical approach is flawed for a number of reasons. First, the statute clearly

identifies "the timing and volume of the imports" as a single factor:

> (I)      the timing and volume of the imports,
>
> (II)     a rapid increase in inventories of the imports, and
>
> (III)    any other circumstances indicating that the remedial effect of the
>          {ADD/CVD} order will be seriously undermined.

19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). The Commission misconstrues this clear

statutory language as cleaving the first factor into separate criteria, when the plain meaning of

subsection "I" is to consider "timing and volume" in tandem.

Moreover, as discussed by Commissioner Schmidtlein, the Commission's approach

suffers from a profound error in logic:

> **The majority focuses on the total volume of subject imports in the post-
> petition period, rather than the increase, and emphasizes that the imports
> were starting from a large base. Following the majority's logic, if subject
> imports start from a large base, there does not necessarily need to be an
> increase in import volume in the post-petition period at all, let alone a
> substantial or "massive" increase as contemplated by the statute and
> legislative history.**

*ITC Final*, USITC Pub. 5529 at 64-65 (Dissent) (emphasis added).

Commissioner Schmidtlein is correct that import volume cannot be examined separately

from the comparison timeframe, as doing so contradicts the statute's plain meaning and its

legislative history. The SAA provides that the Commission is to determine "whether, by

massively increasing imports prior to the effective date of relief, the importers have seriously

27

undermined the remedial effect of the order" and specifically "whether the **surge in imports** prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." SAA at 877 (emphasis added). The Commission's rationale allows a large subject import base to eliminate the necessity of finding a "surge in imports." *Id*. Legislative history indicates that the "undermine seriously" provision was designed "to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by **increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination** by {Commerce}." *ICC Indus.*, 812 F.2d at 699-700 (quoting H.R. Rep. No. 317, 1979 U.S.C.C.A.N. 449) (emphasis added). In basing its decision on pre-petition market share, the Commission improperly shifted the focus to the time period before the Petition was filed, instead of on "the period between initiation of an investigation and a preliminary determination." *Id*.

The Commission through its logic error attempted to demonstrate that this record constituted a [          ] compelling case for critical circumstances than in *Mattresses*:

> within the context of the overall U.S. market, the post-petition increase in volume of imports in this case was [                    ] than in *Mattresses*, which involved a post-petition increase in imports equivalent to only 2.3 percent of apparent U.S. consumption in the final year of the POI. . . . In contrast, the post-petition increase in the volume of imports in this case was equivalent to [   ] percent of apparent U.S. consumption in the final year of the POI. . . . Further, the share of apparent U.S. consumption accounted for by the volume of imports associated with the post-petition period was equivalent to 4.6 percent in *Mattresses*, while here the volume of imports associated with the post-petition period was equivalent to [   ] percent of apparent U.S. consumption.
>
> . . . {T}he subject imports increased their market share of apparent U.S. consumption by [   ] percentage points from 2022 to 2023. . . . By contrast, in *Mattresses*, the Commission noted a [               ] increase in the market share of subject imports from Burma (6.4 percentage points from 2022 to 2023) and imports from Burma accounted for a much smaller share of apparent U.S. consumption (6.9 percent in 2023).

Views at 62-63 & nn.257-28 (citing *Mattresses*, USITC Pub. 5520 at 68-69; FSR Tables IV-8 & C-1).

The Commission's decision in *Mattresses* does not support finding critical circumstances here. That finding was based on a 101.6 percent post-petition increase; in this case, the increase is one-half that percentage, which negates relying on *Mattresses* to support the requisite "**surge in imports prior to the suspension of liquidation**" in this case. SAA at 877 (emphasis added). The Commission's reliance on *Mattresses* as precedent emphasizes irrelevant considerations of the full-year increases and the share of apparent consumption. Views at 62-63 & nn.257-28. The Commission improperly transposes these volume considerations into the critical circumstances analysis when they are limited to being considered in the overall injury analysis, in which "the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). Indeed, *Mattresses* properly focused on "compar{ing} the volume of subject imports six months prior to filing the petitions (February to July 2023) with the volume of subject imports in the six months after the filing of the petitions (August 2023 to January 2024) for purposes of . . . critical circumstances." USITC Pub. 5520 at 66. In contrast, in this case, the Commission failed to focus its analysis in the same legally required manner.

