## UNITED STATES COURT OF INTERNATIONAL TRADE

NURA USA, LLC,

                Plaintiff,

    and

Jianyuan International Co., Ltd., Shandong Yuwang
Ecological Food Industry Co., Ltd., Linyi Yuwang
Vegetable Protein Co., Ltd., Yantai Oriental Protein
Tech Co., Ltd., Jiujiang Tiantai Food Co., Ltd.

                Consolidated Plaintiffs,

       v.

UNITED STATES,

                Defendant,

    and

Puris Proteins, LLC
d/b/a PURIS,

                Defendant-Intervenor.

Before: Lisa W. Wang, Judge
Consol. Court No. 24-00182

## NURA USA, LLC'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, NURA USA,

LLC ("NURA" or "Plaintiff") respectfully moves for judgment on the agency record on the issue

raised in its Complaint challenging the U.S. International Trade Commission's ("Commission")

final affirmative determination of critical circumstances in the antidumping and countervailing

duty investigations on certain pea protein from the People's Republic of China. *See Certain Pea*

Consol. Court No. 24-00182

*Protein From China*, 89 Fed. Reg. 67671 (Int'l Trade Comm'n Aug. 21, 2024) ("*Final Determination*").

For the reasons set forth in the accompanying memorandum, the Commission's determination is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law. Accordingly, NURA respectfully requests that the Court remand the *Final Determination* to the Commission for disposition in accordance with the Court's final opinion; and grant such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for NURA USA, LLC*

Dated: May 27, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**

---

**NURA USA, LLC,**

      **Plaintiff,**

  **and**

**Jianyuan International Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Linyi Yuwang Vegetable Protein Co., Ltd., Yantai Oriental Protein Tech Co., Ltd., Jiujiang Tiantai Food Co., Ltd.**

      **Consolidated Plaintiffs,**

    **v.**

**UNITED STATES,**

      **Defendant,**

  **and**

**Puris Proteins, LLC**
**d/b/a PURIS,**

      **Defendant-Intervenor.**

Before: Lisa W. Wang, Judge
Consol. Court No. 24-00182

---

**ORDER**

**Consol. Court No. 24-00182**

Upon consideration of Plaintiff NURA USA, LLC's Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby

**ORDERED** that said motion is **GRANTED**, and it is further

**ORDERED** that the affirmative critical circumstances determination of the U.S. International Trade Commission ("Commission") is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law; and it is further

**ORDERED** that this matter is remanded to the Commission for further consideration in accordance with the accompanying opinion of this Court.

**SO ORDERED.**

Dated: _____                    _____
      New York, NY                                                Hon. Lisa W. Wang, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE

NURA USA, LLC,

                    **Plaintiff,**

    **and**

Jianyuan International Co., Ltd., Shandong Yuwang
Ecological Food Industry Co., Ltd., Linyi Yuwang
Vegetable Protein Co., Ltd., Yantai Oriental Protein
Tech Co., Ltd., Jiujiang Tiantai Food Co., Ltd.

                    **Consolidated Plaintiffs,**

        **v.**

UNITED STATES,

                    **Defendant,**

    **and**

Puris Proteins, LLC
d/b/a PURIS,

                    **Defendant-Intervenor.**

**Before: Lisa W. Wang, Judge
Consol. Court No. 24-00182**

<u>**NON-CONFIDENTIAL VERSION**</u>

**Business Proprietary Information
Removed from Pages 7, 9, 22-27,
30-31, 34-35**

---

## <u>MEMORANDUM IN SUPPORT OF NURA USA, LLC'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>

David J. Ross
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037

Dated: May 27, 2025

*Counsel for NURA USA, LLC*

Consol. Court No. 24-00182                    NON-CONFIDENTIAL VERSION

<u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION ........................................................................................ 1

II.     RULE 56.2 STATEMENT ........................................................................... 2

        A.     Administrative Determination Under Review ............................... 2

        B.     Issues Presented and Summary of Arguments .............................. 2

               1.     Whether the Commission's affirmative determination with respect to
                      critical circumstances is unreasonable, unsupported by substantial
                      evidence, and otherwise not in accordance with law. ............................ 2

        C.     Request for Court Order and Relief Sought .................................. 3

III.    STATEMENT OF FACTS ............................................................................ 3

        A.     The Petition and the Commission's Preliminary Investigations and Injury
               Determination ................................................................................... 3

        B.     Commerce's Preliminary Affirmative CVD Determination and Affirmative
               Critical Circumstances Determination .......................................... 4

        C.     The Final Phase of the Commission's Investigations ................... 6

        D.     Commerce's Final AD/CVD Determinations and Affirmative Critical
               Circumstances Determination ........................................................ 7

        E.     The Commission's Final Determination ......................................... 8

IV.     STANDARD OF REVIEW ....................................................................... 10

V.      ARGUMENT ............................................................................................ 13

        A.     The Majority Failed to Follow the Statutory Directive to Determine Whether
               Imports Massively Increased in the Post-Petition Period ........... 13

               1.     The Commission Is Required to Determine Whether Imports
                      Massively Increased in the Post-Petition Period .................... 13

               2.     The Majority Unreasonably Relied Upon Commerce's Findings
                      Regarding the Post-Petition Increase in Subject Imports ..... 17

               3.     The Record Evidence Does Not Show a Massive Increase in Subject
                      Imports ..................................................................................... 22

        B.     The Majority Did Not Find That Inventories of Subject Imports Rapidly
               Increased During the Post-Petition Period .................................. 25

        C.     The Majority Unlawfully Ignored Evidence Regarding Pricing Patterns of
               Subject Imports During the Post-Petition Period ....................... 28

        D.     The Majority Erred in Concluding That the Timing of Subject Imports
               Indicated That They Were Likely to Seriously Undermine the Remedial
               Effect of the *Orders* ...................................................................... 32

               1.     The Majority Failed to Consider Evidence Showing That a Large
                      Portion of Imports During Its Period of Focus Sold at Higher Prices

i

**Consol. Court No. 24-00182**                    **NON-CONFIDENTIAL VERSION**

   **and Lower Underselling Margins Than During the Pre-Petition Period** ............................................................................................... 33

  2. **The Majority Disregarded Record Evidence and Plaintiff's Arguments Regarding Increased Demand** ........................................... 35

**VI. CONCLUSION** ................................................................................................... 37

Consol. Court No. 24-00182                                    NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bio-Lab, Inc. v. United States*, No. 24-00024, 2025 WL 1099710, at *8 (CIT 2025)...... 12, 13, 14

*Changzhou Wujin Fine Chemical Factory Co.*, 701 F.3d 1367 (Fed. Cir. 2012)......................... 12

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) ......... 11, 30, 34, 37

*CVB, Inc. v. United States*, 675 F. Supp. 3d 1324, 1337 (CIT 2023) ..................................... 11, 36

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) ............. 11

*Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343 (CIT 2019).......... 12, 21, 22

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318, 1325 (CIT 2024) .................................................................................................................. 11, 12

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................... 12, 13, 14, 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) .................................................................................................................. 11, 12, 28, 37

*RHP Bearings Ltd. v. United States*, 288 F.3d 1334 (Fed. Cir. 2002)............................. 12, 22, 32

*Sweet Harvest Foods v. United States*, 669 F. Supp. 3d 1346, 1356 (CIT 2023).................. 15, 20

*Tak Fat Trading Co. v. United States*, 185 F. Supp. 2d 1358, 1362 (CIT 2002).............. 14, 15, 25

**Statutes, Rules, and Regulations**

19 C.F.R. § 351.206 ......................................................................................................... 20

19 U.S.C. § 1516a ............................................................................................................ 11

19 U.S.C. § 1671d.................................................................................................... passim

19 U.S.C. § 1673d.................................................................................................... passim

Tariff Act of 1930 ................................................................................................... passim

**Administrative Record**

NURA Posthearing Brief and Responses to Commissioner Questions.......................... 6, 7, 22, 35

NURA Prehearing Brief................................................................................................... 27

**U.S. Department of Commerce Determinations**

*Certain Pea Protein From China*, 88 Fed. Reg. 60,495 (Dep't of Commerce Sep. 1, 2023) ........ 4

*Certain Pea Protein From China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 45,924 (Dep't of Commerce July 18, 2023) ................................................................................. 4

Consol. Court No. 24-00182                    NON-CONFIDENTIAL VERSION

*Certain Pea Protein From China; Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 89 Fed. Reg. 15,895 (Dep't of Commerce Mar. 5, 2024) ............................................................................................... 6

*Certain Pea Protein From the People's Republic of China: Antidumping and Countervailing Duty Orders*, 89 Fed. Reg. 68,390 (Dep't of Commerce Aug. 26, 2024) ......................... 2

*Certain Pea Protein From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,557 (Dep't Commerce July 5, 2024) and accompanying Issues and Decision Memorandum ................................................................................................ 1, 7

*Certain Pea Protein From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,559 (Dep't Commerce July 5, 2024) and accompanying Issues and Decision Memorandum .......................................................... 1, 7, 8

*Certain Pea Protein From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 88 Fed. Reg. 52,116 (Dep't of Commerce Aug. 7, 2023).......................... 4

*Certain Pea Protein From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 88 Fed. Reg. 52,124 (Dep't of Commerce Aug. 7, 2023).......................... 4

*Certain Pea Protein from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 88 Fed. Reg. 87,403 (Dep't of Commerce December 18, 2023) and accompanying Preliminary Decision Memorandum ..................................................... 5

*Certain Pea Protein From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 10,038 (Dep't of Commerce Feb. 13, 2024) and accompanying Preliminary Decision Memorandum ..................................................... 5

*Countervailing Duty Investigation of Certain Pea Protein from the People's Republic of China: Final Analysis of Critical Circumstances*, U.S. Dep't of Commerce (June 28, 2024)....... 8

*Countervailing Duty Investigation of Pea Protein from China: Critical Circumstances Analysis*, U.S. Dep't of Commerce (Dec. 11, 2023) ........................................................... 5

*Less-Than-Fair-Value and Countervailing Duty Investigations of Certain Pea Protein from the People's Republic of China: Analysis of Critical Circumstances*, U.S. Dep't of Commerce (Feb. 7, 2024) ................................................................................... 6

