*NONCONFIDENTIAL VERSION*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE LISA W. WANG

Court No. 24-00182

**NURA USA, LLC,**

*Plaintiff,*

and

**JIANYUAN INTERNATIONAL CO., LTD. SHANDONG YUWANG ECOLOGICAL FOODINDUSTRY CO., LTD., LINYI YUWANG VEGETABLE PROTEIN CO., LTD., YANTAI ORIENTAL PROTEIN TECH CO., LTD., JIUJIANG TIANTAI FOOD CO., LTD.,**

*Consolidated Plaintiffs,*

v.

**UNITED STATES,**

*Defendant,*

and

**PURIS PROTEINS, LLC,**

*Defendant-Intervenors.*

## DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

SPENCER TOUBIA
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2906
Facsimile: (202) 205-3111
spencer.toubia@usitc.gov

MARGARET D. MACDONALD
General Counsel
Telephone:  (202) 205-25651

KARL VON SCHRILTZ
Assistant General Counsel for Litigation
Telephone: (202) 205-3096
karl.vonschriltz@usitc.gov

DATED:  September 24, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iv

I.  STATEMENT PURSUANT TO RULE 56.2.................................................1

    A.  Administrative Determination Sought to be Reviewed ......................1

    B.  Questions Presented and Summary of Argument.............................2

        1.  Was the Commission's Selection of Five-Month
            Comparison Periods Reasonable?.................................................2

        2.  Was the Commission's Analysis of the Timing and Volume
            of Imports Supported by Substantial Evidence and in
            Accordance with Law? .................................................................2

        3.  Was the Commission Required to Find "Any Rapid
            Increase in Inventories" as a Matter of Law? ...............................7

        4.  Were the Commission's Findings Concerning "Other
            Factors," Including the Pricing and Impact of Subject
            Imports, Reasonable and in Accordance with Law?....................8

II.  STATEMENT OF FACTS..........................................................................9

    A.  Procedural Background ....................................................................9

    B.  Commerce's Final Critical Circumstances Determinations ............10

    C.  The Commission's Determinations .................................................11

        1.  The Commission's Affirmative Material Injury
            Determinations ...........................................................................11

        2.  The Commission's Affirmative Critical Circumstances
            Determinations ...........................................................................13

             a.  The Commission used five-month comparison
                periods...........................................................................14

             b.  The Commission considerd the "timing and
                volume" of imports. .......................................................14

             c.  The Commission considered "any rapid increase in
                 inventories" of relevant subject imports. .......................16

              d.  The Commission considered "other relevant
                 factors.".........................................................................16

<u>**TABLE OF CONTENTS (cont'd)**</u>

       e.     The Commission concluded that relevant imports were likely to undermine seriously the remedial effect of the orders. ..........................................................17

**III.**    **STANDARD OF REVIEW** ...........................................................**17**

**IV.**    **ARGUMENT** ...........................................................................**19**

    **A.**    **Legal Standard for Critical Circumstances** ..........................**19**

    **B.**    **The Commission's Critical Circumstances Determinations Are Supported by Substantial Evidence and in Accordance with Law** ...........................................................................**21**

        1.    The Commission Reasonably Selected Five-Month Data Comparison Periods. ................................................21

        2.    The Commission's Findings Regarding the Timing and the Volume of Imports Are Supported by Substantial Evidence and Otherwise in Accordance with Law. ....................25

            a.     The increase in post-petition imports was "significant" and the timing of such imports was "instructive." ..................................................25

            b.     The statute does not require the Commission to determine whether subject imports "massively increased." ..................................................33

        3.    The Commission's findings regarding inventories are supported by substantial evidence and otherwise in accordance with law ..........................................39

        4.    The Commission's findings regarding "other relevant" factors are supported by substantial evidence and in accordance with law ..........................................42

            a.     The Commission reasonably considered subject import pricing in the post-petition period. ....................42

            b.     The Commission reasonably considered the impact of subject imports during the POI..................................46

**V.**    **CONCLUSION** ....................................................................**48**

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Altx. Inc. v. United States*,
   370 F.3d 1108 (Fed. Cir. 2004)...................................................................7, 41

*Chemours Co. FC, LLC v. United States*,
   492 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ...........................................17

*Cleo Inc. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007)...............................................................4, 26

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)...............................................................5, 17, 18, 32, 33

*Gonzales v. West*,
   218 F.3d 1378 (Fed. Cir. 2000)...................................................................43

*Goss Graphics Sys., Inc. v. United States*,
   22 CIT 983, 33 F. Supp. 2d 1082 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir.
   2000) ..........................................................................................................18

*Grupo Industrial Camesa v. United States*,
   85 F.3d 1577 (Fed. Cir. 1996)...............................................................32, 33

*ICC Indus., Inc. v. United States*,
   812 F.2d 694 (Fed. Cir. 1987)...........................................................19, 32, 42

*JMC Steel Grp. v. United States*,
   70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) .........................................18, 19, 24

*Metallverken Nederland B.V. v. United States*,
   13 CIT 1013, 728 F. Supp. 730 (1989).......................................................33

*MTD Prods., Inc. v. United States*,
   Slip Op. 23-24, 2023 WL 2535885 (Ct. Int'l Trade Mar. 16, 2023) ............................ *passim*

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006).....................................................................18

*Nucor Corp. v. United States*,
   28 CIT 188, 318 F. Supp. 2d 1207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir.
   2005) ..........................................................................................................18

*Nucor Corp. v. United States*,
   414 F.3d 1331 (Fed. Cir. 2005).............................................................7, 18, 41

## **TABLE OF AUTHORITIES (cont'd)**

**Cases (cont'd)**                                                                                    **Page(s)**

*Rhone Poulenc, S.A. v. United States,*
    8 CIT 47, 592 F. Supp. 1318 (1984) ........................................................................43

*Shandong TTCA Biochem. Co., Ltd. v. United States,*
    35 CIT 545, 774 F. Supp. 2d 1317 (2011) ................................................................19

*Siemens Energy, Inc. v. United States,*
    806 F.3d 1367 (Fed. Cir. 2015) .........................................................................5, 32

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
    17 CIT 146, 818 F. Supp. 348 (1993) .......................................................................43

*Sweet Harvest Foods v. United States,*
    669 F. Supp. 3d 1346 (Ct. Int'l Trade 2023) ...............................................31, 38, 45

*Timken U.S. Corp. v. United States,*
    421 F.3d 1350 (Fed. Cir. 2005) ...............................................................................18

*U.S. Steel Grp. v. United States,*
    96 F.3d 1352 (Fed. Cir. 1996) ................................................................................18

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ...........................................................................................17, 18

*USEC Inc. v. United States,*
    34 F. App'x 725 (Fed. Cir. 2002) ...........................................................................18

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................17

19 U.S.C. § 1671b(d)(2)(B) ...........................................................................................19

19 U.S.C. § 1671b(e) ......................................................................................................10, 19

19 U.S.C. § 1671d(a)(2) ..................................................................................................10, 20

19 U.S.C. § 1671d(a)(2)(B) .................................................................6, 10, 33, 36, 38, 39

19 U.S.C. § 1671d(b)(4)(A) .....................................................................................6, 10

19 U.S.C. § 1671d(b)(4)(A)(i) ............................................................................. *passim*

19 U.S.C. § 1671d(b)(4)(A)(ii) ............................................................................ *passim*

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Statutes (cont'd)**                                                                 **Page(s)**

19 U.S.C. § 1673b(d)(2)(B) ..............................................................................19

19 U.S.C. § 1673b(e) ................................................................................10, 19

19 U.S.C. § 1673d(a)(3) .......................................................................10, 19, 20

19 U.S.C. § 1673d(a)(3)(A) ...........................................................................39

19 U.S.C. § 1673d(a)(3)(B) .........................................................10, 33, 36, 38

19 U.S.C. § 1673d(b)(4)(A) .........................................................................6, 10

19 U.S.C. § 1673d(b)(4)(A)(i) .................................................................. *passim*

19 U.S.C. § 1673d(b)(4)(A)(ii) ................................................................. *passim*

19 U.S.C. § 1675(c) ...........................................................................................2

28 U.S.C. § 2639(a)(1) ....................................................................................17

Tariff Act of 1930 .............................................................................................2

Uruguay Round Agreements Act,
   Pub. Law 103-465, 108 Stat. 4809 (Dec. 8, 1994) ......................2, 35, 36

**Regulatory Materials**

19 C.F.R. § 351.206(h) ........................................................................6, 10, 36

19 C.F.R. § 351.206(i) ............................................................................6, 10

**USITC Investigations**

*Aluminum Lithographic Printing Plates from China and Japan*; Inv. No.
   701-TA-694 and 731-TA-1641-1642 (Final),
   USITC Pub. 5559 (Nov. 2024) ................................................22, 23, 31

*Carbon and Alloy Steel Cut-to-Length Plate from Brazil, South, Africa, and
   Turkey*,
   Inv. Nos. 701- TA-560-561 and 731-TA-1317-1328 (Final),
   USITC Pub. 4664 (Jan. 2017) ...........................................22, 23, 24, 31

*Carbon and Certain Alloy Steel Wire Rod from China*,
   Inv. Nos. 701-TA-512 and 731-TA-1248 (Final),
   USITC Pub. 4509 (Jan. 2015)...................................................21, 25

## TABLE OF AUTHORITIES (cont'd)

**USITC Investigations (cont'd)**                                                                          **Page(s)**

*Certain Amorphous Silica Fabric from China*,
    Inv. Nos. 701-TA-555 and 731-TA-1310 (Final),
    USITC Pub. 4672 (Mar. 2017) ...............................................................................41

*Coumarin from China*,
    Inv. No. 731-TA-677 (Final),
    USITC Pub. 2852 (Feb. 1995) ................................................................................37

*Freight Rail Couplers and Parts Thereof from China and Mexico*,
    Inv. No. 701-TA-682 and 731-TA-1592-1593 (Final),
    USITC Pub. 5438 (July 2023) .....................................................................22, 23, 31

*Gas Powered Pressure Washers from China and Vietnam*; Inv. No.
    701-TA-684 and 731-TA-1597-1598 (Final),
    USITC Pub. 5465 (Oct. 2023) ...................................................................22, 23, 31

*Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the
    Netherlands, Turkey, and the United Kingdom*,
    Inv. No. 701-TA-545-547 and 731-TA-1291-1297 (Final),
    USITC Pub. 4638 (Sep. 2016) .................................................................................22

*Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines,
    Poland, Slovenia, and Taiwan*,
    Inv. Nos. 731-TA-1629-1631, 1633, 1636-1638, and 1640 (Final),
    USITC Pub. 5520 (June 2024).........................................................7, 15, 28, 31, 41

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*,
    Inv. No. 701-TA-671-672 and 731-TA-1571-1573 (Final),
    USITC Pub. 5381 (Nov. 2022) ..........................................................................22, 23

*Paper Plates from China, Thailand, and Vietnam*,
    Inv. Nos. 701-TA-704-705 and 731-TA-1664-1666 (Final),
    USITC Pub. 5595 (Mar. 2025) ...........................................................22, 23, 31, 37

