## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE LISA W. WANG, JUDGE

| | |
|---|---|
| NURA USA, LLC,<br><br>   Plaintiff,<br><br>   and<br><br>JIANYUAN INTERNATIONAL CO., LTD., *et al.*,<br><br>   Consolidated Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>   Defendant,<br><br>   and<br><br>PURIS PROTEINS, LLC, d/b/a PURIS,<br><br>   Defendant-Intervenor. | **Court No. 24-00182**<br><br>**PUBLIC VERSION**<br><br>**Business Proprietary Information Removed from Pages 3-4, 9, 11-13, 23-24, 26-27, 29-31, 33-34, and 37-38** |

## DEFENDANT-INTERVENOR'S RESPONSE BRIEF

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

Date:  October 8, 2025

*Counsel to Defendant-Intervenor PURIS*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... iii

I.      RULE 56.2 STATEMENT ........................................................................................ 1

   A.    The Administrative Determination Under Review ............................................ 1

   B.    Issues Presented And Summary of Argument .................................................. 2

      1.   Whether the Commission is required to make a finding that subject imports "massively increased" to reach an affirmative critical circumstances determination. ..................... 2

      2.   Whether it was reasonable for the Commission to use a comparison period of five months. ........................................................................................................... 3

      3.   Whether the Commission's analysis of the timing and volume of imports was supported by substantial evidence and in accordance with law. ..................... 3

      4.   Whether the Commission correctly considered Inventory data. ................... 4

      5.   Whether the Commission's findings on pricing and other relevant record information were supported by substantial evidence and in accordance with law. ............................ 5

II.     STANDARD OF REVIEW .................................................................................... 7

III.    STATEMENT OF FACTS ...................................................................................... 8

   A.    Petition And Preliminary Determinations ....................................................... 8

   B.    Commerce's Final AD/CVD and Critical Circumstances Determinations ..................... 9

   C.    The Commission's Affirmative Final Material Injury Determinations ..................... 9

   D.    Affirmative Critical Circumstances Determination ........................................ 10

      1.   Timing and volume of subject imports ...................................................... 11

      2.   Increases in inventory of subject imports ................................................. 13

      3.   Other relevant factors ............................................................................ 13

      4.   Affirmative determination of critical circumstances .................................. 13

IV.     ARGUMENT ...................................................................................................... 14

   A.    Legal Standard For Critical Circumstances Determinations ............................ 14

      1.   the timing and the volume of the imports, ................................................ 15

2.   a rapid increase in inventories of the imports, and ...................................................... 15

3.   any other circumstances indicating that the remedial effect of the {order} will be seriously undermined. ................................................................................................. 15

B.   There Is No Requirement That The Commission Find Subject Imports "Massively" Increased To Reach An Affirmative Determination ........................................................ 15

C.   The Commission's Use of Five-Month Data Comparison Periods Is Supported By Substantial Evidence And In Accordance With Law ....................................................... 20

D.   The Commission's Critical Circumstances Determination Was Supported By Substantial Evidence And Otherwise In Accordance With Law ........................................................ 23

1.   The increase in post-petition imports was significant given the context of the industry and the market ................................................................................................................ 23

2.   The Commission's findings regarding inventories are supported by substantial evidence and otherwise in accordance with law ........................................................... 29

3.   Even if the Commission should have used a six-month comparison period, the doctrine of harmless error applies and the Court should uphold the Commission's determination 31

4.   Plaintiffs' arguments regarding other relevant factors are without merit and should be rejected ............................................................................................................................. 35

a)   The Commission reasonably considered pricing and underselling in the post-petition period ......................................................................................................... 35

b)   The Commission reasonably considered record evidence that overlapped with its impact analysis ..................................................................................................... 38

V.   CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

## CASES

*Atl. Sugar Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984).................................................................. 8

*Cleo In. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007)........................................................... 7, 25

*Consolidated Edison v. NLRB*,
    305 U.S. 197 (1938)................................................................................. 7

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)........................................................................... 7, 28

*CP Kelco US, Inc. v. United States*,
    24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015).......... 32

*CVB, Inc. v. United States*,
    675 F. Supp. 3d 1324 (Ct. Int'l Trade 2023) ............................................. 32

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ............................................. 8

*Grupo Industrial Camesa v. United States*,
    85 F.3d 1577 (Fed. Cir. 1996)............................................................... 28

*ICC Indus., Inc. v. United States*,
    812 F.2d 694 (Fed. Cir. 1987)........................................................... 14, 16

*Intercargo Ins. Co. v. United States*,
    83 F.3d 391 (Fed. Cir. 1996)................................................................. 32

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984)................................................................. 7

*Metallverken Nederland B.V. v. United States*,
    728 F. Supp. 730 (Ct. Int'l Trade 1989) ................................................... 28

*MTD Prods., Inc. v. United States*,
    Slip Op. 23-34, 2023 WL 2535885 (Ct. Int'l Trade Mar. 16, 2023) ............ 22, 25, 28

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)............................................................... 8

*Nucor Corp. v. United States*,
    414 F.3d 1331 (Fed. Cir. 2005)............................................................. 29

*PAM, S.p.A v. United States*,
  582 F.3d 1336 (Fed. Cir. 2009) ........................................................................... 7, 8

*Siemens Energy, Inc. v. United States*,
  806 F.3d 1367 (Fed. Cir. 2015) ............................................................................. 28

*Sweet Harvest Foods v. United States*,
  669 F. Supp. 3d 1346 (Ct. Int'l Trade 2023) ....................................................... 36

*Timken Co. v. United States*,
  699 F. Supp. 300 (Ct. Int'l Trade 1988) ................................................................ 8

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ............................................................................................... 7

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................... 7

19 U.S.C. § 1671b(e)(2) .......................................................................................... 15

19 U.S.C. § 1671d(a)(2)(B) .............................................................................. *passim*

19 U.S.C. § 1671d(b)(4)(A)(i) ............................................................ 14, 16, 18, 20

19 U.S.C. § 1671d(b)(4)(A)(ii) ....................................................................... *passim*

19 U.S.C. § 1673b(e)(2) .......................................................................................... 15

19 U.S.C. § 1673d(a)(3)(A) ..................................................................................... 20

19 U.S.C. § 1673d(a)(3)(B) ............................................................................ *passim*

19 U.S.C. § 1673d(b)(4)(A)(i) ............................................................ 14, 17, 18, 20

19 U.S.C. § 1673d(b)(4)(A)(ii) ....................................................................... *passim*

28 U.S.C. § 2639(a)(1) .............................................................................................. 7

## RULES

Fed. R. Civ. P. 61 ................................................................................................... 32

## REGULATIONS

19 C.F.R. § 351.206(h) ........................................................................................... 19

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Carbon and Alloy Steel Cut-to-Length Plate from Brazil, South, Africa, and Turkey*,
Inv. Nos. 701- TA-560-561 and 731-TA-1317-1328 (Final), USITC Pub. 4664
(Jan. 2017) .......................................................................................................... 21

*Carbon and Certain Alloy Steel Wire Rod from China,* Inv. Nos. 701-TA-512 and
731-TA-1248 (Final), USITC Pub. 4509 (Jan. 2015) ............................................. 22

*Certain Pea Protein from China*, 88 Fed. Reg. 60,495 (Int'l Trade Comm'n Sept. 1, 2023) ......... 8

*Certain Pea Protein From China*,
89 Fed. Reg. 67,671 (Int'l Trade Comm'n Aug. 21, 2024) .................................... 1, 9

*Certain Pea Protein from China*, Inv. Nos. 701-TA-692 and 731-TA-1628 (Final),
USITC Pub. 5529 (Aug. 2024) ........................................................................ *passim*

*Certain Pea Protein From the People's Republic of China: Final Affirmative Countervailing
Duty Determination and Final Affirmative Critical Circumstances Determination*,
89 Fed. Reg. 55,557 (Dep't Commerce July 5, 2024) ............................................. 9

*Certain Pea Protein From the People's Republic of China: Final Affirmative Determination
of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances
Determination*, 89 Fed. Reg. 55,559 (Dep't Commerce July 5, 2024) ...................... 9

*Gas Powered Pressure Washers from China and Vietnam*; Inv. No. 701-TA-684 and
731-TA-1597-1598 (Final), USITC Pub. 5465 (Oct. 2023) .............................. 35, 36

*Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands,
Turkey, and the United Kingdom*, Inv. No. 701-TA-545-547 and 731-TA-1291-1297
(Final), USITC Pub. 4638 (Sep. 2016) .................................................................. 21

*Lined Paper School Supplies from China, India, and Indonesia*,
Inv. Nos. 701-TA-442-43, 731-TA-1095-97, USITC Pub. 3884 (Sept. 2006)........................ 15

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*,
Inv. No. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022)... 21

*Pea Protein from China: Preliminary Affirmative Countervailing Duty Determination,
Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final
Determination with Final Antidumping Duty Determination*,
88 Fed. Reg. 87,403 (Dep't of Commerce December 18, 2023) ............................... 8

