UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE LISA W. WANG, JUDGE

————————————————————————x
                                                          :
NURA USA, LLC,                                            :
                                                          :
                            *Plaintiff*,                  :         **PUBLIC VERSION**
                                                          :
JIANYUAN INTERNATIONAL CO., LTD., *et al*., :         Consol. Court No. 24-00182
                                                          :
                  *Consolidated Plaintiffs*,             :
          v.                                              :
                                                          :
UNITED STATES,                                            :
                                                          :
                            *Defendant*,                  :
          and                                             :
                                                          :
PURIS PROTEINS, LLC,                                      :
                                                          :
                  *Defendant-Intervenor*.                :
————————————————————————x

## CONSOLIDATED PLAINTIFFS' REPLY TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S RESPONSE TO CONSOLIDATED PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Ned H. Marshak*
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*599 Lexington Ave FL 36,
New York, NY 10022
 (212) 557-4000

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Consolidated Plaintiffs Jianyuan International Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Linyi Yuwang Vegetable Protein Co., Ltd., Yantai Oriental Protein Tech Co., Ltd., and Jiujiang Tiantai Food Co., Ltd.*

Dated: December 3, 2025

## **TABLE OF CONTENTS**

I.    THE ITC UNLAWFULLY USED A TRUNCATED COMPARISON PERIOD .................. 2

II.   THE ITC UNLAWFULLY FOUND CRITICAL CIRCUMSTANCES BASED ON
      "TIMING AND VOLUME" DATA ....................................................................... 7

III.  THE ITC UNLAWFULLY FOUND CRITICAL CIRCUMSTANCES IN THE ABSENCE
      OF "A RAPID INCREASE IN INVENTORIES" ................................................ 15

IV.   THE ITC UNLAWFULLY FOUND CRITICAL CIRCUMSTANCES BASED ON
      "OTHER CIRCUMSTANCES" ............................................................................. 19

CONCLUSION ................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ............................................................................................ 5, 16
*CITIC Trading Co. v. United States*,
27 CIT 356 (2003) .............................................................................................. 5, 16
*Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*,
23 CIT 88 (1999) ...................................................................................................... 9
*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ...................................................................................... 5, 9, 14
*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................................ 11
*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997) ..................................................................... 5, 19, 20
*Loper Bright Enter. v. Raimondo*,
603 U.S. 369 (2024) ................................................................................................ 13
*Lucent Tech., Inc. v. Gateway*,
580 F.3d 1301 (Fed. Cir. 2009) ................................................................................ 7
*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984) ........................................................................... 5, 14
*MTD Prods., Inc. v. United States*,
2023 WL 2535885 (CIT Mar. 16, 2023) ................................................................. 5
*POSCO v. United States*,
2018 Ct. Intl. Trade LEXIS 23 (Mar. 8, 2018) ................................................. 5, 16
*SKF USA, Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001) ......................................................................... 11, 20
*SKF USA, Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011) ................................................................................ 8
*Sweet Harvest Foods v. United States*,
155 F.4th 1355 (Fed. Cir. 2025) ....................................................................... 11, 16
*Tak Fat Trading Co. v. United States*,
185 F. Supp. 2d 1358 (CIT 2002) ............................................................................ 9

**Statutes**
19 U.S.C. § 1671 ............................................................................................... passim
19 U.S.C. § 1673 ............................................................................................... passim

**Other Authorities**
Dictionary.com .......................................................................................................... 16
H.R. Rep. 96-317 (1979) ............................................................................................. 9
S. Rep. No. 103-412 (1994) ........................................................................................ 9

**ITC Publications**
*Amorphous Silica Fabric from China*,
Inv. Nos. 701-TA-555 & 731-TA-1310 (Final), USITC Pub. 4672 (Mar. 2017) ..................... 17

*Carbon and Alloy Steel Cut-to-Length Plate from Brazil, South, Africa, and Turkey*,
   Inv. Nos. 701-TA-560-61 & 731-TA-1317-28 (Final), USITC Pub. 4664 (Jan. 2017) ......... 4, 6

*Corrosion-Resistant Steel Products from China, India, Italy, Korea, and Taiwan*,
   Inv. Nos. 701-TA-534-537 & 731-TA-1274-1278 (Final), USITC Pub. 4620 (July 2016) ....... 3

*Gas Powered Pressure Washers from Vietnam*,
   Inv. No. 731-TA-1598 (Final), USITC Pub. 5465 (Oct. 2023) ........................................ 20, 21

*Honey from Argentina and China*,
   Inv. Nos. 701-TA-402 & 731-TA-892-93 (Final), USITC Pub. 3470 (Nov. 2001) ............. 7, 17

*Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines, Poland, Slovenia,
   and Taiwan*, Inv. Nos. 731-TA-1629-31, 1633, 1636-38 & 1640 (Final), USITC Pub. 5520
   (June 2024) ................................................................................................... 10, 13, 17

*Pea Protein from China*,
   Inv. Nos. 701-TA-692 & 731-TA-1628 (Final), USITC Pub. 5529 (Aug. 2024) ............. passim

*Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman*,
   Inv. Nos. 701-TA-531-532 & 731-TA-1270-1273 (Final), USITC Pub. 4604 (Apr. 2016) ...... 3

*Preserved Mushrooms from China, India, and Indonesia*,
   Inv. Nos. 731-TA-777-79 (Final), USITC Pub. 3159 (Feb. 1999) ......................................... 10

*Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands,
   Saudi Arabia, Taiwan, Turkey, and the United Arab Emirates*,
   Inv. Nos. 701-TA-646 & 731-TA-1502-04, 1508-09, 1512, 1514, 1516 (Final), USITC Pub.
   5153 (Jan. 2021) ................................................................................................. 3, 4, 6

*Quartz Surface Products from China*,
   Inv. No. 701-TA-606 & 731-TA-1416 (Final), USITC Pub. 4913 (June 2019) ....................... 4

*Raw Honey from Argentina, Brazil, India, and Vietnam*,
   Inv. Nos. 731-TA-1560-1562 & 1564 (Final), USITC Pub. 5327 (May 2022) ........... 10, 11, 16

