**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NURA USA, LLC,<br><br>                  Plaintiff,<br><br>   and<br><br>Jianyuan International Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Linyi Yuwang Vegetable Protein Co., Ltd., Yantai Oriental Protein Tech Co., Ltd., Jiujiang Tiantai Food Co., Ltd.<br><br>                  Consolidated Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>                  Defendant,<br><br>   and<br><br>Puris Proteins, LLC<br>d/b/a PURIS,<br><br>                  Defendant-Intervenor. | Before: Lisa W. Wang, Judge<br>Consol. Court No. 24-00182<br><br><u>**NON-CONFIDENTIAL VERSION**</u><br><br>**Business Proprietary Information Removed from Pages 8, 9, 12, 13** |

<u>**REPLY BRIEF OF NURA USA, LLC IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**</u>

David J. Ross
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037

Dated: December 3, 2025               *Counsel for NURA USA, LLC*

Consol. Court No. 24-00182                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................. 1

II.   ARGUMENT ......................................................................................... 1

    A.    The Statute Required the Commission to Find That Imports Massively
        Increased to Reach an Affirmative Critical Circumstances Determination ... 1

        1.    The SAA Clarifies the Commission's Statutorily Required Findings.. 2

        2.    The Commission's Prior Practice Confirms the Majority's Approach
                Is Not the Best Reading of the Statute ..................................................... 4

        3.    The Majority's Failure to Find that Imports Massively Increased
                Renders the Commission's Determination Unsupported by
                Substantial Evidence and Contrary to Law ........................................... 7

    B.    The Statute Required the Commission to Find That Subject Import
        Inventories Rapidly Increased ..................................................................... 10

        1.    The Government Concedes That the Commission Did Not Find That
                Imports Rapidly Increased ...................................................................... 11

        2.    The Commission's Failure to Explain Its Reasoning Renders Its
                Determination Unsupported by Substantial Evidence and Contrary to
                Law ........................................................................................................... 15

    C.    The Commission Did Not Undertake the Analysis That Defendants Claim Is
        Correct ............................................................................................................. 16

        1.    The Commission Analyzed Its Own Data Regarding Subject Imports
                ...................................................................................................................... 17

        2.    The Commission Considered Subject Imports Over a Different Time
                Period from the Period Considered by Commerce.............................. 18

        3.    Commerce's "Massive Imports" Finding was Based on Adverse Facts
                Available ................................................................................................... 20

III.  CONCLUSION ................................................................................... 22

Consol. Court No. 24-00182                              NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AG der Dillinger Huttenwerke v. United States*, 156 F.4th 1314 (Fed. Cir. 2025) ...................... 3

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) .................................... 16

*CVB, Inc. v. United States*, 675 F. Supp. 3d 1324, 1337 (CIT 2023) ...................................... 8, 11

*Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343 (CIT 2019)...................... 8

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318 (CIT 2024) ....................................................................................................................................... 16

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..................................................... 3, 4, 7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 11

*MTD Prods., Inc. v. United States*, Slip Op. 23-34, 2023 WL 2535885 (CIT Mar. 16, 2023)..... 20

*RHP Bearings Ltd. v. United States*, 288 F.3d 1334 (Fed. Cir. 2002).......................................... 8

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ....................................................................... 4, 7

*Sweet Harvest Foods v. United States*, 155 F.4th 1355 (Fed. Cir. 2025) ........................... 3, 4, 17

*Sweet Harvest Foods v. United States*, 669 F. Supp. 3d 1346 (CIT 2023).............................. 3, 4

*Tak Fat Trading Co. v. United States*, 185 F. Supp. 2d 1358 (CIT 2002)..................... 8, 9, 10, 15

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996)............................................... 8

**Statutes, Rules, and Regulations**

19 C.F.R. § 351.206 ....................................................................................................................... 6

19 U.S.C. § 1671d.......................................................................................................................... 2

19 U.S.C. § 1673d.......................................................................................................................... 2

Statement of Administrative Action, Uruguay Round Trade Agreements Act of 1994, H.R. Rep. 316, 103rd Cong., 2d Sess., vol. 1 ......................................................................... passim

Tariff Act of 1930 ......................................................................................................................... 2

**U.S. Department of Commerce Determinations**

*Countervailing Duty Investigation of Certain Pea Protein from the People's Republic of China: Final Analysis of Critical Circumstances*, U.S. Dep't of Commerce (June 27, 2024) (ACCESS #4586808-01) ...................................................................................... 19, 21

*Less-Than-Fair-Value and Countervailing Duty Investigations of Certain Pea Protein from the People's Republic of China: Analysis of Critical Circumstances*, U.S. Dep't of Commerce (Feb. 7, 2024) (ACCESS # 4505333-01) ...................................................... 21

*Less-Than-Fair-Value Duty Investigation of Certain Pea Protein from the People's Republic of China: Analysis of Critical Circumstances for Final Determination*, U.S. Dep't of Commerce (June 27, 2024) (ACCESS # 4586829-01) .............................................. 19, 21

**U.S. International Trade Commission Determinations**

*Certain Magnesia Carbon Bricks From China and Mexico*, USITC Inv. Nos. 701-TA-468, 731-TA-1166-1167 (Final), USITC Pub. 4182 (Sept. 2010) ...................................................... 7

*Certain Pea Protein From China*, 89 Fed. Reg. 67,671 (Int'l Trade Comm'n Aug. 21, 2024) ..... 1

*Coumarin from The People's Republic of China*, Inv. No. 731-TA-677 (Final), USITC Pub. 2852 (Feb. 1995) ........................................................................................................................ 5

*Crystalline Silicon Photovoltaic Cells and Modules From China*, USITC Inv. Nos. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (Nov. 2012) ................................................ 6

*Disposable Aluminum Containers, Pans, Trays, & Lids from China*, USITC Inv. Nos. 701-TA-727 and 731-TA-1695 (Final), USITC Pub. 5611 (Apr. 2025) ...................................... 20

*Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, USITC Inv. Nos. 701-TA-712–714 and 731-TA-1679–1681 (Final), USITC Pub. 5620 (May 2025) ........................................... 20

