Slip Op. 26-85

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NURA USA, LLC,<br><br>Plaintiff,<br><br>and<br><br>JIANYUAN INTERNATIONAL CO., LTD., et al.,<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>PURIS PROTEINS, LLC,<br><br>Defendant-Intervenor. | Before: Lisa W. Wang, Judge<br><br>Consol. Court No. 24-00182<br><br>**PUBLIC VERSION** |

## OPINION AND ORDER

[Denying Plaintiff's and Consolidated Plaintiffs' motions for judgment on the agency record and sustaining the United States International Trade Commission's final affirmative critical circumstances determination.]

Dated: August 5, 2026

Stephanie E. Hartmann, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, D.C., argued for Plaintiff Nura USA, LLC. With her on the brief was David J. Ross.

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman and Klestadt LLP, of New York, NY argued for Consolidated Plaintiffs Jianyuan International Co., Ltd., et al. With him on the brief were Jordan C. Kahn and Ruting Chen.

Spencer Toubia, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington D.C., argued for Defendant United States. With him

on the brief were Margaret D. Macdonald, General Counsel, and Karl von Schriltz, Assistant General Counsel.

Adam H. Gordon, the Bristol Group PLLC, of Washington, D.C., argued for Defendant-Intervenor Puris Proteins, LLC. With him on the brief were Benjamin J. Bay and Scott D. McBride.

Wang, Judge: This action stems from the final affirmative critical circumstances determination by the United States International Trade Commission ("Commission") in its investigations of high protein content ("HPC") pea protein from the People's Republic of China ("PRC"). Certain Pea Protein from China, 89 Fed. Reg. 67,671 (ITC Aug. 21, 2024), PR 126; Certain Pea Protein from China, Inv. Nos. 701-TA-692 and 731-TA-1628 (Final), USITC Pub. 5529 (Aug. 2024) ("Public Views") at 3, PR 123. Nura USA, LLC ("Plaintiff"), a domestic importer of the subject merchandise, moves for judgment on the agency record pursuant to CIT Rule 56.2. Pl.'s Mot. for J. on Agency R. ("Pl.'s Mot.") at 1, ECF No. 66. Jianyuan International Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Linyi Yuwang Vegetable Protein Co., Ltd., Yantai Oriental Protein Tech Co., Ltd., and Jiujiang Tiantai Food Co., Ltd. (collectively, "Consolidated Plaintiffs"), PRC producers of the subject merchandise, move separately for judgment on the agency record pursuant to CIT Rule 56.2. Consol. Pls.' Mot. for J. on Agency R. ("Consol. Pls.' Mot.") at 7, ECF No. 44; see also Jianyuan International Co., Ltd. et al. v. United States, Court No. 24-00184, Consol. Pls.' Compl., ECF No. 11.

The court granted Plaintiff's and Consolidated Plaintiffs' joint motion to consolidate both actions into one case on December 20, 2024. Order Granting Consent Mot. to Consolidate Cases, ECF No. 30 (consolidating Court No. 24-00184 with this case).

Plaintiff and Consolidated Plaintiffs challenge the Commission's final affirmative critical circumstances determination as to subject imports of certain pea protein from the PRC. Pl.'s Mot. at 2; Consol. Pls.' Mot. at 1.

For the following reasons, Plaintiff's and Consolidated Plaintiffs' motions for judgment on the agency record are denied.

**BACKGROUND**

On July 12, 2023, Puris Proteins, LLC ("Puris"), a domestic producer of the subject merchandise, filed petitions for the imposition of antidumping duties ("AD") and countervailing duties ("CVD") on HPC pea protein from the PRC. Pl.'s Compl. ¶ 5; Public Views at 3. The Commission subsequently commenced its preliminary investigations of the subject merchandise. Certain Pea Protein From China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations, 88 Fed. Reg. 45,924 (ITC July 18, 2023), PR 11. On September 1, 2023, the Commission found "a reasonable indication that an industry in the United States is materially injured by reason of imports of certain pea protein from China" in the AD and CVD investigations. Certain Pea Protein From China, 88 Fed. Reg. 60,495 (ITC Sept. 1, 2023), PR 54.

On November 9, 2023, Puris alleged that critical circumstances existed regarding the importation of HPC pea protein from the PRC. Def.'s Mem. in Opp. to Pl.'s Mot. for J. on Agency R. ("Def.'s Mem."), ECF No. 52 at 9–10. Critical circumstances involve provisions of the statute that allow for an earlier suspension and/or applicability date to address the potential for importers' harming of domestic suppliers through a surge of imports during the period of the investigation before the United States Department of

Commerce's ("Commerce") publication of its preliminary determination. An affirmative finding of critical circumstances allows for the retroactive imposition of duties 90 days prior to the date that provisional duties are first imposed. 19 U.S.C. §§ 1673b(e)(2), 1673d(c)(4), 1671b(e)(2), 1671d(c)(4).

On December 18, 2023, Commerce published its preliminary affirmative determination for the CVD investigation and "preliminarily [found] that critical circumstances exist[ed] with respect to imports of subject merchandise …." Certain Pea Protein From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination with Final Antidumping Duty Determination, 88 Fed. Reg. 87,403, 87,404 (Dep't Commerce Dec. 18, 2023). On February 13, 2024, Commerce issued its preliminary affirmative determination for the AD investigation and also found that critical circumstances existed with respect to the subject merchandise. Certain Pea Protein From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 89 Fed. Reg. 10,038 (Dep't Commerce Feb. 13, 2024).

On March 5, 2024, the Commission began the final phase of its investigations. Certain Pea Protein From China; Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations, 89 Fed. Reg. 15,895 (ITC Mar. 5, 2024), PR 77. Plaintiff and Consolidated Plaintiffs participated in the proceedings. Public Views at 3.

On July 5, 2024, Commerce issued its final determination in the CVD investigation, concluding that it "continues to find that critical circumstances exist" with

respect to subject imports. Certain Pea Protein From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, 89 Fed. Reg. 55,557 (Dep't Commerce July 5, 2024). Commerce made a final affirmative determination in the AD investigation and also concluded that critical circumstances existed for subject imports. Certain Pea Protein From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances Determination, 89 Fed. Reg. 55,559 (Dep't Commerce July 5, 2024).