The Commission's reliance on *Mattresses* reveals its improper shift from post-petition volume increases to preexisting base amounts of subject imports and their share of apparent consumption. Views at 62-63 & nn.257-28. This analytical framework – besides being untethered to the statute, legislative history, and agency practice – unfairly prejudices Chinese Respondents who, in this case, exported subject merchandise to the United States in significant

quantities long before the domestic industry came into existence. Chinese Respondents'
Prehearing Brief at 12-16. "Pea protein production in the United States started well after
production began in China." *Id*. at 16. The Commission's newfangled approach arbitrarily finds
critical circumstances without the requisite surge where, as a result of longstanding market
conditions, subject imports when the Petition is filed had "a very large base" comprising [

] "of the entire market." Views at 63.

Based on the above-referenced analysis, there are four specific "timing and volume"
reasons why this Court should not affirm the Commission's critical circumstances decision.

First, the Commission's reliance on [                    ] post-petition volume increases
– using either the full six-month or truncated five-month comparison period – renders the critical
circumstances finding "unsupported by substantial evidence on the record." 19 U.S.C.
§ 1516a(b)(1)(B)(i). The ADD/CVD orders in this case were not undermined seriously, since
"**the magnitude of the surge in imports** . . . **is {not} sufficiently large that they greatly and
insidiously weaken or subvert the effect of the order**." *Mushrooms*, USITC at 27-28
(emphasis added). These volume data confirm that this is not a "situation{} where **imports have
surged**" as a result of the initiation of an {ADD/CVD} investigation. *Brake Drum Mfrs.*, 23 CIT
at 112 n.38 (emphasis added). The Commission's finding of critical circumstances based on such
a [        ] post-petition volume increase is not supported by "such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at
217.

Second, the Commission's statutory contortion renders its critical circumstances finding
"not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Tandem consideration of "the
**timing and volume** of the imports" is required as a single criterion. *Id*. §§ 1671d(b)(4)(A)(ii)(I),

1673d(b)(4)(A)(ii)(I) (emphasis added). The Commission misconstrued the statutory language by considering timing and volume as separate critical circumstances criteria, transposing the ordinary injury criterion by considering "the volume of subject imports . . . , **both in absolute terms and relative to apparent U.S. consumption**. *ITC Final*, USITC Pub. 5529 at 45 n.260 (emphasis added). By "focus{ing} on the total volume of subject imports in the post-petition period, rather than the increase," *id*. at 64-65, the Commission disregarded the statutory "term 'undermine seriously' establish{ing} a very high standard: that the surge in imports greatly and insidiously weakens or subverts the effect of the order." *Mushrooms*, USITC Pub. 3159 at 27-28. Such contradiction of the clear statutory divide between the ordinary injury volume analysis and the "timing and volume" for critical circumstances cannot be sustained. Because such a convoluted statutory interpretation clearly "**is not the best, it is not permissible**." *Loper*, 603 U.S. at 400 (emphasis added). The fundamental flaw with this approach is that it nullifies the critical circumstances standard "designed to address situations where **imports have surged**" by requiring "**large volumes of, or a surge over a short period of, imports**." *Brake Drum Mfrs.*, 23 CIT at 112 n.38 (emphasis added); *Tak Fat*, 185 F. Supp. 2d at 1360 (emphasis added) (quoting H.R. Rep. 96-317 (1979), at 63). As Commissioner Schmidtlein explained:

> The statute and legislative history make clear that **the magnitude of the increases in . . . import volume . . . are important** to the Commission's analysis (e.g., 'massively increasing imports{}' . . . )." I find that **the increases present on this record do not satisfy this standard**. The majority focuses on the total volume of subject imports in the post-petition period, rather than the increase, and emphasizes that the imports were starting from a large base. **Following the majority's logic, if subject imports start from a large base, there does not necessarily need to be an increase in import volume in the post-petition period at all, let alone a substantial or "massive" increase as contemplated by the statute and legislative history.**

*ITC Final*, USITC Pub. 5529 at 64-65 (Dissent) (emphases added) (quoting SAA at 877).