*Less-Than-Fair-Value Duty Investigation of Certain Pea Protein from the People's Republic of China: Analysis of Critical Circumstances for Final Determination*, U.S. Dep't of Commerce (June 27, 2024)................................................................................. 8

iv

Consol. Court No. 24-00182                     NON-CONFIDENTIAL VERSION

**U.S. International Trade Commission Determinations**

*Aluminum Lithographic Printing Plates from China and Japan*, Investigation Nos. 701-TA-694 and 731-TA-1641-1642 (Final), USITC Pub. 5559 (Nov. 2024) .................................... 21

*Biodiesel From Argentina And Indonesia*, Inv. Nos. 731-TA-1347-1348 (Final), USITC Pub. 4775 (Apr. 2018)............................................................................................................ 15, 17

*Carbon and Certain Alloy Steel Wire Rod from China*, Inv. Nos. 701-TA-512 and 731-TA-1248 (Final), USITC Pub. 4509 (Jan. 2015).................................................................... 17

*Certain Crepe Paper Products from China*, Inv. No. 731-TA-1070A (Final), USITC Pub. 3749 (Jan. 2005)............................................................................................................ 17

*Certain Magnesia Carbon Bricks From China and Mexico*, Inv. Nos. 701-TA-468 and 731-TA-1166-1167 (Final), USITC Pub. 4182 (Sept. 2010)........................................................ 17

*Certain Off-The-Road Tires from China*, Inv Nos. 701-TA-448 and 731-TA-1117 (Final) USITC Pub. 4031 (Aug. 2008).................................................................................... 17

*Certain Pea Protein From China*, 89 Fed. Reg. 67,671 (Int'l Trade Comm'n Aug. 21, 2024) 1, 2, 8

*Circular Welded Carbon-Quality Steel Pipe from China,* Inv. Nos. 701-TA-447 and 731-TA-1116 (Final), USITC Pub. 4019 (July 2008).................................................................... 17

*Common Alloy Aluminum Sheet from China*, Inv. No. 701-TA-591, 731-TA-1399 (Final), USITC Pub. 4861 at 36 (Jan. 2019) ................................................................................ 17

*Coumarin from the People's Republic of China*, Inv. 731-TA-677 (Final), USITC Pub. 2852 (Feb. 1995)............................................................................................................ 15

*Disposable Aluminum Containers, Pans, Trays, and Lids from China*, Inv. Nos. 701-TA-727 and 731-TA-1695 (Final), USITC Pub. 5611 (Apr. 2025) ................................................. 29, 31

*Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, Inv. Nos. 701-TA-712–714 and 731-TA-1679–1681 (Final), USITC Pub. 5620 (May 2025)........................................................ 16

*Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines, Poland, Slovenia, and Taiwan,* Inv. Nos. 731-TA-1629-1631, 1633, 1636-1638, and 1640 (Final), USITC Pub. 5520 (June 2024) ............................................................................... 23, 25

*Paper Plates from China, Thailand, and Vietnam*, Inv. Nos. 701-TA-704–705 and 731-TA-1664–1666 (Final), USITC Pub. 5595 (Mar. 2025)................................................... passim

*Quartz Surface Products from India and Turkey*, Inv. No. 701-TA-624-625, 731-TA-1450-1451 (Final), USITC Pub. 5061 at 39-40 (June 2020)............................................................ 16

*Small Diameter Graphite Electrodes*, Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 (Feb. 2009) ............................................................................................................ 16, 17

Consol. Court No. 24-00182                    NON-CONFIDENTIAL VERSION

*Small Vertical Shaft Engines from China*, Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 (Apr. 2021) ...................................................................................... 15, 18

*Steel Wire Garment Hangers From Vietnam*, Inv. No. 701-TA-487, 731-TA-1198 (Final), USITC Pub. 4371 at 6 & n.21 (Jan. 2013) ........................................................................ 17

*Synthetic Indigo from China*, Inv. No. 731-TA-851 (Final), USITC Pub. 3310 (June 2000) 18, 23

*Truck and Bus Tires from Thailand*, Investigation No. 731-TA-1658 (Final), USITC Pub. 5562 (Dec. 2024) ........................................................................................................................ 21

*Welded Stainless Steel Pressure Pipe from Malaysia, Thailand, and Vietnam*, Inv. Nos. 731-TA-1210-1212 (Final), USITC Pub. 4477 (July 2014) .......................................................... 17

Consol. Court No. 24-00182                          NON-CONFIDENTIAL VERSION

## I.    <u>INTRODUCTION</u>

Plaintiff NURA USA, LLC ("NURA" or "Plaintiff") submits this memorandum in support of its Rule 56.2 Motion for Judgment on the Agency Record ("Rule 56.2 Motion") and respectfully requests that the Court grant Plaintiff's Rule 56.2 Motion.  Defendant-Intervenor Puris Proteins, LLC ("PURIS" or "Petitioner"), a domestic producer of certain high protein content pea protein, petitioned the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("Commission") to investigate imports of certain pea protein from the People's Republic of China ("China") ("subject imports") and to impose antidumping duties ("AD") and countervailing duties ("CVD").  Commerce found that subject imports were sold at less than fair value in the United States and benefited from countervailable subsidies from the Government of China, and the Commission found that the domestic pea protein industry was materially injured by reason of subject imports.  *See Certain Pea Protein From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,557 (Dep't Commerce July 5, 2024) ("Commerce CVD Final Determination"), P.R. 109; *Certain Pea Protein From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,559 (Dep't Commerce July 5, 2024) ("Commerce AD Final Determination"), P.R. 110; *Certain Pea Protein From China*, 89 Fed. Reg. 67,671 (Int'l Trade Comm'n Aug. 21, 2024), P.R. 126 (hereinafter "*Final Determination*").

In their respective determinations, both Commerce and the Commission found that critical circumstances existed with respect to subject imports.  However, in reaching its affirmative critical circumstances determination, the Commission failed to render certain factual findings required by the statute to support its critical circumstances determination.  In addition,

1

the Commission failed to consider record evidence and certain of Plaintiff's arguments that

subject imports were not likely to seriously undermine the remedial effect of the AD/CVD orders

to be issued.  These failures are unreasonable, deprive the Commission's determination of

substantial evidentiary support, and render the determination contrary to law.

## II.     RULE 56.2 STATEMENT

### A.     Administrative Determination Under Review

NURA contests certain aspects of the Commission's *Final Determination* in the

AD/CVD investigations on certain pea protein from China.  *See* Complaint, NURA USA, LLC v.

United States, Ct. No. 24-00182 (CIT Oct. 25, 2024) (ECF No. 19) ("Complaint"); *Final*

*Determination*, P.R. 126; *see also Certain Pea Protein From China,* Investigation Nos. 701-TA-

692 and 731-TA-1628 (Final), USITC Pub. 5529 (Aug. 2024), P.R. 130  ("Final Rep."); *Certain*

*Pea Protein From the People's Republic of China: Antidumping and Countervailing Duty*

*Orders*, 89 Fed. Reg. 68,390 (Dep't of Commerce Aug. 26, 2024) (the "*Orders*").  Specifically,

NURA challenges the Commission's factual findings and the legal conclusions on which the

Commission based its affirmative determination of critical circumstances.  *See* Complaint at 4-5.

### B.     Issues Presented and Summary of Arguments

**1.   Whether the Commission's affirmative determination with respect to critical circumstances is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.**

Yes.  As discussed below, only a two-member majority of the Commission ("Majority")

found that critical circumstances existed in the investigation into imports of certain pea protein

from China.  In reaching this determination, the Majority failed to make the statutorily required

factual findings to support its decision that imports subject to Commerce's critical circumstances

determination were likely to seriously undermine the remedial effect of Commerce's AD and

CVD orders.  In particular, the Majority failed to make the requisite finding whether imports

massively and rapidly increased after the AD/CVD petitions were filed, departing from its

mandate under the statute and relevant legislative history, as well as decades of prior agency

practice.  These failures render the Commission's determination contrary to law.

In addition, the Majority unreasonably ignored evidence of pricing patterns for subject

imports that indicated imports in the post-petition period were unlikely to seriously undermine

the remedial effects of the AD/CVD orders to be issued.  Finally, the Majority erred in finding

that the timing of the subject imports indicated such imports were likely to seriously

undermine the effects of the orders to be issued, because the Majority failed to consider record

evidence and to meaningfully address Plaintiff's  arguments that increased consumer demand

explained the timing for the increase in subject imports.  For these reasons, the Majority's

determination is unreasonable, unsupported by substantial evidence, and not otherwise in

accordance with law.

### C.    <u>Request for Court Order and Relief Sought</u>

Plaintiff respectfully requests that the Court hold that the Commission's affirmative

determination of critical circumstances is unreasonable, unsupported by substantial evidence,

and otherwise not in accordance with law.

Plaintiff further requests that the Court remand the *Final Determination* for disposition

in accordance with the Court's final opinion and grant such other relief as the Court may deem

just and proper.

### III.    <u>STATEMENT OF FACTS</u>

### A.    The Petition and the Commission's Preliminary Investigations and Injury Determination

On July 12, 2023, PURIS, a U.S. producer of pea protein, filed petitions alleging that the

U.S. industry for certain high protein content pea protein is being materially injured, or is

threatened with material injury, by reason of imports of certain pea protein from China that benefit from countervailable subsidies and are sold at less than fair value ("LTFV") in the United States.  Puris Protein Letter, "*Certain Pea Protein from China*," (July 12, 2023), P.R. 1.  The Commission instituted its preliminary investigations that same day.  *Certain Pea Protein From China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 45,924 (July 18, 2023).

The Commission reached affirmative preliminary determinations on August 28, 2023, and published these results in the *Federal Register* on September 1, 2023.  *Certain Pea Protein From China*, 88 Fed. Reg. 60,495 (Dep't of Commerce Sep. 1, 2023), P.R. 54.  The Commission determined that, on the basis of the record developed in the investigations, there was a reasonable indication that the domestic industry was materially injured by reason of subject imports.  *Id.*  The Commission therefore commenced the final phase of its investigations, with scheduling pending affirmative preliminary or final determinations in parallel CVD and LTFV investigations conducted by Commerce.  *Id.*

### B.    Commerce's Preliminary Affirmative CVD Determination and Affirmative Critical Circumstances Determination

Commerce initiated AD and CVD investigations on August 2, 2023.  *See Certain Pea Protein From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 88 Fed. Reg. 52,116 (Aug. 7, 2023); *Certain Pea Protein From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 88 Fed. Reg. 52,124 (Dep't of Commerce Aug. 7, 2023).