*Pentafluoroethane (R-125) from China*,
    Inv. No. 701-TA-662 and 731-TA-1554 (Final),
    USITC Pub. 5281 (Feb. 2022) ................................................................................24

*Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the
    Netherlands, Saudi Arabia, Taiwan, Turkey, & the United Arab Emirates*,
    Inv. Nos. 701-TA-646 and 731-TA-1502-1504, 1508-1509, 1512, 1514, and
    1516 (Final),
    USITC Pub. 5153 (Jan. 2021)................................................................................24

## TABLE OF AUTHORITIES (cont'd)

**USITC Investigations (cont'd)**                                                    **Page(s)**

*Quartz Surface Products from China*,
    Inv. No. 701-TA-606 (Final),
    USITC Pub. 4913 (June 2019)......................................................................24

*Raw Honey from Argentina, Brazil, India, and Vietnam*,
    Inv Nos. 731-TA-1560-1562 and 1564 (Final),
    USITC Pub. 5327 (May 2022).............................................................31, 38

*Small Vertical Shaft Engines from China*,
    Inv. Nos. 701-TA-643 and 731-TA-1493 (Final),
    USITC Pub. 5185 (Apr. 2021) ...................................................................37

*Synthetic Indigo from China*,
    Inv. No. 731-TA-851 (Final),
    USITC Pub. 3310 (June 2000) ...................................................................37

**Legislative Materials**

Statement of Administrative Action to the Uruguay Round Agreements Act,
    H.R. Rep. 103-316, vol. I (1994) .................................................... *passim*

H.R. Rep. No. 96-317, 96th Cong. 1st Sess. (1979)..........................19, 32, 42

S. Rep. No. 96-249, 96th Cong. 1st Sess. (1979) ...........................................19

Defendant U.S. International Trade Commission ("Commission") hereby opposes the motion for judgment upon the agency record filed by Plaintiffs Jianyuan International Co., Ltd.; Shandong Yuwang Ecological Food Industry Co.; Ltd., Linyi Yuwang Vegetable Protein Co.; Ltd., Yantai Oriental Protein Tech Co., Ltd.; Jiujiang Tiantai Food Co., Ltd.; (together, "Jianyuan"); and NURA USA, LLC ("NURA"). As discussed below, the Commission's final affirmative critical circumstances determination regarding certain pea protein from China is supported by substantial evidence and otherwise in accordance with law.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determination Sought to be Reviewed

Plaintiffs seek review of the Commission's final affirmative critical circumstances determination in the antidumping and countervailing duty investigations of certain pea protein from China, notice of which was published at 89 Fed. Reg. 67,671, (Aug. 21, 2024) (PR130).[1] The public version of the Commission's Views and Staff Report for these investigations are contained in *Certain Pea Protein China*, Inv. Nos. 701-TA-692 and 731-TA-1628 (Final), USITC Pub. 5550 (Aug. 2024) (PR130).

---

[1] Citations to the public record are indicated by "PR," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," referring to list number 2 on the index of the administrative record. Citations to the Commission's confidential Views ("Views") are to CR220 and to the confidential Staff Report and its Revisions ("CSR") are to CR205 and CR206.

**B.    Questions Presented and Summary of Argument**

**1.    Was the Commission's Selection of Five-Month Comparison Periods Reasonable?**

Yes.  This selection was clearly reasonable given that imports in December would have been greatly reduced—and indeed were reduced—by Commerce's implantation of the order in the middle of that month through its initial preliminary determination.  As such, the selection of the comparison periods was consistent with Congress's intent that the Commission assess the likely undermining effect of imports made "prior to the effective date of the order."  Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. Rep. 103-316, vol. I, (1994) ("SAA") at 877. [2]  Furthermore, this selection was clearly consistent with previous cases in which the Commission excluded a sixth month from the post-petition comparison period because Commerce's initial preliminary determination fell within the sixth-month post-petition period.  As such, the Commission's affirmative critical circumstances determinations are supported by substantial evidence.

**2.    Was the Commission's Analysis of the Timing and Volume of Imports Supported by Substantial Evidence and in Accordance with Law?**

Yes.  Consistent with the Tariff Act of 1930 ("the statute" or "the Act") the Commission reasonably found that "imports subject to the affirmative {Commerce critical circumstances} determination{s} . . . {were} likely to undermine seriously the remedial effect of the {antidumping duty and countervailing duty} order{s} to be issued."  19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i).  In doing so, the Commission considered all of the

---

[2] The SAA is an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements Act ("URAA"), which passed into law. 19 U.S.C. § 1675(c).  *See* Pub. Law 103-465 §§ 102, 220 (Dec. 8, 1994), 108 Stat. 4809, 4819, 4861.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

relevant statutory factors:  the timing and the volume of the relevant imports, any rapid increase in inventories of those imports, as well as any other relevant circumstances.  *See id*. at §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii); Views at 60-66.

This Court has recognized the Commission's "broad discretion" to consider the timing and volume of imports.  *MTD Prods., Inc. v. United States,* Slip Op. 23-34, 2023 WL 2535885 at *4 (Ct. Int'l Trade Mar. 16, 2023) (citing 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii)).  Regarding this factor, the Commission first reasonably explained that the volume of the increase of subject imports in the post-petition period was significant, particularly as it related to the overall size of the U.S. market and domestic production, and the timing "instructive."  Views at 61-65.  Subject imports increased [███] percent in the post-petition period, equivalent to [███] percent of domestic industry production and [███] percent of the overall size of the U.S. market in 2023, even as U.S. inventories of subject imports increased.  Views at 61-63.  Indeed, the Commission observed that the increase coincided with a [███] percentage point market share shift to subject imports, mostly at the expense of the domestic industry, driven mostly by the [███████] pound increase in subject imports in the post-petition period.  Views at 31 n.122, 61; CSR at Tables IV-10, C-1.  Finding the timing of this increase instructive, the Commission found that after declining in each month of the pre-petition period, subject imports were higher in three months of the post-petition period than in any other month in 2023, peaking in September when they were [███] percent higher than in the peak month of the pre-petition period.  *Id*.  The Commission noted that these September imports were likely ordered immediately following the filing of the petitions given importers' reported lead-times.  *Id*.

Plaintiffs primarily contend that a [███] percent increase in post-petition imports is insufficient to seriously undermine the remedial effect of the order, by simply listing other

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

affirmative critical circumstances determinations involving larger percentages of post-petition volume increases.  These cases in no way bind the Commission's analysis here because it is well settled that each investigation is *sui generis*.  *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007).  Furthermore, the Commission recognized that the [ ▮ ] percent increase here was lower than in other recent cases but explained that the post-petition increase made up a significantly larger share of apparent U.S. consumption in the final year of the POI, [ ▮ ] percent, than the increase in the most recent affirmative critical circumstances determination, 2.3 percent.  Views at 62 n.257.  Indeed, by only focusing on the [ ▮ ] percent increase, Plaintiffs ignore the great weight the Commission gave to the significant size of that increase relative to the size of the U.S. market as well as the timing of the increase.

Similarly misplaced is Jianyuan's argument that the Commission's determinations improperly relied solely on the abovementioned [ ▮ ] market share gain by subject imports from 2022 to 2023 and the "total volume" of post-petition imports.  Views at 65-66.  Jianyuan overlooks all the abovementioned evidence relied upon by the Commission indicating that the post-petition *increase* in subject import volume was substantial in the context of the U.S. market.  Furthermore, given that the increase in post-petition subject imports, equivalent to [ ▮ ] percent of apparent U.S. consumption in 2023, drove the [ ▮ ] increase in subject import market share over the 2022-2023 period, that market share increase was highly relevant to the Commission's analysis.  Views at 61-62.  Furthermore, the overall post-petition subject import volume equivalent to [ ▮ ] percent of apparent U.S. consumption in 2023 was relevant to the

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Commission's finding that the post-petition increase in subject import volume was significant in light of the already-dominant position of subject imports in the U.S. market. *Id*. at 41, 52, 62.

Contrary to NURA's assertion that the post-petition increase resulted from increased demand, the Commission reasonably found that demand declined. Indeed, NURA relies [ ██████ ██████████████████████████████████████████████████ ██████ ] that does not establish that demand increased in the post-petition period. NURA Prehearing Br. at Exh. 2, at 5 (CR190). The court should reject NURA's invitation to reweight evidence reasonably considered by the Commission, including respondents' own hearing testimony and information reported by [ ██████████ ].

Jianyuan is incorrect that the Commission should have considered "arranged imports" allegedly showing declining imports. Arranged imports are not actual imports and would have been delivered in 2024 at the earliest, long *after* Commerce's initial preliminary determination. *See* CSR at VII-12. As such, they could shed no light on whether the order's effectiveness would be "undermined by increasing shipments *prior to the effective date of the order*." SAA at 877 (emphasis added).

Plaintiffs rely on Commissioner Schmidtlein's dissenting views to highlight other facts that they contend require a negative critical circumstances determination. However, "{a}lthough individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

This Court should reject Plaintiffs' invitation to reweigh evidence reasonably considered by the Commission.

Finally, contrary to NURA's assertion, the statute does not require the Commission to find that subject imports "massively increased" or "surged." *See* 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).  NURA confuses Commerce's statutory test for assessing whether imports were "massive" with the Commission's separate statutory test for determining whether the "timing and volume" of relevant imports indicate that they "undermine{d} seriously the remedial effect of the . . . order." *Compare* 19 U.S.C. § 1671d(a)(2)(B) (Commerce) *with* 19 U.S.C. § 1671d(b)(4)(A) (the Commission).  The word's "massive" and "surge" are found nowhere in the Commission's provisions of the statute.  19 U.S.C. §§ 1671d(b)(4)(A), 1673d(b)(4)(A).  NURA invented its "massively increased" test by misreading two sentences in the SAA, which clearly identify the determination that Commerce must make under the statute—to find that subject imports massively increased and/or surged. *See* SAA at 877.  Indeed, even before the Commission's assessment, Commerce already found that imports massively increased as its regulations define "massive imports" as those that "*increased*" in the post-petition period by 15 percent.  19 C.F.R § 351.206(h)-(i) (emphasis added).  The Commission then correctly considered the "timing and volume" of post-petition imports pursuant to its statutory obligation to determine whether the increase was likely to seriously undermine the remedial effect of the order.  As such, the Commission's consideration

*BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED*

of the "timing and volume" of imports was supported by substantial evidence and otherwise in accordance with law.