*Pea Protein From China: Preliminary Affirmative Determination of Sales at Less Than Fair
Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of
Final Determination, and Extension of Provisional Measures*,
89 Fed. Reg. 10,038 (Dep't of Commerce Feb. 13, 2024) ...................................... 9

*Pentafluoroethane (R-125) from China*, Inv. No. 701-TA-662 and 731-TA-1554 (Final),
      USITC Pub. 5281 (Feb. 2022) .................................................................................. 22

*Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands,
      Saudi Arabia, Taiwan, Turkey, & the United Arab Emirates*, Inv. Nos. 701-TA-646 and
      731-TA-1502-1504, 1508-1509, 1512, 1514, and 1516 (Final),
      USITC Pub. 5153 (Jan. 2021) .................................................................................. 22

*Quartz Surface Prods. from China*, Inv. No. 701-TA-606 (Final), USITC Pub. 4913
      (June 2019) .............................................................................................................. 22

## OTHER AUTHORITIES

Statement of Administrative Action to the Uruguay Round Agreements Act,
      H.R. Rep. 103-316, vol. I, (1994) ("SAA") ......................................................... *passim*

# I.    RULE 56.2 STATEMENT

Defendant-Intervenor PURIS Proteins LLC d/b/a PURIS ("PURIS"), petitioner in the underlying investigation, respectfully submits this response in opposition to the Rule 56.2 motions for judgment on the agency record filed in this case by NURA USA, LLC ("NURA") and the consolidated plaintiffs Jianyuan International Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Linyi Yuwang Vegetable Protein Co., Ltd., Yantai Oriental Protein Tech Co., Ltd., and Jiujiang Tiantai Food Co., Ltd. (the "Consolidated Plaintiffs").

## A.    The Administrative Determination Under Review

The administrative determination under review is the United States International Trade Commission's (the "Commission's") final affirmative critical circumstances in the antidumping ("AD") and countervailing duty ("CVD") investigations of certain pea protein from China. *See* Consolidated Plaintiffs' Motion for Judgement on the Agency Record, Ct. No. 24-00182 (CIT May 27, 2025) (ECF No. 43) ("Con. Pl. Br."); NURA USA, LLC's Rule 56.2 Motion For Judgment On The Agency Record, Ct. No. 24-00182 (CIT May 27, 2025) (ECF No. 45) ("NURA Br."). The Federal Register notice was published at 89 Fed. Reg. 67,671 (Aug. 21, 2024), P.R. 130, and the public version of the Commission's Views and Staff Report for these investigations are contained in *Certain Pea Protein from China*, Inv. Nos. 701-TA-692 and 731-TA-1628 (Final), USITC Pub. 5529 (Aug. 2024) ("Commission Views" and "Staff Report"), P.R. 130.[1]

---

[1] Public documents in the administrative record are designated as "P.R." and confidential documents are designated as "C.R."  Business proprietary information from confidential documents is designated using square brackets and is redacted from the public version of the brief, in accordance with Rule 5(g) of the Court's Rules.  Citations to the Commission's confidential Views ("Commission Views") are to C.R. 220 and to the confidential Staff Report and its Revisions ("Staff Report") are to C.R. 205 and C.R. 206.

## B.    Issues Presented And Summary of Argument

### 1.    Whether the Commission is required to make a finding that subject imports "massively increased" to reach an affirmative critical circumstances determination.

**No**.  The plain language of the statute assigns the responsibility for determining if the increase in subject imports in the post-petition period is massive solely to the Department of Commerce ("Commerce"), as Commerce must determine, among other considerations, whether "there have been massive imports of the subject merchandise over a relatively short period."  19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(B).

NURA's arguments to the contrary are based on misreadings of the Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. Rep. 103-316, vol. I, (1994) ("SAA"), specifically from a paragraph addressing elimination of the term "injury which is difficult to repair" as "unnecessary and redundant", and not imposing a "massively increasing imports" requirement on the Commission for the "timing and volume of the imports" factor. SAA at 877.

In fact, NURA ignores that the SAA does discuss the considerations the Commission is required to address by the statute, and that there is no requirement that the Commission find "massive" or "surging" imports as part of its analysis.  *Id*.

Finally, NURA's reading would result in the Commission redoing the statutory analysis already performed by Commerce, but with a higher threshold and a requirement that this finding is dispositive, simply because the words "massive" or "surge" have appeared in prior Commission determinations.  Again, this is not supported by the statute or the SAA.  NURA's arguments should be rejected.

2.    **Whether it was reasonable for the Commission to use a comparison period of five months.**

**Yes.**  The Commission reasonably used five-month comparison periods rather than the typical six-month comparison periods used in other investigations, as the Commission relies on "shorter periods when Commerce's preliminary determination applicable to the country at issue fell within the six-month post-petition period."  Commission Views at 60-61.

In this case, Commerce published its preliminary CVD determination on December 18, 2023.  This occurred during the sixth month of the post-petition period, therefore the Commission elected to use five-month comparison periods based on the date of the preliminary determination.  *Id.*  The Commission's use of a five-month comparison period is consistent with prior Commission practice to account for a significant portion of that sixth month that fell after the effective date of the order, which would have distorted the data analyzed.  As a result, the Commission's choice to use a five-month comparison period should be upheld.

Moreover, if this Court finds, *arguendo*, that the Commission erroneously used five-month comparison periods in its critical circumstances analysis, the Court should still uphold the Commission's final determination because its selection of comparison periods constitutes a harmless error.  The minimal differences in the relevant data between the five- and six-month comparison periods demonstrate that using the six-month period would not have altered the Commission's ultimate critical circumstances determination.

3.    **Whether the Commission's analysis of the timing and volume of imports was supported by substantial evidence and in accordance with law.**

**Yes.**  In line with the statute, the Commission determined that the increase in subject import volume from [          ] pounds in the pre-petition period to [          ] pounds in the post-petition period, which amounted to a [    ] percent increase in subject import volume,

"was significant" and the "timing of the increase in subject imports from China in the post-petition period {was} instructive" to how that increase would undermine the efficacy of the orders. *Id*. at 61-65.

Although Plaintiffs argue that the Commission should have viewed the percentage increase in imports in a vacuum—*i.e.*, without using the context of the market to measure the volume vis-à-vis U.S. apparent consumption and production—and that this value on its own is below the threshold required to make an affirmative determination, these arguments would result in restrictions to the Commission's analysis not found in the statute or the legislative history. Despite Plaintiffs' claims that the Commission must look at only certain data in a vacuum when analyzing this factor, Plaintiffs also argue that the Commission erred in not relying on other facts, such as arranged imports or NURA's position on U.S. demand during the post-petition period, to reach a negative determination. These arguments are without merit and are unsupported by the record.

Lastly, Plaintiffs place significant reliance in the dissent of Commissioner Schmidtlein. These arguments, however, amount to a request for this Court to re-weigh the evidence in this investigation, which this Court cannot and should not do. Therefore, the Court should find that the Commission's analysis of the timing and volume of imports was supported by substantial evidence and otherwise in accordance with law.

### 4.    Whether the Commission correctly considered Inventory data.

**Yes.** The Commission considered, as set out in the statute, "any rapid increase in inventories of the imports." As a result, the Commission determined that the increase in post-petition imports "did not replace decreasing inventories" and, instead, increased, or "stockpiled," those inventories by [          ] pounds, or [     ] percent. *Id*. at 63.

Plaintiffs incorrectly argue that the Commission is required to find that inventories rapidly increased, and that the increase in inventories does not reach a level to be considered "rapid." However, the statue only requires that the Commission "consider" this factor, not make any specific determination regarding it. 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). This is exactly what the Commission did, and based on that consideration, although not finding that the inventory increase was rapid, it did find that the increase in inventories was probative of the Commission's ultimate determination that the increase in post-petition imports would likely undermine the efficacy of the orders, particularly given the market context at the time. The Commission's considerations on this factor, therefore, are supported by substantial evidence and in accordance with law.

> **5.**    **Whether the Commission's findings on pricing and other relevant record information were supported by substantial evidence and in accordance with law.**

**Yes.** The statute instructs the Commission to consider, "among other factors it considers relevant … any other circumstances indicating that the remedial effect of the orders will be seriously undermined." 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). Despite the Plaintiffs' contentions, the Commission's consideration of other relevant factors is supported by substantial evidence and in accordance with law. Regarding pricing information, the Commission reasonably considered the universal underselling at sizeable margins throughout the period of investigation to support the finding that "still larger margins of underselling were not required to effect the significant increase in the volume of imports involved in the post-petition period{.}" Commission Views at 64. Plaintiffs argue that the Commission must, instead, find that prices declined during the post-petition period to reach an affirmative determination, but this contention is not found in the statute or prior Commission practice, and would lead to an absurd result. Essentially, Plaintiffs are arguing for a "get out of jail free" card, one that would permit

subject importers to massively increase imports to beat imposition of an order as long as those imports are already so low priced compared to the domestic industry that any further reduction is unnecessary to achieve this goal. This Court should reject this contention. There is no exception to the critical circumstances statute that would permit such behavior, and to do so here would undermine the efficacy of the law.