*Small Vertical Shaft Engines from China*,
   Inv. Nos. 701-TA-643 & 731-TA-1493 (Final), USITC Pub. 5185 (Apr. 2021) .................... 10

*Synthetic Indigo from China*,
   Inv. No. 731-TA-851 (Final), USITC Pub. 3310 (June 2000) ................................................. 7

**Federal Register Notices**

*Pea Protein from China: Antidumping and Countervailing Duty Orders,* 89 Fed. Reg. 68,390
   (Aug. 26, 2024) ..................................................................................................... 1

*Pea Protein from China: Preliminary Affirmative Countervailing Duty Determination,
   Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final
   Determination With Final Antidumping Duty Determination,*
   88 Fed. Reg. 87,403 (Dec. 18, 2023) ...................................................................... 2

*Pea Protein from China; Institution of Antidumping and Countervailing Duty Investigations and
   Scheduling of Preliminary Phase Investigations,*
   88 Fed. Reg. 45,924 (July 18, 2023) ..................................................................... 2, 3

Consolidated Plaintiffs Jianyuan International Co., Shandong Yuwang Ecological Food Industry Co., Linyi Yuwang Vegetable Protein Co., Yantai Oriental Protein Tech Co., and Jiujiang Tiantai Food Co. (collectively, "Chinese Respondents"), reply to the Response Briefs filed on September 24, 2025, by Defendant U.S. International Trade Commission ("ITC" or "Commission"), ECF51-52 ("ITC. Br."), and October 8, 2025, by Defendant-Intervenor PURIS Proteins LLC ("PURIS"), ECF55-56 (PURIS Br."), opposing Chinese Respondents' Rule 56.2 Motion for Judgment on the Agency Record filed on May 27, 2025, ECF43-44 ("Consol.Pls. Br."). Chinese Respondents' Brief established that the ITC erroneously found critical circumstances in its antidumping and countervailing duty ("ADD/CVD") investigations of pea protein from China, *Pea Protein from China*, Inv. Nos. 701-TA-692 & 731-TA-1628 (Final), Pub. 5529 (Aug. 2024), P.R. 130 ("*ITC Final*"); Views of the Commission (Final), C.R. 220 ("Views"); Final Staff Report (July 16, 2024), C.R. 205 ("FSR"); resulting in the U.S. Department of Commerce ("Commerce") issuing *Pea Protein from China: ADD/CVD Orders,* 89 Fed. Reg. 68,390 (Aug. 26, 2024).

The ITC's critical circumstances analysis is not rehabilitated by the Response Briefs and their post-hoc rationale, because the affirmative determination unlawfully relied on:

1. a five-month instead of six-month comparison period, claiming that it was avoiding distorted data and adhering to ITC practice, when doing so unreasonably relied on even more distorted data and inexplicably deviated from ITC practice;

2. the [              ] post-petition volume increase, claiming that a large preexisting import market share justified its decision. This rationale conflates the ITC's volume analysis needed to support an affirmative finding of material injury with the post-petition surge required by statute (*i.e.*, the "timing and volume" of imports), legislative history and longstanding agency practice to support an affirmative finding of critical circumstances;

3. a [           ] post-petition inventory increase, which the ITC erroneously described as stockpiling. This uptick did not approach the "rapid increase in inventories of the imports" required to support an affirmative finding of critical circumstance; and

1

4.  "other circumstances" (*e.g.*, pricing data) which may support finding material injury, but do not undermine seriously the remedial effect of ADD/CVD orders.

## I.      THE ITC UNLAWFULLY USED A TRUNCATED COMPARISON PERIOD

Chinese Respondents' Brief established that the ITC's "affirmative critical circumstances analysis improperly deviated from practice by employing a five-month comparison period, despite acknowledging that it 'frequently relies on six-month comparison periods.'" Consol.Pls. Br. at 20 (quoting *ITC Final*, Pub. 5529 at 43). Here, the Petition was filed on July 12 and Commerce's preliminary CVD determination published on **December 18**. *Pea Protein from China; Institution of ADD/CVD Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 45,924, 45,924 (July 18, 2023), P.R. 11; *Pea Protein from the China: Preliminary Affirmative CVD Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final ADD Determination*, 88 Fed. Reg. 87,403, 87,405 (Dec. 18, 2023). Thus, based on normal ITC practice the Commission would select the six-month period of July–December to compare to the six-month pre-Petition period of January–June.

The Commission, however, excluded December from its post-Petition period, claiming that it "reasonably selected its five month comparison period to exclude fourteen days of imports subject to provisional duties {(December 18–31)}, which would have distorted the import volume data." ITC Br. at 22; PURIS Br. at 21. Yet **excluding December yields even more distorted data by disregarding 17 days** of import volume (December 1–17) not subject to provisional duties. The ITC and PURIS unpersuasively espouse a distortion-minimizing rationale for relying on five-month periods, when doing so here leads to a more distortive import data. Chinese Respondents' Brief demonstrated that ITC precedent – including all investigations relied

2

upon in the *ITC Final* – relied on an agency practice directly contrary to the ITC's position in this case: the five-month period was used only if Commerce's preliminary determinations "published either early in the omitted month or, at minimum, in the first part of that month." Consol.Pls. Br. at 22; *see Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman*, Inv. Nos. 701-TA-531-532 & 731-TA-1270-1273 (Final), Pub. 4604 (Apr. 2016), at 31; *Corrosion-Resistant Steel Products from China, India, Italy, Korea, and Taiwan*, Inv. Nos. 701-TA-534-537 & 731-TA-1274-1278 (Final), Pub. 4620 (July 2016), at 35-36.