*Melamine from India*, USITC Inv. Nos. 701-TA-707 and 731-TA-1668 (Final), USITC Pub. 5603 (Mar. 2025) ......................................................................................................... 16, 20

*Overhead Door Counterbalance Torsion Springs from China*, USITC Inv. Nos. 701-TA-746 and 731-TA-1724 (Final), USITC Pub. 5675 (Sept. 2025) ................................................. 5, 20

*Raw Honey from Argentina, Brazil, India, and Vietnam*, USITC Inv. Nos. 731-TA-1560-1562 and 1564 (Final), USITC Pub. 5327 (May 2022) .................................................. 7, 9, 12

*Small Diameter Graphite Electrodes from China*, Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 (Feb. 2009) ................................................................................................... 5, 7, 18

## I.    **INTRODUCTION**

Plaintiff NURA USA, LLC ("NURA" or "Plaintiff") submits this reply to the response briefs of Defendant United States ("Defendant" or the "Government") and Defendant-Intervenor PURIS Proteins LLC d/b/a PURIS ("Defendant-Intervenor" or "PURIS") (collectively, "Defendants") regarding the U.S. International Trade Commission's ("Commission") affirmative critical circumstances determination regarding imports of certain pea protein from the People's Republic of China ("China"). *See Certain Pea Protein From China*, 89 Fed. Reg. 67,671 (Int'l Trade Comm'n Aug. 21, 2024) ("*Final Determination*"), P.R. 126. As demonstrated below, the Defendants fail to demonstrate that the Commission's affirmative critical circumstances determination is supported by substantial evidence and otherwise in accordance with law. Accordingly, NURA respectfully requests that this Court grant its Motion for Judgment on the Agency Record and remand this case to the Commission consistent with the points set forth herein.

## II.    **ARGUMENT**

### A.    **The Statute Required the Commission to Find That Imports Massively Increased to Reach an Affirmative Critical Circumstances Determination**

As NURA demonstrated in its opening brief, the Commission's affirmative critical circumstances determination was unsupported by substantial evidence and otherwise not in accordance with law because the two-member majority of the Commission ("Majority") failed to make the requisite statutory findings to support its decision that the subject imports were likely to seriously undermine the remedial effect of Commerce's antidumping and countervailing duty ("AD/CVD") orders. *See* NURA's Mem. in. Supp. of Rule 56.2 Mot. for J. on the Agency R., May 27, 2025 ("Pl. Br."), ECF 45 (conf.), 46 (public). In particular, the Majority failed to make the requisite finding that imports massively increased after the AD/CVD petitions were filed,

departing from its mandate under the statute and relevant legislative history, as well as decades of prior agency practice. *Id.*; *see also* 19 U.S.C. §§ 1671d(b)(4)(A)(i); 1673d(b)(4)(A)(i). The Defendants' arguments in defense of the Commission's determination are without merit, and the Court should reject them.

### 1. The SAA Clarifies the Commission's Statutorily Required Findings

Section 735 of the Tariff Act of 1930 (the "Act"), as amended, provides that when Commerce makes an affirmative critical circumstances determination, the Commission must determine whether the imports subject to that determination are "likely to undermine seriously the remedial effect of the {AD and/or CVD} order{s} to be issued . . . ." 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i). The statute further provides that in making this determination, the Commission "shall consider, among other factors it considers relevant:

(I)     the timing and the volume of the imports,

(II)    a rapid increase in inventories of the imports, and

(III)   any other circumstances indicating that the remedial effect of the {AD and/or CVD} order{s} will be seriously undermined."

19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). According to the SAA, the Commission's task is "to determine whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order." Statement of Administrative Action, Uruguay Round Trade Agreements Act of 1994, H.R. Rep. 316, 103rd Cong., 2d Sess., vol. 1 ("SAA") at 877.

The SAA therefore provides both the "what" and the "how" for the Commission's analysis. It instructs the Commission to evaluate what importers of subject imports may have done—seriously undermined the effect of Commerce's orders—and how they must have done it—by massively increasing imports prior to the effective date of relief. This informs how the

Case 1:24-cv-00182-LWW    Document 61    Filed 12/03/25    Page 7 of 28

Consol. Court No. 24-00182                    NON-CONFIDENTIAL VERSION

Commission should evaluate the "timing and the volume of the imports," "rapid increase in inventories of the imports," and other relevant factors considered to reach its conclusion.

The Government seeks to avoid the implications of the language in the SAA by dispensing with it altogether. *See* Def.'s Mem. in. Opp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R., Sept. 24, 2025 ("Def. Br.") at 34, ECF 51 (conf.), 52 (public) (arguing that the statute is "clear on its face" and that "the Court need not resort to the SAA to understand its meaning"). The Court should reject this tactic. It is well established that the SAA is an authoritative expression of Congressional intent in the interpretation and application of the statute, and courts routinely turn to it as a tool of statutory interpretation. *AG der Dillinger Huttenwerke v. United States*, 156 F.4th 1314, 1324 n.4 (Fed. Cir. 2025) (confirming that, pursuant to 19 U.S.C. § 3512(d), the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the {URAA} and this Act in any judicial proceeding in which a question arises concerning such interpretation or application"); *Tenaris Bay City, Inc. v. United States*, 789 F. Supp. 3d 1352, 1364 (CIT 2025) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (noting that courts must "use every tool at their disposal to determine the best reading of the statute")).