On August 21, 2024, the Commission issued its final determination. Public Views at 3. The Commission determined that the domestic industry was "materially injured by reason of imports of certain HPC pea protein found by [Commerce] to be sold in the United States at less than fair value and subsidized by the government of China." Id. In addition, the Commission concluded that "critical circumstances exist with respect to imports of HPC pea protein from China that are subject to Commerce's final affirmative critical circumstances determinations."[1] Id.

Following the Commission's final affirmative determination, Commerce issued the relevant AD and CVD orders. Certain Pea Protein From the People's Republic of

---

[1] Commissioner Rhonda K. Schmidtlein made a negative determination with respect to critical circumstances and issued dissenting views. Public Views at 3, n.4. Commissioner David S. Johanson found that the domestic industry was threatened with material injury by reason of subject imports from the PRC, and as such, did not reach the issue of critical circumstances. Id. at 3, ns.3–4. That is because a "threat of material injury" determination provides only for prospective relief, and an affirmative critical circumstances determination would provide retroactive relief. See Suramerica De Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 984 (Fed. Cir. 1994).

China: Antidumping and Countervailing Duty Orders, 89 Fed. Reg. 68,390 (Dep't Commerce Aug. 26, 2024).

Plaintiff appealed the Commission's final affirmative critical circumstances determination on September 25, 2024. Pl.'s Am. Summons, ECF No. 17. Consolidated Plaintiffs also appealed the determination on September 25, 2024. Jianyuan International Co., Ltd. et al. v. United States, Court No. 24-00184, Consol. Pls.' Summons, ECF No. 1. The court consolidated the cases on December 30, 2024. Order Granting Consent Mot. to Consolidate Cases.

On May 27, 2025, Plaintiff and Consolidated Plaintiffs filed their respective motions for judgment on the agency record. Pl.'s Mot.; Consol. Pls.' Mot. On September 24, 2025, the Commission filed its response. Def.'s Mem. On October 8, 2025, Defendant-Intervenor filed its response. Def. Int.'s Resp. Br. ("Def. Int.'s Resp."), ECF No. 56. On December 3, 2025, Plaintiff and Consolidated Plaintiffs filed their respective replies. Pl.'s Reply in Supp. of Mot. for J. on Agency R. ("Pl.'s Reply"), ECF No. 61; Consol. Pls.' Reply in Supp. of Mot. for J. on Agency R. ("Consol. Pls.' Reply"), ECF No. 59. Oral arguments were held on March 2, 2026. ECF No. 74.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction over this action. 28 U.S.C. § 1581(c) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930."). This action is commenced under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i).

The court will uphold the Commission's final critical circumstances determinations unless they are "unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); Sweet Harvest Foods v. United States, 155 F.4th 1355, 1362 (Fed. Cir. 2025).

The Supreme Court has specified that "substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). When determining whether an agency action is supported by substantial evidence, the court "asks whether a reasonable fact finder could have arrived at the agency's decision …." In re Gartside, 203 F.3d 1305, 1312 (Fed. Cir. 2000).

In reviewing the Commission's critical circumstances determination, the court "may not reweigh the evidence or substitute its own judgment for that of the agency." Usinor v. United States, 342 F. Supp. 2d 1267, 1272 (CIT 2004); see also Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 936 (Fed. Cir. 1984); Hynix Semiconductor, Inc. v. United States, 431 F. Supp. 2d 1302, 1306 (CIT 2006). The Commission "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Timken United States Corp. v. United States, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Thus, "even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent [the Commission's] determination from being supported by substantial evidence." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001)).

The court "must consider the record as a whole, including that which fairly detracts from its weight." Id. at 1351. However, "when the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder — here the majority of the Presidentially-appointed, Senate-approved Commissioners — to decide which side's evidence to believe." Id. at 1359. Ultimately, the court will "affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." Altx, Inc. v. United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004) (quoting Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1562–64 (Fed. Cir. 1984)).

## DISCUSSION

Plaintiff and Consolidated Plaintiffs challenge the following elements of the Commission's critical circumstances determination as unsupported by substantial evidence or otherwise not in accordance with law: (1) the Commission's treatment of import volumes; (2) the Commission's choice of an appropriate period of comparison; (3) the Commission's consideration of inventory data; and (4) the Commission's finding of critical circumstances based on "any other circumstances" indicating that the remedial effect of the AD and CVD orders were likely to be seriously undermined.

Defendant and Defendant-Intervenor maintain that all challenged elements of the Commission's determination are supported by substantial evidence and otherwise in accordance with law. Each challenge is addressed in turn.

### I. The Commission's Treatment of Import Volumes in its Critical Circumstances Determination Was Lawful

Plaintiff and Consolidated Plaintiffs challenge three elements of the Commission's treatment of import volumes. Plaintiff first claims that the relevant

statutory provisions require the Commission to make an independent finding as to whether subject imports massively increased or surged in the post-petition period. Pl.'s Mot. at 14–15. Plaintiff further argues that the Commission departed from its established practice by failing to make an independent finding as to whether subject imports massively increased or surged. Id. at 21. Finally, Plaintiff and Consolidated Plaintiffs make arguments that rely on the proposition that the Commission improperly considered the timing and volume of subject imports. Id. at 3, 22; Consol. Pl.'s Mot. at 30–32.

**A. Statutory Requirements**

The first issue before the court is whether the Commission, as part of its critical circumstances determination, is statutorily required to make a finding independent from Commerce that there have been massive imports of subject merchandise over a relatively short period.

Plaintiff argues that the Commission's critical circumstances determination is not in accordance with law because "the Commission failed to make the requisite statutory finding that subject imports from China massively increased in the post-petition period." Pl.'s Mot. at 13. Plaintiff claims that because "the statute is silent as to what findings regarding timing and volume of imports should lead the Commission to determine that critical circumstances exist[,] … when considering 'the timing and volume' of the imports, the Commission must make a determination as to whether imports have 'massively increased' or 'surged' prior to the suspension of liquidation for subject imports …." Id. at 14–15 (citing to the Statement of Administrative Action to the Uruguay Round Trade Agreements Act, H. Rep. No. 103-316, vol. I (1994) ("SAA")).