Third, the Commission abused its discretion by developing a new critical circumstances standard that unfairly disadvantages exporters who served the U.S. market long before the domestic industry came into existence, such as Chinese Respondents. Transcript at 10, 13, 145-46; Chinese Respondents' Prehearing Brief at 12-16. The "already-dominant position of subject imports in the U.S. market" has nothing to do with critical circumstances, and the Commission improperly distinguished *Mattresses* as a case without a large preexisting subject import base. *ITC Final*, USITC Pub. 5529 at 44 & nn.257-58. Accordingly, the Commission's critical circumstances determination was "based on an erroneous interpretation of law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Star Fruits*, 393 F.3d at 1281.

Fourth, and at an absolute minimum, this Court should order remand because the Commission impermissibly deviated from its established agency practice by using a [

] post-petition increase to justify finding critical circumstances. "The increases in subject import volume . . . noted by the majority are [    **] less than the increases in previous cases** where the Commission reached affirmative critical circumstances determinations." Dissent at 6-7 n.22 (emphasis added) (citations omitted). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF II*, 630 F.3d at 137. Here, by justifying its departure based on an extra-statutory consideration unrelated to critical circumstances, the Commission failed to "provide an adequate explanation for the change." *Id*. Its reliance on a large preexisting subject import base, both actual and as a percentage of domestic consumption, to find critical circumstances, despite the [      ] post-petition increase, was "arbitrary" because "the agency offered insufficient reasons for treating similar situations differently." *SKF I*, 263 F.3d at 1382. As the Commission's prior requirement for high post-petition volume

increases is mandated by the statute and its legislative history, Section I, *supra*, "the agency must show . . . a more detailed justification . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy." *Fox*, 556 U.S. at 515. The flawed explanation provided by the Commission does not constitute a requisite heightened justification.

## IV.   THE ITC INCORRECTLY FOUND CRITICAL CIRCUMSTANCES BASED ON INVENTORY DATA

Data reported to the Commission do not indicate that during the post-petition period there was "a rapid increase in inventories of the imports" that would "indicat{e} that the remedial effect of the {ADD/CVD} order will be seriously undermined." 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). In fact, inventories maintained by U.S. importers of subject pea protein at year end 2023 were [                    ] higher than those maintained prior to filing of the Petition in July 2023:

| Date | Quantity | Index |
|---|---|---|
| June 30, 2023 | [     ] | [     ] |
| July 31, 2023 | [     ] | [     ] |
| August 31, 2023 | [     ] | [     ] |
| September 30, 2023 | [     ] | [     ] |
| October 31, 2023 | [     ] | [     ] |
| November 30, 2023 | [     ] | [     ] |
| December 31, 2023 | [     ] | [     ] |

FSR at IV-14 (Table IV-9) (emphasis added).

Chinese Respondents submit that the Commission should have relied on the full six-month comparison period. Section II, *supra*. Yet using either period, inventory data does not support finding critical circumstances. As Commissioner Schmidtlein explained:

> U.S. importers' end-of-period inventories of subject imports from China were [          ] pounds at the end of the pre-petition period (June 2023) and [          ] pounds at the end of the post-petition period (November 2023), an increase of [     ] percent. If a six month pre- and post-petition review period is utilized, . . . U.S. importers' end-of-period inventories of subject imports increased by substantially less at [     ] percent. . . . {N}**either set of increases demonstrate a massive and rapid increase that would likely undermine the remedial effect of the orders. Indeed,**

**importers' U.S. inventory levels at the end of 2023 were lower than each of the prior years of the POI, which does not suggest that importers were stockpiling imports** prior to the imposition of duties to be used to undermine the orders.

Dissent at 4-5 (emphasis added) (footnotes omitted). The Commission's improper use of the truncated five-month comparison especially prejudices Chinese Respondents by distorting the inventory analysis by showing an increase of more than [      ] what it should actually have been.