Commerce published its affirmative preliminary determination in the CVD investigation on December 18, 2023.  *Certain Pea Protein from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances*

4

*Determination, and Alignment of Final Determination with Final Antidumping Duty*

*Determination*, 88 Fed. Reg. 87,403 (Dep't of Commerce December 18, 2023) ("Commerce

CVD Preliminary Determination"), and accompanying Preliminary Decision Memorandum

("CVD PDM") at 5-8.  Commerce preliminarily determined that critical circumstances existed

for imports from all Chinese companies.  Commerce found that each of the Chinese respondent's

U.S. imports "increased by at least 15 percent from the base period to the comparison period"

and therefore were "massive." *Countervailing Duty Investigation of Pea Protein from China:*

*Critical Circumstances Analysis*, U.S. Dep't of Commerce (Dec. 11, 2023).  For all other

producers and/or exporters, Commerce analyzed publicly available import statistics, excluding

respondents' shipments, and also found that imports "increased by at least 15 percent" from the

base period (April 2023 to June 2023) to the comparison period (July 2023 to September 2023)

and were therefore "massive." *Id.* at 1-2, Attachment I.  Commerce thus determined that the

provisional CVD cash deposit requirement would apply retroactively to all subject imports

entered on or after September 19, 2023, *i.e.*, 90 days prior to December 18, 2023.  Commerce

CVD Preliminary Determination at 84,705.

Commerce published its preliminary determination in the AD investigation on February

13, 2024. *Certain Pea Protein From the People's Republic of China: Preliminary Affirmative*

*Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of*

*Critical Circumstances, Postponement of Final Determination, and Extension of Provisional*

*Measures*, 89 Fed. Reg. 10,038, 10,039 (Dep't of Commerce Feb. 13, 2024) ("Commerce AD

Preliminary Determination"),  and accompanying Preliminary Decision Memorandum ("AD

PDM") at 15-19.  Commerce preliminarily determined that critical circumstances existed for

imports from all Chinese producers/exporters eligible for a separate rate and for the China-wide

entity. *Less-Than-Fair-Value and Countervailing Duty Investigations of Certain Pea Protein*

*from the People's Republic of China: Analysis of Critical Circumstances*, U.S. Dep't of Commerce (Feb. 7, 2024). Commerce used publicly available import statistics for the period February 2023 through November 2023 to determine that "imports increased by at least 15 percent from the base period to the comparison period" and were therefore "massive." *Id.* at 1-2. Commerce preliminarily relied on adverse facts available ("AFA") for the China-wide entity to determine that subject imports were "massive." *Id.* at 1. Commerce thus determined that the provisional AD cash deposit requirement would apply retroactively to all subject imports entered on or after November 15, 2023, *i.e.*, 90 days prior to February 13, 2024. Commerce AD Preliminary Determination at 10,039.

      C.      **The Final Phase of the Commission's Investigations**

      The Commission commenced the final phase of its investigations on March 5, 2024. *Certain Pea Protein From China; Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 89 Fed. Reg. 15,895 (Dep't of Commerce Mar. 5, 2024), P.R. 80.

      The Commission held a hearing on June 25, 2024. NURA and other interested parties filed post-hearing briefs on July 2, 2024. In its Posthearing Brief and Responses to Commissioner Questions , NURA explained that the record did not support a finding of critical circumstances because there was no massive surge of subject imports post-petition that could seriously undermine the effectiveness of the orders. NURA Posthearing Brief, "Certain Pea Protein From China: Posthearing Brief and Responses to Commissioner Questions," dated July 2, 2024 ("NURA Posthearing Br. and Responses") at 14-15; *id.* at I, p. 2 (Responses to Commissioner Questions), P.R. 103, C.R. 198 ; s*ee Views of the Commission* ("*Views*") at 59-60, P.R. 123, C.R. 220. NURA argued that the volume of subject imports in the post-petition period compared to the pre-petition period is "well below" the amount that the Commission typically

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00182                                    NON-CONFIDENTIAL VERSION

finds to be "massive" and capable of "seriously undermin{ing}" the effectiveness of orders.
NURA Posthearing Br. and Responses at 14, P.R. 103, C.R. 198.

      NURA further explained that the increase in imports that was observed in the second half
of 2023 compared to the first half of 2023 owed to "temporary fluctuations in supply and demand
during the POI, rather than actions that might undermine the effectiveness of the
orders," as shown by record evidence of **[**

                          **]**.  *Id.*  NURA explained that demand for subject
imports increased in the second half of 2023 as **[**                       **]**, but
overall, total subject import volumes remained **[**         **]** import levels in 2022.  *Id.* at
14-15.  Therefore, NURA concluded, the increase in subject imports during the post-petition
period did not evidence a massive increase in imports that would undermine the remedial effect
of the orders.  *Id.* at 15.

      **D.**      **Commerce's Final AD/CVD Determinations and Affirmative Critical
              Circumstances Determination**

      Commerce issued its final determinations in the AD/CVD investigations on June 27,
2024, and published the AD/CVD *Orders* on July 5, 2024.  *See* Commerce CVD Final
Determination, P.R. 109, and accompanying Issues and Decisions Memorandum ("CVD IDM");
Commerce AD Final Determination, P.R. 110, and accompanying Issues and Decisions
Memorandum ("AD IDM").

      In the CVD investigation, Commerce made a final affirmative determination of critical
circumstances with respect to separate rate producers/exporters and "all other" producers/
exporters.  Commerce CVD Final Determination, P.R. 109; CVD IDM at 3-4.  Commerce
determined that each of the Chinese respondent's U.S. imports "increased by at least 15 percent
from the base period (January 2023 through June 2023) to the comparison period (July 2023

through December 2023)" and were therefore "massive." *Countervailing Duty Investigation of Certain Pea Protein from the People's Republic of China: Final Analysis of Critical Circumstances*, U.S. Dep't of Commerce (June 28, 2024) at 1-2. For all other producers and/or exporters, Commerce again analyzed publicly available import statistics, excluding respondents' shipments, and also found that imports "increased by at least 15 percent" from the base period to the comparison period. *Id.*. For all non-responsive companies, Commerce continued to rely on AFA to determine that such companies shipped "massive" quantities of imports during the relevant period. *Id.* at 2. In the AD investigation, Commerce also made a final affirmative determination of critical circumstances with respect to the separate rate companies and the China-wide entity. Commerce AD Final Determination, P.R. 110; AD IDM at 4-6. Commerce again relied on AFA for the China-wide entity to determine that imports were "massive." *Less-Than-Fair-Value Duty Investigation of Certain Pea Protein from the People's Republic of China: Analysis of Critical Circumstances for Final Determination*, U.S. Dep't of Commerce (June 27, 2024) at 1. Commerce conducted the same analysis as in the preliminary phase of the investigation for non-selected companies eligible for a separate rate, expanding the period of analysis from January 2023 to December 2023, and found that "imports increased by at least 15 percent from the base period to the comparison period" such that imports were "massive." *Id.* at 1-2.

> **E.    The Commission's Final Determination**

The Commission issued the *Final Determination* on August 21, 2024. *See Final Determination*. Three of the four participating Commissioners concluded that the domestic industry was materially injured by reason of subject imports of pea protein from China. *Id.* at 1; *Views* at 1, P.R. 123, C.R. 220. Pursuant to this determination, and because Commerce made final affirmative critical circumstances determinations, the Commission was also required to

BUSINESS PROPRIETARY
INFORMATION DELETED

determine whether critical circumstances exist such that subject imports are likely to undermine seriously the remedial effect of the AD/CVD orders to be issued. *Views* at 40-41, 63 n.260.

Two of the four participating Commissioners (*i.e.*, the Majority) made affirmative critical circumstances determinations with respect to subject imports. *Id.* at 3. Commissioner Schmidtlein made a negative determination with respect to critical circumstances. *Id.* at 3 n.2. Commissioner Johanson found that the domestic industry was only threatened with material injury by reason of subject imports, and therefore did not reach the issue of critical circumstances. *Id.* at 3 n.3.

The two-commissioner Majority explained in the *Views* that it compared the volume of subject imports in the five months prior to the July 12 filing of the petitions (February – June 2023) with the volume of imports in the five months after the filing of the petitions (July – November 2023). *Id.* at 60-61. The Majority found that subject import volumes increased by [      ] percent between the pre-petition and post-petition period and that this increase was "significant, particularly given how large the volume of subject imports was even before the post-petition increase in that volume, within the context of the overall U.S. market." *Id.* at 61. The Majority also stated that the "effect of this increase in post-petition volume was exacerbated by the already-dominant position of subject imports in the U.S. market." *Views* at 62. The Majority also found that the increase in imports led to an "increase in end-of-period inventories of subject merchandise between the pre- and post-petition periods." *Id.* at 65.

The Majority acknowledged that the "percentage increase in post-petition imports {was} less than in some other recent investigations" and that, although there was evidence of underselling, the "prices of subject imports did not markedly decrease in the post-petition period." *Id.* at 62-63, P.R. 123, C.R. 220. However, the Majority emphasized that the "increase {in subject imports} was from a very large base" and found that the timing of the subject

imports, which peaked in September 2023, was "instructive". *Id.* at 63-64. The Majority

concluded that these facts indicated that subject imports were "likely to undermine seriously the

effect" of the *Orders*. *Id.* at 65. The Majority therefore found that critical circumstances existed

with respect to the subject imports. *Id.* at 66.