### 3.    Was the Commission Required to Find "Any Rapid Increase in Inventories" as a Matter of Law?

No.  Plaintiffs incorrectly treat the statutory factor "any rapid increase in inventories" as a precondition for the existence of critical circumstances.  The statute only requires the Commission to "*consider* . . . any rapid increase in inventories of the imports{,}" not find a rapid increase in inventories.  19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii) (emphasis added); *see Altx. Inc. v. United States*, 370 F.3d 1108, 1123 (Fed. Cir. 2004) (defining "consideration" of a statutory factor); *see also Nucor Corp. v. United States*, 414 F.3d 1331, 1338-39 (Fed. Cir. 2005) ("considering" underselling under the statute does not require finding that significant underselling existed).  Indeed, the Commission has regularly made affirmative critical circumstances determinations without finding that inventories rapidly increased.  *See e.g., Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines, Poland, Slovenia, and Taiwan,* Inv. Nos. 731-TA-1629-1631, 1633, 1636-1638, 1640 (Final), USITC Pub. 5520 (June 2024) ("*Mattresses*") at 70.  In this case, the Commission clearly considered whether there was "any rapid increase in inventories of the imports."  In doing so, the Commission noted that end-of-period inventories of relevant subject imports increased in the post-petition period by [     ] percent, leading to a "stockpile" of inventories of [          ] pounds.  Views at 63, 65.  As such, the Commission's consideration of "any rapid increase in inventories" was in accordance with law and supported by substantial evidence.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

    **4.** **Were the Commission's Findings Concerning "Other Factors,"**
**Including the Pricing and Impact of Subject Imports, Reasonable and**
**in Accordance with Law?**

Yes.  As this Court has recognized, the Commission has the broad discretion to consider "'among other factors it considers relevant'—*'any other circumstances* indicating that the remedial effect of the {orders} will be seriously undermined.'"  *MTD Prods.*, 2023 WL 2535885, at *4; 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).  When the Commission considered the prices of post-petition subject imports as one of these "other relevant factors," it found that the universal underselling by subject imports at significant margins seen throughout the January 2021 through December 2023, period of investigation ("POI") continued in the post-petition period.  Views at 64.  Specifically, subject imports undersold the domestic like product in [          ] comparisons in the second half of 2023, involving [          ] pounds, at significant margins ranging from [     ] to [     ] percent.  Views at 64.  The Commission explained that this underselling was particularly probative given that it put significant downward pressure on domestic prices and resulted in lost sales, causing the industry to suffer [          ] poor and worsening financial losses, including [          ] and deteriorating gross, operating, and net losses.  Views at 43, 47-48, 65.  In light of these factors, the Commission found that the adverse impact of the relevant subject imports was likely to undermine seriously the remedial effect of the orders.  Views at 65-66.  Because these findings were supported by substantial evidence and otherwise in accordance with law, the Court should sustain them.

    Rather than contesting the Commission's use of these factors, Plaintiffs ask this Court to reweigh evidence already considered by the Commission regarding price trends and causation.  First, the Commission clearly considered the pricing data highlighted by Plaintiffs and recognized that subject import prices had not markedly decreased in the post-petition period.

Views at 63-64.  It then reasonably explained that the continued underselling by subject imports

by wide margins in the post-petition period was such that importers did not have to intensify

their underselling to enable them to significantly increase subject import volume in the post-

petition period.  Views at 64.  Second, contrary to Jianyuan's assertion, the causal link between

subject imports and the industry's poor and worsening performance throughout the POI,

including in the post-petition period, was highly relevant to the Commission's assessment of the

impact of the significant post-petition increase in subject imports.  Such information reasonably

indicated that the significant increase in post-petition subject import volume that continued to

universally undersell the domestic like product at significant margins would likely undermine

seriously the remedial effect of the orders.  *See id*. at 43, 46, 48, 65.  Jianyuan contends that the

Commission "ignored" contradictory information regarding the causal nexus between subject

imports and the domestic industry's abysmal financial performance.  In doing so, Jianyuan

simply rehashes its material injury arguments made during the investigations that the

Commission thoroughly rejected, and Plaintiffs do not challenge any aspect of the Commission's

affirmative present material injury determination.  *See id*. at 38 & n.149, 48-54.  As such, the

Commission's consideration of these "other relevant factors" was supported by substantial

evidence and otherwise in accordance with law.

## II.    STATEMENT OF FACTS

### A.  Procedural Background

On July 12, 2023, Petitioner PURIS Proteins LLC, d/b/a PURIS ("PURIS") filed

antidumping and countervailing duty petitions on imports of certain pea protein from China.

Subsequently, the Commission made preliminary material injury determinations for both cases.

*See* 88 Fed. Reg. 60,495 (Sep. 1, 2023) (PR54).  On November 9, 2023, PURIS alleged that

critical circumstances existed in both investigations. "Critical circumstances" is a provision in the statute that allows for the retroactive imposition of duties 90 days prior to the date that provisional duties are first imposed. *See* 19 U.S.C. §§ 1671b(e), 1673b(e). Both Commerce and the Commission must make separate final affirmative critical circumstances determinations, under different criteria, for retroactive duties to be imposed. *See id*. at §§ 1671d(a)(2), (b)(4)(A), 1673d(a)(3), (b)(4)(A).

In December 2023, and February 2024, Commerce issued its preliminary affirmative determinations for each respective investigation, finding that critical circumstances existed. 88 Fed. Reg. 87,403 (Dec. 18, 2023); 89 Fed. Reg. 10,038 (Feb. 13, 2024) (PR111). On June 27, 2024, Commerce issued its final determinations in both investigations, finding that critical circumstances existed. *See* 89 Fed. Reg. 55,557 (July 5, 2024) (PR109); *See* 89 Fed. Reg. 55,559 (July 5, 2024) (PR110). Subsequently, in August 2024, the Commission made final affirmative material injury and critical circumstances determinations in both investigations. *See* 89 Fed. Reg. 67,671 (Aug. 21, 2024) (PR126).

### B.    Commerce's Final Critical Circumstances Determinations

Commerce determined that critical circumstances existed for all subject imports from China in both the antidumping and countervailing duty investigations because such imports were "massive" over a "relatively short period" pursuant to 19 U.S.C. § 1671d(a)(2)(B) and 19 U.S.C. § 1673d(a)(3)(B). 89 Fed. Reg. 55,557, (PR109); 89 Fed. Reg. 55,559 (PR110). Pursuant to its regulations, Commerce determined that subject imports "increased by at least 15 percent" between the base and comparison periods and were therefore "massive." 19 C.F.R. § 351.206(h)-(i); 89 Fed. Reg. 55,557 (PR109); 89 Fed. Reg. 55,559 (PR110).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

### C.     The Commission's Determinations

#### 1.  The Commission's Affirmative Material Injury Determinations

The Commission defined a single domestic like product coextensive with the scope and the domestic industry as consisting of all domestic producers of the like product.  Views at 11, 17.  Addressing conditions of competition in the U.S. pea protein market, the Commission explained that while the majority of responding market participants reported that U.S. demand either increased steadily or fluctuated upwards over the POI, apparent U.S. Consumption of certain pea protein decreased by [ ▆ ] percent from 2021 to 2023.  Views at 24.  The Commission found that subject imports were [ ▆ ] the largest supply source of certain pea protein in the U.S. market, accounting for more than [ ▆ ] percent of the market throughout the POI.  Views at 24.  Furthermore, it found that there was at least a moderate degree of substitutability between the domestic like product and subject imports and that price was an important factor in purchasing decisions.  Views at 25-27.  Importers reported that their lead times for produced-to-order sales averaged [ ▆ ] days, sales from U.S. inventories averaged [ ▆ ] days, and sales from foreign inventories averaged [ ▆ ] days.  Views at 29.

The Commission then found that the volume of subject imports was significant in absolute terms and relative to U.S. consumption and that the increase in subject imports relative to U.S. consumption was significant.  Views at 31-32.

Regarding price effects, the Commission found that U.S. shipments of subject imports undersold the domestic like product throughout every quarter of POI at margins ranging from 17.9 to 58.6 percent and averaging 38.6 percent.  Views at 32, 47-48.  It also emphasized that the purchase costs of direct imports were also universally lower than the sales prices of the domestic like product throughout the POI, by 46.7 percent on average.  Views at 32-34.  Even considering

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

the average additional purchasing costs reported by importers of 10 to 19 percent, the Commission explained, the net purchase costs of these direct imports would still be lower than domestic sales prices.  Views at 33-34.  The Commission concluded that underselling was significant and pressured U.S. producers' prices and caused U.S. producers to lose sales.  Views at 42.  Furthermore, the Commission considered quarterly price and cost trends spanning throughout POI for every pricing product and found that subject imports depressed U.S. prices and prevented price increases which otherwise would have occurred, to a significant degree.  Views at 41-42.  Hence, the Commission found that subject imports had significant price effects on the domestic industry.  Views at 42.

Finally, the Commission found that the significant volumes of lower-priced subject imports caused the domestic industry to lose sales and market share, which reduced its output and revenues from what they would have been otherwise.  Views at 47.  Furthermore, the domestic industry's declining U.S. shipments and capacity utilization increased its per-unit fixed costs.  Views at 47-48.  Subject imports suppressed domestic prices, preventing domestic producers from sufficiently increasing them to cover their increasing costs, leading to a cost-price squeeze, further reducing the industry's financial performance.  Views at 47-48.  The Commission emphasized that these factors caused the domestic industry to suffer poor and worsening financial losses, including [          ] and deteriorating gross, operating, and net losses throughout the POI.  Views at 43, 47-48.  The Commission also concluded that other causes such as changes in demand and nonsubject imports could not explain the injury that it attributed to subject imports.  Views at 55-56.  Rejecting several arguments raised by Respondents, the Commission found that competition was not attenuated between subject imports and the domestic like product, that subject import volumes, market share, and

underselling correlated to the industry's declining performance, and that other factors, such as the industry's cost structure, could not account for the injury attributed to subject imports. *Id*. at 34, n.138, 37 n. 148, 39 n.154, 48-52. The Commission concluded that subject imports had a significant impact on the domestic industry and accordingly determined that the industry was materially injured by reason of subject imports. *Id*. at 48, 56. Plaintiffs challenge none of these findings.

### 2. The Commission's Affirmative Critical Circumstances Determinations

Having determined that subject imports caused material injury, and in light of Commerce's affirmative critical circumstances determination, the Commission was statutorily required to determine "whether the imports subject to the affirmative {Commerce critical circumstances} determination{s} . . . are likely to undermine seriously the remedial effect of the {antidumping duty and countervailing duty} order{s} to be issued." 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i). In evaluating this issue, as required by statute, the Commission considered "the timing and the volume of the imports" subject to Commerce's affirmative critical circumstances determinations, "any rapid increase in inventories of th{ose} imports," as well as "any other circumstances indicating that the remedial effect of the antidumping and countervailing duty orders would be seriously undermined." *See id*. at §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

### a. The Commission used five-month comparison periods.

The Commission began its analysis by selecting five-month pre- and post-petition comparison periods corresponding to February–June 2023 and July–November 2023.[3]  As the Commission explained, while it "frequently relies on six-month comparison periods," it "has relied on shorter periods when Commerce's preliminary determination applicable to the country at issue fell within the six-month post-petition period."  Views at 60-61.  The Commission found that situation applicable to this case because Commerce's preliminary determination with respect to the countervailing duty investigation was rendered on December 18, 2023, during the sixth month of the post-petition period.[4]  Views at 60-61.

### b. The Commission considered the "timing and volume" of imports.

The Commission found that the increase in the volume of imports in the post-petition period was significant within the context of the U.S. market, particularly given the large volume of subject imports prior to the increase.  Views at 61.  Specifically, it found that subject imports increased [ ▮ ] percent over the comparison periods, which was equivalent to [ ▮ ] percent of apparent U.S. consumption and [ ▮ ] percent of domestic production in 2023.  *Id.*  Noting that

---

[3] The Commission considered July to be in the post-petition period given that it was filed on July 12, 2022.  Views at 61 & n.253.  Plaintiffs do not challenge the inclusion of July in the post-petition period.