The Consolidated Plaintiffs also argue that the Commission impermissibly used material injury considerations in its critical circumstances analysis, and that any reference to universal and significant underselling, along with reference to the effect of subject import behavior on the domestic industry, was "bootstrap{ping} into the critical circumstances analysis the ordinary injury considerations{,}" which the Consolidated Plaintiffs believe "is not permitted by statute." Con. Pl. Brief at 41-42. This is patently false. The statute does not prohibit the Commission from looking at any information on the record; in fact, it instructs the Commission to consider "any other circumstances indicating that the remedial effect of the orders will be seriously undermined." 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

Moreover, the Consolidated Plaintiffs' contend that even if the Commission can consider material injury factors, any decision based on those factors is flawed because the Commission disregarded contradictory evidence that it claims invalidated the Commission's material injury analysis. Con. Pl. Br. at 42. The Consolidated Plaintiffs are asking for a "do over" of the injury case, even though they have not challenged the Commission's material injury determination in this Court. As these arguments have already been dismissed by the Commission without appeal, the Consolidated Plaintiffs have no basis for stating that the Commission cannot use these facts to provide context for its critical circumstances determination here.

This Court should, therefore, find that the Commission's consideration of these "other relevant factors" was supported by substantial evidence and otherwise in accordance with law.

## II.    STANDARD OF REVIEW

In reviewing the Commission's critical circumstances determinations, the Court of International Trade must sustain the Commission's determinations, findings or conclusions unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" 19 U.S.C. § 1516a(b)(1)(B)(i).  Determinations made by the Commission are presumed to be correct, with the burden on the challenging party to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *PAM, S.p.A v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  "The specific factual findings" on which the Commission relies "in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A*., 555 U.S. 305, 316 n.6 (2009).

Under the substantial evidence standard, a Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo In. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007).  As the Supreme Court has held, substantial evidence is "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent" an agency determination from being "supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Accordingly, the CIT has explained that it will not substitute its judgment for that of an agency in choosing between two fairly conflicting interpretations of the facts on the record. *See*

*Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988); *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Further, the Court of Appeals for the Federal Circuit ("Federal Circuit") has held that "substantial evidence on the record means 'more than a mere scintilla' and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if some evidence on the record detracts from the agency's ultimate determination. *Atl. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citing *Universal Camera Corp. v. N.L.R.B*, 340 U.S. 474, 477 (1951)); *PAM S.p.A.*, 582 F.3d at 1339. As the Federal Circuit has held, the substantial evidence standard is a "high barrier" for a challenging party to overcome. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

## III.    STATEMENT OF FACTS

### A.    Petition And Preliminary Determinations

On July 12, 2023, PURIS, an American producer of high protein content ("HPC") pea protein, filed antidumping and countervailing duty ("AD/CVD") petitions (the "Petitions") with Commerce.

In September 2023, the Commission made affirmative preliminary material injury determinations in both the AD and CVD investigations. *Certain Pea Protein from China*, 88 Fed. Reg. 60,495, 60,495 (Int'l Trade Comm'n Sept. 1, 2023), P.R. 54.

Commerce published its preliminary affirmative determinations for the CVD and AD investigations on December 18, 2023 and February 13, 2024, respectively. *Pea Protein from China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 88 Fed. Reg. 87,403 (Dep't of Commerce December 18,

2023);  *Pea Protein From China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 10,038, 10,039 (Dep't of Commerce Feb. 13, 2024).

### B.    Commerce's Final AD/CVD and Critical Circumstances Determinations

On June 27, 2024, Commerce issued its final affirmative determination in both its AD and CVD investigations.  *Certain Pea Protein From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,557 (Dep't Commerce July 5, 2024), P.R. 109; *Certain Pea Protein From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances Determination*, 89 Fed. Reg. 55,559 (Dep't Commerce July 5, 2024) ("Commerce AD Final Determination"), P.R. 110. Commerce found that the volume of each respondent's U.S. imports "increased by at least 15 percent" from the base period to the comparison period and concluding that these imports were "massive."  89 Fed. Reg. 55,557, P.R. 109; 89 Fed. Reg. 55,559, P.R. 110.

### C.    The Commission's Affirmative Final Material Injury Determinations

The Commission published its final affirmative material injury and critical circumstance determinations in both the AD and CVD investigations on August 21, 2024.  *Certain Pea Protein From China*, 89 Fed. Reg. 67,671 (Int'l Trade Comm'n Aug. 21, 2024), P.R. 126.  The Commission Views discussed the factors used to reach its affirmative material injury determinations.  Of particular concern was the market share of subject imports, which accounted for more than [   ] percent of the domestic market during the POI, increasing to [     ] percent in 2023, making subject imports the largest supply source in the U.S. by a [                    ]. Commission Views at 24.  The Commission also found that subject import volume was

significant in both absolute terms and relative to domestic consumption.  *Id*. at 30-31.  Further, the Commission determined that "{s}ubject imports undersold the domestic like product in all 48 quarterly comparisons, involving reported subject import sales of 143.2 million pounds, at margins ranging from 17.9 to 58.6 percent and averaging 38.6 percent" and that "universal underselling by subject imports at large margins of underselling—in a market where there is at least a moderate degree of substitutability and price is an important purchasing factor— pervasively impacted domestic industry's ability to compete in the market throughout the POI, placing sustained downward pressure on domestic prices."  *Id*. at 32 & 42.  None of these findings regarding material injury have been appealed to this Court.

For the above reasons, three of the four participating Commissioners determined that domestic industry was materially injured by reason of subject imports of pea protein from China. Commission Views at 1.[2]

### D.    Affirmative Critical Circumstances Determination

In addition to the material injury determinations, the Commission made affirmative critical circumstances determinations.  *Id*. at 3.  Per the statute, Commerce is explicitly tasked with determining whether "there have been massive imports of the subject merchandise over a relatively short period." 19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(B).  After Commerce reaches its affirmative critical circumstances determination, the Commission then is statutorily required

---

[2] Although the remaining Commissioner did not vote affirmatively for present material injury, that Commissioner did, however, vote in the affirmative that subject imports threatened to materially injure the domestic industry.  Separate and Concurring Views of Commissioner David S. Johanson at 87-89, C.R. 222, P.R. 130 (stating that "it is likely that at some point in the imminent future subject imports would start to significantly depress or suppress domestic producers' prices" and that "given the vulnerability of the U.S. industry even relatively minimal amounts of further price pressure combined with rising import volumes would be likely to have a significant impact.").

to consider the timing and volume of subject imports under Commerce's affirmative critical circumstances determination, rapid increases in inventories of those subject imports, and any other circumstances indicating that the remedial effects of the orders would be seriously undermined. 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

The Commission conducted its investigation by using five-month pre- and post-petition comparison periods, February—June 2023 and July—November 2023. As discussed in its Views, though the Commission "frequently relies on six-month comparison periods" it "has relied on shorter periods when Commerce's preliminary determination applicable to the country at issue fell within the six-month post-petition period. Commission Views at 60-61. In this instance, the Commission determined that the five-month comparison period was called for because Commerce's preliminary CVD determination was rendered during the sixth month of the post-petition period. *Id.* (explaining that Commerce's preliminary determination was published in the Federal Register on December 18, 2023).

### 1.    Timing and volume of subject imports

The Commission then compared the volume of subject imports across the comparison periods. The Commission found that the increase in import volume in the post-petition period represented a significant portion of the U.S. market, with particular focus on the large volume of imports prior to the increase. *Id*. at 61. The Commission found that subject imports increased from [            ] pounds in the pre-petition period to [            ] pounds in the post-petition period, an increase of [    ] percent. *Id* at 62.

In relative terms, the increase in subject imports alone equated to [    ] percent of domestic production and to [    ] percent of apparent U.S. consumption in 2023. *Id*. at 62. The Commission also noted that the post-petition increase happened while subject imports increased their overall share of the domestic market from [    ] percent in 2022 to [    ] percent in 2023.

The Commission rejected Plaintiffs' assertion that the [      ] percent post-petition increase was significantly lower than the increase in other critical circumstances cases, by reference to the recent affirmative determination in *Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines, Poland, Slovenia, and Taiwan* ("*Mattresses*"). Commission Views at 62 n.257. Specifically, in that investigation, the Commission found that while the post-petition increase in the *Mattresses* investigation was greater in percentage terms ([      ] percent), the resulting increase compared to U.S. consumption was lower ([    ]) percent. *Id*. Further, the share of domestic consumption in the determination at hand was [    ] percent compared to [    ] percent in *Mattresses*. Commission Views at 62-63 (citing *Mattresses* at 68-69).