This approach minimizes distortion by excluding the minority of days inappropriate for the critical circumstances analysis and mirrors ITC practice with respect to whether the month in which the Petition is filed belongs to the pre- or post-petition period. *Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi Arabia, Taiwan, Turkey, and the United Arab Emirates*, Inv. Nos. 701-TA-646 & 731-TA-1502-04, 1508-09, 1512, 1514, 1516 (Final), Pub. 5153 (Jan. 2021) ("*PC Wire*"), at 32 n.174 ("The petitions . . . were filed on April 16, 2020. Because this date falls within the second half of the month, April is included in the 'pre-petition' period, per the Commission's practice."). Because PURIS filed its Petition on July 12, the post-petition period began in July. Views at 61 n.253 ("Because the petition was filed on June 12, 2022, that month is included in the post-petition period."). Yet the ITC inexplicably declined to employ this monthly mid-point, distortion-minimizing approach for the relevant ending month.

Following that logical approach reflected in extensive ITC precedent, the Commission would have relied on the full six month comparison. In response, ITC and PURIS herald a single additional investigation from nearly a decade ago employing a five-month period in which Commerce's preliminary determination on "issued on the 22nd day of the six month." ITC Br. at

22; PURIS Br. at 21 (citing *Carbon and Alloy Steel Cut-to-Length Plate from Brazil, South, Africa, and Turkey*, Inv. Nos. 701-TA-560-61 & 731-TA-1317-28 (Final), Pub. 4664 (Jan. 2017) ("*CTLP*") at 48). This one outlier decision does not support ITC's claim that the Commission practice is to "utilize six-month comparison periods . . . when Commerce's preliminary determinations were published in the last third of the month." ITC Br. at 24. To the extent there is a such an ITC practice, which is entirely unclear, it unreasonably includes more distortive import data for investigations where Commerce's preliminary determinations publish after the mid-point of the sixth month – as occurred here, with publication on the 18th. Moreover, the ITC and PURIS undermine their reliance on *CTLP*, which relied on five months despite Commerce's preliminary determination publishing on the 22nd, by emphasizing a pair of investigations relying on six months despite Commerce's preliminary determinations publishing on the 21st of the sixth month. ITC Br. at 24; PURIS Br. at 22 (citing *PC Wire*, Pub. 5153 at 32; *Quartz Surface Products from China*, Inv. No. 701-TA-606 (Final), Pub. 4913 (June 2019), at 24).

*CTLP* presents an unexplained deviation from ITC precedent that uses the full six months if Commerce publishes its preliminary determination in the latter part of the sixth month, as happened here. Neither the ITC nor PURIS has explained how a truncated five month period can be justified based on Commerce's preliminary determination publishing on the 22nd, when the ITC has in fact repeatedly used six-month periods when Commerce's preliminary determinations published one day earlier on the 21st. This unreasoned practice appears results-oriented in that the shorter period here provides import data more supportive of the Commission's critical circumstances finding. The ITC erroneously claims that Chinese Respondents "would prefer that the Commission include December 2023 presumably because doing so reduces the apparent increase in subject imports between . . . periods, but the Commission precisely excluded the

month to avoid this distortion." ITC Br. at 25. Chinese Respondents would instead prefer that the Commission follow a reasoned practice and not rely on a more distorted dataset.

This Court should order remand because the ITC failed to follow a coherent practice and contradicted its stated rationale, rendering its findings unsupported by substantial evidence. The ITC's selection of five-month comparison periods is not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). By disregarding the resultant distortion caused by excluding 18 days in which provisional measures applied, the ITC acted "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). By contradicting its claimed distortion-minimization rationale without following a reasoned practice, the ITC did not here employ a "reasonable methodology" as claimed, and unpersuasively misplaces reliance on a case not involving comparison periods in its plea for "broad discretion to select the appropriate pre- and post-petition comparison periods." ITC Br. at 24; PURIS Br. at 22 (citing *MTD Prods., Inc. v. United States*, 2023 WL 2535885, *4 (CIT Mar. 16, 2023)).

This Court should at minimum order remand because the Commission has not provided sufficient rationale for its selected comparison periods. It is axiomatic that this "Court may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated . . . by the agency itself." *POSCO v. United States*, 2018 Ct. Intl. Trade LEXIS 23 (Mar. 8, 2018) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962). "{T}his court will not accept Defendant-Intervenors' post hoc rationale as a basis for upholding a final determination." *CITIC Trading Co. v. United States*, 27 CIT 356, 368 (2003). Chinese Respondents' specific arguments supporting a six-month period were

disregarded by the ITC. *Compare* Chinese Respondents' Posthearing Brief (July 2, 2024), C.R. 199 & 201, P.R. 106, at 13-14, Response to Commissioner Questions at 53-54 *with ITC Final*, Pub. 5229 at 42-47. The ITC's scant comparative period analysis cannot be supported by post-hoc rationalizations such as:

- "Excluding the sixth month . . . distort{ed} the volume of subject imports." ITC Br. at 21; PURIS Br. at 21-22;

- *CTLP* involved Commerce's preliminary determination being "issued on the 22nd day of the sixth month." ITC Br. at 22 PURIS Br. at 21;

- "U.S. imports would have been affected long before {December 18} to avoid any shipment delays." PURIS Br. at 23; and

- "the Commission's . . . selection of comparison periods constitutes a harmless error. The minimal differences in the relevant data . . . would not have altered the {ITC's} ultimate critical circumstances determination." PURIS Br. at 3, 31-35.

This final post-hoc rationalization presents an especially inappropriate basis on which to sustain the *ITC Final* because the Commission can and does make such equivalency representations, but did not so here. In *CTLP* heralded by the ITC and PURIS, the Commission specifically "note{d} that use of six-month rather than five-month periods would not have appreciably changed the data that we have used in our analyses, and consequently would not have affected our conclusions." Pub. 4664 at 48 n.233. Likewise, the Commission in *PC Wire* expressly "f{ou}nd { that the choice of five- or six-month periods does not affect our conclusions." Pub. 5153 at 32 n.175. No such analysis appears in the ITC's opinion here.