Further, the Commission itself routinely looks to the SAA and other legislative history to inform its analyses. *See Views of the Commission* ("*Views*") at 57-58, C.R. 220; *Sweet Harvest Foods v. United States*, 669 F. Supp. 3d 1346, 1355-56 (CIT 2023) , *aff'd*, 155 F.4th 1355, 1363 (Fed. Cir. 2025) (noting that the relevant language from the SAA "appears in nearly 100 Commission critical circumstances determinations"). This Court has also found that the SAA is relevant to interpreting the critical circumstances provision in particular, because "the statute is silent" as to how the Commission should analyze the relevant factors, such as what time period the Commission should use in conducting its critical circumstances inquiry. *Sweet Harvest*

Case 1:24-cv-00182-LWW    Document 61    Filed 12/03/25    Page 8 of 28

Consol. Court No. 24-00182                    NON-CONFIDENTIAL VERSION

*Foods*, 669 F. Supp. at 1356, *aff'd*, 155 F.4th at 1363; 155 F. 4th at 1362 (applying *Loper Bright* and consulting the SAA to determine the "best reading of the statute"). In sum, contrary to the Government's assertions, the SAA provides essential guidance for properly interpreting the Commission's statutory task. The Court should find that, given the clear expression of congressional intent in the SAA, the best reading of the statute is that the Commission is required to analyze whether subject imports "massively increas{ed}."[1]

### 2. The Commission's Prior Practice Confirms the Majority's Approach Is Not the Best Reading of the Statute

The Commission's long-standing practice further informs the "best reading" of the statute: that the Commission is required to make an independent finding that subject imports massively increased during the post-petition period. *Loper Bright*, 603 U.S. at 374 (noting that an agency's interpretation of a statute "may be especially informative" for a court's interpretive analysis). The Majority in this case interpreted the statute as requiring it to rely on Commerce's findings of "massive imports." However, the Court should afford little weight to the Majority's interpretation because it is inconsistent with the Commission's prior practice. *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

In making its critical circumstances determinations in other proceedings, the Commission has not merely cited Commerce's finding of "massive imports" as evidence that importers have "massively increas{ed} imports prior to the effective date of relief." SAA at 877. Rather, the Commission has consistently acknowledged Commerce's affirmative critical circumstances

---

[1] The Government submitted as subsequent authority the Federal Circuit's decision in *Sweet Harvest Foods v. United States*, 155 F.4th 1355 (Fed. Cir. 2025). However, that case did not address the question of whether the Commission must separately find that imports "massively increas{ed}" in the post-petition period that the Commission considers. That question was never put before the court, as the plaintiff-appellant only challenged the Commission's critical circumstances determination with respect to one factor—the rapid increase in inventories of subject imports. *Id.* at 1362-63. Therefore, this Court should undertake its own analysis, relying on "every tool at {its} disposal," including the SAA, to determine the best reading of the statute as to whether the Commission is required to make its own findings regarding a "massive increas{e}" in subject imports. *Loper Bright*, 603 U.S. at 400.

determinations and proceeded to conduct its own analyses, using the information available on its own record. *See, e.g.*, *Overhead Door Counterbalance Torsion Springs from China*, USITC Inv. Nos. 701-TA-746 and 731-TA-1724 (Final), USITC Pub. 5675 at 46 (Sept. 2025) (describing the Commission's collection of data from U.S. importers based on different groups of producers for which Commerce reached affirmative critical circumstances findings in its AD and CVD determinations); *Small Diameter Graphite Electrodes*, USITC Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 at 24 (Feb. 2009). Even PURIS admits that the Commission's practice is to conduct its own analysis using the data on its own record. Def.-Int.'s Resp. Br., Oct. 8, 2025 ("Def.-Int. Br.") at 15, ECF 55 (conf.), 56 (public) (noting that "{i}n considering the timing and volume of subject imports, the Commission's practice is to compare import quantities prior to the filing of the petitions with those subsequent to the filing of the petitions using monthly statistics on the record").

The Commission's practice then is to make its own finding as to whether the data the Commission staff collected show imports "massively increased," before it makes further findings as to whether any such increase is likely to seriously undermine the remedial effect of Commerce's orders. *See* Pl. Br. at 18; *see, e.g.*, *Small Vertical Shaft Engines from China*, USITC Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 at 47, 51 (Apr. 2021) (finding that a "massive surge of imports" supported an affirmative critical circumstances determination); *Coumarin from The People's Republic of China*, USITC Inv. No. 731-TA-677 (Final), USITC Pub. 2852 at I-17 (Feb. 1995) (reaching an affirmative critical circumstances determination "based on" its own finding of "a large surge in imports" and the relevant statutory factors).

The Commission does not simply adopt Commerce's finding of "massive imports," nor does the Commission merely "redo the statutory analysis performed by Commerce." Def.-Int.

Br. at 19.  This is because Commerce has a different statutory mandate, implemented in
Commerce's regulations, that do not apply to the Commission nor bind its analysis.  Specifically,
Commerce's regulations provide that it may find "massive imports" so long as imports increased
by a minimum of 15 percent in a minimum three-month post-petition period, 19 C.F.R.
§ 351.206(h)(2), (i).  By contrast, the Commission has no numerical threshold for whether
imports "massively increase{ed}," and the Commission typically focuses on the comparative
increase in imports between the five or six months before and after petitions were filed, Pl. Br. at
20; SAA at 877.  If, as Defendants argue, the Commission must adopt Commerce's finding of
"massive imports" over a post-petition period of as few as three months, it would contradict the
statutory framework that provides for the Commission to conduct its own analysis to determine
whether the remedial effect of Commerce's orders is likely to be seriously undermined "by
massively increasing imports" over a longer post-petition period.

The Majority's reasoning suffers from this fatal flaw.  As Commissioner Schmidtlein
explained in her dissenting opinion, the Commission's task of assessing the "magnitude of
increases" in imports during a five or six-month post-petition period is essential, or else the
Commission could find that critical circumstances exist even when imports have not increased at
all during that period.  *Dissenting Views of Commissioner Rhonda K. Schmidtlein Regarding
Critical Circumstances* ("*Dissenting Views*") at 5-6, C.R. 221.  And yet, the Majority here took
the position that it need not evaluate whether imports massively increased because Commerce
had already found evidence of "massive imports."  *Views* at 63 n.260, C.R. 220.  These are not
the same, and the Commission's prior practice indicates that it has not historically embraced this
flawed logic.  *See, e.g.*, *Crystalline Silicon Photovoltaic Cells and Modules From China*, USITC
Inv. Nos. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 at 43-44 (Nov. 2012)
(reaching a negative critical circumstances determination where the Commission "d{id} not find

evidence of a massive surge in subject imports" that would warrant retroactive relief despite