Defendant argues that "[t]he statute imposes no requirement that the Commission use the terms 'massively increased' or 'surged' in considering the 'timing and volume of the imports,' and the Commission has never recognized such a requirement …." Def.'s Mem. at 38.[2]

The consideration of the timing and volume of subject imports is a fact-specific inquiry, and as such, the court evaluates the Commission's findings under the substantial evidence standard. See 19 U.S.C. § 1516a(b)(1)(B)(i). In evaluating the relevant statutory language, the court is required "to exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority …." Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024). The court must use the "relevant interpretive tools" to reach "the best reading of the statute and resolve … ambiguity." Id. at 373. Those interpretive tools include the canons of statutory construction and legislative history. Timex V.I. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) ("Beyond the statute's text, those 'tools' [of statutory construction] include the statute's structure, canons of statutory construction, and legislative history."); Metro. Area EMS Auth. v. Sec'y of Veterans Affs., 122 F.4th 1339, 1345 (Fed. Cir. 2024).

For critical circumstances determinations, the responsibilities of the Commission and Commerce are bifurcated between two distinct sections of the relevant statute. Specifically, 19 U.S.C. § 1673d(b)(4)(A)(i) governs the Commission's standard for consideration of the "retroactive application" of duties (i.e., critical circumstances) in AD investigations:

---

[2] For this and other issues, Defendant-Intervenor largely echoes Defendant's arguments. See Def. Int.'s Resp.

> If the finding of the administering authority under subsection (a)(3) is affirmative, then the final determination of the Commission shall include a finding as to whether the imports subject to the affirmative determination under subsection (a)(3) are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under [section 1673e].

19 U.S.C. § 1671d(b)(4)(A)(i) contains the same operative language regarding the Commission's duty to consider whether imports subject to a CVD investigation are "likely to undermine seriously the remedial effect of the countervailing duty order to be issued under section 1671e of this title."

The relevant statute further instructs that, in making such determinations, the Commission shall consider, "among other factors it considers relevant":

> (I) the timing and the volume of the imports,
> (II) a rapid increase in inventories of the imports, and
> (III) any other circumstances indicating that the remedial effect of the [AD]/[CVD] order will be seriously undermined.

19 U.S.C. § 1673d(b)(4)(A)(ii); <u>see</u> 19 U.S.C. § 1671d(b)(4)(A)(ii).

Separately, 19 U.S.C. § 1673d(a)(3) governs <u>Commerce's</u> responsibility for critical circumstances determinations in AD investigations and provides that:

> If the final [antidumping] determination of the administering authority is affirmative, then that determination, in any investigation in which the presence of critical circumstances has been alleged under [section 1673b(e)], shall also contain a finding of whether—
>
> (A)
>
> > (i) there is a history of dumping and material injury by reason of dumped imports in the United States or elsewhere of the subject merchandise, or
> >
> > (ii) the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the subject merchandise at less than its fair value and that there would be material injury by reason of such sales, and
>
> (B) there have been massive imports of the subject merchandise over a relatively short period.

The relevant statutory provision for CVD investigations similarly requires Commerce, in its critical circumstances analyses, to determine whether "there have been massive imports of the subject merchandise over a relatively short period." 19 U.S.C. § 1671d(a)(2)(B).

The statutory structure is clear. 19 U.S.C. §§ 1673d(a)(3)(B) and 1671d(a)(2)(B) identify the responsibilities of the "administrating authority" (i.e., Commerce) in making critical circumstances determinations. In separate subparts, 19 U.S.C. §§ 1673d(b)(4) and 1671d(b)(4) identify the independent responsibilities of the Commission in determining the appropriateness of the retroactive application of duties. In other words, subsection (a) of sections 1673d and 1671d relates only to Commerce's responsibilities while subsection (b) of sections 1673d and 1671d relates only to the Commission's responsibilities. See SAA at 876 ("If Commerce determines that critical circumstances exist, then the Commission determines whether retroactive duties are necessary to prevent recurrence of material injury."); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 156 (2012) ("Material within an indented subpart relates only to that subpart ….").

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has explained the distinct responsibilities of the Commission and Commerce in these instances:

> The pertinent statutory provision, 19 U.S.C. § 1673d(b)(4)(A)(i), kicks in [for the Commission] if Commerce has made an affirmative determination of critical circumstances under subsection (a)(3) of section 1673d … finding in particular that "there have been massive imports of the subject merchandise over a relatively short period," id. § 1673d(a)(3)(B). If Commerce has made that determination, then the Commission is to determine whether "the imports subject to the affirmative determination under subsection (a)(3) are

> likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e." Id. § 1673d(b)(4)(A)(i).

Sweet Harvest, 155 F.4th at 1363 (emphasis added).[3]

Plaintiff's argument that the Federal Circuit never "properly evaluated" the issue of the Commission's statutory responsibilities in Sweet Harvest falls flat. Pl.'s Reply at 9. Similarly, Consolidated Plaintiffs' argument that Sweet Harvest "confirms the need for the ITC to find post-petition surges" also fails. Consol. Pls.' Reply at 11 (citing Sweet Harvest, 155 F.4th at 1363). These arguments ignore the Federal Circuit's directive that it is the responsibility of Commerce, not the Commission, to determine whether "there have been massive imports of the subject merchandise over a relatively short period." Sweet Harvest, 155 F.4th at 1359. Sweet Harvest directly speaks to the bifurcated responsibilities of Commerce and the Commission. Id. at 1363.

Plaintiff conflates the statutory language governing Commerce's responsibilities under subsection (a) of sections 1673d and 1671d with the responsibility of the Commission to consider "the timing and volume" of imports, but the statute does not require the Commission to duplicate Commerce's analysis.[4] See Pl.'s Mot. at 18–22.