Indeed, the December 2023 inventory amount, when examined as a ratio of imports is [      ] than that maintained in 2022. In December 2023, the ratio of inventories to imports of U.S. importers of subject pea protein was only [      ] percent of 2023 import volumes. FSR at VII-12 (Table VII-9). This ratio of inventories to import volumes for the year ending after the filing of the Petition and after Commerce's affirmative critical circumstances finding in its CVD preliminary determination is [      ] than the end of year inventory ratios to import quantities for 2022, which was [      ] percent. *Id*. This belies any conclusion that subject imports in the post-Petition period could have seriously undermined the remedial effect of the ADD/CVD orders.

Accordingly, the Commission's conclusion that there has been "a rapid increase in inventories of the imports" that would "indicat{e} that the remedial effect of the {ADD/CVD} order will be seriously undermined." 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). As Commissioner Schmidtlein explained using either comparison period:

> The statute and legislative history make clear that **the magnitude of the increases in . . . inventories are important** to the Commission's analysis (e.g., . . . 'rapid increase in inventories'). I find that **the increases present on this record do not satisfy this standard**. . . .
>
> **The increases in . . . inventory levels noted by the majority are [      ] less than the increases in previous cases** where the Commission reached affirmative critical circumstances determinations.

Dissent at 5-6 & n.22 (emphases added) (quoting 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii)) (citing Chinese Respondents' Prehearing Brief at 92-97; *Honey from*

*Vietnam* ("importers' inventories increased by almost threefold in the post-petition period"); *Honey from China* ("importers' inventories increased by 292 percent")).

Based on the above-referenced analysis, there are four reasons why this Court should not affirm the Commission's subsidiary conclusion that inventory levels support an affirmative critical circumstances determination.

First, the Commission's finding that "the effect of the post-petition increase in subject imports was to create **a stockpile of imports** prior to the imposition of provisional duties" is "unsupported by substantial evidence on the record." *ITC Final*, USCIT Pub. 5529 at 46 (emphasis added); 19 U.S.C. § 1516a(b)(1)(B)(i). The word "stockpile" is defined in relevant part as "a large supply." DICTIONARY.COM ("stockpile"). An inventory increase of less than [     ] percent cannot credibly qualify as a stockpile, nor can a [     ] increase of [   ] percent if the correct full comparison period is used. Section II, *supra*. The Commission's finding critical circumstances through reliance on such [     ] post-petition inventory increase data is not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 217.

Second, the Commission ignored the fact that "**importers' U.S. inventory levels at the end of 2023 were lower than each of the prior years of the POI**." *ITC Final*, USITC Pub. 5529 at 64 (Dissent) (emphasis added) (citing FSR at VII-12 (Table VII-9)). The Commission therefore improperly found critical circumstances based on inventory data "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals*, 132 F.3d at 720.

Third, the Commission's disregard of the statutory language renders its critical circumstances determination "not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The

statute plainly requires consideration of "**a rapid increase in inventories** of the imports." 19

U.S.C. §§ 1671d(b)(4)(A)(ii)(II), 1673d(b)(4)(A)(ii)(II) (emphasis added). The word "rapid" is

defined as "moving or acting with great speed." DICTIONARY.COM ("rapid"). The Commission

reveals the extent to which it ignores this statutory requirement by finding critical circumstances

merely because: "The increase in volume of imports in the post-petition period did not replace

decreasing inventories." *ITC Final*, USITC Pub. 5529 at 45. However, the rapid increase

requirement cannot be satisfied merely because "decreasing inventories" were not replaced, a

standard which does not require any increase. *Id*. Such contradiction of the clear statutory

requirement that the increase must be "rapid" to support an affirmative determination cannot be

sustained. Because such a convoluted statutory interpretation clearly "**is not the best, it is not**

**permissible**." *Loper*, 603 U.S. at 400 (emphasis added).

      Finally, and at an absolute minimum, this Court should remand the Commission's

decision for further consideration because the Commission impermissibly deviated from its

established agency practice by using a [                    ] post-petition increase to justify

finding critical circumstances. "The increases in . . . inventory levels noted by the majority are

[    **] less than the increases in previous cases** where the Commission reached affirmative

critical circumstances determinations." Dissent at 6-7 n.22 (emphasis added) (citations omitted).