       In her dissenting opinion, Commissioner Schmidtlein found that critical circumstances

did not exist with respect to the subject imports. Commissioner Schmidtlein found that neither

the increase in volume of subject imports nor the increase in inventory levels post-petition

demonstrated a "massive and rapid increase that would likely undermine the remedial effect of

the orders." *Dissenting Views of Commissioner Rhonda K. Schmidtlein Regarding Critical*

*Circumstances* ("*Dissenting Views*") at 5-6, C.R. 221. Commissioner Schmidtlein noted that the

increases in subject import volume and inventory levels in this case were less than the increases

in previous cases where the Commission has reached affirmative critical circumstances

determinations. *Id.* at 6 n.22. Commissioner Schmidtlein stated that the "statute and legislative

history make clear that the *magnitude* of the increases in both import volumes and inventories

are important to the Commission's analysis (e.g., 'massively increasing imports,' 'rapid increase

in inventories')", and found that the increases on the record "do not satisfy this standard." *Id.* at

6-7 (emphasis added). Finally, Commissioner Schmidtlein observed that, by the Majority's logic

described above, the Commission could find that critical circumstances exist even in cases where

there has been no increase in subject imports during the post-petition period, let alone a

"'massive' increase" as contemplated by the language of 19 U.S.C. §§ 1671d(b)(4) and

1673d(b)(4) and relevant legislative history. *Id.* at 7.

## IV.    <u>STANDARD OF REVIEW</u>

       In reviewing Commission determinations, the Court will hold unlawful any

determination, finding, or conclusion found "to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial

evidence is "more than a mere scintilla" and amounts to what a "reasonable mind might accept as

adequate to support a conclusion," *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d

1369, 1374 (Fed. Cir. 2015) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229

(1938)). To be supported by substantial evidence, the Commission's determination must take

into account "whatever in the record fairly detracts" from the weight of supportive evidence, *CS

Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016), including

"contradictory evidence or evidence from which conflicting inferences could be drawn", *Kaptan

Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318, 1325 (CIT 2024).

The Commission must "pu{t} forward a reasoned explanation by 'mak{ing} the necessary

findings and hav{ing} an adequate evidentiary basis for its findings.'" *CVB, Inc. v. United

States*, 675 F. Supp. 3d 1324, 1337 (CIT 2023), *appeal dismissed sub nom. In re United States*,

No. 2024-1504, 2024 WL 4814738 (Fed. Cir. Nov. 18, 2024) (quoting *In re NuVasive, Inc.*, 842

F.3d 1376, 1382 (Fed. Cir. 2016)). To meet this standard, the Commission must "examine the

relevant data and articulate a satisfactory explanation for its action," including "a 'rational

connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S.,

Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines,

Inc. v. United States*, 371 U.S. 156, 168 (1962)); *CS Wind Vietnam Co. v. United States*, 832

F.3d at 1376  (quoting *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d

1370, 1378 (Fed. Cir. 2013)). Specifically, pursuant to 19 U.S.C. § 1677f(i)(3)(A), the

Commission is required by law to provide in any final determination "an explanation of the basis

for its determination that addresses relevant arguments that are made by {parties to the

investigation} concerning volume, price effects, and impact on the industry of imports of the

subject merchandise." *See Kaptan*, 736 F. Supp. 3d at 1325 (citing *State Farm*, 463 U.S. 29

(1983).  The Commission's failure to do so renders its determination unlawful.

      The Court of Appeals for the Federal Circuit has explained that this standard of review

also encompasses the "arbitrary and capricious" standard established under the Administrative

Procedure Act ("APA").  *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701

F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.,*

*Inc.*, 419 U.S. 281, 284, (1974)).  "{A}n agency action is arbitrary when the agency offer{s}

insufficient reasons for treating similar situations differently."  *RHP Bearings Ltd. v. United*

*States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91

F.3d 232, 237 (D.C. Cir. 1996)).  Thus, the Commission must treat like situations similarly and

may not depart from a prior practice, unless "it provides a reasoned explanation for its change."

*Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1365 (CIT 2019) (citing

*Rust v. Sullivan*, 500 U.S. 173, 187 (1991); *State Farm*, 463 U.S. at 42).  A Commission

determination is also arbitrary when the agency fails to consider "an important aspect of the

problem."  *State Farm*, 463 U.S. at 43.

      Agency determinations that ignore relevant statutory or regulatory language, or interpret

that language contrary to its plain meaning, are not in accordance with law.  *See Zhejiang DunAn*

*Hetian Metal Co. v. United States*, 707 F. Supp. 2d 1355 (CIT 2010), *vacated on other grounds*,

652 F.3d 1333 (Fed. Cir. 2011).  In reviewing an agency's interpretation of a silent or ambiguous

statutory provision, "courts must exercise independent judgment" to identify the "best reading of

a statute."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024).  To do so, courts

should use all the "traditional tools of statutory construction," namely, the "statute's text,

structure, and legislative history, and apply {all} the relevant canons of interpretation."  *Bio-Lab,*

*Inc. v. United States*, No. 24-00024, 2025 WL 1099710, at *8 (CIT 2025) (quoting *Loper Bright*

*Enters.*, 603 U.S. at 394, *Delverde, SrL. v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000),

*as amended on denial of reh'g and reh'g en banc* (June 20, 2000)).  The question before the court

is "whether {the agency's} interpretation of the statute is aligned with the best reading, or the

reading the court would have reached if no agency were involved. . . . In determining the 'best

reading,' the court should defer to {the Commission} only to the extent contemplated by the

statute itself."  *Bio-Lab, Inc.* 2025 WL 1099710, at *9 (quoting *Loper Bright*, 603 U.S. at 400)

(internal quotations omitted).

## V.    **ARGUMENT**

### A.    **The Majority Failed to Follow the Statutory Directive to Determine Whether Imports Massively Increased in the Post-Petition Period**

The Majority's affirmative critical circumstances determination is unreasonable,

unsupported by substantial evidence, and otherwise not in accordance with law because the

Commission failed to make the requisite statutory finding that subject imports from China

massively increased in the post-petition period.

#### 1.    **The Commission Is Required to Determine Whether Imports Massively Increased in the Post-Petition Period**

Section 735 of the Tariff Act of 1930 ("the Act"), as amended by the Uruguay Round

Agreements Act ("URAA"), provides that, when Commerce makes an affirmative critical

circumstances determination in an AD and/or CVD investigation, the Commission must

determine whether imports subject to that determination are "likely to undermine seriously the

remedial effect of the {AD and/or CVD} order{s} to be issued."  19 U.S.C.

§§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i).  In making this determination, the Commission "shall

consider, among other factors it considers relevant":

(I)    the timing and the volume of the imports,

(II)    any rapid increase in inventories of the imports, and

13

(III)    any other circumstances indicating that the remedial effect of the {AD and/or CVD} order{s} will be seriously undermined.

19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).  The Commission must make specific findings on each of these relevant factors.  *See Tak Fat Trading Co. v. United States*, 185 F. Supp. 2d 1358, 1362 (CIT 2002) (quoting H.R. Rep. No. 96-317 (1979)) ("If critical circumstances have been alleged during the investigation, the final determinations of both {Commerce} and the {USITC} must contain findings as to whether the elements of critical circumstances have in fact been shown.").

While the statute makes clear that the Commission should consider a "rapid increase in inventories" as a circumstance indicating that imports are likely to seriously undermine the remedial effect of the orders to be issued (*i.e.*, to determine that critical circumstances exist), the statute is silent as to what findings regarding the timing and volume of imports should lead the Commission to determine that critical circumstances exist.  Given such silence, when reviewing the reasonableness of the Commission's determination, the Court must identify the best reading of the statute based on traditional tools of statutory construction, including the statute's text, structure, legislative history, and relevant interpretive canons.  *Bio-Lab, Inc.*, 2025 WL 1099710 at *8 (quoting *Loper Bright Enters.*, 603 U.S. at 394).

The Statement of Administrative Action accompanying the URAA – which is the authoritative interpretation of the statute – is instructive on this point.  It states that, when making a critical circumstances determination, the Commission's task is "to determine whether, by *massively increasing* imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order."  Statement of Administrative Action, Uruguay Round Trade Agreements Act of 1994, H.R. Rep. 316, 103rd Cong., 2d Sess., vol. 1 (hereinafter "SAA") at 877 (emphasis added).  The SAA further states that the Commission must "determine

14

whether the *surge* in imports prior to the suspension of liquidation . . . is likely to seriously

undermine the remedial effect of the order." *Id.* (emphasis added).  This means that when

considering "the timing and the volume" of the imports, the Commission must make a

determination as to whether imports have "massively increas{ed}" or "surge{d}" prior to the

suspension of liquidation for subject imports (*i.e.*, the date on which imports become subject to

provisional AD or CVD cash deposit rates).  *See Tak Fat Trading Co.*, 185 F. Supp. 2d at 1362

(quoting legislative history stating that the Commission must make findings on the elements

required for critical circumstances).

The Commission has long embraced the SAA's description of the task to which it was

assigned under the statute.  *See Sweet Harvest Foods v. United States*, 669 F. Supp. 3d 1346,

1355-56 (CIT 2023), *appeal docketed*, No. 24-1371 (Fed. Cir. Jan. 22, 2024) (noting that "the

SAA provides that the ITC is required to determine 'whether, by massively increasing imports

prior to the effective date of relief, the importers have seriously undermined the remedial effect

of the order'" and that "{t}he language quoted above from the SAA appears in nearly 100

Commission critical circumstances determinations"); *Biodiesel From Argentina And Indonesia*,

USITC Inv. No. 731-TA-1347-1348 (Final), USITC Pub. 4775 at 7 (Apr. 2018) (reaching a

negative critical circumstances determination because the Commission "d{id} not find that the

increased volumes . . . {were} massive or sufficiently large to undermine seriously the remedial

effect of the order"); *see also Paper Plates from China, Thailand, and Vietnam*, USITC Inv. Nos.

701-TA-704–705 and 731-TA-1664–1666 (Final), USITC Pub. 5595 at 43 (Mar. 2025) (finding

that there was a "surge" in imports during the post-petition period); *Small Vertical Shaft Engines*

*from China*, USITC Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 at 47, 51

(Apr. 2021) (finding that there was a "massive surge" in imports); *Coumarin from the People's*

*Republic of China*, USITC Inv. No. 731-TA-677 (Final), USITC Pub. 2852 (Feb. 1995) ("An

affirmative critical circumstances determination is therefore a finding that, absent retroactive application of the antidumping order, the surge of imports that occurred after the case was tiled, but prior to the suspension of liquidation, will prolong or cause a recurrence of material injury to the domestic industry."); *c.f. Crystalline Silicon Photovoltaic Cells and Modules From China*, USITC Inv. Nos. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 at 43-44 (Nov. 2012) (reaching a negative critical circumstances determination where the Commission "d{id} not find evidence of a massive surge in subject imports"); *Certain Magnesia Carbon Bricks From China and Mexico*, USITC Inv. Nos. 701-TA-468, 731-TA-1166-1167 (Final), USITC Pub. 4182 at 25 (Sept. 2010) (reaching a negative critical circumstances determination where the Commission found that the record showed "no massive increase in subject import volume subsequent to the petition's filing"); *Small Diameter Graphite Electrodes*, USITC Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 at 24 (Feb. 2009) (same).