[4] Provisional duties were first implemented as a result of Commerce's preliminary CVD determination, made on December 11, 2023, and published on December 18, 2023.  Views at 61; 88 Fed. Reg. 87,403 (Dec. 18, 2023).  While recognizing that Commerce's preliminary determination with respect to the antidumping duty investigation was on February 13, 2024, after the six-month post-petition period, the Commission explained that it would use the same five-month post-petition period for its analysis in both investigations, consistent with previous cases Views at 61 & n.253.  Plaintiffs do not contest the Commission's use of the same periods for both the antidumping and countervailing duty critical circumstances analyses.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

the post-petition increase occurred as subject imports increased their market share by [ ▇ ] percentage points from 2022 to 2023, the Commission found that this increase built upon subject imports' already-dominant position of the U.S. market. *Id*.

Rejecting Plaintiffs' arguments that the post-petition increase was less than in other affirmative critical circumstances cases, the Commission explained that while the post-petition increase in the recent affirmative critical circumstances determination in *Mattresses* was greater in percentage terms, that increase was smaller in the context of the U.S. market. Views at 62 n.257 (citing *Mattresses*, USITC Pub. 5520 at 68-69). It added that the share of apparent U.S. consumption comprised of post-petition volume was higher here than in *Mattresses*, and that subject imports had increased their share of apparent U.S. consumption in the last year of the POI by much more than in *Mattresses*. Views at 62-63 nn.257-58.

Finding the timing of the post-petition increase instructive, the Commission explained that while apparent U.S. consumption declined from 2022 to 2023, subject imports increased in the post-petition period. It found that while "subject imports decreased in every month of the five-month pre-petition period," they "were higher in three months of the post-petition period . . . than in any month of the pre-petition period" and higher in September than in any other month in 2023. Views at 64-65. The Commission also found that imports arriving in September "would have been ordered immediately following the filing of the petitions in July{,} given importers' reported lead times." Views at 65.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

### c. The Commission considered "any rapid increase in inventories" of relevant subject imports.

In considering "any rapid increase in inventories," the Commission found that the increase in relevant post-petition subject imports did not merely replace decreasing inventories during the post-petition period. Views at 63. Instead, the increase created a "stockpile" of subject import inventories, which increased between the pre- and post-petition periods. Views at 63, 65.

### d. The Commission considered "other relevant factors."

As another relevant factor, the Commission considered the prices of the increased volume of subject imports in the post-petition period. Views at 63-65. The Commission noted that subject import prices decreased in the second half of 2023 for products 1–3, which [ ███████

█████████████████████████████ ]. Views at 63-64 n.262. Specifically, the average unit values of subject imports of these products decreased from the first half of 2023 to the second half of 2023 by [ ██ ], [ ██ ], and [ ██ ] percent, respectively and their prices were 4.4 percent, 3.4 percent, 4.2 percent, and 11.8 percent lower in the last quarter of 2023 than the first quarter of 2023, respectively. *Id*. While acknowledging that these decreases were not "marked{}," the Commission found that subject imports had undersold the domestic like product throughout the POI at large margins, which did not need to increase to effect the significant post-petition increase in subject import volume. Views at 63-66. Further, subject imports undersold the domestic like product throughout the second half of 2023, at significant margins. Views at 64.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

      **e.** **The Commission concluded that relevant imports were likely to undermine seriously the remedial effect of the orders.**

Based on all the preceding factors, the Commission concluded that the adverse impact of the relevant subject imports was likely to undermine seriously the effect of the orders.  Views at 65.  As the Commission found, subject imports, which universally undersold the domestic like product and maintained a dominant and increasing share of the U.S. market even as U.S. inventories of subject imports grew, increased [ ▆ ] percent in the post-petition period, equivalent to [ ▆ ] percent of domestic industry production in 2023.  Views at 65.  Such underselling was particularly probative, the Commission explained, given that it put significant downward pressure on domestic prices and resulted in lost sales, causing the industry's poor financial performance throughout the POI, including in the post-petition period.  Views at 65-66.

## III.    STANDARD OF REVIEW

Under the statute this Court must uphold the Commission's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Chemours Co. FC, LLC v. United States*, 492 F. Supp. 3d 1333, 1335 (Ct. Int'l Trade 2021).  The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by

substantial evidence." *Consolo*, 383 U.S. at 620. Thus, under the substantial evidence standard, a Court may not, "even as to matters not requiring expertise … displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at 488.

The Commission is the trier of fact in injury investigations. As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006). Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000).

Furthermore, since the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation. *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (quoting *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005). Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned." SAA at 892 (quotations omitted); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005).

"When evaluating challenges to the ITC's choice of methodology," the Court has explained, "the court will affirm the chosen methodology as long as it is reasonable." *JMC Steel*

*Grp. v. United States*, 70 F. Supp. 3d, 1309, 1316-17 & n.4 (Ct. Int'l Trade 2015) (citing

*Shandong TTCA Biochem. Co., Ltd. v. United States*, 35 CIT 545, 556, 774 F. Supp. 2d 1317,

1327 (2011)).

## IV.    ARGUMENT

### A.  Legal Standard for Critical Circumstances

Commerce "ordinarily imposes antidumping and countervailing duties prospectively"

from the publication of Commerce's preliminary determination.  *See MTD Prods.*, 2023 WL

2535885; 19 U.S.C. §§ 1671b(d)(2)(B); 1673b(d)(2)(B).  However, the statute allows for the

retroactive application of AD/CVD duties in certain situations known as "critical circumstances."

*See MTD Prods.*, 2023 WL 2535885, at *1; 19 U.S.C. §§ 1671b(e), 1673b(e).  The critical

circumstances provision was designed "to deter exporters whose merchandise is subject to an

investigation from circumventing the intent of the law by increasing their exports to the United

States during the period between initiation of an investigation and a preliminary determination

by {Commerce}."  *ICC Indus., Inc. v. United States*, 812 F.2d 694, 700 (Fed. Cir. 1987) (quoting

H.R. Rep. No. 96-317, 96th Cong. 1st Sess., at 63 (1979)).  In other words, "{t}he mechanism's

purpose is to prevent clever importers from circumventing impending antidumping and

countervailing duties by rushing in their shipments before the duties take effect."  *MTD Prods.*,

2023 WL 2535885, at *1 (citing H.R. Rep. 96–317).

In order for critical circumstances to exist, Commerce and the Commission must each

make separate determinations, and in doing so, Congress intended for each agency to be

responsible for conducting its own respective test.  SAA at 876; H.R. Rep. No. 96-317; S. Rep.

No. 96-249, 96th Cong. 1st Sess., at 56 (1979) (all discussing each agency's respective test in

separate paragraphs).  First, Commerce must determine, among other findings, "whether 'there

have been massive imports of the subject merchandise over a relatively short period.'" *MTD Prods.*, 2023 WL 2535885, at *1 (quoting 19 U.S.C. §§ 1671d(a)(2), 1673d(a)(3)).

Second, the Commission (after making an affirmative injury determination) must determine "whether the imports subject to {Commerce's} affirmative {critical circumstances} determination{s} . . . are likely to undermine seriously the remedial effect of the {antidumping duty and countervailing duty} order{s} to be issued." 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i).  The statute further provides that, in making this determination,

> the Commission shall consider, among other factors it considers relevant—
>
> (I)    the timing and the volume of the imports;
> (II)   any rapid increase in inventories of the imports; and
> (III)  any other circumstances indicating that the remedial effect of the {countervailing and antidumping duty orders} will be seriously undermined.

19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).  The SAA clarifies that the Commission determines whether imports subject to Commerce's affirmative critical circumstances determination—*i.e.* those that were found by Commerce to have been "massive"—"have seriously undermined the remedial effect of the order" and "whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order."  SAA at 877.  The Commission does so by focusing "on whether an order's effectiveness is undermined by increasing shipments prior to the effective date of the order." *Id.*

B.    **The Commission's Critical Circumstances Determinations Are Supported by Substantial Evidence and in Accordance with Law**

1.    **The Commission reasonably selected five-month data comparison periods.**

The Commission reasonably selected five-month comparison periods in this case instead of the six-month comparison periods frequently relied upon.  Views at 60.  As the Commission explained, while it "frequently relies on six-month comparison periods," it "has relied on shorter periods when Commerce's preliminary determination applicable to the country at issue fell within the six-month post-petition period."  Views at 60-61.  Because Commerce's preliminary determination with respect to the countervailing duty investigation was rendered on December 18, 2023, during the sixth month of the post-petition period, the Commission selected five-month comparison periods.  Views at 60-61.  Excluding the sixth month of the comparison periods was reasonable because Commerce's imposition of provisional duties on December 18, 2023, would have reduced the volume of subject imports in that month, thereby distorting the volume of subject imports in the six-month post-petition period.  *See Carbon and Certain Alloy Steel Wire Rod from China,* Inv. Nos. 701-TA-512 and 731-TA-1248 (Final), USITC Pub. 4509 (Jan. 2015) ("*Wire Rod*") at 26 (excluding the sixth month from the post-petition period because Commerce's preliminary determination would have reduced imports in that month).  Because the Commission's selection of five-month comparison periods was reasonable, the Court should affirm this aspect of the Commission's analysis.

None of Plaintiffs' arguments withstand scrutiny.  Jianyuan first argues, unpersuasively, that the Commission departed from its alleged "practice" of using six-month comparison periods absent a "compelling" reason to use shorter periods.  Jianyuan Br. at 20.  The Commission's selection of five-month comparison periods here was consistent with its approach in past cases.

21

As the Commission explained, the Commission has relied on comparison periods shorter than six months "when Commerce's preliminary determination applicable to the country at issue fell within the six-month post-petition period." Views at 60-61. The Commission's five-month comparison periods in this case were consistent with those in previous investigations in which Commerce's preliminary determinations were issued during the sixth month of the post-petition period, including one issued on the 22nd day of the sixth month. *See, e.g.*, *Carbon and Alloy Steel Cut-to-Length Plate from Brazil, South, Africa, and Turkey*, Inv. Nos. 701- TA-560-561 and 731-TA-1317-1328 (Final), USITC Pub. 4664 (January 2017) ("*CTL Plate*") at 48 (September 22, preliminary determination on the sixth month); *see also Paper Plates from China, Thailand, and Vietnam*, Inv. Nos. 701-TA-704-705 and 731-TA-1664-1666 (Final), USITC Pub. 5595 (Mar. 2025) ("*Paper Plates*") at 41 (July 1, preliminary determination); *Aluminum Lithographic Printing Plates from China and Japan*; Inv. No. 701-TA-694 and 731-TA-1641-1642 (Final), USITC Pub. 5559 (Nov. 2024) ("*ALPP*") at 41; *Gas Powered Pressure Washers from China and Vietnam*; Inv. No. 701-TA-684 and 731-TA-1597-1598 (Final), USITC Pub. 5465 (Oct. 2023) ("*GPPW*") at 47 (June 5, preliminary determination); *Freight Rail Couplers and Parts Thereof from China and Mexico*, Inv. No. 701-TA-682 and 731-TA-1592-1593 (Final), USITC Pub. 5438 (July 2023) ("*FRC*") at 58 & n.317 (March 3, preliminary determination); *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. No. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022) ("*OCTG*") at 50 (March 14, preliminary determination); *Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, Inv. No. 701-TA-545-547 and 731-TA-1291-1297 (Final), USITC Pub. 4638 (Sep. 2016) at 49 & n.251 (January 15, preliminary determination). Indeed, Jianyuan itself concedes that the Commission

has used a shorter comparison period where Commerce's preliminary determination fell within the six-month comparison period. Jianyuan Br. at 21. Thus, contrary to Jianyaun's argument, the Commission's use of five-month comparison periods was consistent with its approach in past cases.