The Commission also found that the timing of post-petition increases was instructive to its critical circumstances analysis. The Commission noted that from 2022 to 2023, U.S. consumption decreased by [    ] percent while subject imports spiked by [    ] percent during the post-petition period. Commission Views at 64-65. This is indicative of an alarming trend across the POI: that subject imports from China amplified their already dominant market position at the expense of domestic producers. Further, the Commission found that subject imports were higher in August, September and November of the post-petition period than in any month of the pre-petition period reaching "[    ] percent higher than in the peak month of the pre-petition period." *Id*. The Commission also determined that "{s}ubject import volume was higher in September 2023, at [        ] pounds, than in any other month in 2023, and [    ] percent higher than in the peak month of the pre-petition period." *Id*. The Commission considered this spike in imports during September in the context of the reported lead times, finding that "reported 45- and 67-day lead times for sales made from foreign inventories and

produced to order, respectively, subject imports arriving in September would have been ordered immediately following the filing of the petitions in July." *Id*. at 64-65.

### 2.    Increases in inventory of subject imports

The Commission determined that the significant post-petition increase resulted in a "stockpile of imports prior to the imposition of provisional duties." Commission Views at 65. Specifically, between the pre- and post-petition periods, subject import inventories increased by [          ] pounds. This resulted in a [          ] percent increase in inventories between the comparison periods. *Id*. at 63, 65. The Commission noted that such an increase meant that these volumes were not used to simply replace depleted inventories in the United States. *Id*. at 63.

### 3.    Other relevant factors

In addition to the volume and timing of subject imports and the effect of those imports on inventory levels, the Commission considered other relevant factors when making its determination. Specifically, the Commission recognized that subject import prices decreased in the second half of 2023 (which aligns with the 5-month post-petition period) for products 1-3, [                                                                ]. *Id*. at 63-64. The Commission found the subject imports undersold the domestic like product throughout the POI at an average of 38.6 percent and that subject imports were underselling the domestic like product across [          ] comparisons, including [          ] pounds at wide margins between [     ] percent to [     ] percent. *Id*. at 63-66.

### 4.    Affirmative determination of critical circumstances

The Commission determined that the "massive" increase in subject imports identified by Commerce were likely to seriously undermine the remedial effects of the orders. *Id*. at 65. The Commission found that the significant and pervasive underselling of subject imports, coupled with subject imports' ascendent and increasingly dominant presence in the U.S. market including

13

increases in subject merchandise inventories, was indicative of the downward pressure and poor

performance of domestic industry in the post-petition period.  *Id*. at 65-66.

The Commission determined that the downward pressure of subject imports, subject

imports' dominating market position, and the increase and timing of import volumes were

demonstrative of the existence of critical circumstances and necessitated the imposition of

retroactive duties to ensure that the intended remedial effect of the orders was not undermined.

*Id*.

## IV.    ARGUMENT

### A.    Legal Standard For Critical Circumstances Determinations

The critical circumstances provision was designed "to deter exporters whose merchandise

is subject to an investigation from circumventing the intent of the law by increasing their exports

to the United States during the period between initiation of an investigation and a preliminary

determination by {Commerce}."  *ICC Indus., Inc. v. United States*, 812 F.2d 694, 700 (Fed. Cir.

1987) (quoting H.R. Rep. No. 96-317, 96th Cong. 1st Sess., at 63 (1979) (the "SAA")).  In order

for critical circumstances to be applied, Commerce must first determine, among other

considerations, that "there have been massive imports of the subject merchandise over a

relatively short period."  19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(B).

Then, only after the Commission makes an affirmative determination of injury, the

Commission must make a determination "whether the imports subject to {Commerce's}

affirmative {critical circumstances} determination{s} … are likely to undermine seriously the

remedial effect of the { } order{s} to be issued."  19 U.S.C. §§ 1671d(b)(4)(A)(i),

1673d(b)(4)(A)(i).  The statute provides that, in making this determination, the Commission shall

consider, among other factors it considers relevant:

1.    the timing and the volume of the imports,

2.    a rapid increase in inventories of the imports, and

3.    any other circumstances indicating that the remedial effect of the {order}
       will be seriously undermined.

19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

In considering the timing and volume of subject imports, the Commission's practice is to compare import quantities prior to the filing of the petitions with those subsequent to the filing of the petitions using monthly statistics on the record regarding those firms for which Commerce has made an affirmative critical circumstances determination. *See, e.g., Lined Paper School Supplies from China, India, and Indonesia*, Inv. Nos. 701-TA-442-43, 731-TA-1095-97, USITC Pub. 3884 at 46-48 (Sept. 2006). The SAA indicates that the Commission is to determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order", and specifically "whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." SAA at 877.

Affirmative critical circumstances determinations by the Commission, in conjunction with an affirmative determination of material injury by reason of subject imports, results in the retroactive imposition of duties for those imports subject to the affirmative Commerce critical circumstances determination for a period 90 days prior to the suspension of liquidation. 19 U.S.C. §§ 1671b(e)(2), 1673b(e)(2).

**B.    There Is No Requirement That The Commission Find Subject Imports "Massively" Increased To Reach An Affirmative Determination**

As a preliminary matter, it is clear from the statutory language that the Commission is not required to make a finding that subject imports massively increased in the post-petition period in order to make an affirmative determination of critical circumstances, despite the gymnastics

15

routine of statutory interpretation performed by NURA in its brief.  NURA concedes that the

statute only enumerates two factors the Commission must consider in its critical circumstances

analysis: the timing and volume of imports and any rapid increase in inventories, along with any

other circumstances indicating the remedial effect of the order will be seriously undermined.

NURA Br. at 13 (citing 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii)).  NURA then

claims, however, that the requirement that the Commission "consider" the timing and volume of

imports is without specific instructions on what conditions would indicate an affirmative

determination of critical circumstances is warranted for that factor.  Therefore, NURA contends

that this Court must set out those instructions.  NURA Br. at 14.  Yet NURA conveniently skips

all of the statutory language, and instead moves to a reading of the SAA without context to argue

that the statutory instruction to "consider" the "timing and volume of the imports" actually

means "the Commission must make a determination as to whether imports have 'massively

increas{ed}' or 'surge{d}' prior to the suspension of liquidation for subject import.  NURA Br.

at 15.

　　　　NURA ignores the plain language of the statute, which assigns the responsibility for

determining if the increase in subject imports in the post-petition period is massive solely to

Commerce.  The critical circumstances analysis has two distinct steps, one step for each agency.

First, Commerce must determine, among other considerations, that "there have been massive

imports of the subject merchandise over a relatively short period."  19 U.S.C. §§ 1671d(a)(2)(B),

1673d(a)(3)(B).  *See also ICC Industries, Inc*, 812 F.2d at 697 ("In order to retroactively impose

the antidumping duty *the ITA* must initially find … massive imports of the merchandise")

(emphasis added).  The Commission then evaluates whether the subject imports "are likely to

undermine seriously the remedial effect of the {orders}."  19 U.S.C. §§ 1671d(b)(4)(A)(i),

1673d(b)(4)(A)(i).  Commerce must affirmatively determine that there have been massive

imports during the post-petition period as part of its affirmative determination; otherwise the

Commission does not consider critical circumstances at all.

Yet despite the clear Congressional intent set forth in the statue that Commerce gauge

whether the relevant imports are massive,[3] NURA misreads the SAA in an attempt to create a

requirement for Commission action where one does not exist.  First, NURA's argument relies on

a phrase plucked from the following paragraph from the SAA:

> Section 214(a)(2)(b) of the bill also eliminates the reference in section
> 705(b)(4)(A) of the Act to 'injury which is difficult to repair' to conform
> to the new language in the antidumping provision concerning the
> Commission determination regarding a surge in imports.  This deleted
> language is unnecessary and redundant because the Commission is already
> required to determine whether, by massively increasing imports prior to
> the effective date of relief, the importers have seriously undermined the
> remedial effect of the order. If the effectiveness of a remedy is
> undermined, the underlying injury would be difficult to repair.

SAA at 877.  This entire paragraph does not further identify a "massively increasing imports"

requirement on the Commission for the "timing and volume of the imports" factor.  Instead it

simply describes the elimination of the term "injury which is difficult to repair" because it is

"unnecessary and redundant".  The reference to "the Commission is already required to

determine whether, by massively increasing imports prior to the effective date of relief, the

importers have seriously undermined the remedial effect of the order" is merely a restatement of

the progression of a critical circumstances determination as set out above: Commerce concludes

---

[3] The Consolidated Plaintiffs, despite arguing that subject imports are not large enough for an
affirmative Commission determination, do acknowledge that it is Commerce's role to determine
if there has been a massive surge in imports.  Con. Pl. Br. at 17 ("regardless of the period that
Commerce selected in fulfilling its responsibility to determine whether imports had been
massive.") and 18 ("Commerce's conclusion that there had been a massive surge in imports.").

that imports increased massively, then those imports are the subject of the Commission's analysis.[4]  19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i).

The SAA, therefore, does not support NURA's attempt to impose an extra statutory obligation on the Commission.

Second, similar to NURA ignoring Congress' clear language giving Commerce the task of analyzing whether imports increased massively, NURA's analysis ignores that there is a paragraph in the SAA that discusses the factors that the Commission should consider:

> Sections 214(a)(2)(B) and (b)(2)(B) of the bill also amend the current list of factors in sections 705(b)(4)(A)(iii) and 735(b)(4)(A)(iii) that the Commission considers in making its final critical circumstances determination.  The new factors track the language of the Agreement, and essentially are reformulations of many of the factors in the current statute. The new list is not exclusive.  The factors provided in existing statute, even though not specifically mentioned in the bill, may be relevant in particular investigations.