In the absence of such analysis, this Court should reject PURIS' claim that "the Commission would have reached the same affirmative conclusion with six-month comparison periods as it did using five-month comparison periods." PURIS Br. at 32. This Court should not credit PURIS' post-hoc conjecture that "the Commission is unlikely to alter its conclusion." *Id*. at 34. "It is well established that speculation does not constitute 'substantial evidence.'" *Lucent*

*Tech., Inc. v. Gateway*, 580 F.3d 1301, 1327 (Fed. Cir. 2009). Indeed, even the Dissenting Views of Commissioner Schmidtlein ("Dissent") – which called the comparison period "a close call in this case" and separated the datasets – did find equivalency finding when concluding that neither dataset supported critical circumstances. Dissent at 5 n.14. Her findings are warranted because, as shown below, neither comparison supports finding critical circumstances.

## II.    THE ITC UNLAWFULLY FOUND CRITICAL CIRCUMSTANCES BASED ON "TIMING AND VOLUME" DATA

Chinese Respondents' Brief established that the ITC's volume data analysis did not support an affirmative finding of critical circumstances. Consol.Pls. Br. at 20-33. The ITC and PURIS unpersuasively downplay the extraordinary deviation from Commission practice reflected in this finding. The percentage increase in post-petition imports is either [        ] or [    ] percent using five- or six-month comparison periods, respectively. FSR at IV-13 (Table IV-8). The ITC acknowledged that this "percentage increase in post-petition imports is **less than in some other recent investigations**." *ITC Final* at 62-63 (emphasis added). However, neither the ITC nor PURIS identify another critical circumstance finding with volumes increase [        ] approximating those [            ] levels. These subject import volume increases in fact "are **[      ] less** than in the previous cases." Dissent at 6 n.22 (emphasis added).

Publicly available post-petition import increase findings that support affirmative critical circumstances decisions range from a high of over 300 percent to a low of 78.5 percent (which was accompanied by a nearly 300 percent increase in inventories). *Synthetic Indigo from China*, Inv. No. 731-TA-851 (Final), Pub. 3310 (June 2000), at 14-15; *Honey from Argentina and China*, Inv. Nos. 701-TA-402 & 731-TA-892-93 (Final), Pub. 3470 (Nov. 2001) ("*Honey from China*"), at 22-24 & nn.161-73.

The issue for this Court is not whether the Commission is "bound by its analysis in . . . past cases" as it insists, ITC Br. at 26-27, but rather whether it has "provide{d} an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). The ITC has not done so, as detailed below.

The ITC arbitrarily found critical circumstances despite [     ] lower post-petition volume increase data that in prior investigations merely because "that increase was from a very large base." *ITC Final* at 63. This new standard unfairly disadvantages exporters, such as Chinese Respondents, who served the U.S. market long before the domestic industry came into existence,. Transcript (June 25, 2024), P.R. 102, at 1-13, 145-46. Such demonstrably flawed logic is disregarded by the ITC, which claims that, given the "dominant position of subject imports," "the post-petition increase in subject import volume was substantial in the context of the U.S. market." ITC Br. at 28-29. PURIS has it backwards in applauding deviation from existing practice, "which would permit large exporters with large levels of market share to avoid critical circumstances determinations." PURIS Br. at 25. The new approach unfairly penalizes "large exporters with large market shares" by subjecting their exports to retroative liability based on [     ] lower volume increases than the ITC has ever found necessary.

Nor is there any attempt to refute the logic flaw pointed out by Commissioner Schmidlein: "**Following the majority's logic, if subject imports start from a large base, there does not necessarily need to be an increase in import volume in the post-petition period at all, let alone a substantial or "massive" increase as contemplated by the statute and legislative history.**" Dissent at 7 (emphasis added). While the ITC responded that "there necessarily must be **an increase** in imports," such logic could employ a miniscule post-petition uptick to find critical circumstances. *Id*. at 45 n.260 (emphasis added). The ITC and PURIS

mischaracterize Chinese Respondents' reliance on this point as re-weighing evidence. ITC Br. at 32-33; PURIS Br. at 28. Yet by proceeding with a new analysis that eviscerates statutory intent, the ITC's volume-based finding is not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 217. Indeed, the ITC minimizes "the behavior the critical circumstances statute is designed to address" as importers merely "increase{ing} their orders of subject merchandise after the filing of the petitions." ITC Br. at 32.

This Court recognizes that the legislation is instead "designed to address situations where **imports have surged** as a result of the initiation of an {ADD/CVD} investigation." *Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 23 CIT 88, 120 n.38 (1999) (emphasis added) (quoting S. Rep. No. 103-412 (1994)). "Congress promulgated the critical circumstances provision in order 'to provide prompt relief to domestic industries suffering from **large volumes of, or a surge over a short period of, imports**.'" *Tak Fat Trading Co. v. United States*, 185 F. Supp. 2d 1358, 1360 (CIT 2002) (emphasis added) (quoting H.R. Rep. 96-317 (1979), at 63)*.* The Commission unpersuasively endeavors to minimize this important legislative history by claiming these statements refer to Commerce's 15 percent regulatory requirement ITC Br. at 36-37. Yet the ITC has long recognized that its statutory requirement to find that "the remedial effect of the {ADD/CVD} order will be seriously undermined" necessitates a surge of imports, stating in 1999 that:

> **{T}he plain meaning of the term "undermine seriously" establishes a very high standard: that the surge in imports greatly and insidiously weakens or subverts the effect of the order.** . . .
>
> **If the magnitude of the surge in imports** . . . **is sufficiently large that they greatly and insidiously weaken or subvert the effect of the order, then the order is undermined seriously**."

*Preserved Mushrooms from China, India, and Indonesia*, Inv. Nos. 731-TA-777-79

(Final), Pub. 3159 (Feb. 1999), at 27-28 (emphases added).

The ITC has not identified any disavowal of this approach in the intervening decades. Indeed, the ITC in fact followed its established practice by very rarely in that intervening time finding critical circumstances, and in those instances emphasizing post-petition import volumes that "**increased sharply**," were not less than "**83.2 percent**," and as high as "**101.6 percent**." *Small Vertical Shaft Engines from China*, Inv. Nos. 701-TA-643 & 731-TA-1493 (Final), Pub. 5185 (Apr. 2021), at 45-51 (emphasis added); *Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines, Poland, Slovenia, and Taiwan*, Inv. Nos. 731-TA-1629-31, 1633, 1636-38 & 1640 (Final), Pub. 5520 (June 2024) ("*Mattresses*"), at 68 (emphasis added); *Raw Honey from Argentina, Brazil, India, and Vietnam*, Inv. Nos. 731-TA-1560-1562 & 1564 (Final), Pub. 5327 (May 2022) ("*Honey from Vietnam*") at 47 (emphasis added).