Commerce's affirmative critical circumstances determination); *Certain Magnesia Carbon Bricks*

*From China and Mexico*, USITC Inv. Nos. 701-TA-468, 731-TA-1166-1167 (Final), USITC

Pub. 4182 at 25 (Sept. 2010) (reaching a negative critical circumstances determination where the

Commission found that "the record reflects no massive increase in subject import volume

subsequent to the petition's filing" despite Commerce's affirmative critical circumstances

determination); *Small Diameter Graphite Electrodes from China*, USITC Inv. No. 731-TA-1143

(Final), USITC Pub. 4062 at 24 (Feb. 2009) (same); *Raw Honey from Argentina, Brazil, India,*

*and Vietnam*, USITC Inv. Nos. 731-TA-1560-1562 and 1564 (Final), USITC Pub. 5327 at 46

(May 2022) (reaching a negative critical circumstances determination for subject imports from

Argentina where "each of the post-petition monthly import volume totals remained within a

limited range of each other").

 The Court should find that the inconsistency of the Majority's approach with the

Commission's past practice deprives the Majority's interpretation of the "power to persuade"

and, therefore, it is entitled to no deference. *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*,

323 U.S. at 140 ). Rather, consistent with the Commission's long-standing practice, the statute is

best read as requiring that the Commission find imports "massively increas{ed}" before reaching

an affirmative critical circumstances determination.

### 3. The Majority's Failure to Find that Imports Massively Increased Renders the Commission's Determination Unsupported by Substantial Evidence and Contrary to Law

 This Court should not sustain the Commission's affirmative critical circumstances

determination where the Majority failed to make a requisite statutory finding. As NURA

explained in its opening brief, this Court has found that the Commission must make specific

findings on each of the elements of its critical circumstances analysis. *See Tak Fat Trading Co.*

Case 1:24-cv-00182-JMM   Document 61   Filed 12/03/25   Page 12 of 28
BUSINESS PROPRIETARY INFORMATION REMOVED

Consol. Court No. 24-00182                          NON-CONFIDENTIAL VERSION

*v. United States*, 185 F. Supp. 2d 1358, 1362 (CIT 2002) (quoting H.R. Rep. No. 96-317 (1979))
(noting that the Commission's final determination "must contain findings as to whether the
elements of critical circumstances have in fact been shown").  Further, to meet the substantial
evidence standard, the Commission must "'hav{e} an adequate evidentiary basis for its
findings'" in order to be able to "put{} forward a reasoned explanation" for its determination.
*CVB, Inc. v. United States*, 675 F. Supp. 3d 1324, 1337 (CIT 2023), *appeal dismissed sub
nom. In re United States*, No. 2024-1504, 2024 WL 4814738 (Fed. Cir. Nov. 18, 2024)  (quoting
*In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)).  If the Commission's action
constitutes an abrupt departure from prior practice, it is required to explain the change, *Jiaxing
Brother Fastener Co.*, *v. United States*, 380 F. Supp. 3d 1343, 1365 (CIT 2019), and give reasons
for treating the situation differently from similar cases in the past, *RHP Bearings Ltd. v. United
States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91
F.3d 232, 237 (D.C. Cir. 1996)).

 As NURA demonstrated in its opening brief, the Majority merely described the increase
in subject imports as "significant . . . within the context of the overall U.S. market" and
considered that the "increase was from a very large base."  Pl. Br. at 17-18; *Views* at 61, 63 &
n.260, 64, C.R. 220.  However, as Commissioner Schmidtlein correctly noted, the increase of
[      ] percent in import volume "do{es} not satisfy {the statutory} standard" for "massively
increasing imports," *Dissenting Views* at 6, C.R. 221, and the Majority made no affirmative
finding that imports "massively increas{ed}" or "surge{d}" in the post-petition period.  Pl. Br. at
17-25; SAA at 877; *Views* at 57, 63, C.R. 220.  Further, the Majority provided no explanation as
to how the findings that it did make supported an affirmative critical circumstances
determination.  Pl. Br. at 23-25; *see Dissenting Views* at 5-7 & n.22, C.R. 221 (noting that the
post-petition increase in subject imports in this case is distinguishable from [        ] larger

Consol. Court No. 24-00182                                  NON-CONFIDENTIAL VERSION

increases in other cases in which the Commission has found critical circumstances to exist, such as increases ranging from 78.5 to 300 percent).

To the extent that the Defendants would argue that the Federal Circuit's recent decision in *Sweet Harvest* supports the Commission's determination in this case, we disagree. The question of whether the Commission properly evaluated the increase in subject imports never arose in *Sweet Harvest* and, in any event, the Commission appears to have made the requisite finding that subject imports from Vietnam "surge{d}" in the post-petition period. *Raw Honey from Argentina, Brazil, India, and Vietnam*, USITC Inv. Nos. 731-TA-1560-1562 and 1564 (Final), USITC Pub. 5327 at 46-49 (May 2022) (describing a "surge of imports" from Vietnam and finding that there was a "sharp increase" in the volume of imports). Consistent with Commissioner Schmidtlein's dissent, that case is also distinguishable from this case because the post-petition increase in subject imports was significantly greater than here. *Compare id.* at 46-47 (finding an 83.2 percent increase in subject imports from Vietnam) *with Views* at 61, C.R. 220 (finding a **[        ]** percent increase in subject imports). Defendants thus cannot rely on *Sweet Harvest* to excuse the Majority's failure to make the requisite findings in this case.

The Majority's failure to comply with the statutory requirement to provide findings on whether subject imports "massively increas{ed}," a key element of the critical circumstances inquiry, is clear error. *See Tak Fat Trading*, 185 F. Supp. 2d at 1362 (noting that the Commission must provide findings on each element of critical circumstances). If, as the Defendants argue, the Majority believed that it was not required to make a specific finding that imports massively increased, it needed to explain why it adopted this new interpretation of the statute that is contrary to the SAA and an abrupt departure from its prior practice. The Majority's failure to make the requisite factual finding that imports massively increased in the post-petition period, and its failure to explain the abrupt departure from its prior practice, renders

the affirmative critical circumstances determination unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.  Pl. Br. at 21.