---

[3] Given the identical language of 19 U.S.C. §§ 1671d and 1673d as it relates to "massive imports," the rationale of the Federal Circuit is equally applicable to CVD investigations.

[4] Plaintiff cites to the SAA in support of its reading that the "the timing and volume" of imports requires a finding of a massive surge, Pl.'s Mot. at 14–15, but the SAA reinforces the statute's directive that it is Commerce's responsibility to determine if "there have been massive imports of the subject merchandise over a relatively short period of time (i.e., a surge of imports) prior to the suspension of liquidation …." SAA at 876. Only "[i]f Commerce determines that critical circumstances exist, then the Commission determines whether retroactive duties are necessary to prevent recurrence of material injury." Id.

Rather, the Federal Circuit has made clear that the Commission's responsibility only "kicks in" once Commerce has already found that there have been massive imports of the subject merchandise over a relatively short period. Id. at 1363. Only if Commerce has made that determination does the Commission need to "consider … the timing and volume of the imports[.]" Id.; see 19 U.S.C. §§ 1673d(b)(4)(A)(ii)(I), 1671d(b)(4)(A)(ii)(I).

As part of its consideration of timing and volume, the Commission is not required to make an independent finding regarding a surge of massive imports. There is no duplicative language of "massive imports" in the statutory sections governing the Commission's responsibilities when considering the timing and volume of subject imports. The Commission thus acted within its statutory authority in refraining from making an independent determination as to whether there have been massive imports of subject merchandise over a relatively short period. See Loper Bright Enters., 603 U.S. at 369.

**B. The Commission's Previous Critical Circumstances Determinations**

The second issue before the court is whether, irrespective of statutory requirements, the Commission has an established practice of making an independent finding as to whether there have been massive imports of subject merchandise over a relatively short period. Only if the Commission has such an established practice would the court need to determine if the Commission departed from its practice in this instance.

Plaintiff argues that "[e]ven if the statute permitted the Commission to rely on Commerce's finding of 'massive imports,' the Majority's abrupt departure from its established practice of determining whether subject imports have 'surge[d]' or

'massively increase[ed]' required a 'reasoned explanation' …." Pl.'s Mot. at 21 (quoting Jiaxing Brother Fastener Co. v. Unites States, 380 F. Supp. 3d 1343, 1365 (CIT 2019)).

Defendant counters that "the Commission has never recognized such a requirement[.]" Def.'s Mem. at 38. Defendant maintains that "[i]n the cases cited by [Plaintiff], the Commission only discussed increasing imports to determine whether they seriously undermined the remedial effect of the orders and not in applying any 'massively increased' test." Id. at 37.

The court previously described the criteria that a party must satisfy to show a departure from an established agency practice:

> First, [a party] must demonstrate that an established practice exists. See Ranchers-Cattlemen Action Legal Found. v. United States, 74 F. Supp. 2d 1353, 1373 (CIT 1999), dismissed per stipulation, 232 F.3d 909 (Fed. Cir. 2000). Second, it must demonstrate a departure from the practice. See DAK Americas LLC v. United States, 456 F. Supp. 3d 1340, 1356 (CIT 2020). And third, the party must demonstrate that the departure is insufficiently explained. See Allegheny Ludlum Corp. v. United States, 346 F.3d 1368, 1373 (Fed. Cir. 2003).

Bluescope Steel, Ltd. v. United States, 719 F. Supp. 3d 1357, 1367 (CIT 2024).

Here, Plaintiff has not demonstrated that the Commission, in its critical circumstances determinations, has an established practice of making an independent finding of whether there have been massive imports of subject merchandise over a relatively short period. The previous critical circumstances determinations cited by Plaintiff do not amount to an established practice requiring the Commission to engage in such analysis. In the cases cited by Plaintiff, the Commission's acknowledgement of a "massive surge" was not an independent quantitative determination. See Pl.'s Mot. at 15–16. All Plaintiff has shown is that the Commission has, at times, acknowledged Commerce's finding of a massive surge, not made its own findings with respect to such

determinations. See e.g., Coumarin from China, Inv. No. 731-TA-677 (Final), USITC Pub. 2852 (Feb. 1995) at I-17 (noting that a "large surge" in post-petition imports, among other factors, showed that retroactive duties were necessary to prevent the "recurrence of material injury[.]"); see also Cleo Inc. v. United States, 501 F.3d 1291, 1299 (Fed. Cir. 2007) ("[E]ach injury investigation by the Commission is sui generis ….") (internal quotations omitted).

Plaintiff has failed to show that the Commission has an established practice of making an independent finding of massive imports of subject merchandise over a relatively short period. Bluescope, 719 F. Supp. 3d at 1367 ("[T]here can be no departure from a practice that does not exist (let alone an unexplained departure)[.]"). As such, the Commission's decision not to make an independent finding regarding massive imports is supported by substantial evidence and otherwise in accordance with law.

### C. The Commission's Consideration of the Timing and Volume of Subject Imports

The court next turns to whether the Commission's consideration of the timing and volume of subject imports is supported by substantial evidence and otherwise in accordance with law.

Consolidated Plaintiffs argue that the Commission improperly considered the "timing and volume" of subject imports for a number of reasons. See Consol. Pls.' Mot. at 30–32. Namely, Consolidated Plaintiffs claim that: (1) the Commission failed to consider "the timing and volume of the imports" as a single criterion; (2) the Commission abused its discretion by developing a new critical circumstances standard that disadvantages exporters who served the U.S. market before the existence of the

domestic industry; and (3) the Commission's finding of critical circumstances based on a [[ ]] post-petition volume increase is unsupported by substantial evidence and improperly deviated from past practice. See Conf. Consol. Pls.' Mot. for J. on Agency R. ("Conf. Consol. Pls.' Mot.") at 30–32, ECF No. 43; Consol. Pls.' Mot. at 30–32.

Plaintiff relatedly argues that the Commission's findings are unsupported by substantial evidence. Pl.'s Mot. 22–23. Plaintiff maintains that the increase in post-petition subject import volumes in this case was smaller than the increases in prior investigations where the Commission found critical circumstances and thus could not seriously undermine the remedial effect of the orders. Id.