"When an agency changes its practice, it is obligated to provide an adequate explanation for the

change." *SKF II*, 630 F.3d at 137. Here, by justifying its departure based on an extra-statutory

consideration unrelated to critical circumstances, the Commission failed to "provide an adequate

explanation for the change." *Id*. Its use of a large preexisting subject import base volume to find

critical circumstances despite the lack of [                ] increased inventories was "arbitrary"

because "the agency offered insufficient reasons for treating similar situations differently." *SKF*

*I*, 263 F.3d at 1382. As the Commission's prior requirement for a rapid increase in inventories –
through stockpiling or tripling – was required by the statute and legislative history, Section I,
*supra*, "the agency must show . . . a more detailed justification . . . when, for example, its new
policy rests upon factual findings that contradict those which underlay its prior policy." *Fox*, 556
U.S. at 515. Here, the flawed explanation provided by the Commission does not constitute a
requisite heightened justification.

## V.     THERE ARE NO OTHER BASES TO FIND CRITICAL CIRCUMSTANCES

The final statutory factor is "any other circumstances indicating that **the remedial effect**
of the {ADD/CVD} order **will be seriously undermined**." 19 U.S.C. §§ 1671d(b)(4)(A)(ii),
1673d(b)(4)(A)(ii) (emphases added). At the Hearing, Chair Karpel asked generally about this
factor (as the only critical circumstances question asked), Transcript at 222-23, providing the
parties with no warning that the Commission was about to invent a new standard through which
a large preexisting base of subject imports could supplant the need for massive post-petition
volume and inventory increases. Chinese Respondents responded accurately that this factor
primarily led to an examination of AUVs over comparison periods. Chinese Respondents'
Posthearing Brief Response to Commissioner Questions at 55-57. The Commission had recently
stated that, in the context of a critical circumstances analysis, it is looking at whether "the
available pricing data indicate a 'rush' to beat the deposit requirement." *GPPW from Vietnam*,
USITC Pub. 5465 at 48. The Commission here relied on such post-petition pricing data:

> although **prices of subject imports did not markedly decrease in the post-
> petition period**, . . . subject imports from China continued to undersell the
> domestic like product in [          ] comparisons in the second half of 2023,
> involving [          ] pounds, and at significant margins ranging from [     ] to
> [     ] percent.

Views at 63-64 (emphasis added).

In fact, the post-petition pricing comparison constitutes substantial evidence that post-petition imports did not undermine seriously the remedial effects of ADD/CVD Orders. [   ] importers provided usable pricing data for sales of the four pricing products. FSR at V-7. Their pricing data, accounting approximately [     ] percent of U.S. shipments of subject imports from China in 2023, *id*., clearly evidenced that the AUVs for the priced products were not reduced to beat the deposit requirements. These data presented below with a summary of subject imports' AUVs, indexed to the first quarter of 2021 shows that the AUV trend of subject imports of all four pricing products were either [                ] at the end of the fourth quarter of 2023 than in prior periods, with [                    ] from quarter-to-quarter:

**HPC pea protein:  Indexed subject U.S. importer prices, by quarter**

Indexed prices in percent; 2021 Q1=100.0

| Period | Product 1 | Product 2 | Product 3 | Product 4 |
|--------|-----------|-----------|-----------|-----------|
| 2021 Q1 | [ ] | [ ] | [ ] | [ ] |
| 2021 Q2 | [ ] | [ ] | [ ] | [ ] |
| 2021 Q3 | [ ] | [ ] | [ ] | [ ] |
| 2021 Q4 | [ ] | [ ] | [ ] | [ ] |
| 2022 Q1 | [ ] | [ ] | [ ] | [ ] |
| 2022 Q2 | [ ] | [ ] | [ ] | [ ] |
| 2022 Q3 | [ ] | [ ] | [ ] | [ ] |
| 2022 Q4 | [ ] | [ ] | [ ] | [ ] |
| 2023 Q1 | [ ] | [ ] | [ ] | [ ] |
| 2023 Q2 | [ ] | [ ] | [ ] | [ ] |
| 2023 Q3 | [ ] | [ ] | [ ] | [ ] |
| 2023 Q4 | [ ] | [ ] | [ ] | [ ] |

Source: from data submitted in response to Commission questionnaires.