Section 735, as codified, also does not define the criteria for finding that subject imports are likely to "undermine seriously" the remedial effect of AD/CVD orders. However, the Commission has interpreted "seriously undermine" as establishing a very high standard, and it has made negative critical circumstances determinations in the vast majority of cases. *See, e.g.*, *Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, USITC Inv. Nos. 701-TA-712–714 and 731-TA-1679–1681 (Final), USITC Pub. 5620 at 14 (May 2025) (finding that, despite an increase in post-petition imports, imports were "not likely to undermine seriously the remedial effects of the {CVD} order"); *id.* at 16 (finding that imports were not "of such a magnitude as to seriously undermine the remedial effect of the order"); *Quartz Surface Products from India and & Turkey*, USITC Inv. Nos. 701-TA-624-625, 731-TA-1450-1451 (Final), USITC Pub. 5061 at 39-40 (June 2020) (finding that increased imports were "not of such a magnitude that would undermine seriously the remedial effect of the {CVD} order"); *Common Alloy Aluminum Sheet*

*from China*, USITC Inv. Nos. 701-TA-591, 731-TA-1399 (Final), USITC Pub. 4861 at 36 (Jan. 2019) ("Although the volume of subject imports is higher in the post-initiation period, the increase is not of such a magnitude that leads us to conclude that those imports appear likely to undermine seriously the remedial effect of the {AD or CVD} duty order{s}."); *Biodiesel From Argentina And Indonesia*, USITC Inv. No. 731-TA-1347-1348 (Final), USITC Pub. 4775 at 7 (Apr. 2018) (concluding the increase in imports was insufficient to seriously undermine the remedial effect of the order); *see also Carbon and Certain Alloy Steel Wire Rod from China*, USITC Inv. Nos. 701-TA-512 and 731-TA-1248 (Final), USITC Pub. 4509 at 26 (Jan. 2015); *Welded Stainless Steel Pressure Pipe from Malaysia, Thailand, and Vietnam*, USITC Inv. No. 731-TA-1210-1212 (Final), USITC Pub. 4477 at 27-28 (July 2014); *Steel Wire Garment Hangers From Vietnam*, USITC Inv. Nos. 701-TA-487, 731-TA-1198 (Final), USITC Pub. 4371 at 6 n.21 (Jan. 2013) (concluding that the increased imports were "insufficient to undermine seriously the remedial effect of the {AD or CVD} orders"); *Certain Magnesia Carbon Bricks From China and Mexico*, USITC Inv. Nos. 701-TA-468, 731-TA-1166-1167 (Final), USITC Pub. 4182 at 25 (Sept. 2010); *Small Diameter Graphite Electrodes*, USITC Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 at 24 (Feb. 2009); *Certain Off-The-Road Tires from China*, USITC Inv Nos. 701-TA-448  and 731-TA-1117 (Final) USITC Pub. 4031 at 30 (Aug. 2008); *Circular Welded Carbon-Quality Steel Pipe from China,* USITC Inv. Nos. 701-TA-447  and 731-TA-1116 (Final), USITC Pub. 4019 at 24-25 (July 2008); *Certain Crepe Paper Products from China*, USITC Inv. No. 731-TA-1070A (Final), USITC Pub. 3749 at 16 (Jan. 2005).

### 2. The Majority Unreasonably Relied Upon Commerce's Findings Regarding the Post-Petition Increase in Subject Imports

In the *Views*, the Majority failed to determine whether subject imports during the post-petition period "massively increas{ed}" or "surge{d}".  The Majority merely described the

**NON-CONFIDENTIAL VERSION**

increase in subject imports as "significant . . . within the context of the overall U.S. market."
*Views* at 61, 63, P.R. 123, C.R. 220.  The Majority stated that it considered "the timing and the
volume of imports . . . both in absolute terms and relative to apparent U.S. consumption" and the
fact that the "increase was from a very large base", *Id.* at 63 & n.260, 64 (emphasis omitted),
P.R. 123, C.R. 220.  But the Majority made no factual finding that imports "massively
increas{ed}" or "surge{d}" in the post-petition period.  *Id.* at 57, 63, P.R. 123, C.R. 220.

      The Majority's failure to make the requisite factual finding about the post-petition
increase in subject imports is clear error, and renders the critical circumstances determination
unreasonable, unsupported by substantial evidence, and contrary to law.  When the record
evidence indicates that there has been a "massiv{e} increas{e}" or "surge" in imports, the
Commission says so, as required by statute.  *See, e.g.*, *Paper Plates from China, Thailand, and
Vietnam*, Inv. Nos. 701-TA-704–705 and 731-TA-1664–1666 (Final), USITC Pub. 5595 at 43
(Mar. 2025) (describing a "surge in subject imports {from China} in the post-petition period" as
evidence in support of its affirmative critical circumstances determination); *Small Vertical Shaft
Engines from China*, USITC Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185
at 47, 51 (Apr. 2021) (finding that a "massive surge of imports" supported an affirmative critical
circumstances determination); *Synthetic Indigo from China*, USITC Inv. No. 731-TA-851
(Final), USITC Pub. 3310 at 15 (June 2000) (citing evidence of a "massive increase in subject
imports" and concluding that "there was a subject import surge that {was} likely to seriously
undermine the effect of the {AD} order"); *Coumarin from the People's Republic of China*,
USITC Inv. No. 731-TA-677 (Final), USITC Pub. 2852 (Feb. 1995) (Separate Views of
Chairman Watson, Vice Chairman Nuzum, and Commissioner Bragg on Critical Circumstances)
("We find that there was a significant surge in LTFV imports immediately following the filing of
the petition.").

Here, without providing any explanation, the Majority appears to have adopted a new interpretation of the statute that it is not required to separately consider whether the imports with respect to which Commerce has made an affirmative critical circumstances determination have "massively increas{ed}" or "surge{d}". Specifically, the Commission stated:

> The statute makes clear that Commerce makes the determination of whether 'there have been massive imports of the subject merchandise over a relatively short period'. Conversely, the Commission, '{i}f the finding of {Commerce} under subsection {1671d(a)(2) or subsection 1673d(a)(3)} is affirmative,' is tasked with making a determination 'as to whether imports subject to {Commerce's affirmative critical circumstances determination} are likely to undermine seriously the remedial effect of the order.'

*Views* at 63 & n.260 (internal citations omitted). In other words, the Commission inexplicably adopted the new position that, when engaging in a critical circumstances analysis under 19 U.S.C. §§ 1671d(b)(4)(A) and 1673d(b)(4)(A), it can rely on Commerce's affirmative critical circumstances determination to fulfill the its own statutory obligation to determine whether a massive increase or surge in imports has occurred. The Majority's interpretation is contrary to the legislative history to Section 735 of the Act and therefore is not the best reading of the statute.

As explained above, the SAA states that the Commission is tasked with determining whether "by *massively increasing* imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order." SAA at 877. Despite what the Majority claims, the Commission cannot substitute Commerce's affirmative critical circumstances determination in place of its own finding because Commerce has a completely different statutory standard. Commerce must only find that there have been "massive imports of the subject merchandise over a relatively short period." 19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(B).

Finding that there were "massive imports" is plainly not the same as finding that there were "massively *increasing* imports" that could seriously undermine the remedial effect of an order.

Commerce's regulation on "massive imports" provides that it normally will examine: the volume and value of the subject imports; seasonal trends; and the share of domestic consumption accounted for by the imports. 19 C.F.R. § 351.206(h). The regulation provides further that unless imports have increased by at least 15 percent in the period beginning on the date the proceeding begins and ending at least three months later – *i.e.*, a three-month "post-petition" period – then Commerce will not consider the imports "massive." 19 C.F.R. § 351.206(h), (i). The comparative increase in imports from before and after the filing of the petition is not one of the relevant factors in Commerce's analysis, whereas it is the focus of the Commission's analysis.

That Commerce's analysis of "massive" imports is different from the Commission's analysis of "massively increasing" imports is further evidenced by the fact that the two agencies assess different time periods. As explained above, Commerce generally considers a three-month post-petition period. By contrast, the Commission evaluates a post-petition period that is often twice that length (*i.e.*, five or six months), and it compares that post-petition period to the pre-petition period. Final Rep. at 43, P.R. 130; SAA at 877 (instructing the Commission to consider imports "prior to the suspension of liquidation"); *see also Sweet Harvest Foods v. United States*, 669 F. Supp. 3d 1346 (CIT 2023) (discussing the Commission's selection of a six-month post-petition period).

A Commerce finding of "massive imports . . . over a relatively short period" is thus clearly inapposite to the Commission's determination of whether imports have "massively increas{ed}" in the Commission's specified post-petition period compared to the pre-petition period. Indeed, the difference in relevant considerations has previously led the Commission to

find that imports *declined* in the post-petition period compared to the pre-petition period

notwithstanding Commerce's finding of "massive imports" under its separate critical

circumstances analysis.[1] *See, e.g.*, *Truck and Bus Tires from Thailand*, USITC Inv. No. 731-TA-

1658 (Final), USITC Pub. 5562 at 39 (Dec. 2024); *Aluminum Lithographic Printing Plates from*

*China and Japan*, USITC Inv. Nos. 701-TA-694  and 731-TA-1641-1642 (Final), USITC Pub.

5559 at 55 (Nov. 2024).

For all these reasons, the Majority's position that it need not undertake its own analysis to

meet its burden of finding that subject imports have "massively increas{ed}" whenever

Commerce has found evidence of "massive imports" is contrary to law.  Even if the statute

permitted the Commission to rely on Commerce's finding of "massive imports," the Majority's

abrupt departure from its established practice of determining whether subject imports have

"surge{d}" or "massively increas{ed}" required a "reasoned explanation" that the Majority

failed to give.  *Jiaxing Brother Fastener Co.*, 380 F. Supp. 3d at 1365.  The Majority offered no

explanation for why, in this case, it adopted the position that it need not adhere to its statutory

mandate, as described in the SAA, despite its longstanding practice of following the SAA in

other cases involving findings of critical circumstances.