Equally unavailing is Jianyuan's argument that the Commission's use of five-month comparison periods here was neither "necessary nor appropriate" because in recent cases "where a shorter than six-month comparison period was used," the "petitions were filed at the very end of a month and Commerce's preliminary determinations were issued at the beginning of a month within the six-month period." *Id*. at 21. On this basis, Jianyuan argues that the Commission should have selected six-month comparison periods, including December 2023, because Commerce's preliminary determination was published in the "latter half" of that month. *Id*. at 23. Contrary to Jianyuan's argument, however, the Commission has regularly excluded the sixth month of a post-petition period when Commerce's preliminary determination falls within that month, without regard to whether the determination was issued in the first or second half of the month. *See e.g.*, *CTL Plate*, USITC Pub. 4664 at 48; *Paper Plates*, USITC Pub. 5595 at 41; *ALPP*, USITC Pub. 5559 at 55; *GPPW*, USITC Pub. 5465 at 47; *OCTG*, USITC Pub. 5381 at 50. In all these cases, the Commission selected five-month comparison periods simply because Commerce's preliminary determination "fell within" the sixth month period. Although Jianyuan cites two cases in which the Commission observed that Commerce's preliminary determination was made in the first half of the sixth month, *GPPW*, USITC Pub. 5465 at 28 and *FRC*, USITC Pub. 5438 at 30, it cites no case in which the Commission selected six-month comparison periods on grounds that Commerce's preliminary determination was made in the second half of the sixth month. To the contrary, the Commission has excluded a month from the post-petition

period even when provisional duties were implemented later than the 18th day of that month.  *See CTL Plate*, USITC Pub. 4664 at 48 & n.232 (September 22, preliminary determination).

When the Commission has utilized six-month comparison periods notwithstanding Commerce's preliminary determination in the sixth month, it has generally done so when Commerce's preliminary determinations were published in the last third of the month.  *See, e.g.*, *Pentafluoroethane (R-125) from China*, Inv. No. 701-TA-662 and 731-TA-1554 (Final), USITC Pub. 5281 (Feb. 2022) at 41-42 (June 25, preliminary determination); *Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi Arabia, Taiwan, Turkey, and the United Arab Emirates*, Inv. Nos. 701-TA-646 and 731-TA-1502-1504, 1508-1509, 1512, 1514, and 1516 (Final), USITC Pub. 5153 (Jan. 2021) at 20 (September 21, preliminary determination); *Quartz Surface Products from China*, Inv. No. 701-TA-606 (Final), USITC Pub. 4913 (June 2019) at 24 (September 21, preliminary determination).  Consistent with these past cases, the Commission reasonably excluded the sixth month of its comparison periods here, where Commerce's preliminary determination fell within the middle of the sixth month.

Fundamentally, Jianyuan is asking the Court to replace the Commission's reasonable methodology for selecting the appropriate comparison periods with its own preferred methodology, which is something the Court may not do.  *See JMC Steel*, 70 F. Supp. 3d at 1316 n.4 ("{T}he court will affirm the chosen methodology as long as it is reasonable.").  The Commission has broad discretion to select the appropriate pre- and post-petition comparison periods for purposes of its critical circumstances analysis.  *See MTD Prods.*, 2023 WL 2535885, at *4 ("Nothing in the statute restricts the Commission's broad discretion to consider data reasonably relevant to determining the 'timing and volume of imports.'") (emphasis omitted).  In this case, as in prior cases, the Commission selected between five- and six-month comparison

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

periods in a manner consistent with congressional intention that it assess whether imports made "*prior to the effective date of relief*" would "seriously undermine the remedial effect of the order."  SAA at 877 (emphasis added).  Had the Commission selected six-month comparison periods, including December 2023, it would have included *14 days* of imports subject to provisional duties in the post-petition period, *after* the effective date of relief.  As the Commission has previously recognized, *see Wire Rod,* USITC Pub. 4509 at 26, the imposition of provisional duties causes subject import volumes to decline, and the record of this case indicated that the imposition of provisional measures in December 2023 coincided with a [ ▮ ] percent reduction in subject import volume relative to November 2023.  *Calculated from* CSR at Table IV-7.  Jianyuan would prefer that the Commission include December 2023 presumably because doing so reduces the apparent increase in subject imports between the pre- and post-petition periods, but the Commission reasonably excluded the month precisely to avoid this distortion. Because the Commission's selection of five-month comparison periods was reasonable, the Court should affirm this aspect of the Commission's analysis.

2. **The Commission's findings regarding the timing and the volume of imports are supported by substantial evidence and otherwise in accordance with law.**

a. **The increase in post-petition imports was "significant" and the timing of such imports was "instructive."**

The Commission found that the [ ▮ ] percent increase in subject import volume, from [ ▮▮▮▮ ] pounds in the pre-petition period to [ ▮▮▮▮ ] pounds in the post-petition period, was significant within the context of the overall U.S. market.  Views at 61-62.  As the Commission explained, this increase was equivalent to [ ▮ ] percent of apparent U.S. consumption and [ ▮ ] percent of domestic production in 2023.  *Id.*  Noting that the post-petition increase occurred as subject imports increased their market share by [ ▮ ] percentage

25

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

points from [    ] percent in 2022 to [    ] percent in 2023, the Commission found that this

increase expanded subject imports' already-dominant position in the U.S. market. Views at 24,

62. Finding the timing of the post-petition increase instructive, the Commission noted that the

increase had occurred while apparent U.S. consumption declined [    ] percent from 2022 to

2023. Views at 64. After declining in every month of the pre-petition period, the Commission

found that subject imports were higher in three months of the post-petition period (August,

September, and November) than in any month of the pre-petition period, higher in September

than in any other month in 2023 and [    ] percent higher than in the peak month of the pre-

petition period. Views at 64-65. The Commission also found that imports arriving in September

would have been ordered immediately following the filing of the petitions in July, given

importer's reported lead times of 45 and 67 days. Views at 64-65. Because the Commission

reasonably found the post-petition increase in subject import volume significant, particularly in

light of its timing, the Court should affirm this aspect of the Commission's analysis.

Citing three previous cases in which the Commission made affirmative critical

circumstances determinations based on larger percentage increases in post-petition subject

import volume, Plaintiffs argue that the [    ] percent increase in this case is somehow

insufficient to support an affirmative critical circumstances determination. *See* Jianyuan Br. at

18-20; NURA Br. at 23. Plaintiffs' reliance on these cases is misplaced because it is well settled

that each Commission investigation is *sui generis* and dependent on the facts unique to the

particular record. *See Cleo Inc.,* 501 F.3d at 1299 (noting that each injury investigation by the

Commission is *sui generis* and, "{f}or that reason, prior determinations by the Commission with

regard to one industry typically provide little guidance for later determinations with regard to

different industries"). The Commission's analysis in this case was in no way bound by its

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

analysis in the past cases cited by Plaintiffs.

Furthermore, the Commission recognized that the percentage increase in post-petition imports was less than in some other recent investigations but explained that the increase was nevertheless significant within the context of the overall U.S. market. Views at 61. In particular, the Commission found that the increase was from a very large base, with subject imports accounting for more than [ ██████ ] of apparent U.S. consumption. Views at 61-62. To place the magnitude of the post-petition increase in subject import volume in context, the Commission observed that the increase was equivalent to [ ██ ] percent of apparent U.S. consumption and [ ██ ] percent of the domestic industry's production in 2023. *Id.* In other words, the increase was sufficient to capture [ ██ ] percentage points of market share from the industry and, by displacing the industry's shipments from the U.S. market, reduce the industry's production by [ ██ ] percent. Indeed, the post-petition increase in subject imports would have driven the [ ██ ] percentage point increase in subject import market share that the Commission found from 2022 to 2023, as they accounted for [ ██████ ] pounds, or [ ████ ] percent, of the [ ████ ] pound increase in subject import volume over the period. Views at 62; *calculated from* CSR at Tables IV-2 and IV-8. The post-petition increase in subject import volume alone, equivalent to [ ██ ] percent of apparent U.S. consumption, was sufficient to account for [ ████ ] of the [ ██ ] percentage points of market share that the domestic industry lost to subject imports from 2022 to 2023. Views at 31 n.122; CSR at Table IV-10. Likewise, the [ ██ ] pound increase in subject imports during the post-petition period was sufficient to account for [ ██████ ] of the [ ██████ ] pound decline in the industry's U.S. shipments from 2022 to 2023, as the industry lost market share to subject imports. Views at 61; CSR at Table C.1. Thus, while acknowledging the relatively smaller percent increase in post-petition

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

subject import volume compared to other recent investigations, the Commission reasonably explained that it was significant relative to the size of the U.S. market and sufficient to seriously undermine the remedial effect of the orders.

The Commission also reasonably rejected Plaintiffs' argument that the relatively lower percent increase in post-petition subject import volume in this case compared to certain other recent investigations somehow warranted negative critical circumstances determinations.  Views at 62 n.257.  As the Commission explained, the percent increase in post-petition subject imports here was less than the 101.6 percent increase in post-petition subject imports from Burma in *Mattresses* but much more substantial in the context of the U.S. market.  *Id.*  While the volume of post-petition subject imports here was equivalent to [ ███ ] percent of apparent U.S. consumption in the final year of the POI and their increase equivalent to [ ███ ] percent of the U.S. market that year, the Commission noted, the volume of post-petition subject imports from Burma was equivalent to only 4.6 percent of apparent U.S. consumption in the last year of the POI for *Mattresses* and their increase equivalent to 2.3 percent of the U.S. market that year.  *Id.*  Thus, in addition to explaining how the [ ███ ] percent post-petition increase in subject import volume was substantial in the context of the U.S. market, and sufficient to seriously undermine the remedial effect of the orders, the Commission also explained why the larger percent increases in post-petition subject import volume in other cases did not mean that those increases were any more substantial.

Jianyuan argues, mistakenly, that the Commission "base{ed} its decision on pre-petition market share" and that subject imports gaining [ ███ ] percent of market share from 2022 to 2023 is "irrelevant" to the Commission's critical circumstances analysis.  Jianyuan Br. at 28-29. Contrary to this argument, the Commission did not rely on this market share shift alone, but on

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

all the evidence indicating that the post-petition increase in subject import volume was substantial in the context of the U.S. market, as discussed above.  Views at 65-66.  The Commission cited the [ ▮ ] percentage point increase in subject import market share from 2022 to 2023 to show that the increase in post-petition subject imports, equivalent to [ ▮ ] percent of apparent U.S. consumption in 2023, would have driven the increase in subject import market share over the period.  Views at 61-62.  Therefore, the Commission's consideration of these market share data was highly relevant to its consideration of whether the post-petition increase was sufficient to significantly undermine the remedial effect of the orders.