SAA at 877.  This paragraph in no way imposes a "massively increasing imports" requirement on the Commission for the "timing and volume of the imports" factor.  In fact, this passage demonstrates that Congress did not list these factors to require certain thresholds to be met in order for a critical circumstances finding to be made.  Instead, these factors "may be relevant in particular investigations."  *Id*.  As such, the Commission has the discretion to adjust its analysis to fit the factual record of the case and the product/industry at issue.

---

[4] NURA also attempts to supports this contention by use of another line in the SAA, but this line, once seen in context—"With regard to Commission determinations, the legislation clarifies that the Commission is to determine whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order."—is clearly referring to the same statutory operation, *i.e.*, that Commerce identifies the massive increase or surge, then the Commission analyzes whether those imports are likely to seriously undermine the remedial effect of the order.  SAA at 877.

Tellingly, NURA itself recognizes this discretion for another factor listed in the statute, even though it argues otherwise here. NURA Br. at 14 ("the Commission should *consider* a 'rapid increase in inventories; as a circumstance indicating that imports are likely to seriously undermine the remedial effect of the orders" (emphasis added)). NURA's claims that the "timing and volume of the imports" factor means that the Commission must make a finding clearly assigned to Commerce, and that this finding is mandatory despite the language of the statue and the SAA, are without merit and should be rejected.

Finally, NURA's approach is nonsensical. NURA is essentially arguing for a requirement that the Commission must redo the statutory analysis performed by Commerce, but with a higher threshold and a requirement that an affirmative finding is dispositive, in order to get around the factual problem they face of the increase in subject imports and inventories of subject imports during a time of decreasing demand in the post-petition period. Commerce had already determined that post-petition imports "massively increased" pursuant to the statute and its regulations, which define "massive imports" as imports that have increased over the comparison periods by at least 15 percent. *See* 19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(B); 19 C.F.R. § 351.206(h).

NURA cannot overcome these failings by use of the Commission's determinations either. Much like its attempted reliance on the SAA, the simple fact that the words "massive" and "surge" have been used by the Commission in prior determinations is not an acknowledgement of an extra statutory requirement, but merely a descriptor, and an apt one at that since Commerce would have already determined that imports were massive in each instance the Commission analyzed critical circumstances. In fact, the statute specifically limits the Commission's analysis to "imports subject to the affirmative determination" made by Commerce, which is where

Commerce has found that "there have been massive imports of the subject merchandise over a relatively short period."  *See* 19 U.S.C. §§ 1671d(a)(2)(B), 1673d(a)(3)(A) (Commerce provisions) and 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i) (Commission provisions). NURA's argument that the Commission should redo Commerce's analysis even though that analysis can only be triggered by Commerce's critical circumstances determination is illogical.

Ultimately, NURA is simply trying to take the statutory consideration of "timing and volume" and transform it into a dispositive threshold, and a high one at that, in order to avoid the factual record that supports the affirmative determination of critical circumstances in this case. However, as NURA's proposed requirement is not found in the statute and is not supported by NURA's strained reading of the SAA, it should be rejected by this Court.

### C.   The Commission's Use of Five-Month Data Comparison Periods Is Supported By Substantial Evidence And In Accordance With Law

The Commission reasonably used five-month comparison periods rather than the typical six-month comparison periods used in other investigations.  Commission Views at 60-61 (explaining that although it "frequently relies on six-month comparison periods," the Commission has "relied on shorter periods when Commerce's preliminary determination applicable to the country at issue fell within the six-month post-petition period").  During the underlying proceedings, Commerce published its preliminary CVD determination on December 18, 2023.  This occurred during the sixth month of the post-petition period.  As a result, the Commission elected to use five-month comparison periods based on the date of the preliminary determination.  *Id.*

The Consolidated Plaintiffs' argument that the Commission "deviated from practice" by using a five-month comparison period without a compelling reason to do so is without merit. Con. Pl. Br. at 20-21.  While insisting that the Commission's use of six-month comparison

periods is typical, the Consolidated Plaintiffs acknowledge that the Commission uses a five-month comparison period when Commerce's preliminary determination was issued in the sixth month.  Consolidated Plaintiffs, however, try to artificially limit application of this approach by claiming that the Commission only does so when Commerce's preliminary determinations were issued "either early in the omitted month or, at minimum, in the first part of that month."  Con. Pl. Br. at 22.  On this basis, Consolidated Plaintiffs argue that the Commission should have selected six-month comparison periods in this case because Commerce's preliminary determination was published in the "latter half" of December 2023.  *Id*. at 23.

In fact, the Commission has used five-month comparison periods in a number of its investigations when including the sixth month would lead to distorting effects on the volume of subject imports during the post-petition period, including when Commerce's preliminary determination occurred halfway or later during the sixth month, and as late as the 22nd day of the six month, which was four days later than the preliminary determination in the present case.  *See, e.g., Carbon and Alloy Steel Cut-to-Length Plate from Brazil, South, Africa, and Turkey*, Inv. Nos. 701- TA-560-561 and 731-TA-1317-1328 (Final), USITC Pub. 4664 (Jan. 2017) at 48 (citing a September 22 preliminary determination date on the sixth month); *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. No. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022) at 50 (citing a March 14 preliminary determination date);  *Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, Inv. No. 701-TA-545-547 and 731-TA-1291-1297 (Final), USITC Pub. 4638 (Sep. 2016) at 49 & n.251 (citing a January 15 preliminary determination date).

While there are instances where the Commission has elected to use six-month comparison periods when Commerce's preliminary determination fell in the sixth month, it is typically done so when that preliminary determination is published at the end of the sixth month. *See, e.g.*, *Pentafluoroethane (R-125) from China*, Inv. No. 701-TA-662 and 731-TA-1554 (Final), USITC Pub. 5281 (Feb. 2022) at 41-42 (June 25 preliminary determination date); *Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi Arabia, Taiwan, Turkey, & the United Arab Emirates*, Inv. Nos. 701-TA-646 and 731-TA-1502-1504, 1508-1509, 1512, 1514, and 1516 (Final), USITC Pub. 5153 (Jan. 2021) at 20 (September 21 preliminary determination date); *Quartz Surface Prods. from China*, Inv. No. 701-TA-606 (Final), USITC Pub. 4913 (June 2019) at 24 (September 21 preliminary determination date). None of these cases demonstrate that the Commission has utilized a six-month comparison period when Commerce's preliminary determination occurred on the 20th of the sixth month or earlier, as is the case here. It was reasonable, therefore, for the Commission to use a five-month comparison period here.

This Court has maintained that the Commission has broad discretion to choose its comparison periods in its critical circumstances analysis, as "{n}othing in the statute restricts the Commission's broad discretion to consider data reasonably relevant to determining the 'timing and volume of imports." *See MTD Prods., Inc. v. United States*, Slip Op. 23-34, 2023 WL 2535885, at *4 (Ct. Int'l Trade Mar. 16, 2023) (emphasis omitted). In the case at hand, the Commission reasonably selected its five-month comparison period to exclude fourteen days of imports subject to provisional duties, which would have distorted import volume data. *See Carbon and Certain Alloy Steel Wire Rod from China,* Inv. Nos. 701-TA-512 and 731-TA-1248

(Final), USITC Pub. 4509 (Jan. 2015) at 26 (stating that the imposition of provisional duties causes subject import volumes to decline).

Those 14 days are not the only days that would be affected in the sixth month. As the Commission discussed in its determination, the lead times from orders being placed and subsequent delivery of said orders, as reported by importers, was between 45 and 67 days. Commission Views at 64-65. While December 18 was when the preliminary determinations (and margins) were published in the Federal Register, estimating shipping times to ensure a shipment would clear customs before a given the date is not a precise science. Given the long lead times to ship products from China, U.S. imports of subject merchandise would have been affected long before in order to avoid any shipment delays that would lead to the application of preliminary duties.

The Consolidated Plaintiffs are trying to impose a six-month comparison period as they believe that the inclusion of an extra month where import volumes were heavily influenced by Commerce's preliminary determination would benefit them. As set out in Section IV.D.3 below, regardless of whether a five- or six-month comparison period is used, the data support a finding of critical circumstances. However, the Commission reasonably excluded the sixth month to ensure that the comparison period was not skewed by the large share of the sixth month in which preliminary duties applied and influenced importer behavior. As a result, the Commission's choice to use a five-month comparison period should be upheld.