The ITC wants *carte blanche* to disregard its prior critical circumstances practice that, per legislative history, required massive post-petition volume surges to avoid ADD/CVD. Yet there is no basis to dispense with requiring surges if there is a large preexisting base, given the logical flaw identified by Commissioner Schmidtlein in dissent – and acknowledged by the majority – of replacing the necessary surge with a standard whereby there only must "necessarily be **an increase** in imports." *ITC Final*, Pub. 5529 at 45 n.260 (emphasis added), 64-65 (Dissent) Moreover, this approach arbitrarily disadvantages foreign exporters that happen to have established U.S. customers – such as the Chinese pea protein industry that served "**more than [        ] of the entire market**" because they existed long before the lone domestic producer. Views at 63 (emphasis added). In contrast, PURIS "did not reach its current size until 2018":

> **The Chinese were here first.** China first used green beans and peas to make starch and then vermicelli more than 300 years ago during the Ming Dynasty. In 2008, the Chinese began producing substantial commercial quantities of food-

grade pea protein for sale in China and around the world. **By 2014, they had established a loyal customer base in the United States.**

Chinese Respondents' Prehearing Brief (June 18, 2024), C.R. 191, P.R. 98 ("Ch. Prehearing Br."), at 1 (emphasis added), 17.

Given such unreasoned disparate treatment, the ITC's critical circumstances finding "is arbitrary {for} offer{ing} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). Indeed, "the agency must show . . . a more detailed justification . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). By inexplicably dispensing with its longstanding policy of requiring surges, the ITC neglected its obligation to provide "a more detailed justification." *Id*.

The recent U.S. Court of Appeals for the Federal Circuit ("CAFC") affirmance of *Honey from Vietnam* confirms the need for ITC to find post-petition surges. *Sweet Harvest Foods v. United States*, 155 F.4th 1355, 1363 (Fed. Cir. 2025). The ITC in that case found that "monthly subject imports from Vietnam surged," given the "post-petition . . . increase of 83.2 percent." *Honey from Vietnam*, Pub. 5327 at 47 & n.295. The CAFC confirmed that the relevant cutoff for the critical circumstances analysis is when Commerce publishes its preliminary determination: "Domestic suppliers are to be protected from dumped imports as of that date. And a surge of imports before *that* date plainly could undermine that protection by diminishing demand for their goods." *Sweet Harvest*, 155 F.4th at (emphasis in original). Since in *Honey from Vietnam* the ITC, and on appeal the CAFC accepted the need for a surge to find critical circumstances, the Commission improperly relies on *Sweet Harvest* to support its replacement of a required volume surge with any increase at all. *Id*.; *Honey from Vietnam*, Pub. 5327 at 47 & n.295; Notice of Supplemental Authority (Oct. 28, 2025), ECF57 ("Supp. Auth."), at 2.

11

Moreover, the ITC ignored then express statutory mandate to consider "the **timing and volume** of the imports." 19 U.S.C. §§ 1671d(b)(4)(A)(ii)(I), 1673d(b)(4)(A)(ii)(I) (emphasis added). To find critical circumstances despite a [      ] post-petition increase, the ITC analyzed volume data in isolation from the comparison periods – belaboring subject import shares "**of apparent consumption in 2023**" and as a "percent of the **domestic industry's production**." Views at 62-63 (emphases added). These data points do not address the statutory requirement to consider timing and volume together – *i.e.*, the volume increase in the post-petition period. Consol.Pls. Br. at 27. The ITC heralds the post-petition imports as being "[   ] percent . . . of apparent U.S. consumption in 2023." Views at 62. Yet there is no comparative market share data for the pre-petition period; the ITC engages in sleight-of-hand by thereafter emphasizing that "from 2022 to 2023, subject imports . . . gain{ed} [     ] percentage points of market share." *Id*. The ITC improperly considered this general injury criterion of "the volume of imports." 19 U.S.C. § 167(7)(B)(i)(I). The distinct, tandem language in the critical circumstances statute precludes the ITC from bootstrapping its ordinary injury volume analysis by looking at market share and volume as a percent of domestic industry production in full years of the period of investigation ("POI"). Consol.Pls. Br. at 31.

The relevant "timing and volume" data comparatively assess pre and post-petition data, and not the "market share that the domestic industry lost to subject imports from 2022 to 2023." ITC Br. at 27. The ITC improperly "focuse{d} on the total volume of subject imports in the post-petition period, rather than the increase." Dissent at 6-7. Even if this focus was not exclusive as claimed, ITC Br. at 29, the tandem "timing and volume" post-petition data was given short shrift. What PURIS minimizes as attempts "to isolate one data point" and "impose an artificial

constraint on the Commission's analysis," PURIS Br. at 25, is an attempt to compel adherence to the statutory focus on the volume increase between periods.

The ITC and PURIS unpersuasively respond by relying on judicial and agency precedent decided before the U.S. Supreme Court decided *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 369-70 (2024). ITC Br. at 31; PURIS Br. at 25. Under *Loper*, if the Commission's analytical analysis of "the timing and the volume of the imports" "**is not the best, it is not permissible**." *Id*. at 400. This Court cannot justify a volume analysis in isolation following *Loper*. Nor do investigations completed before *Loper* support the legality of the ITC's claimed practice to have its "discussion of the increased volume . . . followed by a separate paragraph discussing the timing." ITC Br. at 31.