**B.    The Statute Required the Commission to Find That Subject Import Inventories Rapidly Increased**

NURA's opening brief established that the Majority also erred in reaching an affirmative critical circumstances determination because it failed to find—as required by statute—that a "rapid increase in inventories" was likely to seriously undermine the remedial effect of Commerce's AD/CVD orders.  Pl. Br. at 25-28.  NURA's brief explained that section 735 of the Act states that the Commission "shall consider . . . a rapid increase in inventories" as evidence that critical circumstances may exist, and so the Commission is required to make a specific determination with respect to this factor.  *Id.*; 19 U.S.C. §§ 1671d(b)(4)(A), 1673d(b)(4)(A).  As NURA noted in its brief, this Court has upheld the requirement to make findings on each of the statutory elements for a critical circumstances determination based on relevant legislative history.  *See Tak Fat Trading*, 185 F. Supp. 2d at 1362 (quoting H.R. Rep. No. 96-317 (1979)) ("If critical circumstances have been alleged during the investigation, the final determinations of both {Commerce} and the {USITC} must contain findings as to whether the elements of critical circumstances have in fact been shown.").  The Majority did not find that there was a rapid increase in inventories during the six-month post-petition period it considered, but merely that increases in imports occurred "in the context of increasing U.S. inventories."  *Views* at 65, C.R. 220.  This is not the same as a finding of "rapidly increasing inventories."  Further, the Majority failed to explain the significance that the absence of such a finding has within the context of its overall analysis.

The Government seeks to defend the Majority's inventory analysis by mischaracterizing the statutory obligation.  The Government incorrectly states that the Commission can merely

Case 1:24-cv-00182-LWW    Document 61    Filed 12/03/25    Page 15 of 28

Consol. Court No. 24-00182                    NON-CONFIDENTIAL VERSION

"consider{} whether there was 'any rapid increase in inventories of the imports,'" and find that

increased imports "occurred in the context of increasing inventories" and that these

considerations are somehow sufficient for the Court to sustain this aspect of the Commission's

analysis.  Def. Br. at 39-40.  This is incorrect.  As the Government itself admits, "the

Commission did not find that inventories rapidly increased." *Id.*  The Government attempts to

make up for the absence of a Commission finding by providing its own explanation of the

evidence regarding inventory levels.  *Id.*  However, this Court cannot sustain the Commission's

critical circumstances determination based on explanations that the Majority did not give. *Views*

at 62-65, C.R. 220.

As NURA explained in its opening brief, the Majority was required to consider that

evidence of "a rapid increase in inventories"—a key factor weighing in favor of an affirmative

critical circumstances determination—was absent from the record, indicating that critical

circumstances did not exist.  Pl. Br. at 27-28.  The Majority's failure to explain how it took this

lack of evidence into account and nevertheless concluded that subject imports were likely to

seriously undermine the remedial effect of Commerce's AD/CVD orders deprives the Majority's

determination of an "adequate evidentiary basis," *CVB, Inc.*, 675 F. Supp. 3d at 1337, and shows

that the Majority arbitrarily failed to consider "an important aspect of the problem," *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Thus, the Commission's critical circumstances determination is unsupported by substantial

evidence and otherwise not in accordance with law.

## 1. The Government Concedes That the Commission Did Not Find That Imports Rapidly Increased

The statute requires the Commission to consider "a rapid increase in inventories" of

subject imports as evidence that critical circumstances may exist. 19 U.S.C. §§ 1671d(b)(4)(A),

1673d(b)(4)(A).  This imposes a requirement that the Commission find not only that inventories

increased during the post-petition period, but also that they increased *rapidly*.  Consistent with

this statutory directive, the Commission has found that inventory levels which have doubled or

tripled during the post-petition period weighed in favor of an affirmative critical circumstances

determination.  *Raw Honey from Argentina, Brazil, India, and Vietnam*, USITC Inv. Nos. 731-

TA-1560-1562 and 1564 (Final) USITC Pub. 5327 at 47 (May 2022) (noting that an almost

threefold increase in inventories in the post-petition period constituted a "rapid increase"); *Honey*

*from Argentina and China*, USITC Inv. Nos. 701-TA-402 and 731-TA-892-893 (Final), USITC

Pub. 3470 at 24 (Nov. 2001) (noting that inventories increased by 292 percent).

In this case, there was no rapid increase in inventories of subject imports during the post-

petition period.  Pl. Br. at 25-28.  During the five-month post-petition period between July and

November 2023, the Majority calculated that inventories of subject imports from China

increased only [     ] percent, or by [                    ].  *Views* at 65, C.R. 220.  This change

in inventory levels over a five-month period hardly amounts to a "rapid increase" that weighs in

favor of an affirmative finding of critical circumstances.  In fact, the Commission never asserted

that it considered this change in inventory levels to be a "rapid increase."  Rather, the

Commission merely stated that the increase in imports during the post-petition period "create{d}

a stockpile" and "occurred in the context of increasing U.S. inventories." *Views* at 65, C.R. 220.

In dissent, however, Commissioner Schmidtlein drew the Commission's attention to the fact that

"U.S. inventory levels at the end of 2023 were [     ] than each of the prior years of the

POI." *Dissenting Views* at 6, C.R. 221; *see* Certain Pea Protein from China—Staff Report,

USITC (July 16, 2024) ("Staff Rep.") at VII-12, Table VII-9, C.R. 205.  This contradicted the

Majority's finding that importers had created stockpiles by the end of the post-petition period in

November 2023.  Further, Commissioner Schmidtlein noted that if a six-month post-petition

period was used—which would have been "an equally reasonable choice" given that

Commerce's preliminary determination occurred in the latter half of the sixth month—the overall

increase in inventory levels was "substantially less" than [      ] percent at [      ] percent.