Defendant argues that its analysis was reasonable and supported by substantial evidence because "while acknowledging the relatively smaller percent increase in post-petition subject import volume compared to other recent investigations, the Commission reasonably explained that [the increase] was significant relative to the size of the U.S. market and sufficient to seriously undermine the remedial effect of the orders." Def.'s Mem. at 27–28. Defendant maintains that "the Commission also explained why the larger percent increases in post-petition subject import volume in other cases did not mean that those increases were any more substantial." Id. at 28.

Consolidated Plaintiffs misinterpret the relevant statutory provisions on which they rely. The statutory language provides that, in critical circumstances determinations, the Commission "shall consider, among other factors it considers relevant … the timing and the volume of the imports …." 19 U.S.C. §§ 1673d(b)(4)(A)(ii)(I), 1671d(b)(4)(A)(ii)(I). The statute does not direct the Commission to structure its analysis

of the statutory factors in any particular way, nor does it define the phrase "timing and volume of the imports." 19 U.S.C. §§ 1673d(b)(4), 1671d(b)(4).

The court previously described the Commission's broad discretion in considering the timing and volume of subject imports, noting:

> Nothing in the [Tariff Act of 1930] restricts the Commission's broad discretion to consider data reasonably relevant to determining the "timing and volume of imports." Reinforcing this discretion, the Act directs the agency to consider –"among other factors it considers relevant" – "any other circumstances indicating that the remedial effect of the [orders] will be seriously undermined."

MTD Prods. Inc. v. United States, Slip Op. 2023-34, LEXIS 37, at *4 (CIT Mar. 16, 2023).

Additionally, while "a reviewing court must take into account contradictory evidence or any evidence in the record that undermines the agency's finding, the substantial evidence test does not require that there be an absence of evidence detracting from the agency's conclusion, nor is there an absence of substantial evidence simply because the reviewing court would have reached a different conclusion based on the same record." Cleo, 501 F.3d at 1296; see also Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1385 (Fed. Cir. 2014) ("An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.").

1. Consideration of the Timing and Volume of Subject Imports as a Single Criterion

Here, the Commission analyzed the increase in the volume of subject imports during the post-petition period. Public Views at 44–46. The Commission explained that "[s]ubject imports decreased in every month of the five-month pre-petition period and

were higher in three months of the post-petition period (August, September, and November) than in any month of the pre-petition period." Public Views at 46. Specifically, the Commission pointed to the fact that "[s]ubject import volume was higher in September 2023, at [[ ]] pounds, than in any other month in 2023, and [[ ]] percent higher than in the peak month of the pre-petition period." Conf. Views at 64–65; Public Views at 46.

Further, the Commission expressly explained:

> [T]he Commission is to consider both the timing <u>and the volume</u> of imports. 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). We have considered both the timing and the volume of imports subject to Commerce's affirmative critical circumstances determination, both in absolute terms and relative to apparent U.S. consumption. As reviewed above, the timing and volume of imports subject to Commerce's affirmative critical circumstances determination, together with the rise in inventories and other circumstances, indicate that the imports subject to Commerce's affirmative injury determination are likely to seriously undermine the remedial effects of the order

Public Views at 45, n.260 (emphasis in original). Based on this explanation, the Commission considered both the timing and the volume of subject imports.

The Commission also addressed arguments that would have detracted from its findings. Specifically, the Commission explained that "the percentage increase in post-petition imports is less than in some other recent investigations," but found that the "increase was from a very large base – a share of more than [[ ]] of the entire market." Conf. Views at 62–63; Public Views at 44–45. It noted that:

> While the post-petition increase in the post-petition period was [[ ]] than the post-petition increase in the recent affirmative critical circumstances determination in Mattresses with respect to imports from Burma (101.6 percent), within the context of the overall U.S. market, the post-petition increase in the volume of imports in this case was [[ ]] than in Mattresses, which involved a post-petition increase in

> imports equivalent to only 2.3 percent of apparent U.S. consumption in the final year of the POI [period of investigation].

Conf. Views at 62, n.257 (citing Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, Italy, Philippines, Poland, Slovenia, and Taiwan, Inv. Nos. 731-TA-1629-1631, 1633, 1636-1638, and 1640 (Final), USITC Pub. 5520 (June 2024) ("Mattresses")); Public Views at 44, n.257.

In light of these explanations, the Commission's findings are supported by "evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera, 340 U.S. at 477.

2. U.S. Market Share Considerations

The Commission also addressed the "already-dominant position of subject imports" and explained that "[t]he increase in the volume of subject imports in the post-petition period was significant, particularly given how large the volume of subject imports was even before the post-petition increase in that volume, within the context of the overall U.S. market." Public Views at 44. Contrary to Consolidated Plaintiffs' arguments, such an explanation does not impose a new standard or criteria but addresses the specific circumstances of the market. See Cleo, 501 F.3d at 1299.

Plaintiff further argues that the Commission "unreasonably ignored evidence of pricing patterns for subject imports that indicated imports in the post-petition period were unlikely to undermine seriously the remedial effects of the [orders] ...." Pl.'s Mot. at 3. Plaintiff claims that the Commission failed to "meaningfully address Plaintiff's arguments that increased consumer demand explained the timing increase for the increase in subject imports." Id.

There is a difference between ignoring record evidence, as Plaintiff argues, and disagreeing with the Commission's determination of the probative value and relevance of that evidence. See Seah Steel VINA Corp. v. United States, 950 F.3d 833, 842–43 (Fed. Cir. 2020). This situation falls into the latter category.

Here, the Commission explained that, while U.S. demand decreased, subject imports were significantly higher during the relevant comparison period. Conf. Views at 23–24; Public Views at 17–18. Specifically, the Commission found that:

> [R]esponding domestic producers and a majority of purchasers reported that the HPC pea protein market was subject to seasonality, with contracting occurring in the third and fourth quarters of the harvest year. In light of this, we find it instructive that the volume of reported subject import sales of pricing products was [[ ]] percent higher in the second half of 2023 than in the second half of 2022, even though apparent U.S. consumption was lower in 2023 than in 2022.