PUBLIC VERSION

**HPC pea protein: Indexed U.S. importer prices, by quarter**

[                                                                            ].

FSR at V-27 (Table V-14 & Figure V-11). Given these post-petition pricing product data and

trends, Commissioner Schmidtlein correctly stated:

> There . . . is **no evidence of significant changes in pricing patterns that might**
> **suggest the imports entering in the post-petition period were intended to**
> **circumvent** a potential order. **The average quarterly prices of subject imports**
> **from China generally started declining prior to the petitions being filed, with**
> **no apparent acceleration of this trend after the petitions were filed, and**
> **many pricing products actually show an increase in the price of subject**
> **imports in the last quarter of 2023.**

Dissent at 6 (emphases added).

The Commission's reliance on the post-petition AUVs to support its affirmative

determination therefore renders the critical circumstances finding "unsupported by substantial

evidence on the record." 19 U.S.C. § 1516a(b)(1)(B)(i). The post-petition pricing data do not

"indicate a 'rush' to beat the deposit requirement." *GPPW from Vietnam*, USITC Pub. 5465 at

48. The Commission's finding of critical circumstances through reliance on pricing data showing

that the trend for the AUVs of all products were either [                    ] at the end of 2023, with

[                         ] from quarter-to-quarter, is not supported by "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 217.

The Commission attempts to justify its decision by stating: "That still larger margins of underselling were not required to effect the significant increases in the volume of imports involved in the post-petition period is not remarkable." *ITC Final*, USITC Pub. 5529 at 45. The Commission is wrong. As a matter of law, an affirmative critical circumstances analysis requires "extraordinary" data to meet the "undermine seriously" statutory standard. Section I, *supra.* That data includes "larger margins of underselling . . . in the post-petition period" than in the pre-petition period. *Id*. The Commission improperly found critical circumstances without such extraordinary post-petition data.

The Commission next "view{ed} the timing of the increase in subject imports from China in the post-petition period as instructive." *Id*. at 46. However, as discussed in detail above, the Commission by statute was required to consider "the **timing and volume** of the imports," 19 U.S.C. §§ 1671d(b)(4)(A)(ii)(I), 1673d(b)(4)(A)(ii)(I) (emphasis added) – as opposed to considering the timing and volume in isolation as separate criteria. Section III, *supra*. Moreover, the Commission clearly cherry-picked months in finding that "Subject imports . . . were higher in three months of the post-petition period (August, September, and November) than in any month of the pre-petition period." *ITC Final*, USITC Pub. 5529 at 45. This **selective analysis ignores** the fact that the [            ] pound **October 2023** post-petition volume was less than [      ] of the volume in in three pre-petition months ([                        ]), and the heralded [            ] pound August post-petition quantity in fact [                ] the pre-petition [            ] pound February 2023 quantity. FSR at IV-13 (Table IV-8). The Commission's claim that "Subject imports decreased in every month of the pre-petition period" uses the

incorrect five-month period. *ITC Final*, USITC Pub. 5529 at 45; Section I, *supra*. In fact, subject imports [          ] from [     ] to [             ] pounds between January and February 2023. FSR at IV-13 (Table IV-8).

The Commission fixates on the quantity "being higher in September 2023, and [     ] higher than in the peak month of the pre-petition period." Views at 65. According to the Commission, "subject imports arriving in September would have been ordered immediately following the filing of the petitions in July." *ITC Final*, USITC Pub. 5529 at 45. Yet the Commission ignores the [          ] between September and October, when subject import quantity [                    ]. FSR at IV-13 (Table IV-8). Indeed, imports in October also could have been ordered immediately following the Petition being filed, invalidating the Commission's decision to focus solely on September – and to ignore October – as being based on speculation. Moreover, subject imports [          ] post-petition contradicts the Commission's theory, which improperly focuses on a specific month (September) rather than the comparison periods in their entirety.

Moreover, the Commission ignores "arranged imports" which "are imports for which" reporting importers "ha{ve} placed an order with a foreign supplier for subject merchandise, but delivery of those imports is not scheduled to occur until after" December 31, 2023. U.S. Importers' Questionnaire, P.R. 78, Question II-3a. The Commission's focus on the post-petition monthly increases did not consider that such arranged imports [                ] from the pre-petition to the post-petition period. FSR at VII-12 (Table VII-10).