The Majority's failure to make the requisite factual finding that imports massively

increased in the post-petition period, and its failure to explain the abrupt departure from its prior

practice, thus renders the affirmative critical circumstances determination unreasonable,

unsupported by substantial evidence, and otherwise not in accordance with law.  The

---

[1] The Commission has also found that it is unable to rely on Commerce's determination of "massive imports" in
cases where Commerce's determination is made on the basis of AFA, as it was here with respect to the China-wide
entity in the AD investigation and certain non-responsive companies in the CVD investigation. *See, e.g.*, *Certain*
*Off-The-Road Tires from China*, USITC Inv Nos. 701-TA-448  and 731-TA-1117 (Final) USITC Pub. 4031 at 30
(Aug. 2008) (separately calculating increases in import volumes where Commerce did not calculate official monthly
import statistics and relied on AFA for its critical circumstances determination with respect to the China-wide
entity).

Consol. Court No. 24-00182                                    NON-CONFIDENTIAL VERSION

determination is plainly contrary to law where the Majority ignored the relevant statutory

language, as clarified in the legislative history, instructing the Commission to make a specific

finding about the magnitude of the increase in imports (*i.e.*, "massively increasing"). *See*

*Zhejiang DunAn Hetian Metal Co. v. United States*, 707 F. Supp. 2d at 1381-82. The Majority's

interpretation of the statute is not the best reading of the statute. *Loper Bright*, 603 U.S. at 394-

95. Furthermore, the determination is arbitrary, and therefore unreasonable, because the

Commission failed to "provid{e} a reasoned explanation for its change" from prior cases in

which it conducted a critical circumstances analysis, *Jiaxing Brother Fastener Co.*, 380 F. Supp.

3d at 1365, or to give sufficient reasons for "treating similar situations differently", *RHP*

*Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp.*

*v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).

### 3. The Record Evidence Does Not Show a Massive Increase in Subject Imports

The Majority's affirmative critical circumstances determination is also unreasonable and

unsupported by substantial evidence because the record evidence does not show a massive

increase in subject imports that would meet the high standard of imports capable of seriously

undermining the remedial effect of the *Orders*.

Comparing the five-month pre- and post-petition periods, the Commission calculated that

subject imports from China increased [        ] percent, rising from [            ] pounds in the

pre-petition period of February to June 2023 to [            ] pounds in the post-petition period

of July to November 2023. *Views* at 61, P.R. 123, C.R. 220. Using a six-month comparison –

the length of time that the Commission frequently uses for its critical circumstances analyses –

the increase in subject imports falls to [      ] percent. *Id.* at 59; NURA Posthearing Br. and

Responses at 38, P.R. 103, C.R. 198. Neither of these figures demonstrates a "surge" or

22

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00182                              NON-CONFIDENTIAL VERSION

"massiv{e} increas{e}" in subject imports capable of seriously undermining the effectiveness of

orders.

The statute and relevant legislative history do not define the level of increased imports

that constitutes a "surge" or "massiv{e} increas{e}" in imports, and the Commission has not

articulated standards in previous investigations.  In the absence of such guidance, the

Commission's determinations in previous investigations are instructive, and indicate that the

increase in this case does not rise to the level of a "surge" or "massiv{e} increas{e}".  As

Commissioner Schmidtlein noted in her dissent, the post-petition increase in subject imports in

this case is distinguishable from the [      ] larger increases in import volume calculated in

numerous other cases in which the Commission reached affirmative critical circumstances

determinations.  *Dissenting Views* at 5-7 n.22 (citing cases in which import volumes increased

between 78.5 and 300 percent during the post-petition period); *Synthetic Indigo from China*,

USITC Inv. No. 731-TA-851 (Final), USITC Pub. 3310 at 15 (June 2000) (noting that subject

imports "surged," increasing by "more than 300 percent" during the post-petition period);

*Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines, Poland, Slovenia,*

*and Taiwan,* USITC Inv. Nos. 731-TA-1629-1631, 1633, 1636-1638, and 1640 (Final), USITC

Pub. 5520 at 68 (June 2024) (hereinafter "*Mattresses*") (noting that subject imports from Burma

increased 101.6 percent).  As a result, Commissioner Schmidtlein found that regardless of

whether the five- or six-month post-petition period is used to calculate the increase in imports,

"neither . . . demonstrate{s} a massive and rapid increase that would likely undermine the

remedial effect of the orders." *Dissenting Views* at 5-6, C.R. 221.  Commissioner Schmidtlein

specifically noted the emphasis that the statute and legislative history place on the magnitude of

the increase in imports, and concluded that the record in this case "do{es} not satisfy" the

statutory requirement of "massively increasing imports."  *Id.* at 6.

BUSINESS PROPRIETARY
INFORMATION DELETED

The Majority acknowledged that "the percentage increase in post-petition imports is less than in some other recent investigations." *Views* at 62-63, P.R. 123, C.R. 220. Nevertheless, it offered two explanations for finding that critical circumstances exist. Neither is reasonable, supported by substantial evidence, and in accordance with law.

First, the Majority stated that the "effect of th{e} increase in post-petition volume {in this case} was exacerbated by the already-dominant position of subject imports in the U.S. market" and that the increase in imports occurred "from a very large base." *Id.* at 62-63, P.R. 123, C.R. 220. This explanation fails because it contradicts the statute. As explained above, the Commission's task is to evaluate whether subject imports have "massively increas{ed}" in the post-petition period, not whether the end-of-period import levels are high. Further, as Commissioner Schmidtlein explained in her dissent, "following the {M}ajority's logic, if subject imports start from a large base, there does not necessarily need to be an increase in import volume in the post-petition period at all, let alone a . . . 'massive' increase as contemplated by the statute and legislative history." *Dissenting Views* at 7, C.R. 221.[2] The Majority therefore cannot use this explanation to resolve the core problem that there is no record evidence of the requisite "surge" or "massive increas{e}" in subject imports needed to support its affirmative determination.

Second, the Majority stated that the much lower increase in imports in this case compared to other recent cases in which it made an affirmative critical circumstances determination was irrelevant because the increase in imports relative to the overall market was **[      ]** in this case

---

[2] The Majority addresses Commissioner Schmidtlein's dissent, stating that "contrary to the dissenting views, there necessarily must be an increase in imports (indeed there must be a Commerce finding of 'massive imports of the subject merchandise over a relatively short period') for the Commission to reach an affirmative critical circumstances determination." *Views* at 63 n.260. Again, this is incorrect. Section V.A.1. explains that the Commission must find that subject imports "surge{d}" or "massively increas{ed}", and that the criteria relevant to making this determination differ from the criteria upon which Commerce relies to determine whether there have been "massive imports."

BUSINESS PROPRIETARY
INFORMATION DELETED
Consol. Court No. 24-00182                                      NON-CONFIDENTIAL VERSION

than in those other cases.  *Views* at 44 & 62 n.257, P.R. 123, C.R. 220 (comparing the post-

petition increase in imports equivalent to [      ] percent of U.S. consumption in this case to the

post-petition increase in imports from Burma equivalent to only [      ] percent of U.S.

consumption in *Mattresses*).  However, the Majority once again misses the point.  As explained

above, the statute and legislative history plainly require evidence of a "surge" or "massiv{e}

increas{e}" of imports so as to undermine the remedial effect of the orders.  In *Mattresses*, the

Commission found that there was a "surge in subject imports from Burma."  *Mattresses* at 69.  In

this case, however, the Majority made no finding that a "surge" or "massiv{e} increas{e}" in

imports occurred nor identified any record evidence that would support such a conclusion.  This

Court should therefore reject the Majority's affirmative critical circumstances determination as

unreasonable, unsupported by substantial evidence and otherwise not in accordance with the law.

### B.     The Majority Did Not Find That Inventories of Subject Imports Rapidly Increased During the Post-Petition Period

The Majority's determination is unsupported by substantial evidence and otherwise not in

accordance with the law because the Majority did not make the statutorily required finding that

inventories of subject imports rapidly increased during the post-petition period, and there is no

evidence on the record of such a rapid increase.

Section 735 of the Act instructs the Commission to consider the "rapid increase in

inventories of the imports" in determining whether subject imports are "likely to undermine

seriously the remedial effect of the {AD/CVD} order{s} to be issued."  19 U.S.C.

§§ 1671d(b)(4)(A), 1673d(b)(4)(A).  As explained above, the Commission must make specific

findings on each of the elements of its critical circumstances analysis.  *See Tak Fat Trading Co.

v. United States*, 185 F. Supp. 2d 1358, 1362 (CIT 2002) (quoting H.R. Rep. No. 96-317 (1979))

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00182                                    NON-CONFIDENTIAL VERSION

(noting that the Commission's final determination "must contain findings as to whether the elements of critical circumstances have in fact been shown").

The Majority failed to find that inventories of subject imports "rapidly increased," and the record evidence does not demonstrate any rapid increase in inventories of subject imports from China during the post-petition period.  During the five-month post-petition period between July and November 2023, the Majority calculated that inventories of subject imports from China increased **[      ]** percent, rising from **[            ]** pounds to **[            ]** pounds.  *Views* at 63, P.R. 123, C.R. 220.  A **[                ]** increase in inventory levels over a five-month period hardly amounts to a "rapid increase" likely to seriously undermine the effect of the orders.  Indeed, the Majority never found that the increase in inventories constituted a "rapid increase", as required by the statute.  *Id.* at 63-66.  This is most likely because, as Commissioner Schmidtlein noted in her dissent, in other recent cases in which the Commission made an affirmative critical circumstances determination, the Commission identified increases in inventory levels that were 10 to 20 times higher.  *Dissenting Views* at 6-7 & n.22 (citing *Raw Honey from Argentina, Brazil, India, and Vietnam*, USITC Inv. Nos. 731-TA-1560-1562 and 1564 (Final) USITC Pub. 5327 at 47 (May 2022) (inventories increased by almost threefold in the post-petition period); *Honey from Argentina and China*, USITC Inv. Nos. 701-TA-402 and 731-TA-892-893 (Final), USITC Pub. 3470 at 24 (Nov. 2001) (inventories increased by 292 percent)).  The modest increase in this case stands in stark contrast to those cases and "do{es} not satisfy" the standard for finding that critical circumstances exist.  *Dissenting Views* at 6, C.R. 221.