Also contrary to Jianyuan's argument, the Commission did not rely only on the "total volume" of post-petition imports.  Jianyuan Br. at 31.  While noting that post-petition subject import volume was equivalent to [ ▮ ] percent of apparent U.S. consumption in 2023, the Commission relied on all the evidence discussed above to find that the post-petition *increase* in subject import volume was significant, including the [ ▮ ] percent increase in subject import volume between the pre- and post-petition periods, and the large size of the increase relative to apparent U.S. consumption and domestic industry production in 2023.  Views at 65.  Regardless, the total volume of post-petition imports was relevant to the Commission's finding that the post-petition increase in subject import volume was significant in light of the dominant position of subject imports in the U.S. market, as also reflected by the large volume of pre-petition subject imports and their [ ▮ ] share of the U.S. market.  *See* Views at 61, 63.

Similarly unavailing is NURA's argument that the Commission ignored its argument that subject imports increased in the post-petition period because of purportedly increased U.S. demand in the second half of 2023.  NURA Br. at 35 (citing NURA Posthearing Br. at 14 (CR198) (citing NURA Prehearing Br. at Exh. 2 at 1, 5 (CR190))).  NURA bases its argument on

[ ██████████ ] from [ ████████████████████████████

████████ ] stating that "[ ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ ]." NURA Prehearing Br. at Exh. 2, at 5

(CR190).  NURA does not explain how this exhibit could possibly establish that pea protein

demand increased in the second half of 2023 when it apparently discusses [ ████████████

████████████████ ] relating to [ ████████████████████████ ].  NURA Br. at 35;

NURA Posthearing Br. at 14 (CR198); NURA Prehearing Br. at Exh. 2 at 1, 5 (CR190.

Furthermore, the Commission considered demand trends throughout the entire POI, including in

the post-petition period, and found no such increase.  Views at 22-23 & n.73.  As the

Commission found, subject import volume increased [ ███ ] percent between the pre- and post-

petition periods despite the [ ███ ] percent decline in apparent U.S. consumption, a proxy for U.S.

demand, between 2022 and 2023.  Views at 64.  Consistent with the Commission's analysis,

respondents insisted in their own hearing testimony that demand decreased over the POI.  Views

at 23, Hearing Tr. at 151 (Dougan) (PR102).  Indeed, PURIS, [ ███████████████████

████████ ], reported that demand [ ██████████████ ] while another U.S. producer, Ingredion,

reported [ ████████████████████████████████████ ]. *See* PURIS U.S.

Producer Questionnaire Response at IV-14 (CR135); Ingredion U.S. Producer Questionnaire

Response at II-2d, II-3c-d, f (CR158).   The Court should reject Nura's invitation to reweigh

evidence reasonably considered by the Commission.

Jianyuan argues that the Commission did not consider "arranged imports."  Jianyuan Br.

at 41.  However, arranged imports are not *actual* imports and the Commission does not normally

consider them in its critical circumstances analysis.  *See, e.g., CTL Plate*, USITC Pub. 4664 at

48; *Paper Plates*, USITC Pub. 5595 at 41; *ALPP*, USITC Pub. 5559 at 41; *GPPW*, USITC Pub.

5465 at 47; *FRC*, USITC Pub. 5438 at 58 (none utilizing arranged imports in its critical

circumstances analyses).  Furthermore, by definition, "arranged imports" would not be delivered

until after December 31, 2023, which is *after* Commerce's preliminary determination and thus

the effective date of the order.  *See* CSR at VII-12.  Therefore, the Commission could not use

"arranged imports" to assess "whether an order's effectiveness is undermined by increasing

shipments *prior to the effective date of the order*."  SAA at 877 (emphasis added).

      Jianyuan argues that the Commission unlawfully discussed the timing of subject imports

separate from its discussion of the overall volume of subject imports.  Jianyuan Br. at 13-14, 27.

As this Court has recognized, however, "{n}othing in the statute restricts the Commission's

broad discretion to consider data reasonably relevant to determining the 'timing and volume of

imports.'"  *MTD Prods.*, 2023 WL 2535885, at \*4.  There is no legal requirement that the

Commission structure its analysis of the statutory factors in any particular way.  Here, the

Commission chose to begin its analysis with a discussion of the increased volume of subject

imports in the post-petition period followed by a separate paragraph discussing the timing of the

increase, as it has done in prior investigations.  Views at 64-65; s*ee e.g.*, *Raw Honey from

Argentina, Brazil, India, and Vietnam*, Inv Nos. 731-TA-1560-1562 and 1564 (Final), USITC

Pub. 5327 (May 2022) 47-48, Table V-6 ("*Raw Honey*"), *affd. Sweet Harvest Foods v. United

States,* 669 F. Supp. 3d 1346, 1349 (Ct. Int'l Trade 2023), appeal docketed, No. 24-1371 (Fed.

Cir. Jan. 22, 2024); *see also Mattresses*, USITC Pub. 5520 at 70.  Furthermore, the

Commission's consideration of the timing of the post-petition increase was fully consistent with

its earlier discussion of the significance of the increase and lent further support to its conclusion

*BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED*

that the increase significantly undermined the remedial effect of the orders.  As the Commission

found, the [ █ ] percent post-petition increase could not be explained by any increase in

apparent U.S. consumption, which had declined, and the timing of the increase, which peaked in

September at a level [ █ ] percent higher than in the peak month of the pre-petition period,

was consistent with orders placed immediately following the filing of the petitions in July.

Views at 64-65.  The clear implication was that importers had increased their orders of subject

merchandise after the filing of the petitions to maximize the volume of subject imports they

could enter prior to the effective date of the order, which is precisely the behavior the critical

circumstances statute is designed to address.  *See MTD Prods.*, 2023 WL 2535885, at *1

("purpose is to prevent clever importers from circumventing impending . . .  duties by rushing in

their shipments before the duties take effect"); *ICC Indus.*, 812 F.2d at 700 (quoting H.R. Rep.

No. 96-317).

Finally, Plaintiffs discuss at length the factual findings of a dissenting Commissioner but

avoid discussing the evidence supporting the Commission's findings.  *See, e.g.*, Jianyuan Br. at

27, 31, 34; NURA Br. at 9-10, 23, 26, 30.  However, while Plaintiffs "dispute{} the evidentiary

sufficiency of those findings, and urge{} the court to adopt the dissenting views" of

Commissioner Schmidtlein, "substantial evidence review does not permit the court to re-weigh

the evidence." *MTD Prods.*, 2023 WL 2535885, at *7.  That Commissioner Schmidtlein, this

Court, or Plaintiffs, may have weighed evidence differently, does not provide grounds to

overrule the Commission's determination.  Indeed, "{a}lthough individual Commissioners

reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from

the evidence does not prevent an administrative agency's findings from being supported by

substantial evidence.'" *Siemens Energy,* 806 F.3d at 1372 (quoting *Consolo*, 383 U.S. at 620);

*see also Grupo Industrial Camesa v. United States,*, 85 F.3d 1577, 1582 (Fed. Cir. 1996)

("Although {a party} points to evidence supporting the dissenting commissioners' decision . . .

this does not mean that the Commission's affirmative determination is unsupported by

substantial evidence.") (citing *Consolo*).  As discussed above, the Commission amply explained

the reasons for its conclusion that the substantial post-petition increase in subject imports was

likely to seriously undermine the remedial effect of the orders.  Plaintiffs' efforts to have the

Court compare the dissent's findings with those of the Commission is simply another way of

asking the Court to reweigh evidence.  *See Metallverken Nederland B.V. v. United States,* 13 CIT

1013, 1017, 728 F. Supp. 730, 734 (1989) ("In asking the Court to negate a commissioner's

determination based upon the findings of the dissenting commissioners, plaintiffs are, in essence,

asking the Court to reweigh the evidence.").  Because the Commission's findings regarding the

timing and the volume of the relevant imports are supported by substantial evidence and in

accordance with law, the Court should sustain them.

> **b.  The statute does not require the Commission to determine whether subject imports "massively increased."**

As discussed in section IV.A above, the statute requires Commerce and the Commission

to make two separate findings before retroactive duties may be imposed.  First, Commerce must

determine whether "there have been massive imports of the subject merchandise over a relatively

short period." 19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(B).  Second, the Commission must

determine "whether the imports subject to {Commerce's affirmative critical circumstances

determination} are likely to undermine seriously the remedial effect of the {orders}." 19 U.S.C.

§§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i).  Ignoring the plain text of the statute, NURA argues

that the Commission, like Commerce, was also somehow "{r}equired to determine whether

imports massively increased in the post-petition period" and erred by "mak{ing} no factual

33

finding that imports 'massively increase{ed}' or 'surge{d}' in the post-petition period."  NURA Br. at 13-18.  Nothing in the statute or the SAA requires the Commission to perform such a "magic words" analysis.

The statutory provisions applicable to the Commission's critical circumstances analysis do not require the Commission to find that imports "massively increased" or "surged" in the post-petition period and those terms are found nowhere in the Commission's provisions.  Rather, the statute requires the Commission to "include a finding as to whether the imports subject to" Commerce's affirmative critical circumstances determinations "are likely to undermine seriously the remedial effect of the" antidumping duty or countervailing duty order, as the case may be. 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i).  In making that evaluation, the statute directs the Commission to consider "the timing and the volume of the imports," among other factors. *See* 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).  In considering "the timing and the volume of the imports" here, the Commission reasonably found the post-petition increase in subject import volume "significant" and sufficient to cause an adverse impact likely to seriously undermine the remedial effect of the orders, for the reasons discussed above.  Views at 61, 65. Thus, the Commission considered "the timing and the volume of the imports" in accordance with the statute.

The Court should reject NURA's invitation to read a "massively increased" imports requirement into the statute based on its misreading of the SAA and isolated references to "massive" imports and import "surges" in past Commission critical circumstances determinations.  *See* NURA Br. at 17-19.  As an initial matter, because the statute is clear on its face that the Commission is to consider "the timing and the volume of the imports," the Court need not resort to the SAA to understand its meaning.  That the statute prescribes no particular

approach to this inquiry is consistent with this Court's recognition that "{n}othing in the statute restricts the Commission's broad discretion to consider data reasonably relevant to determining the 'timing and volume of imports.'" *MTD Prods.*, 2023 WL 2535885, at *4.

Furthermore, NURA's argument relies on a misreading of an ancillary passage of the SAA, which merely explains why Congress deleted an "unnecessary and redundant" sentence that takes certain language out of context. NURA Br. at 19 (quoting SAA at 877). NURA bases its argument on the following paragraph:

> Section 214(a)(2)(b) of the bill also eliminates the reference in section 705(b)(4)(A) of the Act to 'injury which is difficult to repair' to conform to the new language in the antidumping provision concerning the Commission determination regarding a surge in imports. This deleted language is unnecessary and redundant because the Commission is already required to determine whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order. If the effectiveness of a remedy is undermined, the underlying injury would be difficult to repair.