### D.    The Commission's Critical Circumstances Determination Was Supported By Substantial Evidence And Otherwise In Accordance With Law

#### 1.    The increase in post-petition imports was significant given the context of the industry and the market

The Commission determined that the increase in subject import volume from [

] pounds in the pre-petition period to [                    ] pounds in the post-petition period,

which amounted to a [      ] percent increase in subject import volume, "was significant" and viewed the "timing of the increase in subject imports from China in the post-petition period as instructive" to how that increase would undermine the efficacy of the orders.  *Id*. at 61-65. Moreover, the Commission put the increase in subject imports into context by comparing the volume to apparent consumption and domestic production.  The Commission found that the post-petition volume of subject imports and the post-petition increase in the volume of subject imports were equivalent to [      ] percent and [      ] percent, respectively, of apparent U.S. consumption in 2023.  *Id*. at 62.  The post-petition increase in the volume of subject imports for the five-month period was equivalent to [      ] percent of the domestic industry's production in 2023.  *Id*. All of these shifts took place as Chinese imports increased as a share of apparent U.S. consumption from [      ] percent in 2022 to [      ] percent in 2023, gaining [      ] percentage points of market share.  *Id*.  These factors led to the Commission's conclusion that the "increase in post-petition volume was exacerbated by the already-dominant position of subject imports in the U.S. market", which means that "while the percentage increase in post-petition imports is less than in some other recent investigations, that increase was from a very large base—a share of more than [         ] of the entire market" which made the effect of these imports greater than the percentage increase would portray.  *Id*. at 62-63.

NURA and the Consolidated Plaintiffs argue that on its own, the [      ] percent increase is below the threshold the Commission requires to make an affirmative critical circumstances determination, based on other cases.  NURA Br. at 23 and Con. Pl. Br. at 18-20.  In its determination, the Commission addressed Plaintiffs' position on this issue, setting out how the context demonstrates why an affirmative determination is reasonable and is differentiated from the Commission's prior determinations.  Commission Views at 62 n.257.  Ultimately, Plaintiffs'

arguments are an attempt to isolate one data point, and apply a threshold not found in the statute, in order to avoid the record that as a whole that supports an affirmative determination. This argument attempts to decouple the Commission's analysis from the conditions in the marketplace, which would permit large importers with large levels of market share to avoid critical circumstances determinations based on the percentage increase in imports, even when those increases are massive in absolute terms and in relation to consumption or production. This is also contrary to the discretion given to the Commission in the statute to consider "any other circumstances indicating that the remedial effect of the {} order will be seriously undermined." 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). This is particularly important as the Commission's approach to each investigation is *sui generis*, and must respond to the unique set of facts that surrounds each industry. *See Cleo Inc.,* 501 F.3d at 1299 (because each injury investigation by the Commission is *sui generis*, "prior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries").

The Consolidated Plaintiffs also argue that the Commission improperly interpreted "timing" and "volume" separately when dealing with the overall volume of subject imports, contrary to the plain language of the statute. Con. Pl. Br. at 27. This argument, however, has no statutory or legal basis, and is an attempt to impose an artificial constraint on the Commission's analysis. "Nothing in the statute restricts the Commission's broad discretion to consider data reasonably relevant to determining the 'timing and volume of imports.'" *MTD Prods., Inc*, 2023 WL 2535885 at *4 (Ct. Int'l Trade Mar. 16, 2023). In this case, the Commission analyzed both the increased volume and the timing of that increase in post-petition imports, finding that the

timing of the imports informs the significance of the volume increase.  Commission Views at 64-65.

Yet, the Consolidated Plaintiffs take issue with the Commission's focus on September 2023 volume, but not other months, as "based on speculation."  Con. Pl. Br. at 41.  This, however, ignores that the Commission reasonably based this finding on the "45- and 67-day lead times for sales made from foreign inventories and produced to order, respectively, which place the responsive surge in imports squarely in the September time period, as "45 days after July 12, 2023 is August, 26, 2023 while 67 days after July 12, 2023 is September 17, 2023."  Commission Views at 65 n.269.  The Consolidated Plaintiffs claim that the Commission should have given more weight to other months, such as October, yet October did not line up a large increase in monthly import volume with the filing of the petition based on information provided in responses to the U.S. Importers' questionnaires regarding lead times like September 2023.  As a result, Consolidated Plaintiff's argument does not withstand scrutiny.

The Consolidated Plaintiffs further argue that the Commission "base{ed} its decision on pre-petition market share" and that subject imports gaining [      ] percent of market share from 2022 to 2023 is "irrelevant" to the Commission's critical circumstances analysis.  Con. Pl. Br. at 28-29.  This is another attempt by Plaintiffs to try to separate facts from the relevant context that informed the Commission concerning whether the post-petition increase would undermine the orders.  Given that the increase in post-petition imports was equivalent to [      ] percent of U.S. apparent consumption in 2023, that increase drove the increase in market share in that year and demonstrated the market effects of such a volume.  Commission Views at 61-62.

The Consolidated Plaintiffs' similar attempt to give relevance to the arranged import data is also misplaced.  Con. Pl. Br. at 41.  Arranged imports are imports or orders for imports after

the end of the period of investigation. In this case, all of the arranged import data are from 2024, *i.e.*, after Commerce's preliminary determination in December 2023. *See* Staff Report at I-2 & VII-12. These data are, therefore, irrelevant to the Commission's critical circumstances analysis, and would be so even assuming, *arguendo*, that it would have been appropriate for the Commission to use the six-month comparison period advocated by the Plaintiffs, the end point of which is December 31, 2023. Moreover, Plaintiffs ignore that the key time frame for analysis in critical circumstances determinations is a closing window where subject importers are working to time their imports in order to avoid paying duties. It is predictable that not only would imports decline as projected lead times predict shipments will overlap with the date preliminary duties would be imposed, but that arranged imports in 2024 would significantly decline because that window of opportunity has firmly closed.

NURA also argues that an increase in demand is tied to the increase in subject imports during the post-petition period. NURA Br. at 35. NURA points to [

] NURA Prehearing Br. Exh. 2 at 5, C.R. 190. In other words, NURA relies on [                                                        ], then extrapolates that assertion to the entire pea protein market in the second half of 2023. First, this is contrary to [

] *See* U.S. Producers' Questionnaire Response of PURIS at IV-14, C.R. 135. Moreover, another U.S. producer, Ingredion, [                                        ]. U.S. Producers' Questionnaire Response of Ingredion at II-2d, II-3c-d, f, C.R. 158. Finally, this assertion is contrary to the full record of the investigations, which found no increase in demand

over the period of investigation based on the record developed throughout the investigation. Commission Views at 22-23 & n.73; *see also* Staff Report at C-3. Given that the Commission appropriately weighed the evidence and reached a different, fact-based, reasonable conclusion, NURA's unsupported assertions should be rejected.

The Plaintiffs' arguments primarily rely on the dissent of Commissioner Schmidtlein for support, but this reliance is misplaced. "In asking the Court to negate {the Commission's} determination based upon the findings of the dissenting commissioner{}, plaintiffs are, in essence, asking the Court to reweigh the evidence."). *Metallverken Nederland B.V. v. United States,* 728 F. Supp. 730, 734 (Ct. Int'l Trade 1989). However, "substantial evidence review does not permit the court to re-weigh the evidence." *MTD Prods.*, 2023 WL 2535885, at *7. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1372 (Fed. Cir. 2015) (cleaned up) (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Industrial Camesa v. United States,*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision . . . this does not mean that the Commission's affirmative determination is unsupported by substantial evidence.") (citing *Consolo*).

As discussed above, the Commission considered the timing and volume of imports, as required by the statute, using record evidence to provide context to support its conclusion that the massive post-petition increase in subject imports was likely to seriously undermine the remedial effect of the orders. Plaintiff's arguments to the contrary amount to a request to reweigh the evidence using extra statutory thresholds and restrictions on the Commission's analysis to separate data from the context that demonstrates the probative value of those data. The

Plaintiffs' attempts should be rejected.  The Court should uphold the Commission's findings regarding the timing and the volume of Chinese imports, which are supported by substantial evidence and in accordance with law.

> **2.    The Commission's findings regarding inventories are supported by substantial evidence and otherwise in accordance with law**

The Commission considered "any rapid increase in inventories of the imports" as directed by the statute.  In analyzing inventories, the Commission determined that the increase in post-petition imports "did not replace decreasing inventories" and, instead, increased those inventories by [          ] pounds, or [    ] percent.  Commission Views at 63.  Plaintiffs contend that the Commission did not find that inventories "rapidly increased" and claim that the [    ] percent increase in inventories is below the threshold for what would be considered a "rapid increase."  Con. Pl. Br. at 35-36; NURA Br. at 26-27.  Moreover, Plaintiffs insist, incorrectly, that finding that an increase in inventories constitutes a "'rapid increase' as required by the statute."  NURA Br. at 26 and Con. Pl. Br. at 35-36.