The ITC specifically misplaces reliance on *Mattresses* which it heralds as a less compelling case for critical circumstances – despite it featuring a 101.6 percent post-petition increase in imports. Views at 62 n.257; ITC Br. at 28; PURIS Br. at 12; *Mattresses*, Pub. 5520, at 68. It defies credulity that an increase nearly [     ] that amount presents a "[

          ]" case for finding critical circumstances, and the strained analogy is not reasonably supported through inapposite reference to the increase as a "percent of apparent U.S. consumption in the final year of the POI." Views at 62 n.257. The timing and volume of imports constituted a surge supporting critical circumstances in *Mattresses*; the ITC and PURIS improperly maintain the manta that "context of the U.S. market" here justifies transposing the ordinary injury market share analysis to find critical circumstances despite the [

          ] increase in post-petition volume. Views at 61-62 & n.257; ITC Br. at 4, 14-15, 25-29; PURIS Br. at 23-28. The important "context of the U.S. market," *id*., ignored by the ITC is that

"{t}he Chinese were here first" and that domestic pea protein production came long after the Chinese Respondents had created the market. Ch. Prehearing Br. at 1, 13-21.

This preexisting condition of the U.S. market during the POI does not justify the ITC deviating from its longstanding practice to require a post-petition surge before finding critical circumstances. The dominance of Chinese Respondents owing to the late market entry of domestic production and paucity of domestic producers cannot justify a changed practice. Indeed, the ITC tellingly overstates its case in arguing that the post-petition "increase was sufficient to . . . reduce the industry's production by [    ] percent." ITC Br. at 27. The record does not evidence domestic production dropping by more than [       ] because of the post-petition uptick. Without comparative market share or domestic production data for the pre-petition period, the most that can be said of the "timing and volume" is that subject imports increased by [          ] or [    ] percent in the post-petition period – "[     ] less that the increases in previous cases." FSR at IV-13 (Table IV-8); Dissent at 6 n.2. As this relatively [                    ] conflicts with legislative history and ITC practice, the critical circumstances finding based on volume is unsupported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 217.

Moreover, the ITC's volume analysis reveals improper cherry-picking. The ITC fixates on post-petition months having higher volumes, and September in particular. Views at 65. The ITC and PURIS defend this focus based on projected lead times. ITC Br. at 32; PURIS Br. at 26. Yet, as PURIS acknowledges, "estimating shipping times . . . is not a precise science. Given the long lead times to ship products, U.S. imports of subject merchandise" cannot realistically be scheduled to arrive on a certain month. PURIS Br. at 23. The ITC conveniently ignores volume in October being [                  ] pounds – less than [      ] that in three pre-petition months

([                              ]). FSR at IV-13 (Table IV-8). Similarly, PURIS and ITC defend the

Commission's disregard of arranged imports because their delivery fell outside of the post-

petition window. ITC Br. at 31; PURIS Br. at 26-27. However, as the ITC readily considered

volume data before the pre-petition period, it stands to reason such a flexible approach would

likewise consider arranged imports ordered during the post-petition period. The ITC

unreasonably conducted a one-sided temporal analyses by ignoring unfavorable time periods.

### III.    THE ITC UNLAWFULLY FOUND CRITICAL CIRCUMSTANCES IN THE ABSENCE OF "A RAPID INCREASE IN INVENTORIES"

The statute compels the ITC in its critical circumstances analysis to consider whether

there was "a **rapid increase in inventories** of the imports." 19 U.S.C. §§ 1671d(b)(4)(A)(ii),

1673d(b)(4)(A)(ii). Here the post-petition inventory increase was less than [      ] percent under

the five-month period and [          ] percent if the correct full comparison period is used.

FSR at IV-14 (Table IV-9) (emphasis added). "**{N}either set of increases demonstrate a massive**

**and rapid increase that would likely undermine the remedial effect of the orders.**" Dissent at 4-

5 (emphasis added); Consol.Pls. Br. at 33-37. In response, the Commission and PURIS concede that

there was not a rapid increase in inventories – submitting that the ITC discharged its statutory

obligation to merely consider whether there was such a rapid increase. ITC Br. at 40-41; PURIS at

29-31. The ITC further claims that the statutory inventory criterion is optional because "Congress

could not have intended for importers to escape retroactive duties by significantly increasing their

imports after the filing of petitions and then selling the increased imports on the U.S. market **rather**

**than stockpiling them**." ITC Br. at 42 (emphasis added).

One problem with this defense is that it relies on the ITC finding that the post-petition

increase "**create{d} a stockpile of imports** prior to the imposition of provisional duties." *ITC*

*Final*, Pub. 5529 at 46 (emphasis added). "Stockpile" is defined as: "a **large accumulated stock**

**of goods** or materials, especially one **held in reserve** for use at a time of shortage or other emergency. GOOGLE ("stockpile") (emphases added). The post-petition inventory increase cannot credibly constitute a stockpile, and the Commission's flawed factual finding cannot be salvaged by now claiming that finding a stockpile was unnecessary. The ITC and PURIS advance impermissible post-hoc rationale that there need not have been a finding of stockpiled imports, when in fact the ITC made such a finding rather than explain it was unnecessary. ITC Br. at 40-41; PURIS at 29-31. It is axiomatic that this "Court may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated . . . by the agency itself." *POSCO*, 2018 Ct. Intl. Trade LEXIS 23 (quoting *Burlington*, 371 U.S. at 168-69).[1]

The ITC once more misplaces reliance on *Sweet Harvest*, which it claims dispenses with the need to find that "import volume during the post-petition period was 'stockpiled' by importers." Supp. Auth. at 2. In *Sweet Harvest*, the ITC found "evidence that importers were stockpiling subject imports." *Honey from Vietnam*, Pub. 5327 at 49. That appeal did not question whether the data evidenced a stockpile; rather, the CAFC rejected the claim that critical circumstances could not be found merely because the stockpile had been depleted before the ADD/CVD orders issued. *Sweet Harvest*, 155 F.4th at 1362-63. *Dicta* from the CAFC concerning a factual pattern absent from that case and here – *i.e.*, whether a stockpile had to be found – does not resuscitate the ITC's factually inaccurate statement, for which remand is necessary. The ITC and PURIS recite the Commission's finding of stockpiling, but tellingly limit

---

[1]    PURIS adds post-hoc speculation that the inventory "data is likely understated, because . . . purchases could have also landed in purchaser inventories." PURIS Br. at 30-31 n.6. "{T}his court will not accept Defendant-Intervenors' post hoc rationale as a basis for upholding a final determination." *CITIC*, 27 CIT at 368.

their defense to claiming that this factual determination was not necessary to have been made in the first place. ITC Br. at 40-41; PURIS Br. at 31.