*Dissenting Views* at 4-5 & n.14, C.R. 221.  The Majority did not address these important facts on

the record that detracted from the weight of the evidence in favor of an affirmative critical

circumstances determination.

    The Government concedes that "the Commission did not find that inventories rapidly

increased." Def. Br. at 40.  The Government then makes several unsuccessful attempts to

convince this Court why it should nevertheless sustain the Commission's analysis with respect to

this finding.  First, the Government mischaracterizes the Commission's statutory task.  The

Government says the Commission "reasonably considered whether there was 'any rapid increase

in inventories of the imports'" where it found that the post-petition increase in subject imports

"occurred in the context of increasing U.S. inventories."  Def. Br. at 39-40; *Views* at 63, 65-66,

C.R. 220.  But the statute does not merely require that the Commission evaluate whether

increased imports led to increased inventories.  The question is whether there was a "rapid"

increase in inventories that suggests subject imports would seriously undermine Commerce's

remedial AD/CVD orders.  19 U.S.C. §§ 1671d(b)(4)(A), 1673d(b)(4)(A).

    The Government does not, and cannot, argue that the Majority analyzed whether overall

increases in U.S. inventories during the post-petition period were sufficiently "rapid" so as to

weigh in favor of an affirmative critical circumstances determination.  Nevertheless, the

Government argues that the Commission somehow did enough for this Court to sustain its

analysis on this point. Def. Br. at 40.  The Government is wrong.  As explained above, the

statute specifically requires the Commission to evaluate whether *rapidly* increasing inventories

suggest that subject imports are likely to undermine the remedial effects of Commerce's

AD/CVD orders.  The Majority did not find evidence of rapidly increasing imports, nor did it

address the absence of such evidence in reaching the ultimate determination that critical

circumstances existed.  *Views* at 65, C.R. 220.

Next, the Government tries to make up for the Majority's failure to explain its

consideration of an absence of rapidly increasing imports by substituting its own explanation.

But this Court cannot affirm the Commission's determination based on explanations that the

Majority did not itself provide.  *Views* at 60-66, C.R. 220.  Specifically, the Government claims

that the Commission's affirmative critical circumstances determinations were "primarily based

on its analysis of the timing and volume of the post-petition increase in subject imports, and their

universal underselling at substantial margins, and not subject import inventories."  Def. Br. at 40

(noting that the Majority highlighted "dominant market share, universal underselling, and

increase in volume all occurred '{with}in the context' of increased inventories").  However,

nothing in the Majority's analysis indicates which factors it considered more or less important to

its affirmative determination.  *Views* at 60-66, C.R. 220.  The very sentence that the Government

cites as evidence that the Majority considered changes in inventory levels as less important to its

analysis provides no such support.

The Government also attempts to direct this Court to a separate portion of the Majority's

analysis highlighting substantial import volumes and underselling as evidence of the importance

that the Majority placed on other factors besides a rapid increase in inventories.  Def. Br. at 40

(citing *Views* at 47, C.R. 220).  However, this portion of the Majority's analysis pertains strictly

to its material injury analysis, not its critical circumstances analysis.  *Views* at 47, C.R. 220.

Thus, the Government again fails to show that the Majority provided a reasonable explanation

for its failure to adequately consider whether a rapid increase in inventories indicated that subject

imports were likely to seriously undermine the remedial effect of Commerce's AD/CVD orders.

Case 1:24-cv-00182-LWW   Document 61   Filed 12/03/25   Page 19 of 28

Consol. Court No. 24-00182                                   NON-CONFIDENTIAL VERSION

### 2. The Commission's Failure to Explain Its Reasoning Renders Its Determination Unsupported by Substantial Evidence and Contrary to Law

The Government further seeks to defend its position that the Commission is not required to find that inventories rapidly increased by arguing that such a requirement would not "make any sense" because "a significant post-petition increase in subject import volume can 'seriously undermine the remedial effect of the order.'" Def. Br. at 41-42. Only part of this statement is true. A significant increase in post-petition imports can contribute to undermining the remedial effect of Commerce's AD/CVD orders. That is precisely why, as explained in NURA's opening brief and above, the Commission is required to find that imports "massively increased" in the Commission's post-petition period. However, it is incorrect to argue that a factor that Congress has specifically identified as critical to the Commission's analysis is unnecessary simply because another criterion is met. This Court recognizes that the Commission must make findings on whether each element of critical circumstances has in fact been shown. *See Tak Fat Trading*, 185 F. Supp. 2d at 1362.

In any event, the Government ultimately agrees that the Commission "did not find that inventories rapidly increased." Def. Br. at 40. Consequently, the Commission was required to explain how it considered this record evidence in nevertheless reaching an affirmative critical circumstances determination. As the Commission's prior practice demonstrates, an absence of rapidly increasing inventories usually weighs against an affirmative finding. *See, e.g.*, *Paper Plates from China, Thailand, and Vietnam*, USITC Inv. Nos. 701-TA-704–705 and 731-TA-1664–1666 (Final), USITC Pub. 5595 at 46-47 (Mar. 2025) (reaching negative critical circumstances determinations for subject imports from Thailand and Vietnam where there was no meaningful stockpiling of subject imports); *Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, Inv. Nos. 701-TA-712–714 and 731-TA-1679–1681 (Final), USITC Pub. 5620 at 13

(May 2025) (finding that, "{a}lthough end-of-period inventories substantially increased in the post-petition period . . . the inventory build-up {was} comparatively small", and therefore the "data {did} not indicate a deleterious stockpiling of the relevant subject imports"); *see also Melamine from India*, USITC Inv. Nos. 701-TA-707 and 731-TA-1668 (Final), USITC Pub. 5603 at 15 (Mar. 2025) (reaching a negative critical circumstances determination where there was "no buildup of subject import inventories").  The same conclusion should have applied here. The absence of record evidence demonstrating rapidly increasing inventories, *Views* at 62-65, C.R. 220, "fairly detracts" from the weight of supportive evidence and supports the "conflicting inference{}" that critical circumstance did not exist.  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318, 1325 (CIT 2024).  The Commission was required to provide a "reasoned explanation" regarding its consideration of this contradictory evidence.  *CVB, Inc.*, 675 F. Supp. 3d at 1337.  Without such explanation, the Commission's determination is unsupported by substantial evidence and contrary to law.