Conf. Views at 64, n.265; Public Views at 46, n.265.

The Commission further supported its finding, explaining that "[g]iven importers' reported 45- and 67-day lead times for sales made from foreign inventories and produced to order, respectively, subject imports arriving in September would have been ordered immediately following the filing of the petitions in July … the effect of the post-petition increase in subject imports was to create a stockpile of imports prior to the imposition of provisional duties, as reflected by the [[ ]] percent increase in end-of-period inventories of subject merchandise between the pre- and post-petition periods." Conf. Views at 65; Public Views at 46.

Based on this explanation, the Commission's consideration of the U.S. market share and pricing patterns of subject imports is supported by substantial evidence and otherwise in accordance with law.

3. Post-Petition Volume Considerations

Lastly, Consolidated Plaintiffs claim that the post-petition volume increase in this case "does not [[ ]] approaching the increases in import volumes in cases where the Commission found critical circumstances."[5] Conf. Consol. Pls.' Mot. at 24. Plaintiff similarly argues that the Commission's critical circumstances determination is unsupported by substantial evidence "because the record evidence does not show a massive increase in subject imports that would meet the high standard of imports capable of seriously undermining the remedial effect of the [o]rders." Pl.'s Mot. at 22.

The Commission's consideration of volume increases in the post-petition period satisfies the requirements of the substantial evidence standard. Conf. Views at 30–31; Public Views at 23. Here, the Commission found that subject import volume increased [[ ]] percent between the pre- and post-petition periods despite the [[ ]] percent decline in apparent U.S. consumption between 2022 and 2023. Conf. Views at 64–65; Public Views at 46; see Conf. Views at 41, n.163 (noting that U.S. demand for HPC pea protein is "moderately inelastic"); Public Views at 30, n.163. The Commission further explained that the increase in this case was "significant, particularly given how large the volume of subject imports was even before the post-petition increase in that volume, within the context of the overall U.S. market." Public Views at 44.

Given these statements, the parties' arguments that the Commission's conclusion is unsupported by record evidence fall flat. Consolidated Plaintiffs and

---

[5] Consolidated Plaintiffs couch this argument as a practice issue but have failed to demonstrate that the Commission has an established practice of using a quantitative minimum of post-petition increases in subject import volume to justify affirmative critical circumstances determinations. See Bluescope, 719 F. Supp. 3d at 1367.

Plaintiff may be dissatisfied as to the weight assigned to certain evidence, but such a responsibility "falls exclusively within the authority of the Commission." Nippon Steel Corp., 458 F.3d at 1358. The court will not disturb such calls. See United States Steel Group – a Unit of USX Corp. v. United States, 96 F.3d 1352, 1362 (Fed. Cir. 1996). As such, the Commission's findings regarding the timing and volume of subject imports are supported by substantial evidence and otherwise in accordance with law.

## II. The Remaining Challenged Elements of the Commission's Critical Circumstances Determination Are Lawful

Plaintiff and Consolidated Plaintiffs challenge three additional elements of the Commission's critical circumstances determination. Consolidated Plaintiffs claim that the Commission improperly deviated from its established practice by employing a five-month comparison period. Consol. Pls.' Mot. at 20. Further, both parties argue that the Commission erred in its consideration of inventory data. See Pl.'s Mot. at 25, 28; Consol. Pls.' Mot. at 35–36. Finally, both parties raise claims that the Commission improperly considered "any other circumstances" indicating that the remedial effect of the orders were likely to be undermined. See Pl.'s Mot at 28, 32; Consol. Pls.' Mot. at 15.

### A. The Commission's Choice of an Appropriate Period of Comparison

The next issue before the court is whether the Commission has an established practice of employing six-month comparison periods for its critical circumstances analyses when a preliminary determination issued by Commerce falls within this six-

month period.[6] Only if the Commission has such an established practice would the court need to determine if the Commission departed from its practice in this instance. Bluescope, 719 F. Supp. 3d at 1367.

Consolidated Plaintiffs argue that "[t]he Commission's affirmative critical circumstances analysis improperly deviated from practice by employing a five-month comparison period …."' Consol. Pls.' Mot. at 20. Consolidated Plaintiffs assert that "[t]here was no basis to shorten the full six-month comparison period that the Commission ordinarily uses in its critical circumstances analysis because the preliminary CVD publication published on the 18th day of the month." Id. at 13. Consolidated Plaintiffs further claim that "[i]n the Commission's recent cases where a shorter than six-month comparison period was used, the reasons were clear – petitions were filed at the end of the very end of a month and Commerce's preliminary determinations were issued at the beginning of a month within the six-month period." Id. at 21.

Defendant argues that "[t]he Commission's selection of five-month comparison periods here was consistent with its approach in past cases … the Commission has relied on comparison periods shorter than six months 'when Commerce's preliminary

---

[6] The issue of whether the Commission has an established practice of employing six-month comparison periods for its critical circumstances analyses, as a general matter, is not before the court.

determination applicable to the country at issue fell within the six-month post-petition period.'" Def.'s Mem. at 21–22.

The threshold requirement for showing a departure from an established agency practice is first that "an established practice exists." Bluescope, 719 F. Supp. 3d at 1367. Here, Consolidated Plaintiffs have failed to show that the Commission has an established practice of using six-month comparison periods for its critical circumstances analyses when preliminary determinations issued by Commerce fall within that six-month period.

Contrary to Consolidated Plaintiffs' assertions, the Commission has previously employed less than six-month comparison periods when Commerce's preliminary determinations were issued during the sixth month of the post-petition period, regardless of whether the preliminary determination was published in the latter half of that month.[7] See Carbon and Alloy Steel Cut-to-Length Plate from Brazil, South Africa, and Turkey, Inv. Nos. 731-TA-1319, 1326, and 1328 (Final), USITC Pub. 4664 (Jan. 2017) at 48 (employing a five-month comparison period when Commerce's preliminary determination fell on the 22nd day of the sixth month of the post-petition period); Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom, Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297 (Final), USITC Pub. 4638 (Sep. 2016) at 49 (employing a five-month comparison period when Commerce's preliminary determination fell on the 15th day of the sixth month).