Finally, the Commission bootstraps into the critical circumstances analysis the ordinary injury considerations of "the effect of imports . . . on prices in the United States" and "the impact of imports . . . on domestic producers." 19 U.S.C. § 1677(7)(B). The Commission supported its

critical circumstances finding with its ordinary injury findings that "subject imports undersold the domestic like products at large margins of underselling throughout the POI" and that "the domestic industry . . . [                                    ] throughout the POI." Views at 64-65. As with the ordinary injury volume factor, the Commission is not permitted by statute to bleed its normal injury analysis into its distinct critical circumstances analysis. Section III, *supra*. A finding that post-petition imports undermine seriously the remedial effect of ADD/CVD orders requires that the Commission focus on whether these post-petition imports had a distinct impact on the domestic industry, over and above the impact of imports throughout the POI. Section I, *supra*. Insofar as the Commission supports its decision by stating that pre-petition conditions merely continued, that decision is not supported by substantial evidence and is contrary to law.

Finally, assuming *arguendo* that the Commission was able to consider ordinary injury factors, its disregard of contradictory evidence invalidated that analysis. For example, the Commission relied on underselling to find critical circumstances but in that finding did not address Chinese Respondents' demonstrations that pea protein is not purchased on the basis of price, there is minimal overlap between domestic producers and subject import, and the weak statistical correlation between market share and such insignificant underselling. Chinese Respondents' Prehearing Brief at 3, 44-44; Chinese Respondents Posthearing Brief at 3-8, Response to Commissioner Questions 1-5. Similarly, the Commission relied on domestic industry underperformance to find critical circumstances but in that finding did not address Chinese Respondents' demonstrations that such underperformance was due to start-up costs, the business model that – unlike the Chinese industry – does not export starch to offset production costs, and those costs are [                                    ]. Chinese

Respondents' Prehearing Brief at 3, 56-70; Chinese Respondents' Posthearing Brief at 8-12, Response to Commissioner Questions 7-9.

In short, the Commission's critical circumstances finding based on the third statutory criteria is "unsupported by substantial evidence on the record." 19 U.S.C. § 1516a(b)(1)(B)(i). The findings disregarded record evidence of arranged imports and conditions of competition, such as the unimportance of price in purchasing decisions and the disparate business models with respect to pea protein costs – *i.e.*, "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals*, 132 F.3d at 720. The Commission's critical circumstances analysis is devoid of any references to these important evidentiary considerations. *See ITC Final*, USITC Pub. 5529 at 42-47.

## **CONCLUSION**

For the foregoing reasons, Chinese Respondents respectfully request that this Court remand the Commission's affirmative critical circumstances determination in the ADD/CVD investigations of pea protein from China, for reconsideration and redetermination.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/ Ned H. Marshak*
Ned H. Marshak
Jordan C. Kahn*
Ruting Chen

599 Lexington Ave., 36th Floor
New York, New York 10022
**
*1201 New York Ave., NW
Suite 650
Washington, DC 20005

PUBLIC VERSION

*Counsel for Consolidated Plaintiffs*
*Jianyuan International Co., Ltd., Shandong*
*Yuwang Ecological Food Industry Co., Ltd.,*
*Linyi Yuwang Vegetable Protein Co., Ltd.,*
*Yantai Oriental Protein Tech Co., Ltd., and*
*Jiujiang Tiantai Food Co., Ltd.*

Dated: May 27, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 13,227 words, less than the 14,000 word limit set by the Court's January 4, 2017 Order.

_/s/ Ned H. Marshak_

_Counsel for Consolidated Plaintiffs_
_Jianyuan International Co., Ltd., Shandong_
_Yuwang Ecological Food Industry Co., Ltd.,_
_Linyi Yuwang Vegetable Protein Co., Ltd.,_
_Yantai Oriental Protein Tech Co., Ltd., and_
_Jiujiang Tiantai Food Co., Ltd._

Dated: May 27, 2025

52228_1