The post-petition increase in import inventories is even lower if calculated over the Commission's typical six-month post-petition period, which captures the **[      ]** in inventories beginning in December 2023.  As NURA explained to the Commission, this

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00182                                    NON-CONFIDENTIAL VERSION

[          ] in U.S. importers' inventories of subject imports resulted in end-of-period inventories

that were only [                    ] than inventories as of June 30, 2023.  NURA Prehearing

Brief ("NURA Prehearing Br."). at 38, P.R., 95, C.R. 190; Certain Pea Protein from China—

Staff Report, USITC (July 16, 2024) ("Staff Rep.") at IV-14, Table IV-9, C.R. 205.  Further, the

[          ] in inventories resulted in "inventory levels at the end of 2023 {that} were [        ]

than each of the prior years of the POI."  *Dissenting Views* at 6, C.R. 221; *see* Staff Rep. at VII-

12, Table VII-9, C.R. 205.  [              ] than expected inventories are inconsistent with the idea that

importers "massively increas{ed} imports . . . to undermine the remedial effect of the orders."

SAA at 877.

     As Commissioner Schmidtlein explained, the unusually [        ] inventory levels "d{o}

not suggest that importers were stockpiling imports prior to the imposition of duties to be used to

undermine the orders."  *Dissenting Views* at 5-6, C.R. 221.  Indeed, the Commission has

previously declined to find that critical circumstances existed where there was "no meaningful

stockpiling of subject imports."  *See, e.g.*, *Paper Plates from China, Thailand, and Vietnam*,

USITC Inv. Nos. 701-TA-704–705 and 731-TA-1664–1666 (Final), USITC Pub. 5595 at 46-47

(Mar. 2025) (reaching negative critical circumstances determinations for subject imports from

Thailand and Vietnam); *Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, Inv. Nos. 701-TA-

712–714 and 731-TA-1679–1681 (Final), USITC Pub. 5620 at 13 (May 2025) (finding that,

"{a}lthough end-of-period inventories substantially increased in the post-petition period relative

to the pre-petition period, the inventory build-up {was} comparatively small", and therefore the

"data {did} not indicate a deleterious stockpiling of the relevant subject imports"); *see also*

*Melamine from India*, USITC Inv. Nos. 701-TA-707 and 731-TA-1668 (Final), USITC Pub.

5603 at 14 (Mar. 2025) (reaching a negative critical circumstances determination where there

was "no buildup of subject import inventories").

The Majority's failure to find that there was a "rapid increase" in subject imports in the post-petition period, combined with the absence of record evidence demonstrating rapidly increasing inventories, *Views* at 62-65, P.R. 123, C.R. 220, fairly detracts from its conclusion that critical circumstances existed.  The Majority was required to consider this evidence and to explain how it nevertheless determined that subject imports were likely to seriously undermine the remedial effect of the *Orders*.  *Views* at 63, P.R. 123, C.R. 220.  As a result, the Commission's determination is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.  *See State Farm,* 463 U.S. at 43.

### C.    The Majority Unlawfully Ignored Evidence Regarding Pricing Patterns of Subject Imports During the Post-Petition Period

The Commission's determination is unsupported by substantial evidence and is otherwise not in accordance with law because the Majority ignored pricing patterns that contradict its finding that subject imports were likely to seriously undermine the remedial effect of the orders.

Section 735 of the Act instructs the Commission to consider "any other circumstances indicating that the remedial effect of the . . . order will be seriously undermined."  19 U.S.C. §§ 1671d(b)(4)(A), 1673d(b)(4)(A).  The pricing of subject imports is highly relevant to the critical circumstances determination because a finding that importers decreased prices during the post-petition period could suggest that importers sought to increase imports into the United States prior to the imposition of the provisional AD/CVD orders, and that such imports are capable of seriously undermining the remedial effect of the orders.  Conversely, a finding that importers maintained or increased prices in the post-petition period would weigh against finding that importers sought to increase imports to circumvent the orders and would suggest that such imports are unlikely to seriously undermine the effect of the orders.

The Commission therefore normally considers pricing patterns as a relevant factor in its critical circumstances analysis, with respect to changes in both the price of subject imports and underselling margins. *See e.g.*, *Disposable Aluminum Containers, Pans, Trays, & Lids from China*, USITC Inv. Nos. 701-TA-727 and 731-TA-1695 (Final), USITC Pub. 5611 at 39-40 (Apr. 2025) (reaching a negative critical circumstances determination where pricing showed that "underselling was largely comparable or less" in the post-petition period compared to the pre-petition period); *Melamine from India*, USITC Inv. Nos. 701-TA-707 and 731-TA-1668 (Final), USITC Pub. 5603 at 16 (Mar. 2025) (consulting pricing data and finding that increases in prices of subject imports "do not indicate that subject import pricing was seriously undermining the remedial effects of the order"); *Gas Powered Pressure Washers from Vietnam*, USITC Inv. Nos. 731-TA-1598 (Final), USITC Pub. 5465 at 48 (Oct. 1, 2023) (analyzing pricing data and concluding that "available pricing data d{id} not indicate a 'rush' to beat the deposit requirement'"); *c.f. Paper Plates from China, Thailand, and Vietnam*, Inv. Nos. 701-TA-704–705 and 731-TA-1664–1666 (Final), USITC Pub. 5595 at 44 (Mar. 2025) (noting that "pricing data show{ed} that underselling of the domestic like product by subject imports {from China} intensified" during the post-petition period and that average unit values decreased).

Here, contrary to the statute and the Commission's prior practice, the Majority ignored evidence about the pricing of subject imports that weighed against a finding that the imports were likely to seriously undermine the effectiveness of the orders. In the *Views*, the Majority described the record as showing that "prices of subject imports did not markedly decrease in the post-petition period". *Views* at 63, P.R. 123, C.R. 220. However, the Majority failed to consider more detailed evidence indicating that prices for many pricing products in fact *increased* during the post-petition period. *Id.* at 63-64; Staff Rep. at V-7 to V-23, Tables V-4 to V-11, C.R. 205. Additionally, the Majority does not appear to have considered record evidence showing that

BUSINESS PROPRIETARY
INFORMATION DELETED

**Consol. Court No. 24-00182**                                    **NON-CONFIDENTIAL VERSION**

underselling margins remained constant, and in some cases *decreased* during the post-petition period. *Views* at 63-64, P.R. 123, C.R. 220; Staff Rep. at V-7 to V-13, Tables V-4 to V-7, C.R. 205. The Majority merely observed that subject imports "undersold the domestic like product at large margins of underselling *throughout the POI*," *i.e.*, January 21 to December 2023 (emphasis added). *Views* at 63-64, P.R. 123, C.R. 220. This evidence is irrelevant to the assessment of the likely effects of imports during the post-petition period. Moreover, the Majority implicitly acknowledged that underselling margins did not increase in the post-petition period. *See Views* at 63-64, P.R. 123, C.R. 220 (stating that "larger margins of underselling were not required to effect the significant increase in the volume of imports involved in the post-petition period"). And while it stated that this evidence was "not remarkable", it did not explain why this was so. *Id.*, P.R. 123, C.R. 220. The Majority's failure to take into account evidence of pricing patterns that "fairly detracts" from its critical circumstances determination was unlawful. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).

        Had the Commission properly considered pricing data during the post-petition period, it would have found that pricing patterns weighed against finding that imports were likely to seriously undermine the effect of the AD/CVD orders. As Commissioner Schmidtlein explained in her dissent, "many pricing products actually show an [          ] in the price of subject imports in the last quarter of 2023." *Dissenting Views* at 6, C.R. 221; Staff Rep. at V-7 to V-23, Tables V-4 to V-11, C.R. 205. In fact, subject imports in all four pricing products experienced an increase in the weighted average free on board ("f.o.b.") price and/or a decrease in the underselling margin in the third and fourth quarters of 2023, which overlap with the post-petition period. Staff Rep. at V-7 to V-13, Tables V-4 to V-7, C.R. 205. Specifically, the underselling margin for Product 1 [          ] from a high of [          ] percent as of the fourth quarter of 2022 to [          ] percent as of the fourth quarter of 2023. *Id.* at V-7, Table V-4. The weighted average

30

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00182                                    NON-CONFIDENTIAL VERSION

f.o.b. price of Product 2 [          ] from [          ] as of the second quarter of 2023 to [          ] in

the fourth quarter of 2023, causing the underselling margin to [          ] from [          ] percent to

[          ] percent over the corresponding periods. *Id.* at V-9, Table V-5.  For Product 3, the

weighted-average f.o.b. price [                    ] in the post-petition period, rising from [          ]

in the second quarter of 2023 to [          ] in the third quarter of 2023.  *Id.* at V-11, Table V-6.  For

Product 4, the weighted-average f.o.b. price [               ] from [          ] as of the end of the pre-

petition period, rising to [          ] in the third quarter of 2023 before settling at [          ] in the

fourth quarter of 2023.  *Id.* at V-13, Table V-7.  These [               ] resulted in a substantial [

] in the underselling margin for Product 4 during the post-petition period, falling from

[          ] percent in the second quarter of 2023 to [          ] percent in the third quarter of 2023 and

ending at [          ] percent in the fourth quarter of 2023.  *Id.*.

        These figures demonstrate that importers did not "intensif{y}" the underselling of subject

imports, as the Commission has found in other cases where it made affirmative critical

circumstances determinations, but rather that importers' "underselling was largely comparable or

less" in the post-petition period compared to the pre-petition period, which the Commission has

previously found to support negative critical circumstances determinations. *Compare Paper

Plates from China, Thailand, and Vietnam*, USITC Inv. Nos. 701-TA-704–705, 731-TA-1664–

1666 (Final), USITC Pub. 5595 at 44 (Mar. 2025)  *with Disposable Aluminum Containers, Pans,

Trays, and Lids from China*, Inv. Nos. 701-TA-727 and 731-TA-1695 (Final), USITC Pub. 5611

at 39-40 (Apr. 2025).