SAA at 877. Contrary to NURA's argument, Congress did not intend to impose a new "massively increasing imports" requirement on the Commission, found nowhere in the Commission's provisions of the statute, with this paragraph. Rather, Congress simply explained that the URAA eliminated the term "injury which is difficult to repair" as "unnecessary and redundant" because when the Commission finds that the effectiveness of a remedy is undermined, as already required, the underlying injury would be difficult to repair. NURA attaches great significance to the sentence "the Commission is already required to determine whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order," but this sentence is simply a restatement of the corresponding statutory provision. The statute provides, in relevant part, that "the Commission shall include a finding as to whether the imports subject to the affirmative

35

determination under subsection (a)(2) of this section {(or (a)(3))}"—Commerce's determination that imports have massively increased—"are likely to undermine seriously the remedial effect of the countervailing {and/or antidumping} duty order . . . ." 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i). Indeed, in the same section of the SAA, Congress observes that "critical circumstances exist if Commerce determines that . . . there have been massive imports of the subject merchandise over a relatively short period of time (*i.e.*, a surge of imports) prior to the suspension of liquidation." SAA at 876. Thus, the clause "by massively increasing imports prior to the effective date of relief" is a reference to the determination that Commerce must make, and not a commentary on how the Commission is to consider "the timing and volume of the imports." Tellingly, even before the Commission's assessment, Commerce had already determined that post-petition imports "massively increased" pursuant to its regulations, which define "massive imports" as imports that have increased over the comparison periods by at least 15 percent. *See* 19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(B); 19 C.F.R. § 351.206(h).

Similarly misplaced is NURA's reliance on another sentence fragment from the SAA taken out of context, stating that "the Commission is to determine whether the surge in imports prior to the suspension of liquidation . . . is likely to seriously undermine the remedial effect of the order." NURA Br. at 14-15 (quoting SAA at 877). With the benefit of the full sentence, Congresses' intent was clearly to explain a clarification made by the URAA, not the imposition of any new test found nowhere in the statute: "With regard to Commission determinations, the legislation clarifies that the Commission is to determine whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." SAA at 877. Again, the clause "the surge in imports prior to the suspension of liquidation" is a reference to the determination that Commerce

must make and not a commentary on how the Commission should consider "the timing and volume of the imports."

Nor does the fact that NURA could find past determinations in which the Commission used the words "massive" or "surge" establish that the Commission is statutorily required to use such words in considering the "timing and volume of the imports." *See* NURA Br. at 18. In the cases cited by NURA, the Commission only discussed increasing imports to determine whether they seriously undermined the remedial effect of the orders and not in applying any "massively increased" test. *See Paper Plates*, USITC Pub. 5595 at 43, 46 (rebutting the assertion that increase volume "does not constitute the type of 'massive surge' that the Commission has previously found to undermine the remedial effect of an order" and finding that "{t}he volume of imports in the post-petition period was substantial"); *Small Vertical Shaft Engines from China*, Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 at 47-48 (Apr. 2021) (finding that a "massive surge" is "likely to protract the adverse impact of the imports subject to the affirmative critical circumstances finding and thereby undermine seriously the remedial effect"); *Synthetic Indigo from China,* Inv. No. 731-TA-851 (Final), USITC Pub. 3310 at 15 (June 2000) (acknowledging a "massive increase" and determining that "a subject import surge that is likely to seriously undermine the effect of the antidumping duty order"); *Coumarin from China*, Inv. No. 731-TA-677 (Final), USITC Pub. 2852 at I-17 (Feb. 1995) (finding that a "large surge" in post-petition imports among other factors showed that retroactive duties are necessary to "prevent the recurrence of material injury"). In each case, the Commission did not mention any "massive increase" of subject imports in its conclusion regarding critical circumstances, but only that subject imports were likely to seriously undermine the remedial effect of the orders. *Id*. Indeed, this court recently sustained an affirmative critical circumstances determination by the

Commission in which the Commission made no mention of the words "massive" or "surge" when describing the increased imports. *Raw Honey*, USITC Pub. 5327, at 49 (May 2022), *aff'd*, *Sweet Harvest Foods*, 669 F. Supp. 3d at 1363. That the Commission has used the words "massive" and "surge" in a handful of the innumerable critical circumstances determinations is unsurprising and not evidence that the Commission has "long embraced" NURA's erroneous interpretation of the SAA. *See* NURA Br. at 15.

Because the statute imposes no requirement that the Commission use the terms "massively increased" or "surged" in considering the "timing and volume of the imports," and the Commission has never recognized such a requirement, NURA's argument that the Commission somehow adopted a "new interpretation of the statute" that it is not required to consider whether subject imports "massively increased" or "surged" is misplaced. *Id*. at 19. Nor did the Commission in any way indicate that it could substitute Commerce's "massive imports" finding for its own obligation to consider the "timing and volume of the imports," as NURA mistakenly suggests. *Id*. Rather, the Commission correctly noted that under the statute, Commerce makes the determination of "whether 'there have been massive imports'" while the Commission makes the determination of "as to whether imports subject to {Commerce's affirmative critical circumstances determination} are likely to undermine seriously the remedial effect of the order." Views at 63 n.260 (quoting 19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(B), 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i)). The Commission also recognized that in making that determination, it was to consider "the timing and volume of the imports," among other factors enumerated by the statute. *Id*. Indeed, the statute expressly limits the Commission's critical circumstances analysis, including its consideration of "the timing and volume of the imports," to those "imports subject to the affirmative determination" made by Commerce, that "there have

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

been massive imports of the subject merchandise over a relatively short period," making

Commerce's critical circumstances determination highly relevant to the Commission's analysis.

*See* 19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(A) (Commerce provisions); 19 U.S.C.

§§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i) (Commission provisions).  Thus, the very first step of

the Commission's critical circumstances analysis here was to identify the imports as to which

Commerce had made affirmative critical circumstances determinations.  Views at 60.  The

Commission then proceeded to consider in great detail whether "the timing and volume of the

imports" was such that the imports were "likely to undermine seriously the remedial effect of the

order," as discussed above, belying NURA's mistaken assertion that the Commission somehow

"substitute{d} Commerce's affirmative critical circumstances determination in place of its own

finding."  NURA Br. at 19.  Because the Commission's consideration of "the timing and volume

of the imports" was in accordance with law, as well as supported by substantial evidence as

discussed above, the Court should affirm this aspect of the Commission's analysis.

### 3.    The Commission's findings regarding inventories are supported by substantial evidence and otherwise in accordance with law.

In considering "any rapid increase in inventories of the imports," the Commission found

that the post-petition increase in subject imports did not replace existing inventories but rather

created a stockpile of imports prior to the imposition of provisional duties.  *See* Views at 63, 65.

Specifically, end-of-period U.S. inventories of subject imports increased from [          ]

pounds at the end of the pre-petition period to [          ] pounds at the end of the post-

petition period, an increase of [     ] percent.  Views at 63.  The Commission reasonably

concluded that the [     ] percent increase in post-petition subject imports "occurred in the

context of increasing U.S. inventories," lending additional support to its conclusion that the

adverse impact of the subject imports was likely to undermine seriously the remedial effect of

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

the orders.  Views at 65-66.  Therefore, the Commission reasonably considered whether there was "any rapid increase in inventories of the imports," and the Court should sustain this aspect of its analysis.

Plaintiffs argue, mistakenly, that the Commission erred by somehow failing to find that inventories "rapidly increased," asserting that the [ ▮ ] precent increase found by the Commission would not have supported such a finding.  Jianyuan Br. at 35-36 (asserting that imports were not "stockpiled" and that inventories were less than in prior years of the POI); NURA Br. at 26-27.  As an initial matter, the Commission's affirmative critical circumstances determinations were primarily based on its analysis of the timing and volume of the post-petition increase in subject imports, and their universal underselling at substantial margins, and not subject import inventories.  Views at 65 (dominant market share, universal underselling, and increase in volume all occurred "{with}in the context" of increased inventories).  As Plaintiffs recognize, the Commission did not find that inventories rapidly increased.  Jianyuan Br. at 36, NURA Br. at 26-27.  In this case, importers used most of the significant post-petition increase in subject import volume to increase their U.S. shipments and market share, facilitated by significant underselling, rather than to build inventories.  *See* Views at 47, 65-66.  Nevertheless, the Commission explained that the [ ▮ ] percent increase in post-petition subject import volume also coincided with a [ ▮ ] percent increase in post-petition inventories of subject imports, indicating that importers were stockpiling subject imports rather than seeking to maintain a consistent level of inventories as sales were made.  Views at 61, 63.  Thus, the Commission reasonably concluded that the post-petition increase in subject imports "occurred in the context of increasing U.S. inventories of subject imports."  Views at 65.

Furthermore, the Commission is not required to find a rapid increase in inventories of the

imports as a precondition for making an affirmative critical circumstances determination, as Plaintiffs mistakenly argue.  NURA Br. at 26; Jianyuan Br. at 35-36.  The statute only requires the Commission to "*consider . . .* any rapid increase in inventories of the imports."  19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii) (emphasis added).  As the Federal Circuit explained in *Altx*, the Commission's "consideration" of a statutory factor does not encompass an obligation to come to any conclusion regarding that factor.  370 F.3d at 1123 (discussing "consideration" of the magnitude of the margin of dumping); *see also Nucor*, 414 F.3d at 1339 (rejecting the argument that "the Commission did not properly assess the significance of underselling because it failed to provide . . . a concrete conclusion," and holding that "{t}he Commission complied with the statutory requirement that it consider whether there had been underselling") (quotation omitted).  Therefore, while the Commission must consider whether there has been "any rapid increase in inventories of imports," among other factors, the Commission is not required to find such an increase before making an affirmative critical circumstances determination.  Indeed, the Commission has made affirmative critical circumstances determinations without finding that inventories rapidly increased.  *See e.g., Mattresses*, USITC Pub. 5520 at 70; *Certain Amorphous Silica Fabric from China*, Inv. Nos. 701-TA-555 and 731-TA-1310 (Final), USITC Pub. 4672, at 31 (Mar. 2017).  Because the Commission reasonably considered whether there had been "any rapid increase in inventories of imports," consistent with the statute, the Court should affirm that aspect of the Commission's analysis.

Nor would a requirement that inventories rapidly increase in the post-petition period make any sense.  A significant post-petition increase in subject imports could result in increased U.S. shipments of subject imports and subject import market share without importers increasing their inventories of subject imports.  There is no reason that a significant post-petition increase in

subject imports that is used by importers to increase their U.S. shipments and market share would be any less likely to undermine the remedial effect of an order than an increase that is stockpiled by importers in inventory.  In either case, the significant post-petition increase in subject imports would ultimately displace domestic industry shipments from the U.S. market, thereby undermining the remedial effect of the order.  Given that the purpose of the statute is to "prevent clever importers from circumventing" duties by "rushing in their shipments before the duties take effect," Congress could not have intended for importers to escape retroactive duties by significantly increasing their imports after the filing of petitions and then selling the increased imports on the U.S. market rather than stockpiling them.  *MTD Prods.*, 2023 WL 2535885, at *1; *ICC Indus.*, 812 F.2d at 699-700 (quoting H.R. Rep. No. 96-317).  Whether they are held in inventory or immediately shipped to purchasers, a significant post-petition increase in subject import volume can "seriously undermine the remedial effect of the order."  *See* SAA at 877; 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i).