First, the plain language of the statute sets out that the Commission must "*consider. . . any rapid increase in inventories of the imports*," not to absolutely find that rapid increases occurred. 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii) (emphasis added).  Despite the claims that this is a requirement, both NURA and the Consolidated Plaintiffs concede elsewhere in their briefs that this is the case.  Con. Pl. Br. at 35-36 ("The statute plainly requires consideration of "a rapid increase in inventories of the imports.") (emphasis omitted); NURA Br. at 25 ("Section 735 of the Act instructs the Commission to consider the "rapid increase in inventories of the imports…").  The Commission's "consideration" of a statutory factor does not equate to a requirement to reach a certain conclusion in order support an affirmative determination. *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005).  In other

words, the Commission is not required to affirmatively find rapidly increasing imports to be able to make an affirmative critical circumstances determination.  This is merely one factor that the Commission must consider, however, its relevance varies on a case-by-case basis.[5]

Second, the Commission correctly found that the [    ] percent increase in inventories, given the context of the U.S. market, is probative to show that the increase in subject imports during the post-petition period would likely undermine the remedial effect of the orders.  In these investigations, while the Commission did not find that inventories rapidly increased during the post-petition period, the Commission did find that there was an unnecessary increase in inventory levels of from [          ] pounds at the end of the pre-petition period to [

] pounds at the end of the post-petition period, an increase of [    ] percent.  Commission Views at 63.  This shows that the increase in subject imports in the post-petition period did not merely "replace existing inventories."  *Id*.  This is because the [    ] percent increase in inventories took place while, on a full year basis, both U.S. importers' inventories of subject imports and apparent domestic consumption declined from 2022 to 2023.  Staff Report at C-3. Therefore, there was no need for additional inventories in 2023, and inventories [

].[6]

---

[5] The SAA states that the factors listed in the statue are merely a few of many that the Commission can consider, and holds that other combinations of factors can be relevant depending on the specifics of the Investigation.  Specifically, 19 U.S.C. §§ 1671d(b)(4)(A)(i) and 1673d(b)(4)(A)(i) "track the language of the Agreement, and are essentially reformulations of many of the factors in the current statute.  The new list is not exclusive.  The factors provided in existing statute, even though not specifically mentioned in the bill, may be relevant in particular investigations."  SAA at 877 (emphasis added).

[6] Furthermore, the volume of inventories captured in the Commission's critical circumstances data is likely understated, because not all of the increase in subject imports in the post-petition period ended up in U.S. importers' inventories.  This is because they ended up in the total of Chinese shipments that caused a [    ] percentage point increase in Chinese market share from 2022 to 2023, again during a period of declining demand.  Staff Report at C-3.  Beyond taking

Moreover, China already accounted for [    ] percent of apparent consumption at the end of 2023.  The total of Chinese inventories held at the end of 2023 ([                ] pounds) represents another [    ] percentage points of market share.  Given China's already substantial market position, China would not need to increase inventories by a significant rate to have those inventories affect the domestic market.  However, as pointed out by the Commission, the effect of the post-petition increase "was to create a stockpile of imports prior to the imposition of provisional duties, as reflected by the [    ] percent increase in end-of-period inventories of subject merchandise between the pre- and post-petition periods."  Commission Views at 65.

Stockpiling inventories is one way of undermining the efficacy of the order, but it is not the only way, and that is why inventories are merely one factor for consideration by the Commission in the statute, and are not dispositive in the Commission's findings if a certain threshold level is not met.  To treat this factor in that manner, as the Plaintiffs argue, would again create a carve out where subject imports with a preexisting large market presence and large inventories would be able to massively increase shipments to the United States after a petition is filed to heap further damage on the domestic industry without the domestic industry able to avail of the protection of the critical circumstances provision, as Congress intended.

> **3.** **Even if the Commission should have used a six-month comparison period, the doctrine of harmless error applies and the Court should uphold the Commission's determination**

Even if the Court were to decide, *arguendo*, that the Commission erroneously used five-month comparison periods in its critical circumstances analysis, the Court should still uphold the

---

market share and undermining the orders in that manner, these purchases could have also landed in purchaser inventories, which would harm market conditions after the orders went into effect.

Commission's final determination because its selection of comparison periods constitutes a harmless error.

The Federal Rules of Civil Procedure direct the Court to avoid the vacating, modifying, or otherwise disturbing of a judgement or order on the basis of error "{u}nless justice requires otherwise."  Fed. R. Civ. P. 61.  The doctrine of harmless error applies to agency proceedings and has specifically been invoked and applied to injury determinations made by the Commission. *See Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996) (stating that harmless error applies to judicial review of agency proceedings); *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1353 (Ct. Int'l Trade 2014) (invoking harmless error when reviewing a Commission injury determination) *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015).

At its core, the doctrine of harmless error is intended to preserve a judgement, or in this case an agency determination, when an error has occurred that would not have changed the final result.  *See CVB, Inc. v. United States*, 675 F. Supp. 3d 1324, 1343 (Ct. Int'l Trade 2023) (citing *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1353).  In *CVB*, plaintiffs alleged that the Commission improperly ignored record evidence of market segmentation, among other things, that should have impacted the Commission's material injury analysis.  In that case, the Court did find that the Commission erred in failing to consider and address market segmentation. *Id.* at 1342-43.  However, the Court also held that, even with these errors, the Commission's final affirmative injury determination was still supported by substantial evidence, rendering the errors regarding market segmentation "harmless."  *Id.* at 1343, 1346.

Here, the Commission would have reached the same affirmative conclusion with six-month comparison periods as it did using five-month comparison periods.  While Plaintiffs insist that using a six-month comparison would dramatically change the volume of subject imports

assessed during the five-month comparison period, this is not the case. As the Commission describes in its Views, the volume of subject imports in the six-month post-petition comparison period was still [          ] than those measured during the pre-petition comparison period, increasing by [     ] percent. Commission Views at 59. As discussed previously, the Commission's analysis of the five-month comparison periods resulted in an [          ] of [     ] percent of subject imports compared to the pre-petition period. *Id*. at 61. Comparing the differences between the volume of subject imports using six-month comparison periods and five-month comparison periods reveals a meager difference of [     ] percent.

      Moreover, the difference between the five- and six-month comparison periods is minimal concerning the context of the volume, and the growth in that volume, when compared to consumption and production. When looking at the five-month periods, the Commission found that post-petition volume of subject imports and the post-petition increase in the volume of subject imports were equivalent to [     ] percent and [     ] percent, respectively, of apparent U.S. consumption in 2023. Commission Views at 62. Using a six-month comparison period, those ratios are even more significant at [     ] percent and [     ] percent, respectively. Staff Report at IV-13 & IV-15. The post-petition increase in the volume of subject imports for the five-month period was equivalent to [     ] percent of the domestic industry's production in 2023. Commission Views at 62. By adding in the sixth month to the comparison period, that increase is equivalent to [     ] percent of domestic production. All of these shifts, regardless of whether a five- or six-month period is examined, take place as Chinese imports increased as a share of apparent U.S. consumption from [     ] percent in 2022 to [     ] percent in 2023, gaining [     ] percentage points of market share. *Id*. at 62. As these indicators relied upon by the Commission using the 6-month comparison period are, at worst, minimally lower than the

data for the five-month period, the Commission is unlikely to alter its conclusion that the "increase in post-petition volume was exacerbated by the already-dominant position of subject imports in the U.S. market," meaning that "while the percentage increase in post-petition imports is less than in some other recent investigations, that increase was from a very large base—a share of more than [          ] of the entire market" which made the effect of these imports greater than the percentage increase alone would portray. *Id*. at 62-63.

In addition, although the increase in the level of inventories between the end of the pre-petition period would decrease from [     ] percent under the five-month period to [     ] percent in the six-month period, the fact that there was a significant increase under either comparison indicates that the Commission would still find that inventories were stockpiled, given that the increase occurred during a time of decreasing demand and at a time when subject imports took [  ] percentage points of market share from 2022 to 2023. *Id*. at 64-65. Again, these increases all occurred when utilizing a six-month comparison period where over a third of the sixth month was covered by preliminary duties.

Furthermore, the other timing factors that the Commission considered in making its determination are unaffected by either comparison period. Specifically, the largest wave of subject imports during the comparison period occurred in the third month, September. Staff Report at Table IV-8. This wave also coincided with the greatest increases in inventories, when inventories increased by [          ] from August 2023 to September 2023. *Id*. at IV-14. These shifts align with the reported lead times for pea protein deliveries, signaling that importers rushed to flood the market with as many subject imports as possible following the filing of the petition.

In the event that this Court holds that the Commission erred in not using a six-month comparison period, it should deem this error 'harmless' as it would not have altered the Commission's critical circumstances determination. For these reasons, this Court should uphold the Commission's critical circumstances determination.

### 4. Plaintiffs' arguments regarding other relevant factors are without merit and should be rejected

The statute instructs the Commission to consider, "among other factors it considers relevant … any other circumstances indicating that the remedial effect of the orders will be seriously undermined." 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). Despite the Plaintiffs' contentions, the Commission's consideration of other relevant factors is supported by substantial evidence and in accordance with law.

### a) The Commission reasonably considered pricing and underselling in the post-petition period

Plaintiffs contend that pricing product data for 2023 undermine the Commission's affirmative critical circumstances determination. NURA argues that any increases in the AUVs of the pricing products between the pre- and post-petition periods detracts from the case for an affirmative vote, and the Commission's failure to take those increases into account renders the Commissions determination unsupported by substantial evidence and not in accordance with law. NURA Br. at 34. The Consolidated Plaintiffs go a step further, arguing, based on their interpretation of the Commission's determination in *Gas Powered Pressure Washers from Vietnam*, that the Commission treats situations where the "post-petition pricing data do not 'indicate a 'rush' to beat the deposit requirement'" as dispositive. Con. Pl. Br. at 30 (citing *Gas Powered Pressure Washers from Vietnam*, USITC Pub. 5465 at 48). However, Plaintiffs once again ignore not only the statute, but also the context provided in the Commission's prior determination.