Moreover, the ITC unpersuasively relies on two cases in which it claims the Commission "made affirmative critical circumstances determinations without finding that inventories rapidly increased." ITC Br. 41. The ITC did not find critical circumstances in *Amorphous Silica Fabric from China*, Inv. Nos. 701-TA-555 & 731-TA-1310 (Final), USITC Pub. 4672 (Mar. 2017). The three-Commissioner majority expressly did "not ma{k}e an affirmative critical circumstances" because only two Commissioners (including Schmidtlein) did so based on a post-petition "surge"; two other Commissioners found threat-only (and therefore no critical circumstances). *Id.* at 1, 29-39. And in *Mattresses*, the ITC in fact specifically noted a "**rapid increase in imports** . . . mostly during the {period} preceding the retroactive liability period." *Mattresses*, Pub. 5520 at 70 n.367 (emphasis added).

"**The increases in . . . inventory levels noted by the majority are [      ] less than the increases in previous cases** where the Commission reached affirmative critical circumstances determinations." Dissent at 6 n.22 (emphases added) (citing Ch. Prehearing Br. at 92-97; *Honey from Vietnam*, Pub. 5327 at 47). The ITC here neglected to "provide an adequate explanation for the change," having previously found critical circumstances based on "a rapid increase in inventories." *SKF*, 630 F.3d at 1373; 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). For example, *Honey from China* found that "**end-of period inventories** . . . **surged** . . . representing an **increase of 292 percent**." *Honey from China*, Pub. 3470 at 24 (emphasis added). This determination is accompanied by the lowest post-petition volume increase for which data are public, finding that "the subject imports surged to . . . an increase of more than 78.5 percent." *Id.* These data points show the ITC ensuring that both the volume and inventory statutory criteria are

satisfied, with a sliding scale such that a relatively low post-petition import surge can find critical circumstances – if accompanied by a rapid inventory increase. The ITC here eviscerates these statutory criteria by replacing the necessary volume surge with merely "an increase" and jettisoning the inventories criterion. *ITC Final*, Pub. 5529 at 45 n.260; ITC Br. at 40-41.

The ITC and PURIS improperly minimize the clear and controlling statutory language. According to the ITC: "There is **no reason** that a significant post-petition increase in subject imports . . . would be any less likely to undermine the remedial effect of an order than an increase that is stockpiled." ITC Br. at 41-42 (emphasis added). Yet Congress specifically drafted the criterion that the ITC's theorizing disregards. Because the ITC and PURIS' convoluted statutory interpretation clearly "**is not the best, it is not permissible**." *Loper*, 603 U.S. at 400 (emphasis added). PURIS adds that giving effect to this statutory criterion "would again create a carve out" for "subject imports with a preexisting large market presence and large inventories." PURIS Br. at 31. As discussed above, Chinese Respondents submit that the statutory language cannot be ignored to unfairly punish exporters who happened to have served the U.S. market long before domestic production. Section II, *supra*; Ch. Prehearing Br. at 1, 1, 13-21). The ITC's effort to "carve in" the Chinese Respondents constitutes an unjustified departure from Commission practice that conflicts with the statute.

Setting aside the statute and Commission practice, substantial evidence does not support subject import inventory data providing a basis to find critical circumstances. Specifically, the ITC ignored that "**importers' U.S. inventory levels at the end of 2023 were lower than each of the prior years of the POI**." *ITC Final*, Pub. 5529 at 64 (Dissent) (emphasis added) (citing FSR at VII-12 (Table VII-9)). The Commission, therefore, improperly found critical circumstances based on inventory data "without taking into account contradictory evidence or evidence from

which conflicting inferences could be drawn." *Gerald Metals*, 132 F.3d at 720. Indeed, the ITC

and PURIS tellingly declined to address this significant fact despite it being emphasized by

Chinese Respondents and Commissioner Schmidtlein. *Compare ITC Final*, Pub. 5529 at 64;

Consol.Pls. Br. at 35; *with* ITC Br. at 39-42; PURIS Br. at 29-31.

## IV.    THE ITC UNLAWFULLY FOUND CRITICAL CIRCUMSTANCES BASED ON "OTHER CIRCUMSTANCES"

The ITC's statutory critical circumstances analysis considers "any other circumstances

indicating that **the remedial effect** of the {ADD/CVD} order **will be seriously undermined**."

19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii) (emphases added). The ITC's findings for

this third, catch-all criterion should control whether it lawfully found critical circumstances here,

because – as demonstrated above – an affirmative determination cannot reasonably be based on

either: (i) post-petition "timing and volume" data; or (ii) inventory data, which do not

approximate a rapid increase. Sections II, III, *supra*. The ITC's "other circumstances" findings

fall short of carrying an affirmative critical circumstances finding, as detailed below.

The ITC acknowledged that "prices of subject imports did not markedly decrease in the

post-petition period." Views at 45. Indeed, "the trend for the AUVs of all four priced products of

subject imports were either [                    ] at the end of the fourth quarter of 2023, with [

                    ] from quarter-to-quarter." Chinese Respondents Posthearing Brief, Response

to Commissioner Questions at 56. This information was provided in response to the lone

question asked by the ITC concerning critical circumstances. Transcript at 222-23. In response to

Chair Karpel asking about the ITC recently considering "other factors," *id*., Chinese

Respondents demonstrated that this was demonstrably not a situation – as the ITC described less

than a year before – where "the available pricing data indicate a 'rush' to beat the deposit

requirement." *Gas Powered Pressure Washers from Vietnam*, Inv. No. 731-TA-1598 (Final),

Pub. 5465 (Oct. 2023) ("*GPPW from Vietnam*"), at 48. As in that case, the post-petition pricing

data do not support finding critical circumstances:

> There also is no evidence of significant changes in pricing patterns that might
> suggest the imports entering in the post-petition period were intended to
> circumvent a potential order. The **average quarterly prices of subject imports
> from China generally started declining prior to the petitions being filed, with
> no apparent acceleration of this trend after the petitions were filed, and
> many pricing products actually show an increase in the price of subject
> imports in the last quarter of 2023.**

Dissent at 6 (emphasis added).