### C.    The Commission Did Not Undertake the Analysis That Defendants Claim Is Correct

NURA's opening brief challenged the Commission's affirmative critical circumstances determination based in part on the Majority's failure to render a statutorily required finding that imports "massively increased" in support of its determination.  Pl. Br.  The Defendants argue that the Commission has no responsibility for making such a finding—rather, the statute assigns this responsibility "solely to Commerce."  Def.-Int. Br. at 16; *see* Def. Br. at 36.  The Government further asserts that, because Commerce found that there were "massive imports" that occurred "over a relatively short period," the Commission's task was simply to determine whether those *particular* imports—*i.e.*, those that Commerce found to be "massive"—were likely to seriously

undermine the remedial effect of the AD/CVD orders.  Def. Br. at 19-20.  Requiring the

Commission to do anything more, PURIS argues, would mean requiring the Commission to

"redo the statutory analysis performed by Commerce."  Def.-Int. Br. at 19.  For the reasons

stated above and in NURA's opening brief, this is wrong.

Moreover, even if one were to assume (incorrectly) that the Defendants were correct[2], the

Commission did not adopt Commerce's "massive imports" analysis.  To the contrary, the

Commission collected its own data and conducted its own analysis of import volumes over

different pre-petition and post-petition periods from Commerce to make the factual findings in

support of its separate affirmative critical circumstances determination.  The Commission

necessarily needed to conduct its own analysis because Commerce's "massive imports" finding

was not based on actual import volumes, but rather on adverse facts available ("AFA").  If this

Court were to agree with the Defendants about how the Commission should perform its statutory

task, it should, at a minimum, remand to the Commission for disposition consistent with the

Defendants' suggested approach.

## 1.  The Commission Analyzed Its Own Data Regarding Subject Imports

The Commission did not determine, and could not have determined, whether the

particular imports that Commerce found to be "massive" were likely to seriously undermine the

remedial effect of the AD/CVD orders because the Commission relies upon different data.

Consistent with its usual practice, the Commission collected its own data by issuing

questionnaires to U.S. producers.  *See* Staff Rep. at IV-1, C.R. 205.  Also consistent with its

usual practice, the Commission conducted its own analysis to identify relevant figures, including

---

[2] We acknowledge that the U.S. Court of Appeals for the Federal Circuit recently adopted this position in *Sweet Harvest Foods*, 155 F.4th at 1363.

the change in import volume between the pre-petition and post-petition periods, the change in inventories, and the margin of underselling. *See generally id*. Even PURIS acknowledges that the Commission's usual practice involves comparing import volumes prior and subsequent to the filing of the petitions "using monthly statistics on {the Commission's} record regarding those firms for which Commerce has made an affirmative critical circumstances determination." Def.-Int. Br. at 15; *see also Small Diameter Graphite Electrodes from China*, USITC Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 at 24 (Feb. 2009). This does not align with the Defendants' apparent view that the Commission's job is to focus specifically on the imports that Commerce has found to be "massive" and consider only whether those imports are likely to seriously undermine the remedial effects of Commerce's AD/CVD orders. Further, as explained in detail below, the Commission could not have relied on the same import data analyzed by Commerce to make its critical circumstances findings because the two agencies have separate records and Commerce relied on AFA—not actual import data—in finding that there were "massive imports." *See* Part II.C.3.

## 2. The Commission Considered Subject Imports Over a Different Time Period from the Period Considered by Commerce

The fact that the Commission considered different pre-petition and post-petition periods than Commerce further demonstrates that the Commission did not undertake the analysis that the Defendants argue is correct. If the Commission was merely responsible for considering whether the specific imports subject to Commerce's affirmative critical circumstances determination were likely to seriously undermine the remedial effect of Commerce's AD/CVD orders, the Commission should have focused its analysis on those imports over the same time periods as Commerce. But this is not what the Commission did.

In reaching its final affirmative critical circumstances determinations in the CVD investigations, Commerce sought import data from the Chinese respondents during the period January 2023 to December 2023—using six-month comparison periods before and after the July 2023 filing of the AD/CVD petitions. *Countervailing Duty Investigation of Certain Pea Protein from the People's Republic of China: Final Analysis of Critical Circumstances*, U.S. Dep't of Commerce (June 27, 2024) (ACCESS #4586808-01) at 1-2. Commerce then analyzed publicly available import statistics over the same period to evaluate imports from all other producers and/or exporters—again relying on six-month comparison periods. *Id.* Commerce also used six-month comparison periods from January 2023 to December 2023 to analyze imports from non-selected companies eligible for a separate rate in the AD investigations. *Less-Than-Fair-Value Duty Investigation of Certain Pea Protein from the People's Republic of China: Analysis of Critical Circumstances for Final Determination*, U.S. Dep't of Commerce (June 27, 2024) (ACCESS # 4586829-01) at 1-2.

The Commission did not evaluate the same import data for purposes of its critical circumstances analysis. The Commission staff reported monthly import data for calendar year 2023 collected from the U.S. importer questionnaire responses. *Views* at 61, C.R. 220; Staff Rep. at Table IV-8, C.R. 205. The Majority compared the reported volume of subject imports in the five months prior to the July 12 filing of the petitions (February – June 2023) with the volume of imports in the five months after the filing of the petitions (July – November 2023). *Views* at 60-61, C.R. 220. Both the Defendants assert that the Majority's use of five-month comparison periods was correct. Def. Br. at 14; Def.-Int. Br. at 20-23.