---

[7] Consolidated Plaintiffs themselves acknowledge that "[t]he Commission has used a shorter comparison period in instances where Commerce's preliminary determination fell within the six-month comparison period." Consol. Pls.' Mot. at 21.

Having failed to demonstrate an established practice, the court evaluates the Commission's chosen comparison period for reasonableness. See Coal. of Gulf Shrimp. Indus. v. United States, 71 F. Supp. 3d 1356, 1365 (CIT 2015) ("When evaluating challenges to the [Commission's] methodology, the court will affirm the chosen methodology as long as it is reasonable."); see also United States Steel Group, 96 F.3d at 1357.

Here, the Commission sufficiently explained why it chose a comparison period shorter than six months. Specifically, it noted that although it "frequently relies on six-month comparison periods, [the Commission] has relied on shorter periods when Commerce's preliminary determination applicable to the country at issue fell within the six-month post-petition period." Public Views at 43. The Commission further explained, "[t]hat situation arises here as Commerce's preliminary critical circumstance determination with respect to the countervailing duty investigation was rendered on December 18, 2023." Id.

Such an explanation is reasonable, supported by substantial evidence and otherwise in accordance with law. As such, the court will not disturb the Commission's choice of a five-month comparison period. See Nucor Corp. v. United States, 414 F.3d 1331, 1337 (Fed. Cir. 2005) ("[T]he Commission has broad discretion to choose the most appropriate period of time for its investigation ….").

### B. The Commission's Consideration of Import Inventories

The next issue before the court is whether the Commission's consideration of subject import inventories is supported by substantial evidence and otherwise in accordance with law. See 19 U.S.C. §§ 1673d(b)(4)(A)(ii)(II), 1671d(b)(4)(A)(ii)(II).

Consolidated Plaintiffs argue that the Commission "improperly found critical circumstances based on inventory data …" for several reasons. Consol. Pls.' Mot. at 35. Namely, Consolidated Plaintiffs claim that: (1) "the Commission's finding that the effect of the post-petition increase in subject imports was to create a stockpile of imports prior to the imposition of provisional duties is unsupported by substantial evidence on the record"; (2) "the Commission ignored the fact that importers' U.S. inventory levels at the end of 2023 were lower than each of the prior years of the POI"; and (3) the Commission ignored the statutory requirement that "the increase must be 'rapid' to support an affirmative determination."[8] Id. at 35–36 (internal quotations omitted).

Relatedly, Plaintiff argues that the Commission's determination is unsupported by substantial evidence and otherwise not in accordance with law because the

---

[8] Consolidated Plaintiffs refurbish a previous argument, claiming that "the Commission impermissibly deviated from its established practice by using a relatively modest post-petition increase to justify finding critical circumstances." Conf. Consol. Pls.' Mot. at 32; Consol. Pls.' Mot. at 32. Consolidated Plaintiffs have failed to show that the Commission sets a minimum amount of post-petition increases in subject import inventory levels when making a critical circumstances determination. See Bluescope, 719 F. Supp. 3d at 1367. Here, the Commission recognized that the increase was less than in other investigations and explained its findings. Specifically, the Commission stated that the increase in post-petition inventory levels was significant within the context of the overall U.S. market. Conf. Views at 62, n.257; Public Views at 44, n.257. Such an explanation is reasonable and supported by substantial evidence.

Commission "did not make the statutorily required finding that inventories of subject imports rapidly increased during the post-petition period …." Pl.'s Mot. at 25. Plaintiff points to "the absence of record evidence demonstrating rapidly increasing inventories," asserting that the Commission "was required to consider this evidence and to explain how it nevertheless determined that subject imports were likely to seriously undermine the remedial effect of the [o]rders." Id. at 28.

Defendant argues that "Plaintiffs incorrectly treat the statutory factor 'any rapid increase in inventories' as a precondition for the existence of critical circumstances." Def.'s Mem. at 7. Defendant maintains that "the Commission has regularly made affirmative critical circumstances determinations without finding that inventories rapidly increased." Id. Defendant further asserts that "[i]n considering 'any rapid increase in inventories of the imports,' the Commission found that the post-petition increase in subject imports did not replace existing inventories but rather created a stockpile of imports ….'" Id. at 39.

The relevant statutory provisions provide that in critical circumstances analyses, the Commission "shall consider, among other factors it considers relevant," in AD investigations, "a rapid increase in inventories of the imports," 19 U.S.C. § 1673d(b)(4)(A)(ii)(II), and in CVD investigations, "any rapid increase in inventories of the imports," 19 U.S.C § 1671d(b)(4)(A)(ii)(II).

Contrary to Consolidated Plaintiffs' and Plaintiff's assertions, the statute does not require the Commission to affirmatively find a rapid increase in inventories of the imports to make an affirmative critical circumstances determination. As the Federal

Circuit has explained, the Commission's "consideration" of a statutory factor does not amount to a requirement to reach any conclusion regarding that factor:

> Here, the Commission fully complied with its statutory duty by at least consider[ing] … the magnitude of the margin of dumping. We decline to ask more of the Commission than required by the statute.

Altx, 370 F.3d at 1123 (emphasis in original) (internal quotations and citations omitted).

In this case, the Commission complied with its statutory directive to "consider" a or any "rapid increase in inventories of the imports." 19 U.S.C. §§ 1673d(b)(4)(A)(ii)(II), 1671d(b)(4)(A)(ii)(II). It explained that the increase in post-petition subject imports did not merely replace decreasing inventories during the post-petition period but rather created a "stockpile" of subject import inventories, which increased between the pre- and post-petition periods. Conf. Views at 65–66; Public Views at 46. Specifically, the Commission found "end-of-period U.S. inventories of the relevant subject imports from China were [[ ]] pounds at the end of the pre-petition period and [[ ]] pounds at the end of the post-petition period, an increase of [[ ]] percent." Conf. Views at 63; Public Views at 45. The Commission explained that:

> [T]he effect of the post-petition increase in subject imports was to create a stockpile of imports prior to the imposition of provisional duties, as reflected by the [[ ]] percent increase in end-of-period inventories of subject merchandise between the pre- and post-petition periods.