        The Majority unlawfully failed to consider this evidence showing that subject imports

were not likely to undermine the remedial effect of the orders.  In doing so, the Majority failed to

take into account "whatever fairly detracts" from the weight of supportive evidence, thereby

depriving its determination of substantial evidentiary support. *CS Wind Viet.*, 832 F.3d at 1373.

31

The Majority also failed to follow the statute in considering "any other circumstances indicating that the remedial effect of the . . . order will be seriously undermined", 19 U.S.C. §§ 1671d(b)(4)(A), 1673d(b)(4)(A), and to explain its reasoning for "treating similar situations differently" given that it has considered similar evidence in similar cases and concluded that such evidence supports a negative critical circumstances determination, *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).

> **D.    The Majority Erred in Concluding That the Timing of Subject Imports Indicated That They Were Likely to Seriously Undermine the Remedial Effect of the *Orders***

In addition to the errors discussed above, the Majority also erred in concluding that the timing of the subject imports indicated that they were likely to seriously undermine the remedial effect of the *Orders*.  For this reason as well, the Majority's affirmative critical circumstances determination is unsupported by substantial evidence and not otherwise in accordance with law.

Section 735 of the Act instructs the Commission to consider, *inter alia*, "the timing and the volume of the imports" and "any other circumstances indicating that the remedial effect of the . . . order will be seriously undermined."  19 U.S.C. §§ 1671d(b)(4)(A), 1673d(b)(4)(A).

The *Views* make clear that the Majority afforded great weight to the timing of the subject imports during the post-petition period in reaching its decision that such imports threatened the remedial effect of the *Orders*.  The Majority described the "timing of the increase in subject imports" as "instructive" and noted that imports in the months of August, September, and November of 2023 were higher than in any month in the pre-petition period.  *Views* at 64, P.R. 123, C.R. 220.  Further, the Majority observed that subject imports were higher in September 2023 than in any other month of 2023, which the Majority surmised was the result of orders being placed "immediately following the filing of the petitions in July" given average lead times.

*Id.* at 64-65, P.R. 123, C.R. 220. Based on these findings, the Majority concluded that the timing of the subject imports indicated that such imports were likely to seriously undermine the remedial effects of the order. *Views* at 63 n.260, P.R. 123, C.R. 220.

The record evidence contradicts the Majority's conclusion. While the Majority accurately observed that import volumes in August, September, and November of 2023 were higher than in any month of the pre-petition period, Staff Rep. at IV-13, Table IV-8, C.R. 205, its conclusion that the higher import volumes in those months necessarily indicated that such imports would seriously undermine the remedial effect of the *Orders* was erroneous. This error resulted from the Majority's failure to consider, as required by statute, "any other circumstances" that would or would not indicate that subject imports were likely to seriously undermine the remedial effect of the *Orders*, including pricing patterns and demand trends. 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

### 1. The Majority Failed to Consider Evidence Showing That a Large Portion of Imports During Its Period of Focus Sold at Higher Prices and Lower Underselling Margins Than During the Pre-Petition Period

The record evidence shows that in the third quarter of 2023 – *i.e.*, the period of increased imports that the Majority identified as "instructive" – high import volumes corresponded with higher than usual prices and lower than usual underselling margins for two of four pricing products. Specifically, for Product 3, the weighted-average f.o.b. price in the third quarter of 2023 was the highest of any quarter during the POI. Staff Rep. at V-11, Table V-6, C.R. 205. Further, the underselling margin in the third quarter of 2023 was lower than in 9 out of 10 quarters of the pre-petition POI (*i.e.*, the first quarter of 2021 through the second quarter of 2023). *Id.* For Product 4, in the third quarter of 2023, the weighted-average f.o.b. price was the highest and the underselling margin was the lowest of any point in 2023. *Id.* at V-13, Table V-7.

Consol. Court No. 24-00182                    NON-CONFIDENTIAL VERSION

In fact, the underselling margin for Product 4 in the third quarter of 2023 was more than 23

percentage points lower than the underselling margin at the end of the pre-petition period.  *Id.* at

V-13, Table V-7.  Together, Products 3 and 4 accounted for nearly 40 percent of the volume of

subject imports during the third quarter of 2023.  *Derived from id.* at V-7 to V-13, Tables V-4 to

V-7.  This means that nearly 40 percent of the subject imports that entered the U.S. during the

period that the Majority considered "instructive" for reaching an affirmative critical

circumstances determination were priced higher and were undersold at lower margins than during

the pre-petition period.  These facts do not suggest that importers sought to flood the

United States market with subject imports to circumvent the intent of the Orders.

    To the extent that the Commission's focus on the peak in import volumes during

September 2023 primarily relates to imports of Product 2, Plaintiff notes that the volume of

Product 2 imports during the third quarter of 2023 increased by **[**

    **]** compared to the first quarter of 2023 and, in any event, remained below Product 2

import volumes during 6 out of 10 quarters of the POI.  *Id.* at V-9, Table V-5.  It defies logic to

conclude that shipment volumes of Product 2 subject imports during the third quarter of 2023

provide "instructive" evidence of importers' intent to circumvent the effect of the Orders when

such volumes were roughly equivalent to shipment volumes during the first quarter of 2023 (*i.e.*,

prior to the filing of the Petition).

    This detailed evidence regarding subject imports shipped during the specific period that

the Majority identified as "instructive" "fairly detracts" from other evidence supporting an

affirmative critical circumstances determination, *CS Wind Viet.*, 832 F.3d at 1373.  The

Majority's failure to take it into account renders its determination unsupported by substantial

evidence and not otherwise in accordance with law.

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00182                                    NON-CONFIDENTIAL VERSION

### 2. The Majority Disregarded Record Evidence and Plaintiff's Arguments Regarding Increased Demand

The Majority disregarded evidence and Plaintiff's argument that the increase in imports during the third quarter of 2023 was likely caused by the increased consumer demand for subject imports that arose in the second half of 2023 compared to the first half of 2023. As NURA explained to the Commission in its Posthearing Brief, consumer demand for subject imports and the domestic like product was weaker in the first half of 2023 compared to the second half of 2023 because [

]. NURA

Posthearing Br. and Responses at 3 & nn.11-12, P.R. 103, C.R. 198. The increase in imports responded to the increase in demand in the second half of 2023. Even then, the record evidence shows that the total import volume of subject imports in the third quarter of 2023 was only slightly more than [                          ] of the total volume of subject imports from the first quarter of 2022. *Derived from* Staff Rep. at V-7 to V-13, Tables V-4 to V-7, C.R. 205. The increase in overall shipments of subject imports in the third quarter of 2023 – a large portion of which were at higher than usual prices – therefore reflects the recovery in consumer demand for subject imports, not any effort by importers to "massively increas{e}" imports prior to the imposition of the remedial measures. NURA Posthearing Br. and Responses at 14, P.R. 103, C.R. 198 ("The relative increase in subject imports in 2H 2023 compared to 1H 2023 was due to temporary fluctuations in supply and demand during the POI, rather than actions that might undermine the effectiveness of the orders."). The Majority's analysis unreasonably ignored both Plaintiff's argument and the supporting record evidence when determining that the timing of

subject imports during the post-petition period indicated imports were likely to seriously

undermine the *Orders*.

In sum, the Majority's failure to consider the full scope of the record evidence pertaining

to subject imports during its period of focus – September 2023, or the third quarter of 2023 –

renders its assessment of the "timing" of subject imports unsupported by substantial evidence.

For the reasons stated above, the Majority incorrectly concluded that, because there was a peak

in subject imports during September 2023, post-petition imports necessarily were likely to

circumvent the intent of the *Orders*.  In doing so, the Commission unreasonably disregarded

contrary record evidence that a large portion of imports during this period were sold at higher

than usual prices and at lower underselling margins and were therefore unlikely to undermine the

remedial effect of the *Orders*.   The Majority also disregarded the evidence that the increased

subject import volumes in the third quarter or 2023 nevertheless remained far below subject

import volumes at earlier times in the POI (*e.g.*, the first quarter of 2022).  The Majority ignored

that the shipment volume of Product 2 subject imports, which primarily caused the peak in

September 2023, was nearly the same as the shipment volume of such imports in the first quarter

of 2023, prior to the Petition and initiation of the relevant investigations. Staff Rep. at V-9, Table

V-5.  Finally, the Majority entirely failed to address Plaintiff's argument that the increase in

subject imports was due to the recovery of demand during the second half of 2023.

The Majority was required to consider this record evidence of "any other circumstances"

that would indicate whether or not the remedial effect of the *Orders* was likely to be seriously

undermined by subject imports.  19 U.S.C. §§ 1671d(b)(4)(A), 1673d(b)(4)(A).  The failure to

consider this evidence deprives the Majority's findings on the timing of subject imports of an

"adequate evidentiary basis", *CVB, Inc. v. United States*, 675 F. Supp. 3d 1324, 1337 (CIT

2023), and shows that the Majority arbitrarily failed to consider "an important aspect of the

problem", *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Majority was required to take the evidence into account, *CS Wind Viet.*, 832 F.3d at 1373, and if it nevertheless concluded that the "timing" of the imports supported an affirmative critical circumstances determination, the Majority needed to "articulate a satisfactory explanation" for doing so.  *State Farm*, 463 U.S. at 43.  The Majority did neither.  As a result, its critical circumstances determination is unsupported by substantial evidence and otherwise not in accordance with law.

## VI.    **CONCLUSION**

NURA respectfully requests that this Court find that the Commission's determination is unsupported by substantial evidence and is otherwise not in accordance with law, and that the Court remand the *Final Determination* to the Commission for disposition in accordance with the Court's opinion.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for NURA USA, LLC*

Dated: May 27, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that this Memorandum in Support of NURA's Rule 56.2 Motion for Judgment on the Agency Record complies with the word limitation requirement. The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 11,582 words and therefore does not exceed 14,000 words.

<u>/s/ Stephanie E. Hartmann</u>
(Signature of Attorney)

<u>Stephanie E. Hartmann</u>
(Name of Attorney)

<u>NURA, USA, LLC</u>
(Representative Of)

<u>May 27, 2025</u>
(Date)