### 4.    The Commission's findings regarding "other relevant" factors are supported by substantial evidence and in accordance with law.

#### a.    The Commission reasonably considered subject import pricing in the post-petition period.

The Commission must consider "any other circumstances indicating that the remedial effect of the orders will be seriously undermined," and may consider "other factors it considers relevant."  19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).  As one of these other factors, the Commission considered the pricing of subject imports in the post-petition period.  Views at 63-64.  It observed that although these prices did not markedly decrease, subject imports undersold the domestic like product at large margins, averaging 38.6 percent, throughout the POI.  Views at 63-64.  It found that larger margins of underselling were not required to affect the

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

significant post-petition increase in subject import volume, given that subject imports undersold the domestic like product in [     ] comparisons in the second half of 2023, involving [     ] pounds, at significant margins ranging from [     ] to [     ] percent.  Views at 64.  In other words, the Commission recognized that subject import prices did not markedly decrease in the post-petition period but explained that importers had no need to reduce their prices further because simply continuing the significant underselling margins that had prevailed throughout the POI enabled them to significantly increase subject import volume in the post-petition period.  Because the Commission's analysis of subject import pricing in the post-petition period was reasonable, the Court should affirm this aspect of the Commission's analysis.

NURA argues that Commission "ignored" certain data that "weighed against" critical circumstances including that prices increased for many pricing products and "underselling margins remained constant, and in some cases decreased" during the post-petition period.  NURA Br. at 29-30, 33-34.  Similarly, Jianyuan argues that the Commission somehow overlooked trends in the pricing data that, in its view, did not indicate any price declines consistent with a rush by importers to beat the deposit requirement.  Jianyuan Br. at 38-40.  As an initial matter, "{a}bsent some showing to the contrary, the Commission is presumed to have considered all of the evidence in the record." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 17 CIT 146, 164, 818 F. Supp. 348, 365 (1993) (quoting *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 55, 592 F. Supp. 1318, 1326 (1984)); *see also Gonzales v. West*, 218 F.3d 1378, 1381 (Fed. Cir. 2000) ("{A}bsent specific evidence indicating otherwise, all evidence contained in the record at the time of the {agency}'s determination . . . must be presumed to have been reviewed by {the agency}, and no further proof of such review is needed.").  Furthermore, rather than ignoring pricing trends, the Commission meticulously examined price and

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

underselling trends throughout the POI, in both its critical circumstances and price effects analyses.  Views at 32 & n.127 (yearly underselling trends, including in 2023); Views at 35 & nn.140-42 (price trends during the entire POI, including quarterly price trends throughout 2023); Views at 37, 63-65 (underselling and price trends in 2023), CSR at Tables V-1-2, 8-13, C-1.  In considering subject import pricing for purposes of its critical circumstances analysis, the Commission noted that subject import sales prices decreased from the first half of 2023, corresponding to the pre-petition period, and the second half of 2023, corresponding to the post-petition period, for three of the four pricing products, which made up a majority of reported subject import sales volume.  Views at 63-64, n.262.[5]  It also noted that subject import sales prices were lower in the fourth quarter of 2023 than in the third quarter of 2023 for all four pricing products.  Views at 64 n.262.  Thus, contrary to Plaintiffs' arguments, the Commission found that subject import prices had generally declined between the pre- and post-petition periods.

While recognizing that subject import sales prices did not "markedly decrease" in the post-petition period, the Commission observed that subject imports undersold the domestic like product at large margins throughout the POI, averaging 38.6 percent, and that larger margins of underselling were not required to effect the significant post-petition increase in subject import volume.  Views at 63-64.  In this regard, the Commission noted that subject imports continued to undersell the domestic like product in [ ███ ] quarterly comparisons in the second half of 2023, at margins ranging from [ ██ ] to [ ██ ] percent.  Views at 64.  Thus, the Commission

---

[5] Further undermining to NURA's assertions, the Commission examined overall price trends in the interim period in its price effects section.  Specifically, "prices . . . increased through the last quarter of 2022 or first quarter of 2023 and then generally declined in 2023, again with some fluctuation."  *See* Views at 35 n.140; CR at Tables V-4-7.

considered the pricing data highlighted by Plaintiffs and recognized that subject import prices had not markedly decreased in the post-petition period but reasonably explained that importers did not have to intensify their underselling because it was already sufficient to enable them to significantly increase subject import volume in the post-petition period.  As such, the Court should reject Plaintiffs' invitation to reweigh this evidence.

Nor is there any requirement under the statute that the Commission find that importers sought to "beat the deposit requirement" by increasing their underselling before making an affirmative critical circumstances determination, as Jianyuan mistakenly argues.  Jianyuan's Br. at 39.  In light of the Commission's findings that there was a moderate degree of substitutability between subject imports and the domestic like product and that price was an important factor in purchasing decisions, Views at 25-27, the Commission reasonably found that subject import underselling in all quarterly comparisons during the post-petition period, at substantial underselling margins, made subject import prices sufficiently attractive to purchasers.  Views at 63-64.  Therefore, importers were able to significantly increase their subject imports during the post-petition period without reducing subject import prices markedly.  Views at 63-64.  The Commission found that the timing of the subject imports, not any intensification of underselling, indicated that importers had substantially increased their orders of subject merchandise immediately following the filing of the petitions in July, driving the significant post-petition increase in subject import volume.  Views at 64-65.  This Court has affirmed the Commission's reliance on "the *continued* underselling of the domestic like product by wide margins," rather than any increase in underselling margins or a decrease in prices, in making an affirmative critical circumstances determination.  *See e.g.*, *Sweet Harvest Foods*, 669 F. Supp. 3d at 1349 (emphasis added).

45

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**b. The Commission reasonably considered the impact of subject imports during the POI.**

In its uncontested present material injury determination, the Commission found that the universal underselling by significant and irregularly increasing volumes of subject imports caused the domestic industry's poor financial performance during the POI, including [          ] and worsening gross, operating, and net losses, by taking sales from the industry and depressing and suppressing domestic prices. *See* Views at 43, 46, 48, 65. For its critical circumstances determination, the Commission reasonably referenced its analysis of the impact of subject imports on the domestic industry during the POI as support for its finding that the significant increase in post-petition subject import volume had an adverse impact on the industry likely to undermine seriously the remedial effect of the orders. *See* Views at 43, 46, 48, 65. Essentially, the Commission found that given the subject imports' dominant share of the U.S. market and universal underselling at large margins throughout the POI, the significant post-petition increase in subject import volume would adversely impact the industry in the same way that subject imports adversely impacted the industry during the POI, by taking sales from the industry and placing downward pressure on domestic prices. Because the Commission's consideration of this "other factor" was reasonable, the Court should affirm this aspect of its analysis.

Jianyuan argues, unpersuasively, that the Commission's reference to the domestic industry's [                              ] throughout the POI inappropriately "ble{d} its normal injury analysis into its distinct critical circumstances analysis" to the exclusion of any finding that "these post-petition imports had a distinct impact on the domestic industry, over and above the impact of imports throughout the POI." Jianyuan Br. at 42. As an initial matter, the Commission expressly found that the imports subject to Commerce's

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

affirmative critical circumstances determination had an adverse impact on the domestic industry likely to undermine seriously the effect of the orders, based on the [ ▮ ] percent increase in post-petition subject import volume, equivalent to [ ▮ ] percent of the industry's production in 2023, in the context of increasing U.S. inventories of subject imports.  Views at 65.  Thus, the Commission made the critical circumstances determinations required by the statute and those determinations were supported by substantial evidence and in accordance with law, as discussed above.

Furthermore, the causal link between subject imports and the industry's poor and worsening performance during the POI, discussed in section V.E. of the Views, was highly relevant to the Commission's assessment of the impact of the significant post-petition increase in subject imports.  Views at 65-66.  Given the subject imports' dominant market share and universal underselling at large margins throughout the POI, it was reasonable for the Commission to find that the significant increase in post-petition subject import volume would adversely impact the domestic industry in the same way that subject imports adversely impacted the industry during the POI, by taking sales from the industry and exerting downward pressure on domestic prices.  As such, contrary to Jianyuan's assertion, the Commission did not repeat its "normal injury analysis."  Jianyuan Br. at 42.

Moreover, critical circumstances data regularly overlaps with data used in the Commission's current material injury analysis.  Indeed, because the Commission's final determinations can be made over a year after the filing of petitions, as in this case, the post-petition period considered in a critical circumstances analysis will necessarily overlap with the period of investigation considered in a present material injury analysis.  *See MTD Prods.*, 2023 WL 2535885, at *1 (much of the Commission's POI overlapping with the post-petition period).

For this reason, certain data used by the Commission to make its present material injury determination will often be relevant to the Commission's critical circumstances analysis, as was the case here.

Finally, Jianyuan asserts that even if the Commission properly considered its "ordinary injury factors," the Commission's disregard of "contradictory evidence" somehow invalidated that analysis. Jianyuan Br. at 42. In doing so, Jianyuan simply rehashes its material injury arguments made during the investigations that subject imports had no significant adverse price effects or adverse impact on the domestic industry. *Id*. After rejecting each of those arguments, the Commission determined that the domestic industry was materially injured by reason of subject imports, and Plaintiffs do not challenge any aspect of the Commission's affirmative present material injury determination. *See* Views at 38 n.149 (addressing startup cost argument); Views at 48-54 (addressing substitutability, overlap in customers, price-based purchasing, correlation, startup costs, and cost structure arguments). Accordingly, Jianyuan has no grounds for arguing that the Commission's reliance on its uncontested impact analysis was improper.

## V.    CONCLUSION

For the foregoing reasons, we respectfully request that the Court affirm the Commission's affirmative critical circumstances determinations in these investigations.

Respectfully submitted,

Margaret D. Macdonald
General Counsel

Karl von Schriltz
Assistant General Counsel

*/s/ Spencer Toubia*

Spencer Toubia
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2906
Facsimile: (202) 205-3111
spencer.toubia@usitc.gov

*Attorneys for Defendant United States*

Dated: September 24, 2025

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Court's Scheduling Order and Chambers Procedures 2(B)(1) and (2), I hereby

certify that the attached **DEFENDANT UNITED STATES INTERNATIONAL TRADE**

**COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO**

**PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

contains 13,993 words, according to the word-count function of the word processing system used

to prepare this brief (Microsoft Word 2010).


Dated: September 24, 2025                    */s/ Spencer Toubia*
                                             Spencer Toubia
                                             Attorney-Advisor
                                             Office of the General
                                             U.S. International Trade Commission
                                             500 E Street, SW
                                             Washington, DC 20436
                                             Telephone: (202) 205-2906
                                             Facsimile: (202) 205-3111
                                             spencer.toubia@usitc.gov