35

First, contrary to the assertion by Consolidated Plaintiffs, there is no language in the Statue that requires an increase in the instances or margins of underselling during the post-petition period. Moreover, there is no specific requirement for the Commission to consider prices in any manner in the statute. 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). As such, there is no clear requirement that an increase in pricing product underselling is a threshold matter.

In fact, this Court has recently affirmed the Commission's affirmative critical circumstances determination that was made without reference to any such increase in underselling. *Sweet Harvest Foods v. United States*, 669 F. Supp. 3d 1,346, 1,349 (Ct. Int'l Trade 2023) (finding the remedial effect of an order to be seriously undermined due, in part, to the "continued underselling of the domestic like product by wide margins.").

Second, the Consolidated Plaintiffs cite to *Gas Powered Pressure Washers from Vietnam* in support of their argument but ignore that in that determination the Commission considered pricing data as merely one data point in the context of the record evidence and did not simply look at the pricing data in a vacuum to make its determination. *Gas Powered Pressure Washers from China and Vietnam*; Inv. No. 701-TA-684 and 731-TA-1597-1598 (Final), USITC Pub. 5465 (Oct. 2023). In that investigation, the Commission put the pricing product data in context, also analyzing that there was no increase in inventories between the pre- and post-petition periods, that the relevant increase in subject imports "did not prevent the domestic industry from gaining … market share" while both domestic producer and subject import AUVs increased. *Id.* at 48. Consolidated Plaintiffs ignore that the record evidence in this case is contrary to those in *Gas Powered Pressure Washers from Vietnam* that lead to the Commission's negative determination of critical circumstances in that case. Namely, among other factors, inventories

increased between the pre- and post-petition periods, and subject imports gained [   ] percentage

points in a contracting market in 2023, all as subject import AUVs decreased (and although

domestic producer prices [



].  Commission Views at 63-64 and Staff Report at C-3.

Finally, all Plaintiffs, including NURA, ignore the in-depth discussion by the

Commission on how it reasonably considered the universal underselling at sizeable margins

throughout the period of investigation to support the finding that "still larger margins of

underselling were not required to effect the significant increase in the volume of imports

involved in the post-petition period{.}"[7]  Commission Views at 64.  The average margin of

underselling throughout the period of investigation was 38.6 percent, and subject imports

undersold the domestic like product in the second half of 2023 at margins ranging from [

] percent.  *Id*.  Moreover, for Pricing Product 2, [



].  Staff Report at V-9.  In fact, the lowest margin between Chinese and

domestic producer prices is [

].

Staff Report at V-11.  The significant and universal margins for Chinese import underselling are

also confirmed by the import purchase cost data.  Staff Report at V-15 to V-24.

---

[7] The Consolidated Plaintiffs ignore this analysis with regard to their pricing arguments, but do
reference it when claiming that this analysis was an impermissible use of the Commission's
material injury analysis.  The reasons for why this argument fails is provided in Section IV.D.4.b
below.

Yet, despite this discussion regarding universal underselling at high margins throughout the period of investigation, the Plaintiffs claim that the Commission cannot make an affirmative determination of critical circumstances. Plaintiffs argue that to find critical circumstances, the Commission must find that the subject import prices were lower in the post-petition period, regardless of their overall pricing behavior. Not only must prices be lower, but the required pricing data must be "extraordinary" in the degree of underselling. Con. Pl. Br. at 40. This contention ignores the truly significant degree of underselling, never mind that this underselling had direct market effects as subject importers undercut the market to such a degree that they were able to claim [  ] percentage points of market share from 2022 to 2023. Staff Report at C-3. Essentially, Plaintiffs are arguing for a "get out of jail free" card, one that would permit subject importers to massively increase imports to beat imposition of duties as long as those imports are already so low priced compared to the domestic industry that any further reduction is unnecessary to achieve this goal. This Court should reject this contention. There is no exception to the critical circumstances statute that would permit such behavior, and to do so here would undermine the efficacy of the law.

### b)    The Commission reasonably considered record evidence that overlapped with its impact analysis

The Consolidated Plaintiffs assert that the Commission impermissibly used material injury considerations in its critical circumstances analysis. Consolidated Plaintiffs argue that the Commission's refence to universal and significant underselling, along with reference to the effect of subject import behavior on the domestic industry, was "bootstrap{ping} into the critical circumstances analysis the ordinary injury considerations{,}" which the Consolidated Plaintiffs believe "is not permitted by statute." Con. Pl. Br. at 41-42. Consolidated Plaintiffs are incorrect. First, the critical circumstances provision does not instruct the Commission to avoid record

evidence relied upon for its injury determination. This would be impracticable, as the entirety of the pre- and post-petition periods—and this is true whether a five- or six-month period is used— fall within the last full year of the period of investigation. Second, the statute states that the Commission can use "any other circumstances indicating that the remedial effect of the … order will be seriously undermined." In other words, all relevant record evidence is available to give context to critical circumstances analysis, which is exactly how the Commission used it here. Finally, the goal of the critical circumstances statute is to prevent the remedial effect of the order from being undermined. SAA at 877. The SAA states that "{i}f the effectiveness of a remedy is undermined, the underlying injury would be difficult to repair. *Id*. Consolidated Plaintiffs are thus arguing that the Commission cannot look at the additional damage directly caused by the surge in imports prior to the date of relief in order to evaluate whether the efficacy of the order intended to prevent further injury from those imports. That position is nonsensical.

Moreover, the Consolidated Plaintiffs contend that, even if the Commission can consider material injury factors, any decision based on those factors is flawed because the Commission disregarded contradictory evidence that it claims invalidated the Commissions material injury analysis. Con. Pl. Br. at 42. As a preliminary matter, it is important to note that the Commission's affirmative material injury determination, including its consideration of respondent arguments regarding contradictory record evidence, has not been challenged on appeal. Yet the Consolidated Plaintiffs argue that the Commission must replicate its entire material injury analysis within the context of its critical circumstances analysis. In short, Consolidated Plaintiffs want a "do over" of the injury case, even though they have not challenged the Commission's material injury determination at all, and especially with respect to respondent arguments. Commission Views at 38 n.149 (addressing startup cost argument) and

48-54 (addressing substitutability, overlap in customers, price-based purchasing, correlation, startup costs, and cost structure arguments).  As these arguments have already been considered and dismissed by the Commission without appeal, the Consolidated Plaintiffs have no basis for stating that the Commission cannot use these facts to provide context for its critical circumstances determination here.

## V.    CONCLUSION

For the foregoing reasons, Defendant-Intervenor respectfully requests that this Court deny Plaintiffs' motion for judgment on the agency record and sustain the Commission's *Critical Circumstances Determination* as supported by substantial evidence and otherwise in accordance with law.

Respectfully submitted,


Date:  October 8, 2025                    */s/ Adam H. Gordon*
                                          Adam H. Gordon, Esq.
                                          Benjamin J. Bay, Esq.
                                          Scott D. McBride, Esq.
                                          **THE BRISTOL GROUP PLLC**
                                          1707 L Street NW
                                          Suite 1050
                                          Washington, DC 20036
                                          Tel:  (202) 991-2701

                                          *Counsel to Defendant-Intervenor PURIS*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION**

I hereby certify that according to the word count function of Microsoft Word, which was used to prepare the brief, the foregoing brief contains 12,806 words and therefore complies with word count limitation in the Standard Chambers Procedures.

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

*Counsel to Defendant-Intervenor PURIS*

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

| | |
|---|---|
| **NURA USA, LLC,** | |
|       **Plaintiff,** | |
|       **and** | |
| **JIANYUAN INTERNATIONAL CO., LTD.,** *et al.*, | |
|       **Consolidated Plaintiffs,** | **Court No. 24-00182** |
|       **v.** | |
| **UNITED STATES,** | |
|       **Defendant,** | |
|       **and** | |
| **PURIS PROTEINS, LLC, d/b/a PURIS,** | |
|       **Defendant-Intervenor.** | |

**ORDER**

Upon consideration of the Rule 56.2 motions for judgment on the agency record filed by plaintiffs by NURA USA, LLC and the consolidated plaintiffs Jianyuan International Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Linyi Yuwang Vegetable Protein Co., Ltd., Yantai Oriental Protein Tech Co., Ltd., and Jiujiang Tiantai Food Co., Ltd, the responses in opposition filed by defendant, the United States, and defendant-intervenor, Puris Proteins, LLC, d/b/a PURIS, the record, and all other pertinent papers, it is hereby:

**ORDERED** that the plaintiffs' motions are **DENIED**; and it is further

**ORDERED** that the challenged determination is sustained in all respects.

**IT IS SO ORDERED.**

                                    _____

                                              LISA W. WANG, JUDGE

Dated: _____
            New York, New York