Remand is warranted because the ITC, therefore, improperly found critical circumstances

based on post-petition data "without taking into account contradictory evidence or evidence from

which conflicting inferences could be drawn." *Gerald Metals*, 132 F.3d at 720. The ITC's claim

to have "meticulously examined price" data is unjustified given that post-petition pricing trends

were specifically briefed in response to a Commissioner question and emphasized in dissent; in

these circumstances the ITC should not be "presumed to have considered all the evidence." ITC

Br. at 43 (quotation omitted). The ITC minimizes its own contemporaneous statement from

*GPPW from Vietnam* in disputing "any requirement under the statute that the Commission find

that importers sought to 'beat the deposit requirement.'" *Id*. at 45. Yet the statutory requirement

for finding "that **the remedial effect** of the {ADD/CVD} order **will be seriously undermined**"

presupposes more than just ordinary findings of underselling over the POI needed to justify

finding injury. 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii) (emphases added). It is

insufficient to merely find "that subject import prices had generally declined." ITC Br. at 44.

Juxtaposition with *GPPW from Vietnam* reveals the extent to which the ITC "is

arbitrar{ily} offer{ing} insufficient reasons for treating similar situations differently." *SKF*, 263

F.3d at 1382. There, as here, "subject imports . . . were higher in the post-petition period as

compared to the pre-petition period," "there was no stockpiling of subject imports after the filing of petitions," and "pricing data do not indicate a 'rush' to beat the deposit requirement." *GPPW from Vietnam*, Pub. 5465 at 47-48. PURIS tellingly attempts to distinguish *GPPW from Vietnam* based on ordinary injury considerations such as the share of the "gain of market share from 2022 to 2023," "all as subject import AUVs decreased." PURIS Br. at 36-38. PURIS and the ITC candidly defend the affirmative critical circumstances finding through repeated references to ordinary injury considerations in a conflation of the distinct statutory analyses:

- "the Commission . . . reasonably considered the universal underselling . . . throughout the {POI}"

- "The average margin of throughout the {POI} was 38.6" percent;

- "The {ITC} meticulously examined . . . underselling trends throughout the POI";

- "the Commission reasonably referenced its analysis of the impact of subject imports on domestic industry during the POI"; and

- "the Commission found that the subject imports{} . . . would adversely impact the industry **in the same way** that subject imports during the POI."

*Id*. at 37; ITC Br. at 43-46 (emphasis added).

There is no statutory basis to bootstrap the ordinary injury analysis into the "any other considerations" criterion. These inquiries must be distinct, with a heightened standard necessary to find the remedial effect seriously undermined; otherwise Congress would have enacted a single injury standard for which ADD/CVD would be assessed retroactively. Chinese Respondents submit that the ITC cannot make the critical circumstances findings by merely reiterating that "subject import volume would adversely impact the domestic industry **in the same way** that subject imports adversely impacted the industry during the POI." ITC Br. at 47 (emphasis added). Likewise, the ITC cannot implicitly incorporate by reference its rejection of Chinese Respondents' arguments that subject imports did not injure the domestic industry. The

ITC justified finding critical circumstances because "subject imports undersold the domestic like products at large margins of underselling throughout the POI" and that "the domestic industry . . . [                              ] throughout the POI." Views at 64-65. Yet the ITC declined to explain why these ordinary injury considerations constituted "other circumstances indicating that the remedial effect of the {ADD/CVD} order will be seriously undermined," let alone address Chinese Respondents' contrary arguments in so finding. 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii); Consol.Pls. Br. at 41-43.

The ITC tellingly emphasizes that Chinese Respondents did not appeal injury, ITC Br. at 48, with PURIS going so far as to characterize this objection as "want{ing} a 'do over' of the injury case." PURIS Br. at 39. That Chinese Respondents did not appeal whether the ITC findings satisfied the ordinary injury criteria does not preclude their challenge to the Commission's reliance on these same findings to support an affirmative critical circumstances decision, under a separate and more exacting statutory standard. While the ITC criticizes Chinese Respondents for "simply rehash{ing}" is material injury arguments," ITC Br. at 48, nothing in the ITC opinion indicates that such claims were considered in analyzing whether the remedial effect of the ADD/CVD orders were seriously undermined. *See* Views at 57-66. While "present material injury" factors may "be relevant to the critical circumstances analysis," ITC Br. at 48, here the ITC's overwhelming reliance on injury factors as "other circumstances," while ignoring contrary arguments, renders its finding unsupported by substantial evidence. Rather than seeking a "'get out of jail free' card" as alleged, PURIS Br. at 38, Chinese Respondents contest the ITC's finding the separate, strict undermine seriously test satisfied as unsupported by substantial evidence and contrary to both the statutory language and longstanding Commission practice.

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in their Opening Brief, Chinese

Respondents respectfully request that this Court remand the *ITC Final* for reconsideration by the

Commission.

<div style="margin-left: 50%;">

Respectfully submitted,

*/s/ Jordan C. Kahn*
Ned H. Marshak*
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*599 Lexington Avenue FL 36
New York, NY 10022
-and-
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Consolidated Plaintiffs
Jianyuan International Co., Ltd., Shandong
Yuwang Ecological Food Industry Co., Ltd.,
Linyi Yuwang Vegetable Protein Co., Ltd.,
Yantai Oriental Protein Tech Co., Ltd., and
Jiujiang Tiantai Food Co., Ltd.*

</div>

Dated: December 3, 2025

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Reply contains 6,999 words, including footnotes, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's Microsoft Word processing system, and is less than the 7,000 word limit.

*/s/ Jordan C. Kahn*
Jordan C. Kahn

*Counsel for Consolidated Plaintiffs*

Dated: December 3, 2025

15067882_1