It is common for the Commission and Commerce to analyze import data over different periods for purposes of their separate critical circumstances analyses. *See Views* at 60-61 n.251, C.R. 220 ("We note that the Commission is not required to examine the same periods that

Consol. Court No. 24-00182                              NON-CONFIDENTIAL VERSION

Commerce examined in performing the critical circumstances analysis."); *see also Overhead Door Counterbalance Torsion Springs from China*, USITC Inv. Nos. 701-TA-746 and 731-TA-1724 (Final), USITC Pub. 5675 at 48 n.273 (Sept. 2025) (same); *Melamine from India*, USITC Inv. Nos. 701-TA-707 and 731-TA-1668 (Final), USITC Pub. 5603 at 12 n.31 (Mar. 2025) (same); *Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, USITC Inv. Nos. 701-TA-712–714 and 731-TA-1679–1681 (Final), USITC Pub. 5620 at 12 n.37 (May 2025) (same); *Disposable Aluminum Containers, Pans, Trays, & Lids from China*, USITC Inv. Nos. 701-TA-727 and 731-TA-1695 (Final), USITC Pub. 5611 at 36 n.251 (Apr. 2025) (same).  In fact, PURIS admits that the Commission has "broad discretion to choose its comparison periods in its critical circumstances analysis."  Def.-Int. Br. at 22 (citing *MTD Prods., Inc. v. United States*, Slip Op. 23-34, 2023 WL 2535885, at *4 (CIT Mar. 16, 2023)).  The Commission's decision to collect its own monthly import data and authority to choose its own comparison periods plainly contradict the Defendants' claims that the Commission must adopt Commerce's finding of "massive imports."

### 3. Commerce's "Massive Imports" Finding was Based on Adverse Facts Available

The Commission could not have analyzed the impact of the particular imports that Commerce had found to be "massive" in this case, because Commerce relied on adverse facts available—not actual import volumes—to reach this determination.  As NURA explained in its opening brief, Commerce noted in its preliminary AD/CVD determinations that the mandatory Chinese respondents had failed to respond to its questionnaires, and therefore Commerce relied on AFA to find that there were "massive imports" with respect to the China-wide entity.  Pl. Br. at 6; *Less-Than-Fair-Value and Countervailing Duty Investigations of Certain Pea Protein from the People's Republic of China: Analysis of Critical Circumstances*, U.S. Dep't of Commerce

(Feb. 7, 2024) (ACCESS # 4505333-01).  Commerce continued to rely on AFA to find that

imports were "massive" in its final determinations.  Pl. Br. at 8; *Less-Than-Fair-Value Duty*

*Investigation of Certain Pea Protein from the People's Republic of China: Analysis of Critical*

*Circumstances for Final Determination*, U.S. Dep't of Commerce (June 27, 2024) (ACCESS #

4586829-01) at 1-2; *Countervailing Duty Investigation of Certain Pea Protein from the People's*

*Republic of China: Final Analysis of Critical Circumstances*, U.S. Dep't of Commerce (June 27,

2024) (ACCESS #4586808-01) at 2.  Thus, Commerce's finding of "massive imports" was not

based on actual import data, and it would have been impossible for the Commission to do as the

Defendants suggest—namely, to have assessed whether the specific imports that Commerce

analyzed were likely to seriously undermine the remedial effects of Commerce's AD/CVD

orders based on the relevant statutory factors.  Def. Br. at 33-39; Def.-Int. Br. at 15-20.

      Instead, the Commission necessarily had to conduct its own analysis of subject import

volumes to determine whether imports "massively increas{ed}" in order to make a determination

on critical circumstances.  *Views* at 60-62, C.R. 220.; Staff Rep. Tables IV-8-10, C.R. 205.  In

performing that analysis, the Commission did not merely "redo Commerce's analysis," as PURIS

argues, but instead evaluated imports in the context of its own statutory mandate.  Def.-Int. Br. at

19.  If the Commission were not required to conduct such an analysis—even in cases where

Commerce has relied on AFA to find that there were "massive imports"—this would increase the

incidence of the issue that Commissioner Schmidtlein raised in her dissent—that the

Commission could reach affirmative critical circumstances determinations in cases where the

data that the Commission staff collect show imports did not increase *at all* during the relevant

post-petition period.  Pl. Br. at 24-25; *Dissenting Views* at 7, C.R. 221.

      The Defendants do not address the significant differences between Commerce's and the

Commission's analyses in this case due to Commerce's reliance on AFA, nor do they offer any

solution to this apparent problem with their recommended approach in cases where Commerce's critical circumstances determination is based on AFA, not actual imports.  Def. Br. at 33-39; Def.-Int. Br. at 15-20.

Even if one were to assume (incorrectly) that the Defendants were correct in asserting that the Commission should rely on Commerce's findings of "massive imports" in reaching its critical circumstances determinations, the Commission did not follow that approach here.  To the contrary, consistent with the agencies' differing statutory mandates, the Commission collected its own data; conducted its own analyses over pre- and post-petition periods that were different from Commerce's; and analyzed import volumes independently from Commerce, because Commerce's "massive imports" finding was based on AFA.  The Defendants must therefore decide whether they disagree that the Commission should follow the statutory instruction to conduct its own analysis regarding import volumes and make findings regarding "massively increasing" imports, or whether the Commission is bound by Commerce's specific findings regarding "massive imports," but they cannot have it both ways.  If the Commission is bound by Commerce's finding of "massive imports," which in this case pertained to the six-month post-petition period, the Court must remand to the Commission to reconsider its critical circumstances analyses based on the impact of imports that occurred during this time period.

## III.    **CONCLUSION**

For the foregoing reasons, and as detailed in NURA's opening brief, NURA respectfully requests that this Court find that the Commission's determination is unsupported by substantial

evidence and is otherwise not in accordance with law, and that the Court remand the *Final*

*Determination* to the Commission for disposition in accordance with the Court's opinion.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for NURA USA, LLC*

Dated: December 3, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that this Reply in Support of NURA's Rule 56.2 Motion for Judgment on the Agency Record complies with the word limitation requirement. The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 6,915 words and therefore does not exceed 7,000 words.

/s/ Stephanie E. Hartmann
(Signature of Attorney)

Stephanie E. Hartmann
(Name of Attorney)

NURA, USA, LLC
(Representative Of)

December 3, 2025
(Date)