Conf. Views at 65; Public Views at 46.

The Commission also addressed arguments and evidence that would have detracted from its findings. For example, the Commission explained:

> We are unpersuaded by respondents' contention that the [[ ]] percent increase in post-petition import volume and the increase in end-of-period inventories are far less than the increases found in prior cases in which the Commission found critical circumstances …. [W]ithin the context of the overall U.S. market, the post-petition increase in the volume of imports in

> this case was [[ ]][,] … equivalent to [[ ]] percent of apparent U.S. consumption in the final year of the POI.

Conf. Views at 62, n.257 (emphasis added); Public Views at 44, n.257.

Such explanation is a reasonable consideration of the statutory factors, and the court declines to ask more of the Commission than is required by the statute. Altx, 370 F.3d at 1123. Further, the Commission reasonably explained its consideration of import inventories, which included addressing arguments and information that detracted from its conclusion. See United States Steel Group, 96 F.3d at 1357.

**C. The Commission's Consideration of "Any Other Circumstances"**

Lastly, the court turns to whether the Commission's consideration of "any other circumstances indicating that the remedial effect of the [AD] / [CVD] order will be seriously undermined" is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. §§ 1673d(b)(4)(A)(ii)(III), 1671d(b)(4)(A)(ii)(III).

Consolidated Plaintiffs argue that "[n]o other circumstances constitute substantial evidence that the remedial effect of the order will be seriously undermined." Consol. Pls.' Mot. at 15. Consolidated Plaintiffs assert that the Commission "improperly found critical circumstances based on post-petition data 'without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" Consol. Pls.' Reply at 20 (citing Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)). Consolidated Plaintiffs further claim that "the post-petition pricing data do not support finding critical circumstances" and that "the Commission improperly bleeds its considerations for ordinary injury … into the distinct critical circumstances analysis." Id.; Consol. Pls.' Mot. at 15.

Relatedly, Plaintiff argues that the Commission "ignored pricing patterns that contradict its finding that subject imports were likely to seriously undermine the remedial effect of the orders" and "erred in concluding that the timing of the subject imports indicated that they were likely to seriously undermine the remedial effect of the [o]rders." Pl.'s Mot. at 28, 32.

Defendant argues that the Commission's consideration of other circumstances was proper, stating specifically that "the Commission considered the pricing of subject imports in the post-petition period" and "observed that although these prices did not markedly decrease, subject imports undersold the domestic like product at large margins, averaging 38.6 percent, throughout the POI." Def.'s Mem. at 42. Defendant rebuts the contentions of Consolidated Plaintiffs and Plaintiff, asserting that "rather than ignoring pricing trends, the Commission meticulously examined price and underselling trends throughout the POI …." Id. at 43–44. Lastly, Defendant refutes Consolidated Plaintiffs' claim that it inappropriately bled its normal injury analysis into the critical circumstances analysis, maintaining that "the Commission did not repeat its normal injury analysis[,]" and that "[g]iven the subject imports' dominant market share and universal underselling at large margins throughout the POI, it was reasonable for the Commission to find that the significant increase in post-petition subject import volume would adversely impact the domestic industry in the same way that subject imports adversely impacted the industry during the POI[.]" Id. at 47 (internal quotations omitted).

The relevant statutory provisions provide that the Commission "shall consider, among other factors it considers relevant … any other circumstances indicating that the remedial effect of the [AD] / [CVD] order will be seriously undermined." 19 U.S.C. §§

1673d(b)(4)(A)(ii)(III), 1671d(b)(4)(A)(ii)(III). It is well established that the Commission has "broad discretion" to consider data that it finds relevant in its critical circumstances analyses. See MTD Prods., Slip Op. 2023-34, at 4; see also Am. Bearing Mfrs. Ass'n v. United States, 350 F. Supp. 2d 1100, 1123 (CIT 2004); United States Steel Group, 96 F.3d at 1357.

Here, the Commission explained the other circumstances that it found relevant for its critical circumstances analysis:

> [W]e find the adverse impact of the subject imports from China subject to Commerce's affirmative critical circumstances determinations on the domestic industry is likely to undermine seriously the effect of the [orders]. Subject imports, which maintained a dominant and increasing share of the U.S. market throughout the POI while universally underselling domestic product at large margins of underselling, increased by [[ ]] percent in the post-petition period, where this increase in volume of subject imports was equivalent to [[ ]] percent of the domestic industry's production in 2023 and occurred in the context of increasing U.S. inventories of subject imports.

Conf. Views at 65; Public Views at 46–47. The Commission further explained that continued underselling by subject imports by wide margins in the post-petition period was such that importers did not have to intensify their underselling to enable them to significantly increase subject import volume in the post-petition period. Public Views at 37.

The Commission also addressed arguments that may have detracted from its findings. Specifically, it examined pricing data highlighted by Consolidated Plaintiffs and Plaintiff and found that "although prices of subject imports did not markedly decrease in the post-petition period … subject imports undersold the domestic like product at large margins of underselling throughout the POI, averaging 38.6 percent." Public Views at 45. Further, the Commission explained that "the domestic industry as a whole and on a

company-specific basis [[ ]] throughout the POI as it lost sales and sustained downward pricing pressure on account of universal underselling by subject imports at large margins of underselling." Conf. Views at 65–66; Public Views at 47.

Having provided a rational connection between the evidence on the record and its findings, a reasonable mind could conclude that the Commission sufficiently considered the statutory factors of 19 U.S.C. §§ 1673d(b)(4)(A)(ii)(III) and 1671d(b)(4)(A)(ii)(III). As such, the court will not disturb the Commission's findings. See Universal Camera Corp., 340 U.S. at 477.

**CONCLUSION**

For the foregoing reasons, the Commission's final affirmative critical circumstances determination is sustained. Judgment shall be entered accordingly.

/s/ Lisa W. Wang
Lisa W. Wang, Judge

Dated: August 5, 2026
New York, New York